1   THOMAS W. BARTH, SBN 154075
    BARTH TOZER & TIMM LLP
2   431 I Street, Suite 201
    Sacramento, California 95814
3   Telephone: (916) 440-8600
    Facsimile:  (916) 440-9610
4   Email:  tbarth@bttlawfirm.com

5   Attorneys for Plaintiffs NATOMAS
    GARDENS INVESTMENT GROUP LLC and
6   ORCHARD PARK DEVELOPMENT LLC

7                    UNITED STATES DISTRICT COURT

8               EASTERN DISTRICT OF CALIFORNIA

9   NATOMAS GARDENS INVESTMENT GROUP          Case No. 2:08-CV-02308-FCD-KJM
    LLC, a California limited liability company,
10  ORCHARD PARK DEVELOPMENT LLC, a
    California limited liability company,
11                                            FIRST AMENDED COMPLAINT
              Plaintiffs,                     UNDER THE RACKETEER
12                                            INFLUENCED AND CORRUPT
         v.                                   ORGANIZATIONS ACT; FRAUD;
13                                            BREACH OF FIDUCIARY
    JOHN G. SINADINOS, STANLEY J. FOONDOS,    DUTIES; PROFESSIONAL LEGAL
14  STEPHEN FOONDOS, VILLAGE CAPITAL          MALPRACTICE; PROFESSIONAL
    GROUP LLC, a California limited liability company,  ACCOUNTING MALPRACTICE;
15  VINTAGE CREEK LLC, a California limited liability  CONVERSION; AND PETITION
    company, SOUTH WATT & FLORIN PARTNERS, a  FOR WRIT OF MANDATE TO
16  California general partnership, CHI-SAC VILLAGE  COMPEL INSPECTION OF
    CAPITAL GROUP INVESTORS LLC, a California  RECORDS
17  limited liability company, CHI-SAC FLORIN
    VINEYARDS INVESTORS LLC, a California limited  JURY TRIAL DEMANDED
18  liability company, CASELMAN & CARLISLE
    PARTNERS, a California general partnership, CHI-
19  SAC VINTAGE CREEK INVESTORS LLC, a
    California limited liability company, CHI-SAC GAP
20  INVESTORS, PRIME MINISTER GROUP LLC, a
    California limited liability company, PARK RIDGE
21  INVESTMENTS LLC, a California limited liability
    company, CHI-SAC SOUTH SUTTER INVESTORS,
22  CHI-SAC WHITE ROCK 150 INVESTORS, LLC, a
    California limited liability company, CHICAGO
23  SOUTH WATT INVESTORS, LLC, a California
    limited liability company, CHICAGO INFILL
24  INVESTORS LLC, a California limited liability
    company, STEWART TITLE COMPANY, GUS
25  GALAXIDAS, GLENN SORENSEN, JR.,
    STOCKTON & 65TH, LP, a California limited
26  partnership, LARRY DEANE, BALJIT JOHL,
    HARINDER JOHL, and DOES 1 through 100,
27  inclusive,
              Defendants.
28

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    Plaintiffs Natomas Gardens Investment Group LLC (Natomas) and Orchard Park

2    Development LLC (Orchard Park) for their complaint against defendants, allege as follows:

3    **I.    NATURE OF THE ACTION**

4    1.    By a scheme of fraud, embezzlement, money laundering, mail and wire

5    fraud, unlawful tax evasion, witness tampering, interstate travel in aid of a racketeering

6    enterprise, breach of fiduciary duties, professional malpractice, and conversion, defendants

7    destroyed and substantially interfered with plaintiffs' business opportunities at seven residential

8    development projects via a pattern of racketeering activities.  Plaintiffs began each of the projects

9    by assembling the rights to acquire numerous contiguous parcels in each project, located in the

10   Sacramento region and near Madera, California.  Defendants began their elaborate, unlawful

11   scheme by promising to finance the development entitlement process for each of the projects.

12   2.    Unknown to plaintiffs, defendants undertook numerous illegal transactions

13   from the beginning of their involvement in these projects.  Defendants siphoned off large and

14   small amounts of money to themselves and others.  Rather than honor their fiduciary duties, abide

15   by a duty of care and their respective professional codes of conduct, and invest capital in a

16   financially responsible strategy for acquisition and development of raw land, defendants used

17   undocumented, shady deals among themselves to defraud plaintiffs by bilking money and equity

18   value from each of the separate projects.

19   3.    Defendants promised plaintiffs the investment of capital in these projects,

20   which would only be repaid, with return on investment, upon completion of the development

21   entitlement process and ultimate sale of each project to home builders.  Instead, defendants

22   moved money in, among, and out of these projects without any financial controls or proper

23   notice/approvals.  They often characterized large sums as "loans" on the checks, with no other

24   documentation, such as promissory notes or deeds of trust.

25   4.    From the beginning, defendants had several fraudulent goals in mind.

26   They knew they would profit from their scheme, regardless of the strength of the real estate

27   market.  They laundered their illegal profits on many occasions by intentionally not documenting

28   the original source of funds and/or creating false documents such as tax returns and capital

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1  account statements in order to conceal and disguise the nature, source and ownership of the funds.

2  Even before the slightest hint of a downturn in the real estate market, defendants implemented

3  their plan to eviscerate one of Natomas' projects, to guarantee their maximum illegal profits.  The

4  ill-fated project is Vintage Creek.

5         5.       While planning to cannibalize Vintage Creek, defendants also intended to

6  claim inflated equity positions in another project, designated herein as Village.  They laundered

7  money stolen elsewhere by claiming it as new money "invested" in Village.  A substantial portion

8  of defendants' "investments" in Village are fraudulently converted "loans" from elsewhere,

9  including Vintage Creek.

10         6.       Attempting to hide their illegal activities, defendants intentionally avoided

11  maintaining any customary financial records, used elaborate multi-stage transactions to obscure

12  the money trails, filed fraudulent, false tax returns, and resisted and refused complete disclosure

13  of books and records upon plaintiffs' demands for inspection.  Defendants also conspired among

14  themselves, for the purpose of having their surrogates apply pressure against plaintiffs, to force

15  the abandonment of their claims.

16         7.       In total, defendants' pattern of racketeering activity resulted in losses of

17  plaintiffs' entire business opportunities, goodwill, prospective business opportunities, and

18  monetary assets exceeding $3,000,000, subject to proof at trial in these proceedings.  Defendants'

19  illegal conduct exposes plaintiffs to very substantial liabilities for unpaid taxes, fines, penalties

20  and interest on phantom income, and claims of third-party victims of defendants' fraudulent

21  scheme.

22         8.       As detailed below, defendants conducted and/or participated, directly or

23  indirectly, in the conduct of enterprises through a pattern of racketeering activity, and/or

24  conspired to do so, in violation of the Racketeer Influenced and Corrupt Organizations Act

25  ("RICO"), Title 18, United States Code Section 1961, *et seq.*

26         9.       Certain defendants also breached their fiduciary duties in their capacities as

27  managers of the development companies for these projects, and in their professional capacities,

28  purporting to provide legal and accounting services for multiple companies.

10.     Through their conduct, defendants committed fraud against plaintiffs in connection with their scheme to embezzle substantial sums of money from the operations of these development projects, to obtain falsely inflated equity interests in the development projects by fraudulent means, and to commit tax fraud for financial benefit and avoidance of liability.

11.     Plaintiffs make certain allegations in this Complaint on the basis of information and belief, because the necessary information supporting those facts lies within the exclusive control of defendants.

## II.    **PARTIES**

12.     Plaintiff Natomas Gardens Investment Group LLC (Natomas) is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of California, with its principal place of business in the State of California.  The manager of Natomas at all relevant times has been Eric Solorio (Solorio), who also holds a majority membership interest in the limited liability company.  Natomas is, and at all relevant times was, the holder of a 45% membership interest in Village Capital Group LLC and Vintage Creek LLC.

13.     Plaintiff Orchard Park Development LLC (Orchard Park) is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of California, with its principal place of business in the State of California.  The manager of Orchard Park at all relevant times has been Mr. Solorio, and he owns all membership interests in the limited liability company.  Orchard Park is, at all relevant times was, the holder of a 25% membership interest in Madera Avenue 12 Capital Group LLC.

14.     Defendant John G. Sinadinos (Sinadinos) is, and at all relevant times was, a citizen of California, and on information and belief, residing in Sacramento County, California.

15.     Defendant Stanley J. Foondos (Stanley Foondos, or Foondos) is, and at all relevant times was, a citizen of California, and on information and belief, residing in Sacramento County, California.

16.     Defendant Stephen Foondos (Stephen Foondos) is, and at all relevant times was, a citizen of California, and on information and belief, residing in Sacramento County, California.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

17.     Defendant Village Capital Group LLC (Village) is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of California, with its principal place of business in the State of California.  The manager of Village at all relevant times has been South Watt & Florin Partners, with Sinadinos as its managing partner and serving as the person responsible for management of Village.

18.     Defendant Vintage Creek LLC (Vintage Creek) is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of California, with its principal place of business in the State of California.  The manager of Vintage Creek at all relevant times has been Caselman & Carlisle Partners, with Sinadinos as its managing partner and serving as the person responsible for management of Vintage Creek.

19.     Defendant South Watt & Florin Partners is, and at all relevant times was, a general partnership organized and existing under the laws of the State of California, with its principal place of business in the State of California.  On information and belief, Sinadinos and Stanley Foondos have been partners in South Watt & Florin Partners at all times relevant to this complaint.  South Watt & Florin Partners has at all relevant times been the tax matters partner for Village.

20.     Defendant Chi-Sac Village Capital Group Investors LLC is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of California, with its principal place of business in the State of California.  Chi-Sac Village Capital Group Investors LLC is, at all relevant times was, the holder of a 55% membership interest in Village, and on information and belief, was at all relevant times one of the companies used by Sinadinos and Stanley Foondos for financial transactions relating to the Village project, and Sinadinos and Stanley Foondos held controlling ownership interests in Chi-Sac Village Capital Group Investors LLC.

21.     Defendant Chi-Sac Florin Vineyards Investors LLC is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of California, with its principal place of business in the State of California.  On information and belief, Chi-Sac Florin Vineyards Investors LLC was at all relevant times one of the companies

1   used by Sinadinos and Stanley Foondos for financial transactions relating to the Village project,

2   and Sinadinos and Stanley Foondos held controlling ownership interests in Chi-Sac Florin

3   Vineyards Investors LLC.

4          22.     Defendant Caselman & Carlisle Partners is, and all relevant times was, a

5   general partnership organized and existing under the laws of the State of California, with its

6   principal place of business in the State of California.  On information and belief, Sinadinos and

7   Stanley Foondos have been partners in Caselman & Carlisle Partners at all times relevant to this

8   complaint.

9          23.     Defendant Chi-Sac Vintage Creek Investors LLC is, and at all relevant

10  times was, a limited liability company organized and existing under the laws of the State of

11  California, with its principal place of business in the State of California.  Chi-Sac Vintage Creek

12  Investors LLC is, and at all relevant times was, the holder of a 55% membership interest in

13  Village. On information and belief, Chi-Sac Vintage Creek Investors LLC was at all relevant

14  times one of the companies used by Sinadinos and Stanley Foondos for financial transactions

15  relating to the Vintage Creek project, and Sinadinos and Stanley Foondos held controlling

16  ownership interests in Chi-Sac Vintage Creek Investors LLC.  At all relevant times, Chi-Sac

17  Vintage Creek Investors LLC was the tax matters partner for Vintage Creek.

18         24.     Defendant Chi-Sac Gap Investors is, and at all relevant times was, an entity

19  of unknown legal status, with its principal place of business in the State of California.  On

20  information and belief, Sinadinos and Stanley Foondos formed Chi-Sac Gap Investors as one of

21  the companies used by them for financial transactions relating to the Vintage Creek project.  The

22  purported members, partners, or persons affiliated with Chi-Sac Gap Investors are presently

23  unknown to plaintiffs, and plaintiffs will amend the complaint to allege those facts when

24  ascertained.

25         25.     Defendant Prime Minister Group LLC is, and at all relevant times was, a

26  limited liability company organized and existing under the laws of the State of California, with its

27  principal place of business in the State of California.  On information and belief, Prime Minister

28  Group LLC was at all relevant times one of the companies used by Sinadinos and Stanley

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

00002764                                    - 6 -

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1  Foondos for financial transactions relating to both the Village and the separate Vintage Creek

2  projects, and Sinadinos and Stanley Foondos held controlling ownership interests in Prime

3  Minister Group LLC.

4     26. Defendant Park Ridge Investments LLC is, and at all relevant times was, a

5  limited liability company organized and existing under the laws of the State of California, with its

6  principal place of business in the State of California.  On information and belief, Park Ridge

7  Investments LLC was at all relevant times one of the companies used by Sinadinos and Stanley

8  Foondos for financial transactions relating to both the Village and the separate Vintage Creek

9  projects, and Sinadinos and Stanley Foondos held controlling ownership interests in Park Ridge

10  Investments LLC.

11     27. Defendant Chi-Sac South Sutter Investors is, and at all relevant times was,

12  an entity of unknown legal status, with its principal place of business in the State of California.

13  On information and belief, at all relevant times Sinadinos and Stanley Foondos have held

14  controlling ownership interests in Chi-Sac South Sutter Investors, and Sinadinos and Stanley

15  Foondos have used that company for financial transactions relating to both the Village and the

16  separate Vintage Creek projects.

17     28. Defendant Chi-Sac White Rock 150 Investors LLC is, and at all relevant

18  times was, a limited liability company organized and existing under the laws of the State of

19  California, with its principal place of business in the State of California.  On information and

20  belief, at all relevant times Sinadinos and Stanley Foondos have held controlling ownership

21  interests in Chi-Sac White Rock 150 Investors LLC, and they have used that company for

22  financial transactions relating to both the Village and the separate Vintage Creek projects.

23     29. Defendant Chicago South Watt Investors LLC is, and at all relevant times

24  was, a limited liability company organized and existing under the laws of the State of California,

25  with its principal place of business in the State of California.  On information and belief, at all

26  relevant times Sinadinos and Stanley Foondos have held controlling ownership interests in

27  Chicago South Watt Investors LLC, and they have used that company for financial transactions

28  relating to both the Village and the separate Vintage Creek projects.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1        30.     Defendant Chicago Infill Investors LLC is, and at all relevant times was, a

2    limited liability company organized and existing under the laws of the State of California, with its

3    principal place of business in the State of California.  On information and belief, at all relevant

4    times Sinadinos and Stanley Foondos have held controlling ownership interests in Chicago Infill

5    Investors LLC, and they have used that company for financial transactions relating to both the

6    Village and the separate Vintage Creek projects.

7        31.     Defendant Stewart Title Company is an entity of unknown legal status and

8    origin, with its principal place of business in the State of California.  Defendant Sinadinos has

9    used defendant Stewart Title Company at all times relevant to this case, for the purpose of

10   handling escrow accounts relating to certain property transactions, as hereinafter alleged.

11       32.     Defendant Gus Galaxidas is, and at all relevant times was, a citizen of

12   California, and on information and belief, residing in Sacramento County, California.

13       33.     Defendant Glenn Sorensen, Jr., is, and at all relevant times was, a citizen of

14   California, and on information and belief, residing in Sacramento County, California.

15       34.     Defendant Stockton & 65th LP is, and at all relevant times was, a limited

16   partnership organized and existing under the laws of the State of California, with its principal

17   place of business in the State of California.  On information and belief, defendant Glenn

18   Sorensen, Jr., has held a controlling ownership interest in Stockton & 65th LP at all times relevant

19   to this case.

20       35.     Defendant Larry Deane is, and at all relevant times was, a citizen of

21   California, and on information and belief, residing in Sacramento County, California.  At all

22   relevant times, Mr. Deane has been a minority interest holder as a member of Natomas.

23       36.     Defendant Baljit Johl is, and at all relevant times was, a citizen of

24   California, and on information and belief, residing in Sacramento County, California.

25       37.     Defendant Harinder Johl is, and at all relevant times was, a citizen of

26   California, and on information and belief, residing in Sacramento County, California.

27       38.     Plaintiffs are ignorant of the true names and capacities of defendants sued

28   herein as Does 1 through 100, inclusive, and therefore sues these defendants by the fictitious

names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously-named defendants is responsible in some manner for each act or omission herein alleged.

39. At all times herein mentioned, each of the defendants was the agent and employee of each of the remaining defendants, and in doing the things hereinafter alleged, was acting within the course and scope of that agency.

40. At all times herein mentioned, plaintiffs use the phrase "Sinadinos and his co-conspirators" or "Sinadinos, Stanley Foondos, and their co-conspirators" to mean defendants Sinadinos, Stanley Foondos, Stephen Foondos, South Watt & Florin Partners, Chi-Sac Village Capital Group Investors LLC, Chi-Sac Florin Vineyards Investors LLC, Caselman & Carlisle Partners, Chi-Sac Vintage Creek Investors LLC, Chi-Sac Gap Investors, Prime Minister Group LLC, Park Ridge Investments LLC, Chi-Sac South Sutter Investors, Chi-Sac White Rock 150 Investors, LLC, Chicago South Watt Investors LLC, Chicago Infill Investors LLC, Stewart Title Company, Gus Galaxidas, Glenn Sorensen, Jr., Stockton & 65th LP, Larry Deane, Baljit Johl, and Harinder Johl, as to their respective involvements, directly and indirectly, by active or passive participation and/or conspiracy, in the particular transactions as alleged in this complaint. The participation of particular defendants in specific transactions is hereinafter alleged.

### III.   JURISDICTION AND VENUE

41. This Court has jurisdiction over the subject matter of this action pursuant to Title 28 United States Code Section 1331, Title 18 United States Code Section 1961, *et seq.*, and Title 28 United States Code Section 1367.

42. Personal jurisdiction and venue in this District are proper pursuant to Title 18 United States Code Section 1965 and Title 28 United States Code Section 1391(b) because: (a) defendants are found in, have agents in, and/or transact their business and affairs in, this District, and (b) a substantial part of the events or omissions giving rise to the claims for relief occurred in this District.

///

///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    IV.    **FACTUAL BASIS FOR CLAIMS**

2    A.    **Natomas Assembles Development Projects**

3          43.    During early to mid-2003, Solorio negotiated with property owners in

4    several locations in Sacramento County, for the purpose of obtaining rights to purchase

5    undeveloped land, for development and subsequent sale.  Prior to these activities, he had

6    relatively little experience as a residential real estate developer.  He had previously worked on the

7    development of properties belonging to relatives, entering into a joint venture with another

8    individual, Alan Warren, in which Mr. Warren breached his obligations to Solorio, associated

9    with a small development project.

10         44.    After many meetings and discussions with property owners and their

11   representatives, Solorio succeeded in identifying a number of contiguous parcels, which could

12   form the nucleus of a development project in Sacramento County.  Before entering into

13   agreements with the property owners, Solorio filed articles forming Natomas as a new limited

14   liability company on August 18, 2003.

15         45.    As he was preparing to enter into certain purchase and sale agreements

16   with the property owners, Solorio investigated sources of financing for the potential project.  He

17   was acquainted with Tim Lewis and Jeff Moore, land acquisition manager in the home building

18   company, Tim Lewis Communities.  Solorio also met Larry Deane, who introduced him to John

19   Sinadinos.  Immediately, Sinadinos showed interest in the project.  Solorio understood that

20   Sinadinos was directly affiliated with, and even related to a major developer in the region, Angelo

21   Tsakopoulos.

22         46.    Upon first meeting Solorio, Sinadinos said that he was licensed to practice

23   law in New York and California, had in the past represented Donald Trump in New York, and

24   was in-house attorney for Angelo Tsakopoulos in California.

25         47.    During initial conversations with Sinadinos, Solorio shared information

26   about his ongoing legal dispute with Mr. Warren.  Among other things, Solorio shared that he did

27   not have enough money to support the cost of a lawsuit against Mr. Warren to protect his family's

28   property.  Sinadinos told Solorio repeatedly that he would personally loan money to Solorio to

00002764                          - 10 -

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    make Warren go away.  Ultimately, even though Solorio strongly contended that he was not at

2    fault in the dispute with Warren, he accepted the promised assistance by Sinadinos, to pay for a

3    settlement of that dispute.

4              48.     From this initial contact with Solorio, plaintiffs are informed and believe,

5    and thereon allege, that Sinadinos concluded Solorio was an easy target for fraud.  He had learned

6    Solorio was not sophisticated in the business of real estate development, had no substantial

7    personal assets to vindicate his rights in litigation, and was apparently willing to rollover in a

8    legal fight, even when Solorio strongly believed he was right.  As a financial predator, Sinadinos

9    had found a mark.

10             49.     In early discussions, Solorio demanded that Sinadinos properly document

11   their respective rights and obligations, to avoid the same breach of fiduciary duty problem he had

12   encountered with Mr. Warren.  Sinadinos assured Solorio those problems would not occur,

13   specifically stating that "if anyone close to Angelo Tsakopoulos did anything unethical, he would

14   cut you off at the knees."  Solorio relied on this representation, trusting that Sinadinos would

15   follow appropriate business practices.

16             50.     In the early stages of their working relationship, Sinadinos arranged several

17   meetings by Solorio with Angelo Tsakopoulos.  The meetings took place in Sinadinos' law office

18   located in Mr. Tsakopoulos' company headquarters building. On each occasion, Mr. Tsakopoulos

19   reviewed the parcel maps for properties, to which Mr. Solorio had acquired acquisition rights, and

20   the Community Plan which contained each parcel, then congratulated Solorio on his progress in

21   assembling properties for real estate development, telling Solorio he had "hit a home run."  The

22   praise and assurances of financial success by Mr. Tsakopoulos solidified Solorio's confidence in

23   the apparent financial capabilities and real estate development expertise of Sinadinos.

24             51.     Sinadinos also introduced Solorio to defendant Stanley J. Foondos.  They

25   both represented to Solorio that Foondos was a certified public accountant with many high net

26   worth clients, who would be among the investors in the development projects.  They also

27   represented to Solorio that Foondos would support the development operations for these projects

28   by use of customary accounting practices, and performance of all accounting and tax reporting

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   responsibilities for the development companies associated with the projects.  Relying on their

2   representations, Solorio understood and expected that Stanley Foondos would be maintaining all

3   proper financial records for the development projects and completing necessary and appropriate

4   tax reporting for all development companies and their members.

5           52.   By the end of 2003, Solorio had assembled purchase rights to a number of

6   contiguous parcels at one general location in Sacramento County, acting on behalf of Natomas.

7   When Natomas entered into the first three purchase and sale agreements toward the end of August

8   2003, Sinadinos made necessary deposits in escrow, using one of his companies, Prime Minister

9   Group LLC.  Again in October 2003, Natomas entered into purchase and sale agreements with

10   three more property owners, and Sinadinos confirmed the deposits of earnest money in escrow for

11   those transactions, using letterhead of his law office, designated Sinadinos & Vryonis LLP.  At all

12   times relevant to these proceedings, Sinadinos has been an attorney, actively practicing as a

13   member of the California State Bar.

14           53.   Ultimately, by mid-2004 Natomas obtained rights under the provisions of

15   14 agreements to purchase and develop approximately 109 acres of land located generally in the

16   vicinity of the intersection of South Watt Avenue and Florin Road in Sacramento County.  The

17   first Natomas residential development project, originally designated Florin Vineyards, is depicted

18   on the map attached as Exhibit A to Exhibits to First Amended Complaint Under the Racketeer

19   Influenced and Corrupt Organizations Act; Fraud; Breach of Fiduciary Duties; Professional Legal

20   Malpractice; Professional Accounting Malpractice; Conversion; and Petition for Writ of Mandate

21   to Compel Inspection of Records, Volume 1 ("Exhibits to First Amended Complaint, Volume 1")

22   filed concurrently herewith and incorporated herein.

23           54.   Sinadinos formed Village Capital Group LLC as the development company

24   associated with the Florin Vineyards project, by filing limited liability company articles with the

25   Secretary of State on October 4, 2004.  For ease of reference, the Florin Vineyards development

26   will be referred to as the Village project throughout this complaint.

27           55.   During early 2004, Solorio negotiated with property owners on behalf of

28   Natomas, in a second general location of Sacramento County.  By October 2004, he obtained

00002764
- 12 -

1   rights under the provisions of 17 additional agreements to purchase and develop approximately 85

2   acres of land located generally in the vicinity of Caselman Road and Carlisle Avenue.  That

3   residential development project, originally designated Vintage Creek, is depicted on the map

4   attached as Exhibit B to Exhibits to First Amended Complaint, Volume 1, filed concurrently

5   herewith and incorporated herein.

6          56.   Sinadinos formed Vintage Creek LLC as the development company

7   associated with the Vintage Creek project, by filing limited liability company articles with the

8   Secretary of State on July 21, 2004.  For ease of reference, this project will be referred to as

9   Vintage Creek throughout this complaint.

10         57.   Sinadinos represented to Solorio that he would invest $4,000,000 in each

11  project, for acquisition and development costs.  He made that representation prior to drafting the

12  operating agreements for Village and Vintage Creek.  Solorio relied on Sinadinos to provide that

13  equity investment, which Sinadinos further represented as adequate to achieve development

14  entitlements for each project.

15         58.   At one point, Solorio asked Sinadinos for more detailed background

16  information about his prior development project experience, to verify his ability to provide

17  financing for these projects.  Sinadinos readily and frequently emphasized his development

18  experience and funding capacity, and he sent an e-mail to Solorio, containing a summary of his

19  recent and ongoing residential development investments.  Sinadinos also gave Solorio a copy of a

20  meeting agenda containing a "Project Status Update" regarding ongoing development projects,

21  including the Village project listed as item #8.  On April 23, 2004, Sinadinos personally provided

22  the meeting agenda and project status update to investors in the Chicago, Illinois, area.  Sinadinos

23  regularly traveled from Sacramento to Chicago to hold quarterly meetings with these investors,

24  who provided investment money for the projects managed by Sinadinos, including the Village,

25  Vintage Creek, and Madera projects.  A true and correct copy of the email summary is attached as

26  Exhibit D to Exhibits to First Amended Complaint Under the Racketeer Influenced and Corrupt

27  Organizations Act; Fraud; Breach of Fiduciary Duties; Professional Legal Malpractice;

28  Professional Accounting Malpractice; Conversion; and Petition for Writ of Mandate to Compel

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    Inspection of Records, Volume 2 ("Exhibits to First Amended Complaint, Volume 2") filed

2    concurrently herewith and incorporated herein.  A true and correct copy of the meeting agenda for

3    the Chicago investors is attached as Exhibit E to Exhibits to First Amended Complaint,

4    Volume 2, and incorporated herein.  Relying on the representations and investment summaries by

5    Sinadinos, Solorio understood that Sinadinos had participated as an investor and investment

6    manager in a number of very large development projects, resulting in highly successful

7    investments in those prior ventures.  Sinadinos led Solorio to believe that he had ample capacity

8    and experience to provide equity investments for each development project in amount and form

9    of $4,000,000.

10          59.     While assembling properties for Village and Vintage Creek, Natomas also

11   obtained purchase rights at two other locations in Sacramento County.  One project, designated

12   Vintage Ranch, consists of two parcels totaling approximately 20 acres, located east of the

13   Village project.  The other development, designated Hedge, consists of one parcel of

14   approximately 6 acres, located south of the Village project.

15          60.     During April-May 2005, Solorio assembled property acquisition rights for

16   a development project located generally in the vicinity of Avenue 12 and County Road 30 1/2 in

17   Madera County, California.  Commencing in approximately April 2005, Solorio acted by and

18   through his company, Orchard Park, to negotiate and execute five option agreements, relating to

19   contiguous land in that general location.  Under the terms of the option agreements, Orchard Park

20   acquired the right to purchase approximately 265 acres of real property for the purpose of

21   residential real estate development.  That project, ultimately designated "Orchard Park," is

22   depicted on a map attached as Exhibit C to Exhibits to First Amended Complaint, Volume 1, and

23   incorporated herein.

24          61.     Solorio paid option and entitlement costs for the Orchard Park

25   development for approximately twenty (20) months before Sinadinos' involvement in the project.

26   Sinadinos represented to Solorio that he would provide financing for entitlement costs of the

27   Orchard Park project.  Relying on the representations by Sinadinos about his financing capacity

28   and prior investment experience, Solorio agreed to include Sinadinos in the Company ultimately

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   formed for development of the Madera properties, Madera Avenue 12 Capital Group LLC

2   (hereinafter referred to as "Madera").

3   **B.     Sinadinos and Foondos Take Control of Natomas Projects**

4             62.     Beginning with the first transaction, Sinadinos and Stanley Foondos began

5   using other companies under their control and direction as a source of funds for deposit in escrow

6   on properties under contract with Natomas.  The Prime Minister Group LLC deposited $50,000

7   on September 5, 2003, for the benefit of Natomas, to fund escrow on the Sparks parcel in Village.

8   The Prime Minister Group LLC also deposited $50,000 in escrow for the purchase agreement on

9   the Balovich parcel, also located in the Village project, in September 2003, for the benefit of

10  Natomas.  In October 2003, several more deposits were made by Sinadinos and Stanley Foondos,

11  using their other companies, in escrow for the benefit of Natomas, with respect to other parcels in

12  the Village project.

13            63.     A spreadsheet, entitled "Specific Examples of Enterprise Activities," is

14  attached as Exhibit I to Exhibits to First Amended Complaint Under the Racketeer Influenced and

15  Corrupt Organizations Act; Fraud; Breach of Fiduciary Duties; Professional Legal Malpractice;

16  Professional Accounting Malpractice; Conversion; and Petition for Writ of Mandate to Compel

17  Inspection of Records, Volume 4 ("Exhibits to First Amended Complaint, Volume 4"), and

18  incorporated herein.  The spreadsheet at Exhibit I lists particular details of selected mailings,

19  interstate wire transmissions, and other predicate acts by defendants, involved in or incidental to

20  the conduct of their fraudulent schemes.  Each transaction listed in the spreadsheet is cross-

21  referenced to the specific section and paragraph number in the complaint, which alleges facts

22  concerning such transactions.

23            64.     With respect to each initial deposit, Sinadinos sent a letter to Solorio,

24  requiring his agreement to give Sinadinos sole and absolute discretion to control the transaction

25  with the seller, and requiring Natomas to indemnify the Prime Minister Group LLC for any

26  breach of the agreement.  Those letters were delivered to Solorio on the letterhead of Sinadinos &

27  Vryonis LLP, Attorneys at Law.  A true and correct copy of one of those letters addressed to

28  Solorio on behalf of Natomas, from Sinadinos, dated September 10, 2003, with true and correct

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1  copies of related third party deposit instructions, receipts and checks for deposits on the Balovich

2  and Sparks parcels, is attached as Exhibit J to Exhibits to First Amended Complaint Volume 4,

3  and incorporated herein.  From his review of the letters and his communications with Sinadinos,

4  Solorio was led to believe that he was required to enter into these letter agreements, in order to

5  obtain the financial support promised by Sinadinos and Foondos.  Solorio further understood

6  from review of these letters and related communications with Sinadinos, that Sinadinos was

7  giving legal advice for the benefit of Natomas, concerning the handling of the escrow deposit

8  transactions and communications with property owners about the process of developing their

9  land.

10                    65.      Ultimately when each initial deposit was released to a seller, Sinadinos

11  directed Solorio to send letters to that seller via certified mail, to notify them, as required under

12  the contract, that the company had elected to move forward with the development project and

13  their related underlying purchase and sale agreement.  The escrow release instructions to title

14  companies were transmitted by mail and wire communications for disbursement of money from

15  escrows for each of the 35 properties in the developments and for the additional six 1031

16  exchange investors who repurchased six of the properties.  True and correct copies of notices

17  mailed by Natomas, at the direction of legal counsel Sinadinos, to the Balovich and Sparks

18  property owners, dated December 24, 2003, with true and correct copies of the escrow release

19  forms that accompanied the notices, and the certified mail slips and return receipts for those

20  letters, are attached as Exhibit K to Exhibits to First Amended Complaint, Volume 4, and are

21  incorporated herein.

22                    66.      During approximately May 2004, Sinadinos began co-mingling funds

23  between the separate accounts held for the benefit of the separate Village and Vintage Creek

24  projects.  The investment fund account he established for Vintage Creek was initially held by a

25  company he formed, Chi-Sac Gap Investors.  The investment fund account he established for the

26  Village project was initially held by a company he formed, Chi-Sac Florin Vineyards Investors

27  LLC.

28  ///

67.     Initially, Sinadinos made apparent loans of money from the Vintage Creek account to the Village account, with substantial repayment of the loans within several months. For instance, on May 19, 2004, Sinadinos transferred $5,000 by check No. 9902 from the Vintage Creek account to the Village account.  On June 21, 2004, he repaid $5,000 from Village to Vintage Creek.  Also, on June 10, 2004, he wired $50,000 from the Vintage Creek account to the Village account.  On September 7, 2004, he transferred $45,000 back to Vintage Creek by check No. 1033, drawn on the Village account, with the note "partial re-pay."

68.     Sinadinos did not create any documents, which would customarily relate to loan transactions, such as promissory notes or other evidence of indebtedness by one company to another.  Plaintiffs are informed and believe, and thereon allege, that Sinadinos and Stanley Foondos used the first several transactions of co-mingling funds among the company accounts to confirm that they had obtained the trust and cooperation of Solorio by misrepresentations that they would accurately and responsibly control the financing for the development projects.

69.     With limited exception, Sinadinos and Foondos did not inform Solorio about their financial transactions among the development companies.  In fact, Solorio made numerous requests directed to both Sinadinos and Stanley Foondos, that they provide a comprehensive finance report to Natomas on a periodic basis, detailing the financial status of the development projects.  In each instance, Sinadinos and Foondos either ignored such requests or failed to disclose the details of their transactions.

70.     In an attempt to track the financial progress of the development projects, Solorio created his own spreadsheets, using the limited financial information he obtained from other sources.  Unknown to him, Sinadinos and Foondos were not giving him relevant financial information, and they were conducting many fraudulent transactions without the knowledge of Solorio.  Moreover, Sinadinos and Stanley Foondos were not maintaining comprehensive financial records of their dealings.

## C.    Johl-Barnard-Sparks Transactions

71.     During mid-2004, Sinadinos began a series of transactions intended by him and his co-conspirators to drain assets away from Vintage Creek for their illegal benefit as

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   purported investors of Village.  The commencement of these transactions coincided with the

2   timing of a first major infusion of cash into Village from an intended ultimate buyer of the

3   project, the commercial home builder, KB Homes.  KB Homes entered into a purchase agreement

4   with Village and made its first deposit of $2,243,575 into escrow on November 9, 2004.

5         72.    Plaintiffs are informed and believe, and thereon allege, that Sinadinos and

6   his co-conspirators began their active pursuit of a scheme designed to obtain fraudulently inflated

7   capital investment accounts in Village as it became clear that a national commercial home builder

8   had guaranteed, with an irrevocable letter of credit, to pay Village more than $8 million in

9   deposits toward the purchase of Village's property rights.  One of their early actions was the

10  investment by a co-conspirator, Glenn Sorensen, Jr., and his company, Stockton & 65th LP, of

11  approximately $3 million from a Section 1031 exchange into the Village project.

12        73.    When Sinadinos first approached Solorio about the proposed investment,

13  he explained that Sorensen would be paid a return on his investment of 25% annually, among

14  other highly favorable provisions.  Solorio objected repeatedly to the proposal on a number of

15  grounds.  The high rate of return was not in line with prior statements by Sinadinos, that he had

16  "parked" Section 1031 money for investors at a rate of return ranging from 6% to 8%.  Besides

17  rejecting the proposed high rate of return to Sorensen, Solorio objected to the commitment of all

18  of the investment money to only two parcels in the Village project, as proposed by Sinadinos.

19  The primary parcel targeted for the investment was owned by Mr. Baljit Johl, who had granted

20  Natomas an option to purchase the property at any time during the next several years.  There was

21  no need in 2004 to commit substantial funding to the purchase of the Johl parcel.

22        74.    Despite Solorio's objections, Sinadinos went ahead with his plan,

23  promising Solorio in exchange for his cooperation, that Sorensen's 25% return would be paid

24  solely out of other investors' share of project returns.  Sinadinos also agreed with Solorio that

25  upon Sorensen's payment of approximately $2.3 million to Johl, that Johl would "park" $1.3

26  million as a Section 1031 exchange by Johl into other properties in the Village project.  Those

27  other properties were designated in the Johl-Natomas purchase agreement as either the Park Place

28  parcel or the parcel belonging to Andrew Sephos.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

75.     In order to obtain the agreement by Solorio and Natomas to the proposed transactions with Stockton & 65th LP and Sorensen, Sinadinos also promised that Stockton & 65th LP would option the properties acquired through these transactions back to Village for the same price paid by Stockton & 65th LP to acquire the parcels.  These option agreements were represented by Sinadinos as part of the consideration to be obtained from Stockton & 65th LP and Sorensen contemporaneous with closing the transaction in the fall of 2004.

76.     Relying on those promises, Solorio agreed to initiate the transaction with Sorensen by assigning the interests of Natomas in the Johl and Von Behren parcels, within Village, to Stockton & 65th LP.  On September 29, 2004, the parties executed the assignment of the Johl parcel from Natomas to Stockton & 65th LP.

77.     Upon fraudulently obtaining the cooperation and consent by Natomas to the proposed investment by Stockton & 65th LP, Sinadinos executed his original plan, which he had misrepresented to Solorio.  He completed a purchase by Sorensen of the Johl parcel in November 2004, for approximately $2.3 million.  In December 2004, rather than "park" the proceeds of $1.3 million received by Johl into other Village parcels as Sorenson and Sinadinos had promised and the Johl-Natomas purchase contract had explicitly agreed, Sinadinos and Sorenson instead directed Johl to purchase the Barnard parcel which is part of the entirely separate Vintage Creek project.  Allegedly to secure repayment to Johl of those proceeds, Sinadinos arranged for a deed of trust to be placed against the original Johl parcel in Village for the benefit of Johl.   Within four months Sinadinos and Sorenson asked Johl to remove his deed of trust and instead placed it on another parcel not subject to purchase by the national homebuilder.  Following their request, Johl agreed to move his deed of trust to another parcel.

78.     Only part of the $1.3 million transferred by Sinadinos into Vintage Creek was used to acquire the Barnard parcel.  Sinadinos took control of Vintage Creek's net profit from the Barnard-Johl sale in early January 2005, in the approximate amount of $837,287.

79.     Sinadinos simultaneously arranged what he purported to be a "loan" from Vintage Creek to Village in the approximate amount of $700,000, using the "profit" he obtained from the excess Johl proceeds. He conducted and completed that action of transferring the money

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   from Vintage Creek to Village by pattern of conduct of mail and wire fraud.  Within days of the

2   close of escrow from the Barnard-Johl sale and the resulting purported loan of Vintage Creek's

3   profits to Village, Sinadinos used that money to purchase substantial equity ownership in the

4   Sparks parcel, which is part of the Village project.  On approximately December 21, 2004,

5   Sinadinos sent an Amendment to Purchase and Sale Agreement, for the Sparks parcel, to Solorio

6   by e-mail.  Sinadinos used that document, among others, to put his fraudulent scheme into effect,

7   relating to the purchase of equity ownership in the Sparks parcel.

8          80.      Ultimately, Sinadinos, Stanley Foondos, and their co-conspirators have

9   claimed, in the form of filing fraudulent tax returns for both companies, and multiple letters and

10   emails in 2007 and 2008 that the $700,000 is not a debt owed by Village to Vintage Creek.

11   Instead, Sinadinos, Stanley Foondos, and their co-conspirators claim the approximate $700,000

12   used to purchase the Sparks parcel is "additional capital invested" by the investor entity, Chi-Sac

13   Village Capital Group Investors LLC, which they are members of and thereby added to the

14   investment capital account maintained by Sinadinos and Foondos for the Village project and

15   reflected as such on the falsely filed tax returns.  Plaintiffs are informed and believe, and thereon

16   allege, that Sinadinos, Stanley Foondos, and their co-conspirators would stand to benefit directly

17   by the fraudulent addition of approximately $700,000 to the investment capital account for Chi-

18   Sac Village Capital Group Investors LLC , and by their actions to launder the proceeds

19   transferred from Vintage Creek into the purported form of their own investments in Village.

20          81.      Sinadinos arranged for the balance of the proceeds from the original

21   investment by Stockton & 65th LP, the money not originally placed into the Johl parcel, to be

22   paid toward the purchase of equity in the approximate amount of $673,000 in the Von Behren

23   parcel, in Village.  Sinadinos and his co-conspirators completed that purchase by Stockton &

24   65th LP during November 2004.

25          82.      Contrary to Sorenson's and Sinadinos' original promises to Solorio,

26   Sinadinos did not obtain an agreement by Stockton & 65th LP or Sorensen to option the Johl and

27   Von Behren parcels back to Village.  Even though Solorio asked repeatedly for the option

28   agreements on those parcels to be documented by Sinadinos, Sinadinos failed and refused, and

1   continues to refuse the drafting and completion of those option agreements.  As a result, plaintiff

2   Natomas was defrauded of its purchase rights to the Johl and Von Behren parcels, and Village has

3   been placed at risk by Sinadinos and his co-conspirators of having no clear, contractually defined

4   rights regarding the repurchase of the Johl and Von Behren parcels from Stockton & 65th LP or

5   Sorensen on the favorable terms originally promised by Sinadinos and his co-conspirators.  In

6   effect, Sinadinos and his co-conspirators, including Stockton & 65th LP and Sorensen, have

7   placed Natomas at risk, and subject to undefined and unfavorable potential legal demands they

8   might impose against the project.  On two occasions by use of interstate wire transmissions via e-

9   mail, Sinadinos attempted to fraudulently establish a $6 million debt owed by Village to Stockton

10  & 65th LP, to be due and payable in December 2008.  On one such occasion, Sinadinos sent an

11  email to Solorio on October 24, 2006, with an attached list of purported amounts owed to

12  investors in the Village project, showing $6 million owed to Stockton & 65th LP.

13  **D.      Homebuilder Investments and Execution of Operating Agreements**

14              83.     Sinadinos delayed drafting and completion of the operating agreements for

15  Village Capital Group LLC and Vintage Creek LLC, until after he had completed the

16  undocumented Stockton & 65th LP Section 1031 exchange of $3 million, and after Sinadinos had

17  executed two separate purchase and sale agreements with homebuilders who each agreed to

18  purchase the companies' projects, and just prior to a required distribution of substantial proceeds

19  deposited in each project by home builders.  The KB Homes first deposit in escrow during

20  November 2004 of approximately $2.2 million remained in escrow until the first release of funds

21  for Village project purposes on May 19, 2005.  On that day, approximately $1.7 million was

22  released for the purchase of two parcels in the project.

23              84.     The Village operating agreement was signed by and on behalf of its two

24  members, Natomas and Chi-Sac Village Capital Group Investors LLC, on May 12, 2005.  A true

25  and correct copy of the Operating Agreement for Village Capital Group, LLC, is attached as

26  Exhibit F to Exhibits to First Amended Complaint, Volume 2, and incorporated herein.  The first,

27  rough draft of that agreement was first presented to Solorio for review, on behalf of Natomas,

28  approximately nine months before it was ultimately signed.  Solorio objected to certain provisions

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   in the draft agreement and demanded the inclusion of other provisions.  In his attempts to

2   negotiate the form of the agreement, Solorio could not afford the cost of comprehensive legal

3   assistance.  Sinadinos referred Solorio to Allen Hine, an attorney with multiple undisclosed

4   conflicts of interest.  Among other objections, Solorio objected to the inclusion of an arbitration

5   clause in the operating agreement, and Hine advised that Solorio should not pursue that issue with

6   Sinadinos.  Sinadinos communicated with Hine and Solorio during negotiation of the operating

7   agreements, transmitting drafts of the documents by email.

8              85.     Nearly one year earlier, in mid-2004 Natomas had insisted that the

9   operating agreements for these development companies be drafted and executed before going into

10  contract with homebuilders who might purchase the projects.  Sinadinos delayed the negotiations

11  and review/revision of the operating agreements, until homebuilders were in binding contracts

12  and actually made their first deposits in escrow accounts held for the development companies.

13  Ultimately, Solorio executed the operating agreement, although he continued his objections to the

14  arbitration provisions inserted by Sinadinos.  Because of Sinadinos' calculated delay and his

15  entering into contract to sell Natomas' interest to homebuilders, if Natomas did not agree to

16  Sinadinos' unconscionable arbitration clause and waiver of Natomas' rights and instead tried to

17  part ways with Sinadinos, then Natomas was subject to substantial damages from the

18  homebuilders for breach of contract.  Natomas was exposed, because it controlled the purchase

19  rights, which Sinadinos contractually obligated for purchase by the homebuilders.  This situation,

20  together with other factors directly resulting from defendants' actions, caused Natomas undue

21  influence, duress and oppression.

22             86.     The Vintage Creek operating agreement was signed by and on behalf of its

23  two members, Natomas and Chi-Sac Vintage Creek Investors, on August 9, 2005.  A true and

24  correct copy of the operating agreement for Vintage Creek, LLC, is attached as Exhibit G to

25  Exhibits to First Amended Complaint Under the Racketeer Influenced and Corrupt Organizations

26  Act; Fraud; Breach of Fiduciary Duties; Professional Legal Malpractice; Professional Accounting

27  Malpractice; Conversion; and Petition for Writ of Mandate to Compel Inspection of Records,

28  ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    Volume 3 ("Exhibits to First Amended Complaint, Volume 3") filed concurrently herewith, and

2    incorporated herein.

3         87.    Prior to Vintage Creek entering into the agreement with Tim Lewis

4    Communities (TLC), Solorio made multiple requests that Sinadinos complete the drafting of the

5    Vintage Creek operating agreement.  Sinadinos delayed the completion of that operating

6    agreement until after he had acquired more leverage over Natomas by receiving a $200,000

7    deposit from TLC on June 27, 2005, and Sinadinos continued to pressure Solorio through July 25,

8    2005, when Solorio assigned 50% of Natomas' interest in Vintage Creek property acquisition

9    rights to Sinadinos investment company, Chi-Sac Vintage Creek Investors LLC, and the

10   remaining 50% of Natomas' interest to Vintage Creek LLC.  Sinadinos obtained further leverage

11   over Natomas on July 29, 2005, by executing a sales contract with TLC and then on August 1,

12   2005, receiving another $796,885 deposit from TLC.  Once Sinadinos had taken full control of

13   the underlying purchase agreements and the first $1 million deposit by TLC into the project, then

14   Sinadinos sent by e-mail to Solorio on August 8, 2005, the final version of the Vintage Creek

15   operating agreement.  It was mutually executed the next day.  Two days later, on August 10,

16   2005, Sinadinos continued with his anger and yelling at Solorio in private meetings to pressure

17   Solorio into giving Sinadinos an additional $400,000 concession through an amendment of the

18   operating agreement, without any return consideration to Natomas.  Solorio was tired of being

19   badgered by Sinadinos over the prior year, and 10 days later he agreed to give Sinadinos the

20   $400,000 concession to alleviate to pressure Sinadinos was putting on Solorio and Natomas.

21   Sinadinos conducted the activities described above by the use of interstate wire transmission.  See

22   Exhibit I to Exhibits to First Amended Complaint Volume 4.

23         88.    The drafting and execution of the Vintage Creek operating agreement

24   suffered from the same defects as the Village operating agreement and more.  Solorio was

25   pressured by Sinadinos to enter into the Vintage Creek agreement on behalf of Natomas by

26   Sinadinos, because the agreement was a last-minute product after the receipt of the TLC deposit.

27   The "last-minute product" and Sinadinos' oppressive actions are evidenced in the additional

28   $400,000 concession he obtained 10 days after executing the operating agreement.  Solorio was

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   denied the ability of fair negotiations about the terms and conditions of the Vintage Creek

2   operating agreement, including the unconscionable arbitration clause in particular, because

3   Sinadinos had previously obtained, under duress, the complete control of Natomas' interest in its

4   personal property -- the 17 underlying option agreements for the project properties -- and

5   Sinadinos obtained full control of $1 million deposit money TLC paid to acquire the rights to the

6   option agreements, which Natomas had assigned under duress without receiving consideration.

7          89.    Also, Sinadinos was compelling signature by Solorio, on behalf of

8   Natomas, on the operating agreements long after Sinadinos had begun his fraudulent activities,

9   causing damages to the projects which were unknown to Solorio and undisclosed by Sinadinos.

10   Accordingly, Sinadinos obtained the concession by Solorio, of his objections to the arbitration

11   and related provisions limiting Solorio's access to a judicial forum and exercise of his right to a

12   jury trial, after Sinadinos had already committed substantial fraud against plaintiffs.

13          90.    Just prior to executing the operating agreements, Sinadinos presented

14   conflict waiver letters to Solorio, which misrepresented and failed to disclose actual ethical

15   conflicts involving Sinadinos, in his capacity as lawyer for the development projects, Natomas,

16   and various participants and investors.  Accordingly, the purported waiver of trial and jury rights,

17   and the arbitration provisions in the operating agreements, are unconscionable, illegal,

18   unenforceable as contractual provisions, and subject to being stricken by the Court.

19   **E.    Fraudulent Loans from Vintage Creek to Village**

20          91.    Besides the fraudulent transfer of approximately $700,000 in the Johl-

21   Barnard-Sparks transactions, Sinadinos and his co-conspirators also transferred additional illegal

22   "loans" from Vintage Creek to Village, by wire and check transactions between approximately

23   June 2004 through the end of 2007.  In total, Sinadinos and his co-conspirators transferred

24   approximately $2,155,000 from Vintage Creek to Village, balanced against partial

25   reimbursements of approximately $825,000.  Plaintiffs are informed and believe, and thereon

26   allege, that the result of these activities by Sinadinos and his co-conspirators has been the

27   conversion and laundering of approximately $1,330,000 of Vintage Creek monetary assets, which

28   ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1 Sinadinos, Stanley Foondos, and the co-conspirators have added to their purported capital

2 accounts, with no intention of reimbursing Vintage Creek.

3      92.    Sinadinos only informed Solorio about two of these so-called loans from

4 Vintage Creek to Village.  In each instance, Solorio objected to the co-mingling of funds between

5 the Vintage Creek and Village projects.  At all times when these two loan transactions occurred

6 Solorio was unaware of the scope and nature of the illegal conduct by Sinadinos and his co-

7 conspirators.  The multiple occasions of co-mingling of funds by Sinadinos and his co-

8 conspirators between the projects violated the terms of the operating agreements for Vintage

9 Creek and Village.

10 **F.**    **Unlawful Return of Capital Contributions to Investors**

11      93.    On multiple occasions, between approximately November 2004 and

12 continuing to the present, Sinadinos and his co-conspirators transferred funds from Vintage Creek

13 and Village to themselves, without lawful authority and in direct contravention of the provisions

14 in the operating agreements.  These transfers of funds violated section 5 of the operating

15 agreements for the Village and Vintage Creek projects.  Sinadinos and his co-conspirators

16 reimbursed equity investments which they had allegedly made in the projects, using other

17 proceeds including payments by homebuilders KB Homes and TLC.

18      94.    Sinadinos and his co-conspirators also employed continuing, rampant use

19 of so-called "loans" to satisfy their required investments in the projects.  They readily reimbursed

20 themselves substantial amounts of money, which by law and the terms of the operating

21 agreements should have remained in their capital accounts as project investments.  The net effect

22 of this activity has been the siphoning off of funds to Sinadinos and his co-conspirators from

23 assets of the development companies to which they were not entitled, and the gross overstatement

24 of their respective capital accounts in these companies.

25      95.    Sinadinos and his co-conspirators also made double payment of alleged

26 loan reimbursements, resulting in the direct theft of substantial sums by them.  Sinadinos and his

27 co-conspirators accomplished these illegal transactions by means of mail and wire fraud.  See

28 Exhibit I to Exhibits to First Amended Complaint Volume 4.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

96.     At first, Sinadinos promised that he would provide investments of $4,000,000 in each of the development projects, Village and Vintage Creek. He began those investments by making deposits, usually in the amount of $50,000, to open escrow on the purchase of property by Natomas. For instance, during September and October 2003, Sinadinos made such deposits by using his company, Prime Minister Group LLC, to open escrow on the acquisition of the Sparks and Von Behren parcels in the Village project.

97.     By November 2004, Sinadinos used other funds invested in the Village project to reimburse $50,000 on the Von Behren parcel, by payment of those funds to another company controlled by him and Stanley Foondos, Chi-Sac Florin Vineyards Investors LLC.

98.     On January 31, 2005, Sinadinos directed First American Title Company handling the close of escrow on the purchase of the Barnard parcel by Johl (previously described in the Johl-Barnard-Sparks transaction) to transfer approximately $98,000 to his company affiliated with the Vintage Creek project, Chi-Sac Gap Investors. On that same day, Sinadinos used the account held by Chi-Sac Gap Investors to reimburse his other company, Prime Minister Group LLC, the amount of $75,000. On the check he used for that payment, he wrote the note "repay loan." By that transaction, Sinadinos actually repaid himself and his co-conspirators for a capital investment using project funds to which he was not entitled, without authority to do so.

99.     On the next day, February 1, 2005, Sinadinos paid an additional $20,000 to himself and his co-conspirators, by check made payable to the Prime Minister Group LLC from the Chi-Sac Gap Investors account. Again, Sinadinos unlawfully reimbursed himself and his co-conspirators some or all of a prior capital investment using project funds to which he was not entitled. Plaintiffs are informed and believe, and thereon allege, that Sinadinos and his co-conspirators made these payments to themselves with the intent of receiving an unlawful reimbursement of capital, without reducing their purported capital accounts for these development projects. They continued to claim these capital investments in the projects, although they had secretly reimbursed themselves from project funds.

100.    Plaintiffs are informed and believe, and thereon allege, that the total amount of unlawful reimbursement of capital investment funds by Sinadinos and his

1   co-conspirators, and the resulting overstatement of their capital accounts, is more than several

2   hundred thousand dollars, subject to proof at trial.

3          101.    In a pattern of activity similar to the outright reimbursement of original

4   capital investments, Sinadinos made frequent repayments to himself, his co-conspirators, and

5   their companies of prior alleged "loans" to Village and Vintage Creek.  In each instance when

6   there had actually been a prior investment by one of Sinadinos' companies, such repayments were

7   unlawful returns of equity to Sinadinos and his co-conspirators.  In many circumstances, the

8   payments by Sinadinos were outright embezzlement of development company assets.

9          102.    On May 20, 2005, Sinadinos wrote check number 9905 on a Village

10  account, payable to another company controlled by him, Park Ridge Investments, for $25,000.

11  Plaintiffs are informed and believe, and thereon allege, that this payment of $25,000 to Park

12  Ridge by Sinadinos was an unlawful return of equity to an investor in the project.

13         103.    On June 6, 2006, Sinadinos wrote check number 1105 from a Vintage

14  Creek account, for $20,000, payable to Chi-Sac South Sutter Investors.  Sinadinos wrote a note on

15  the check, attempting to characterize it as a "loan repayment." Plaintiffs are informed and believe,

16  and thereon allege, that Sinadinos and his co-conspirators hold controlling interests in Chi-Sac

17  South Sutter Investors, and that no prior loan had been made by that company to Vintage Creek,

18  which would justify the purported repayment.  This payment resulted from an agreement by

19  Sinadinos and his co-conspirators to siphon off $20,000 of Vintage Creek assets for the direct,

20  unlawful benefit of themselves.

21         104.    On June 15, 2006, Sinadinos wrote check number 1110 on a Vintage Creek

22  account, payable to Park Ridge Investments, for $25,000.  He wrote a note on the check of "repay

23  loan 4/15/05."  Park Ridge Investments had previously deposited $25,000 in a Vintage Creek

24  account by check dated April 13, 2005, signed by Sinadinos. He also wrote check number 1111

25  on June 15, 2006, made payable to Park Ridge Investments, in the amount of $2,916, on which he

26  wrote the note "interest 4/14/5-6/15/6."  His payment of the $25,000 and the purported interest to

27  Park Ridge was an unauthorized return of equity, with interest, to an investor in the project.

28  ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

105.    Again, plaintiffs are informed and believe, and thereon allege, that Sinadinos and his co-conspirators have claimed a capital account balance which includes original investments such as the $25,000 by Park Ridge, although Sinadinos has actually reimbursed those amounts with interest.  The reimbursements to the investors benefit Sinadinos and his co-conspirators directly, because they hold controlling ownership interests in the entities which have invested in the Village and Vintage Creek projects.

106.    Also on June 15, 2006, Sinadinos made two other payments by check to Park Ridge Investments from a Vintage Creek account, in the respective amounts of $10,000 and $20,000.  He executed two more checks on that day, allegedly paying interest to Park Ridge Investments on those purported loans, in the respective amounts of $1,108 and $2,122.  He wrote notes on those checks, referring to alleged repayments of loans, with interest.  Plaintiffs are informed and believe, and thereon allege, that Sinadinos had never made any original "loans" on behalf of his company, Park Ridge, for those amounts, and the purported repayments were his outright embezzlement of those funds from Vintage Creek.

107.    On September 28, 2006, Sinadinos wrote check number 1143 from a Vintage Creek account, for $55,000, payable to Park Ridge Investments.  There was no note on the check, and no prior indication of a deposit in that amount from Park Ridge.  Plaintiffs are informed and believe, and thereon allege, that Sinadinos and his co-conspirators embezzled the $55,000 from Vintage Creek by this transaction, without any legal justification for the transfer of project funds.

108.    On February 20, 2007, defendant Gus Galaxidas loaned $110,000 to Village.  Sinadinos and Stanley Foondos received a kickback of $3,000 each from Village funds, as commissions, apparently for originating the loan by Galaxidas, who is also an investor in Village, the broker for the contracted sale to a homebuilder and has resulting fiduciary duties and required legal disclosures that were outright disregarded by Galaxidas.  Sinadinos used the Galaxidas loan for construction of a wall during February 2007, around an approximate two acre homesite on the Nguyen parcel in the Village project.

///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

109.    Plaintiffs are informed and believe, and thereon allege, that Sinadinos, Foondos, and Galaxidas conspired to deposit the $110,000 in Village, allowing Sinadinos and Foondos to take an illegal commission from that deposit, with the original intent of reimbursing that money, with interest, to Galaxidas from Vintage Creek assets.  In fact, on May 30, 2007, Sinadinos and his co-conspirators directed by e-mail communications to Stewart Title Company that the $110,000 be paid to Galaxidas, with interest at 10% per annum.  On that day, Stewart Title Company paid Galaxidas approximately $113,727 from an escrow containing excess funds belonging to the separate and independent Vintage Creek project.  By these transactions, Sinadinos and his co-conspirators, including Stewart Title Company, actively participated in the conduct of mail and wire fraud, resulting in the depletion of Vintage Creek assets associated with the unlawful payments to Galaxidas, Sinadinos and Foondos.  A true and correct copy of the email communication from Sinadinos to Stewart Title and Galaxidas, copied to Solorio, Deane, and Stanley Foondos, is attached as Exhibit L to Exhibits to First Amended Complaint, Volume 4, and incorporated herein.

110.    Sinadinos paid himself and his co-conspirators twice for certain purported loan repayments from the Village and Vintage Creek projects.  By these activities, Sinadinos and his co-conspirators embezzled money from both projects by a scheme of duplicate reimbursements.  In each instance, the reimbursement of equity investments was itself unlawful, as occurred in similar circumstances with the heretofore alleged "loan" repayments.

111.    On March 29, 2005, Sinadinos wrote a check on an account held by his company, Park Ridge Investments, for $35,000, payable to Chi-Sac Gap Investors.  He made that payment, writing a note on the check of "loan."  Plaintiffs are informed and believe, and thereon allege, that Sinadinos and his co-conspirators held controlling interests in Park Ridge Investments and Chi-Sac Gap Investors at all times relevant to these transactions.

112.    On March 30, 2005, Sinadinos wrote a check on an account belonging to Chi-Sac Gap Investors, for $35,000, made payable to Park Ridge Investments.  He made that payment, indicating on the check that it was a repayment of the loan from the prior day.

///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

113.    On June 15, 2006, Sinadinos wrote a check on an account belonging to Vintage Creek, in the amount of $35,000, made payable to Park Ridge Investments.  He made that payment, writing a note on the check of "repay loan 3/31/05."  That payment was a duplicate reimbursement of the purported loan from Park Ridge Investments on March 29, 2005.  Sinadinos and his co-conspirators embezzled $35,000 by these transactions.

114.    On October 2, 2006, Sinadinos wrote a check on an account belonging to Chi-Sac White Rock 150 Investors LLC, in the amount of $10,000, made payable to Village.  He made that payment as a purported loan to Village.  Plaintiffs are informed and believe, and thereon allege, that Sinadinos and his co-conspirators had controlling interests in Chi-Sac White Rock 150 Investors LLC at all times relevant to these transactions.

115.    On October 6, 2006, Sinadinos wrote a check on account belonging to Village, in the amount of $10,000, made payable to himself.  He made that payment, with a note on the check indicating the purpose for the payment was to repay the $10,000 loan from Chi-Sac White Rock 150 Investors LLC.

116.    On November 6, 2006, Sinadinos wrote a check on an account belonging to Village, in the amount of $10,000, made payable to Chi-Sac White Rock 150 Investors.  He made that payment, including a note on the check of "repayment."  That payment was a duplicate reimbursement of the purported loan from White Rock 150 Investors LLC on October 2, 2006.  Sinadinos and his co-conspirators embezzled $10,000 by these transactions, from Village assets.

**G.    Fraud in Inducement of New Investors into Vintage Creek**

117.    Plaintiffs are informed and believe, and thereon allege, that from the beginning of their involvement with these residential development projects, Sinadinos and his co-conspirators never intended to repay the funds they were stealing from Vintage Creek, which exceed $1.3 million.  Their intentional fraudulent scheme to bilk money away from Vintage Creek was well underway even prior to the initial investment by the homebuilder, TLC, in July 2005, when TLC made its first deposit of $1.3 million.

118.    Sinadinos and his co-conspirators were fully aware that the deposits being made by TLC in Vintage Creek were essentially nonrecourse; TLC would make no claim for a

1    recovery of its investment, if the project failed.  The eventual downturn in the real estate market

2    after TLC became involved in Vintage Creek was irrelevant to the potential financial success of

3    the Vintage Creek residential development project.  Regardless of the movement of the general

4    real estate market in the Sacramento region, Vintage Creek was doomed to financial failure by the

5    specific fraudulent intent of Sinadinos and his co-conspirators at the beginning, to deplete its

6    assets in a scheme designed solely to result in their personal, fraudulent financial benefit.

7                119.    As part of their overall scheme to pump assets out of Vintage Creek and

8    ultimately dump the development project, Sinadinos and his co-conspirators sought out third-

9    party victims for additional sources of illegal profits.  One such victim was Margarida Leavitt.

10   Ms. Leavitt had approximately $1.2 million in Section 1031 exchange money available in the

11   summer of 2007 to invest in real property.

12               120.    Plaintiffs are informed and believe, and thereon allege, that Sinadinos and

13   his co-conspirators, including Stanley and Stephen Foondos, made numerous fraudulent

14   misrepresentations to Ms. Leavitt, to convince her to invest her 1031 exchange money in the

15   purchase of the Donabedian parcel, in the Vintage Creek project.  Among other

16   misrepresentations, they informed her that she would be investing in an active residential real

17   estate development project, with some level of guaranteed, excellent financial return.

18               121.    Sinadinos and his co-conspirators purposefully avoided disclosing the truth

19   about their fraudulent scheme and the certain financial failure of the Vintage Creek project, when

20   they intentionally defrauded her for the purpose of securing her investment of $1.2 million in the

21   project.  Approximately one year before their misrepresentations to Ms. Leavitt, TLC had

22   expressly communicated to Sinadinos that it was not interested in continuing with the purchase

23   agreement and would wait until its next option payment was due before formally terminating its

24   purchase rights for the development.  In May 2007 TLC formally terminated their rights as

25   previously stated.  After the abandonment of the Vintage Creek project by the homebuilder in

26   May 2007, any reasonable investor would be very likely influenced by that information toward

27   not investing their funds in that project.  Sinadinos and his co-conspirators not only failed to

28   disclose the abandonment of the project by the homebuilder to Ms. Leavitt; they failed to disclose

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    the company's other financial obligations to "put option" holders and substantial income tax

2    liability for tax evasion and they falsely represented the opposite picture to her, that the

3    development would return substantial benefit on her investment.

4         122.    Plaintiffs are informed and believe, and thereon allege, that the role of co-

5    conspirator Stephen Foondos in this scheme to defraud Ms. Leavitt was his representation of her

6    interests as her attorney in the transaction with Sinadinos and Stanley Foondos.  Plaintiffs are

7    informed and believe, and thereon allege, that she was introduced to this fraudulent transaction by

8    co-conspirator Stanley Foondos, who had previously served as her certified public accountant.

9    Not only did Stephen and Stanley Foondos conspire with Sinadinos to defraud Ms. Leavitt; they

10   actively participated in the conduct which implemented the fraud, by means including mail and

11   wire transmissions.  True and correct copies of an email, dated June 22, 2007, and the documents

12   attached to the original email, sent by Sinadinos to Sharon Wichmann at Stewart Title, with

13   copies to Stanley Foondos, Deane, and Solorio, concerning Leavitt escrow-related documents, are

14   attached as Exhibit M to Exhibits to First Amended Complaint, Volume 4, and incorporated

15   herein.

16        123.    In early August 2007, the co-conspirators accomplished the fraudulent

17   transaction, by closing escrow on the purchase of the Donabedian parcel with $1.2 million of

18   Ms. Leavitt's Section 1031 proceeds.  The Donabedian sellers originally agreed with Natomas to

19   sell the property in June 2004 for $900,000.  Prior to mid-2007, Vintage Creek had paid

20   $450,000, or half the purchase amount.  Plaintiffs are informed and believe, and thereon allege,

21   that Sinadinos and his co-conspirators used the net proceeds from the Leavitt investment, in the

22   approximate amount of $750,000, to further the goals of their fraudulent, racketeering scheme,

23   whether to illegally reimburse their prior investments without reducing their stated capital

24   accounts, or to accomplish the embezzlement and laundering of those proceeds.

25        124.    During the summer of 2007, Sinadinos and his co-conspirators lured

26   another third-party investor into Vintage Creek by fraudulent means, after the homebuilder TLC

27   had abandoned the project.  During July 2007, Sinadinos and his co-conspirators closed escrow

28   on an investment of approximately $662,000 by the Vathis family.  Plaintiffs are informed and

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1  believe, and thereon allege, that Sinadinos and his co-conspirators fraudulently misrepresented to

2  the Vathis family that their investment in Vintage Creek would result in a particular projected

3  favorable return, based on the false representation that the development project was proceeding

4  toward successful conclusion, with guaranteed substantial increase in value of the property assets.

5        125.    At the time of making such misrepresentations, Sinadinos and his co-

6  conspirators were fully aware of their intentions to dump the Vintage Creek project, with full

7  knowledge that they were eviscerating and planning to abandon the development.  Plaintiffs are

8  informed and believe, and thereon allege, that had the Vathis family been aware of the truth about

9  the Vintage Creek project, they would not have invested their money.

10        126.    By their fraudulent conduct, Sinadinos and his co-conspirators induced the

11  Vathis family to invest Section 1031 exchange funds in a Vintage Creek parcel, which resulted in

12  net proceeds of approximately $187,000.  Plaintiffs are informed and believe, and thereon allege,

13  that Sinadinos and his co-conspirators used the net proceeds from the Vathis investment to further

14  their fraudulent scheme, in the same manner they used the net proceeds from the fraud

15  perpetrated against Leavitt.  In particular, approximately $113,727 was transferred from the

16  Vathis escrow in Vintage Creek by Stewart Title Company, according to and in concert with the

17  email directions by Sinadinos, to Gus Galaxidas, for the fraudulent purpose of repaying his prior

18  loan to the separate and independent company Village, with interest, for construction of the wall

19  around the Nguyen parcel.  Sinadinos and his co-conspirators used the illegal proceeds from the

20  Vathis fraud for the unlawful payment of the Galaxidas loan.

21        127.    By the end of 2007, just a few months after the Vathis and Leavitt

22  fraudulent transactions, Sinadinos and his co-conspirators took specific action to continue their

23  scheme of dumping the Vintage Creek project.  They sent letters to nearly all property owners in

24  the project, notifying the owners that Vintage Creek was terminating their purchase and option

25  agreements.  Sinadinos and his co-conspirators transmitted those letters through the mail to the

26  property owners on or about December 31, 2007, intending to support their fraudulent scheme by

27  claiming the equity interests lost by Vintage Creek in those properties as losses offsetting other

28  taxable gains such as the $4 million profit from the TLC transaction, the $837,000 profit from the

1 | Barnard-Johl transaction, the $750,000 profit from the Leavitt transaction and the $187,000 profit

2 | from the Vathis transaction.

3 | 128. Sinadinos and his co-conspirators did not send termination letters to either

4 | Ms. Leavitt or the Vathis family. Although they had terminated project interests in nearly all

5 | other properties, Sinadinos and his co-conspirators continued the fraudulent scheme of misleading

6 | the Leavitt and Vathis property owners about the continued viability of the project.

7 | 129. During 2008, Sinadinos and his co-conspirators have continued their fraud

8 | against Leavitt and Vathis. They have continued making monthly option payments to the

9 | property owners, to avoid arousing suspicions by the owners about defendants' intentions for the

10 | Vintage Creek project. Sinadinos and his co-conspirators also made payments during 2008, sent

11 | by mail to representatives of an owner's group, responsible for coordinating environmental review

12 | for multiple regional development projects. During approximately April 2008, Sinadinos wrote a

13 | check in the amount of $50,000 on an account belonging to his law office, made payable to

14 | Vintage Creek. He deposited that check in an account belonging to Vintage Creek and paid

15 | approximately half of that amount to the owner's group, regarding environmental review for

16 | Vintage Creek.

17 | 130. Plaintiffs are informed and believe, and thereon allege, that the only reason

18 | for Sinadinos' transmittal of that payment to the owner's group was his fraudulent plan to

19 | misrepresent that Vintage Creek continues as an active development project. Instead, the truth is

20 | that Sinadinos and his co-conspirators have never intended to pursue successful residential

21 | development in the Vintage Creek project, and clearly terminated the project by no later than

22 | December 2007. One month prior to the payment by Sinadinos to the owner's group, during

23 | March 2008, defendant Larry Deane sent an e-mail correspondence to the owner's group,

24 | requesting that they "remove Vintage from the group." The continuing payments of obligations

25 | pertaining to Vintage Creek in 2008 are for the sole reason of covering up their previous frauds

26 | against Ms. Leavitt, the Vathis family and plaintiffs.

27 | 131. All of these fraudulent transactions, directly targeting Leavitt and Vathis as

28 | victims of financial fraud, have exposed plaintiffs to the risk of liability claims which may be

1   made by the defrauded investors.  As soon as plaintiffs became aware of the fraudulent activities

2   by Sinadinos and his co-conspirators in these regards, plaintiffs began immediately attempting to

3   correct defendants' wrongful conduct and disassociate from the fraudulent activities by

4   defendants.  Besides the increased liability risk to the plaintiffs occasioned by defendants'

5   fraudulent activities, plaintiffs are informed and believe, and thereon allege, that defendants have

6   attempted to inflate their stated capital investments in the Village project by the use of their ill-

7   gotten proceeds from Leavitt and Vathis, in a scheme of money laundering.

8   **H.     Embezzlement, Kickbacks, and Money Laundering**

9            132.     Sinadinos and his co-conspirators have conducted multiple additional

10  transactions involving embezzlement, kickbacks, and money laundering.  Those unlawful

11  activities included unauthorized payments to themselves and their other companies, use of Village

12  and Vintage Creek money to satisfy obligations of their other companies, payment of "loan fees"

13  or "points" for many investments in these projects, and laundering the proceeds of their fraudulent

14  activities by promoting their illegal enterprise and attempting to hide their illegal profits from the

15  Internal Revenue Service.

16           133.     On August 2, 2005, Sinadinos wrote check number 1006 on an account

17  belonging to Vintage Creek, in the amount of $25,000, made payable to his investment group

18  associated with that project, Chi-Sac Gap Investors.  He deposited that check in the Chi-Sac Gap

19  Investors account.  On that same day, he wrote check number 1081, on the Chi-Sac Gap Investors

20  account, in the amount of $25,000, made payable to Village.  On that check he wrote the note

21  "capital contribution," intending to falsely represent that the payment from his investment group,

22  Chi-Sac Gap Investors was an investment of their own funds into the Village project.  He

23  deposited the $25,000 check into the Village account, treating it as an addition to the capital

24  account in that project for the benefit of himself and his co-conspirators.  Those funds actually

25  originated from the first deposit by TLC in the Vintage Creek project, on July 29, 2005.  So, by

26  these transactions, Sinadinos and his co-conspirators fraudulently converted and laundered

27  $25,000 of TLC money belonging to Vintage Creek, for their personal, unlawful benefit.

28  ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

134.    As previously alleged, Park Ridge Investments is a company directly controlled by Sinadinos and his co-conspirators, and Park Ridge received numerous payments by them from Vintage Creek funds. One of the latter payments by Sinadinos and his co-conspirators from Vintage Creek to Park Ridge Investments occurred on September 28, 2006. On that day, Sinadinos wrote check number 1143 in the amount of $55,000, made payable to Park Ridge Investments. He transferred that money to Park Ridge without legal authority, resulting in the embezzlement of that money for the personal, unlawful benefit of himself and his co-conspirators.

135.    On March 26, 2007, Sinadinos and his co-conspirators laundered part of the money illegally obtained from Vintage Creek, via transfers to Park Ridge Investments. On that day, Sinadinos wrote check number 2067 on an account belonging to Park Ridge Investments, in the amount of $50,000, made payable to Village, and deposited that check in a Village account. Plaintiffs are informed and believe, and thereon allege, that Sinadinos and his co-conspirators completed this deposit in Village for the purpose of laundering the proceeds of their prior mail and wire fraud against Natomas, intending to use the money stolen from Vintage Creek to fraudulently inflate their purported capital accounts and ownership interest in Village.

136.    Also on March 26, 2007, Sinadinos and his co-conspirators obtained one more illegal benefit from the $50,000 money laundering transaction into Village. On that day, Sinadinos wrote check number 1111 from a Village account, in the amount of $2,500, made payable to "cash," with a note written by him of "Park Ridge loan." Sinadinos wrote and cashed that check to obtain a $2,500 commission for his personal benefit, which he justified based on the illegal transfer of $50,000 of laundered proceeds into Village.

137.    On August 4, 2007, Sinadinos wrote check number 1232 on an account belonging to Vintage Creek, for $34,000, made payable to the Sacramento Legal Group, as partial payment of a commission on the Leavitt transaction. Stephen Foondos is part of the Sacramento Legal Group. Also on August 4, 2007, Sinadinos wrote check number 1233 on an account belonging to Vintage Creek, for $16,000, made payable to Stephen Foondos, as further commission to him for serving as the attorney for Ms. Leavitt, as she was being swindled by the co-conspirators. Plaintiffs are informed and believe, and thereon allege, that not only did Stephen

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1  Foondos violate his fiduciary and professional, ethical obligations to Ms. Leavitt by this

2  transaction, but he also profited by the $50,000 kickback completed in two separate payments to

3  him and his law firm.

4          138.    Then, on September 6, 2007, Stephen Foondos wrote check number 2495

5  on his personal account, in the amount of $50,000, made payable to Village.  He and Sinadinos

6  deposited that check in the Village account, for the apparent purpose of laundering the money he

7  had received as a kickback from the fraud perpetrated against Ms. Leavitt in the Vintage Creek

8  project.  Also on September 6, 2007, Sinadinos wrote check number 1145 on a Village account,

9  in the amount of $10,000, made payable to Stephen Foondos.  Plaintiffs are informed and believe,

10  and thereon allege, that this payment was a further kickback of $10,000 to Stephen Foondos,

11  while Sinadinos and his co-conspirators credited Stephen Foondos with an artificially inflated

12  capital account in the Village project, based on his money laundering investment of $50,000.

13          139.    Sinadinos and his co-conspirators used approximately $7,400 of Vintage

14  Creek money to pay California Secretary of State, California State Franchise Tax Board, and

15  United States Treasury filing fees for other companies, including Chi-Sac Vintage Creek

16  Investors, Chicago Infill Investors, South Watt & Florin Partners, and Chi-Sac Village Investors.

17  Those payments, mailed on at least 15 occasions beginning in July 2005 and continuing through

18  April 2008, were unauthorized and an illegal use of Vintage Creek money for the benefit of

19  Sinadinos and his co-conspirators.

20          140.    Sinadinos and his co-conspirators used approximately $6,000 of Village

21  money to pay California Secretary of State, California State Franchise Tax Board, and United

22  States Treasury filing fees for other companies, including Chi-Sac Village Capital Group

23  Investors, Chicago Infill Investors, and Chicago South Watt Investors.  Those payments, mailed

24  on at least 13 occasions beginning in July 2005 and continuing through October 2007, were an

25  unauthorized and illegal use of Village money for the benefit of Sinadinos and his co-

26  conspirators.

27          141.    Between approximately November 2004 and February 2008, Sinadinos and

28  his co-conspirators wrote checks on a Vintage Creek account, ranging in value from $2,500 to

FIRST AMENDED COMPLAINT UNDER RICO; FRAUD, BREACH OF FIDUCIARY DUTIES, ETC.          [CASE NUMBER 2:08-CV-02308-FCD-KJM ]

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   $7,500, made payable to "Cash," for the sole apparent purpose of embezzling those funds from

2   the company. The total amount taken from Vintage Creek unlawfully in this manner was

3   approximately $42,500. Those payments were not authorized, and in one instance the signature

4   endorsing the back of a $5,000 check appears to be that of Georganna Sinadinos, the wife of

5   defendant Sinadinos.

6   **I.   Sinadinos Plunders Madera**

7            142.    Sinadinos followed his pattern of fraudulent business activities in his

8   position as co-manager with Solorio for the Madera project. He controlled the financial

9   transactions relating to Madera and refused repeated requests by Solorio for information about

10  project finances. After preventing Solorio's access to financial information concerning Madera,

11  Sinadinos used money belonging to Madera for the unlawful, personal financial benefit of himself

12  and his co-conspirators. Sinadinos has provided a copy of an unsigned operating agreement,

13  which he purports to be the final version of the operating agreement for Madera Avenue 12

14  Capital Group LLC. A true and correct copy of the document, which Sinadinos purports to be the

15  operating agreement for Madera, is attached as Exhibit H to Exhibits to First Amended

16  Complaint, Volume 3, and incorporated herein.

17           143.    On several occasions, he used Madera funds to pay his law office secretary,

18  fraudulently characterizing such payments as "consulting" fees. On November 30, 2006, he

19  wrote check number 9902 on an account belonging to Madera, for $2,116, made payable to Joy

20  Villaruz, a secretary he shares with other persons in his office. The note written by him on the

21  check reads "Nov. '06 consulting." On January 22, 2007, he wrote check number 1009 on a

22  Madera account, in the amount of $2,116, made payable to Joy Villaruz.  Sinadinos wrote check

23  number 1026 on the Madera account, made payable to Ms. Villaruz in the amount of $2,116, with

24  a note indicating "June '07 consulting." He wrote the date "6/25/06" on the check, but it appears

25  that check was written in June 2007. His payment of his own law office overhead using Madera

26  funds was unauthorized and a theft of project funds by him.

27           144.    Sinadinos wrote check number 9901 on the Madera checking account on

28  November 30, 2006, for $5,000, payable to the "Law offices of John G. Sinadinos." The note

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

written by him on the check reads "legal fees."  On December 4, 2006, Sinadinos wrote check number 9909 on the Madera checking account, for $24,000, payable to the "Law offices of John Sinadinos."  He deposited those funds in his law office account.  On December 11, 2006, Sinadinos wrote check number 9910 on the Madera checking account, in the amount of $10,000, made payable to the "Law offices of John Sinadinos."  He deposited those funds in his law office account.  These payments by Sinadinos were not authorized, not based upon any invoice for legal fees, and based on his fraudulent intent to steal money from the project.

145.    On March 5, 2007, Sinadinos wrote check number 1013 on the Madera checking account, in the amount of $5,000, made payable to the "Law offices of John G. Sinadinos."  He wrote the note on the check of "short term loan."  Sinadinos had no authority to make a loan to his law office from Madera project funds.  The payment by Sinadinos was not based upon proper invoicing for any legal services to the Madera project.  Plaintiffs are informed and believe, and thereon allege, that he wrote this check for the purpose of embezzling $5,000 from Madera for his personal benefit.

146.    Also on March 5, 2007, Sinadinos wrote check number 1014 on the Madera checking account, in the amount of $5,000, made payable to "Vintage Creek, LLC."  On this check he also wrote the note of "short-term loan."  Sinadinos had no authority to make such a loan to Vintage Creek from Madera project funds.  On May 17, 2007, Sinadinos wrote check number 1025 on the Madera checking account, in the amount of $25,000, made payable to "Vintage Creek, LLC."  He wrote the note on this check of "loan."  Sinadinos had no authority to make such loans to Vintage Creek from Madera project funds.  Plaintiffs are informed and believe, and thereon allege, that he wrote these checks for the purpose of embezzling the money from Madera for the benefit of himself and his co-conspirators.

147.    On August 3, 2007, Sinadinos wrote check number 1224 on the Vintage Creek checking account, in the amount of $26,000, made payable to "John Sinadinos."  He wrote the note on this check of "repay Madera 5/17."  This payment by Sinadinos to himself was a theft of money from the Madera and Vintage Creek projects.  He had no authority to pay himself the $25,000, which he purportedly loaned to Vintage Creek from Madera, plus an inexplicable extra

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    $1,000 from Vintage Creek money.  Evidently, he thought it appropriate to pay himself an

2    additional fee of $1,000 for having successfully completed this fraudulent transaction.

3    **J.    Solorio Learns of Racketeering Activity and Demands Inspection of Records**

4            148.    After Sinadinos completed his transaction with Ms. Leavitt, he confided in

5    Solorio that he had defrauded Leavitt and asked Solorio to assist in preserving the false

6    appearance of Vintage Creek as a successful residential development project.  At that time,

7    Solorio first became aware that Sinadinos was engaging in fraudulent activities involving the

8    Vintage Creek project.

9            149.    Solorio asked Sinadinos for access to books, records and documents of all

10   development projects, including Vintage Creek, Village, and Madera.  He had previously asked

11   for such access to monitor the financial conditions of the companies, and Sinadinos had

12   consistently ignored or avoided those requests.  Sinadinos again ignored his requests, and by

13   passive refusal to cooperate, Sinadinos refused the requested access to project records.  Solorio

14   sought the assistance of attorney Allen Hine.  Mr. Hine failed to make any substantial progress.

15           150.    Based on his growing suspicions after learning about the Leavitt

16   transaction that Sinadinos had been engaging in the widespread fraudulent activities, Solorio was

17   seeking information from the development companies, to which he was entitled by law and

18   operating agreements.  Solorio continued to press Sinadinos for access to the books, records and

19   documents of the companies.  Sinadinos responded that the records were always available for his

20   review, but then Sinadinos would not allow the access by Solorio to the documents.

21           151.    After approximately six months of Sinadinos' failure and refusal to

22   cooperate in Solorio's request for access to the records, Solorio became aware that Mr. Hine

23   would not assist him as necessary, in this dispute.  In approximately April 2008, Solorio hired the

24   firm of Barth Tozer & Timm LLP.  On April 4, 2008, Mr. Barth sent a letter to Sinadinos on

25   behalf of Solorio, in his capacity as manager of Natomas and as manager of Orchard Park,

26   demanding that Sinadinos identify, preserve and protect all records of the Vintage Creek, Village

27   and Madera companies, whether in paper, electronic, or other form.  On behalf of Solorio, in his

28   capacity as manager of Natomas and Orchard Park, Mr. Barth demanded access to all books,

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

Case 2:08-cv-02308-LKK-CKD   Document 5   Filed 11/04/08   Page 41 of 66

records and documents relating to Vintage Creek, Village, and Madera, as required by law and the terms of the respective operating agreements for each company.

152.    Solorio also retained the services of the forensic accounting firm, Ueltzen & Company, for the purpose of reviewing and auditing financial information which might be disclosed by Sinadinos.  A forensic accountant with that firm, Joy Urquhart, was assigned to work on this dispute.

153.    From the beginning of April 2008 and continuing for several months, Sinadinos and his co-conspirators resisted and failed to comply with Solorio's request for access to company books, records and documents.  Barth sent a letter dated April 7, 2008, to Sinadinos, demanding on behalf of Solorio that all records of the companies, required to be maintained by the operating agreements, be made available for inspection and copying.  Sinadinos did not respond to that letter.

154.    After a brief period of attempts to resolve disputes between the parties, Barth renewed the request for his client's access to all records of the three companies, by letter to Sinadinos, dated April 24, 2008.  Sinadinos first responded that Solorio did not have proper authority to request access to the company books, records and documents.  Counsel representing Sinadinos, Carl Blaine, specifically advised that Solorio, acting in his capacity as manager of Natomas, and his agents had authority to gain access to the documents.  Sinadinos therefore allowed an inspection visit by Ms. Urquhart to his office in late April 2008.  He made available certain financial records for her inspection and promised to provide copies of those records.

155.    The copies he provided were incomplete, missing copies of entire folders of information.  Upon a second visit by Ms. Urquhart and Barth to his office in early May 2008, Sinadinos provided copies of the particular folders, which had been identified by Urquhart as missing from her first inspection of the records.  At the time of the second visit, Barth renewed his earlier request on Solorio's behalf, for all other books, records and documents of the three development companies.  At that time and in following days, Barth pursued demands on behalf of his client to the release of certain missing records by Sinadinos.  Among other records, Barth

///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    sought his client's access to escrow documents, signed operating agreements, and detailed records

2    of ongoing litigation involving the projects.

3         156.   Again, Sinadinos resisted providing the documents.  He sent a letter dated

4    May 8, 2008, refusing to provide access to escrow documents pertaining to real property

5    transactions in the Village and Vintage Creek projects.  After communication by Barth with

6    Sinadinos' attorney Mr. Blaine, Blaine convinced his client to cooperate on disclosure of escrow

7    documents from the two title companies which had worked on transactions for the projects.

8         157.   After several more weeks of delay, First American Title Company

9    provided copies of certain escrow documents in its possession to Solorio.  First American Title

10   Company had predominately worked on real estate transactions involving the Village project.

11   Stewart Title Company had predominately worked on real estate transactions involving Vintage

12   Creek.  Sinadinos and Stewart Title promised to provide complete copies of escrow documents

13   which could be disclosed under the law to Solorio.

14        158.   The copies of escrow documents ultimately provided by Stewart Title, after

15   some additional delay, were incomplete.  In particular, the copies of escrow documents from

16   Stewart Title did not include any information pertaining to specific transactions, such as the

17   Leavitt investment.  More so, Stewart Title withheld at least 15 escrow files including the TLC

18   file.  Plaintiffs are informed and believe, and thereon allege, that Sinadinos and Stewart Title

19   Company unlawfully conspired together to refuse access by Solorio and/or his representatives to

20   all available escrow documents, to which Solorio is entitled to have access, in part to conceal

21   defendants' illegal activities and in part to conceal co-conspirator, Stewart Title Company's illegal

22   activities, as involved in the managing and ultimate disposition of the Ubungen escrow.

23        159.   Plaintiffs are informed and believe, and thereon allege, that Sinadinos and

24   his co-conspirators have refused access by Solorio, in his capacity as manager of Natomas, and/or

25   his representatives, to multiple documents and company records, which by law and the terms of

26   the operating agreements should be made available to Solorio.  As a particular example, Solorio

27   and his representatives have made numerous requests for a copy of the operating agreement for

28   Madera, complete with signatures by all parties to the agreement.  Sinadinos has failed and

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    refused for nearly one year to provide a copy of that document, or even to respond that no such

2    document exists.  Sinadinos has only provided a copy of what he purports to be the operating

3    agreement for Madera, but it is unsigned.

4            160.    Another example of the failure by Sinadinos to provide lawful access by

5    Solorio to company books and records pertains to the option agreement that Sinadinos was

6    required to obtain between Stockton & 65th LP and Village, regarding the Johl and Von Behren

7    parcels in that project.  Sinadinos has not provided a copy of the required option agreement.  In

8    one conversation with Mr. Barth, Sinadinos stated there was no such agreement, but he later

9    argued he had not made such a statement.  In other verbal and written statements, Sinadinos

10   claims that he has "an agreement in principle" with Sorensen and Stockton & 65th LP.  But,

11   Sinadinos has failed and refused to provide access to an enforceable option agreement, on the

12   terms originally required by the agreement to assign Natomas' rights to the parcels acquired by

13   Sorensen.

14   **K.    Fraudulent Tax Reporting by Sinadinos and Foondos**

15           161.    Solorio demanded, on behalf of Natomas, that Sinadinos provide access to

16   all tax returns pertaining to Village, Vintage Creek, and Madera.  Sinadinos responded by

17   alleging that the tax returns were in the possession, custody and control of Stan Foondos, and

18   Mr. Foondos would provide complete copies of those returns.  Sinadinos and Foondos produced

19   copies of tax returns during approximately May 2008, which they represented to be the returns

20   filed with the IRS on behalf of Village and Vintage Creek for tax years 2005 and 2006.  The

21   copies of tax returns provided by Sinadinos and Foondos are substantially and materially different

22   from the prior Schedule K-1s provided to plaintiffs, unsigned, without any indication they were

23   filed with the Internal Revenue Service, beyond the statements of that purported fact by Sinadinos

24   and Foondos.

25           162.    Plaintiffs are informed and believe, and thereon allege, that the tax returns,

26   copies of which were provided by Sinadinos and Foondos, were never filed with the IRS.

27   Instead, Sinadinos and Foondos conspired to disclose to plaintiffs copies of false returns,

28   intending to cover up their fraudulent activities and dissuade plaintiffs from further investigation

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   of the wrongful conduct by Sinadinos, Foondos, and their co-conspirators.  Besides the fraud

2   perpetrated by Sinadinos and his co-conspirators against the federal government, their unlawful

3   conduct has specifically exposed plaintiffs to the risk of penalties, interest, and other charges

4   which would not have accrued if defendants had properly reported all financial transactions to the

5   IRS.  Moreover, the production of copies of false returns by Sinadinos and his co-conspirators to

6   plaintiffs violated defendants' obligations under relevant provisions of the California Corporations

7   Code and the operating agreements, to allow access by plaintiffs to all proper books, records and

8   documents of the three development companies.

9          163.   Plaintiffs are informed and believe, and thereon allege, that the actual tax

10  returns filed by Sinadinos, Foondos, and their co-conspirators, were intentionally falsified, for the

11  apparent fraudulent purpose of hiding assets and substantial financial transactions from the

12  federal government, to avoid the payment of taxes lawfully owed on all such transactions and

13  launder the proceeds of tax evasion (unreported and unpaid taxes).  As a particular example, the

14  fraudulent tax returns filed by Sinadinos, Foondos, and their co-conspirators, fail to disclose the

15  millions of dollars invested by the homebuilders in these projects and fraudulently misrepresent

16  the capital accounts of Sinadinos and his co-conspirators, as purported investors in these

17  development projects.  Plaintiffs are informed and believe, and thereon allege, that Sinadinos,

18  Stanley Foondos, and their co-conspirators committed mail fraud and wire fraud by willfully

19  filing materially false tax returns with the IRS and the California Franchise Tax Board.  Further,

20  Sinadinos, Foondos, and their co-conspirators caused Natomas and each member of the

21  companies to unknowingly commit mail fraud and wire fraud by individually filing false tax

22  returns based upon the false partnership returns (Schedule K-1) prepared by Foondos.

23         164.   Furthermore, plaintiffs are informed and believe, and thereon allege, that

24  Sinadinos and his co-conspirators specifically conducted their scheme of fraudulent transfers of

25  money among the various development companies, in substantial part for the fraudulent purpose

26  of hiding money from the IRS, which they were embezzling, converting, and laundering for their

27  personal, financial benefit.  A particular example of such transactions occurred on August 4,

28  2005, involving multiple checks written by Sinadinos to himself and Stanley Foondos.

165.   On August 4, 2005, Sinadinos wrote checks numbered 1008 through 1010 on the Vintage Creek account, payable to himself in the respective amounts of $9,500, $9,500, and $6,000.  He also wrote three more checks, numbered 1011 through 1013, on the Vintage Creek accounts, payable to Stanley Foondos in the respective amounts of $6,000 $9,500 and $9,500.  On each of the six sequential checks, Sinadinos wrote the note "loan."

166.   Plaintiffs are informed and believe, and thereon allege, that Sinadinos and Foondos fraudulently intended to transfer $25,000 each into their personal accounts from Vintage Creek, without triggering the customary bank reporting to the IRS of money transfers exceeding $10,000.  The only purpose for writing separate checks in the amounts chosen by Sinadinos and Foondos was to accomplish tax fraud in the transfer of these funds.

L.   **Fraudulent Payments of Attorneys Fees and Consultant Payments**

167.   Commencing in approximately August 2003 and continuing to the present, Sinadinos acted in multiple capacities for each of the three development projects.  From the start of his involvement with the Village and Vintage Creek projects, he acted in his individual capacity as the manager of the two separate joint ventures each consisting of an investor entity and Natomas which later became two separate limited liability companies formed for the development of each of the two projects.  Sinadinos also acted in his capacity as a general partner of the partnerships designated to be managers of such limited liability companies.  Sinadinos also acted in the capacity as the attorney representing plaintiffs, the various investors and development companies associated with all three projects.  At all times from approximately August 2003 and continuing to the present, Sinadinos communicated with plaintiffs and others concerning these projects by using his law office stationery, holding himself out to be the attorney representing all of the development entities associated with the projects, including plaintiffs, using his law office phone/fax/email to communicate with plaintiffs and holding all meetings with plaintiffs in his law offices.

168.   At all times relevant to these proceedings, Sinadinos has failed to provide or execute any retainer agreements with any of the plaintiffs or the development entities associated with the projects.  Furthermore, at all times relevant to these proceedings, Sinadinos

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   has failed to prepare or provide invoices, detailing any legal work he may have performed for any

2   of the plaintiffs, development entities, or the three development projects.

3        169.   Despite failing to complete ethically-required documents, to define the

4   lawyer-client relationships he allegedly formed, and despite his failure to properly document any

5   justification for payment for his alleged legal services, Sinadinos paid himself and his law offices

6   approximately $354,000 between June 21, 2004 and October 15, 2007.  Each of those payments

7   were in large, round numbers, without any justification or documentation to support them.

8        170.   Using Vintage Creek funds, he paid his former law firm of Sinadinos &

9   Vryonis a payment in June 2004 of $20,000, and a payment in July of 2005 of $25,000.  On

10  May 18, 2006, Sinadinos paid the "Law Office of John Sinadinos" the amount of $50,000 by

11  check.  On June 15, 2006, he made a similar payment to his law office in the amount of $25,000.

12  Over the course of time between June 2004 and October 2007, Sinadinos paid unauthorized and

13  unjustified legal fees to his law offices from Vintage Creek assets in the amount of approximately

14  $189,000.

15       171.   Using Village funds, Sinadinos paid his former law firm of Sinadinos &

16  Vryonis $25,000 on May 20, 2005.  On September 13, 2005, October 17, 2005, and January 5,

17  2006, he made three separate payments of $25,000 each to the "Law Office of John Sinadinos."

18  Over the course of time between May 2005 and October 2006, Sinadinos paid unauthorized and

19  unjustified legal fees to his law offices from Village assets in the amount of approximately

20  $165,000.

21       172.   As previously alleged, Sinadinos also paid certain amounts from the

22  account for Madera to his law offices, characterizing the payments as "loans," without complying

23  with proper ethical requirements for taking loans from his purported clients, nor documenting any

24  basis for the payments in the form of attorney fees.  The payment of the alleged loans to his law

25  office were unauthorized, unjustified, unethical, and unknown to plaintiffs.

26       173.   Besides paying the illegal amounts to his law offices from monetary assets

27  belonging to three separate projects, Sinadinos also unlawfully used project money to pay the

28  staff in his law offices.  Between August 26, 2004 and October 18, 2007, Sinadinos paid several

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   secretaries and a person he claims to be his godson working as an assistant in his law office, the

2   total amount of approximately $17,299 from Vintage Creek funds, by 10 separate checks bearing

3   the explanatory note of "consultant" on each check.  Each payment was made to the individuals

4   while they worked as assistants and secretaries in Sinadinos' law office.  At all times relevant to

5   these proceedings, those individuals were not authorized, nor were they employed or serving in

6   any capacity as "consultants" to these three development projects.

7           174.    Between approximately August 5, 2005, and May 23, 2007, Sinadinos also

8   paid two of his law office secretaries the total amount of $9,711 from funds belonging to the

9   Village project.  That total amount was paid out over seven different occasions, in amounts

10   ranging from $280-$2,645, with the checks predominately bearing the notation that the payments

11   were for a "consultant."  Again, neither of the secretaries in Sinadinos' law office were

12   authorized, employed or serving in any capacity as a "consultant" to the Village project.

13           175.    As previously alleged, Sinadinos made similar unlawful, unauthorized, and

14   unethical payments to his law office staff from the Madera account, without plaintiffs'

15   knowledge.

16   **M.      Fraudulent/Unethical Settlement of Johl Claims**

17           176.    While Solorio was fighting with Sinadinos in April 2008, to compel

18   compliance with document inspection and copying on behalf of Natomas, Sinadinos was

19   continuing his fraudulent conduct to the detriment of the development companies and Natomas.

20   Sinadinos completed an unlawful, unethical transfer of Vintage Creek property equity interests to

21   Mr. Surjit Johl, in exchange for a settlement and release of claims alleged by Surjit Johl, Baljit

22   Johl and Harinder Johl against Sinadinos, with the conspiratorial assistance of Stewart Title

23   Company.

24           177.    By doing so, Sinadinos personally undertook the illegal transfer of

25   approximately $500,000 of equity value from Vintage Creek to Johl, compromising alleged legal

26   claims against Sinadinos personally.  He had no legal authority to enter into such a compromise,

27   and in fact, he acted expressly contrary to several specific objections by Solorio, on behalf of

28   Natomas, to any such transfer.  Sinadinos did not comply with his legal, ethical obligations of

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   disclosure and consent by his purported clients, before he completed the transfer of the Vintage

2   Creek equity to Mr. Surjit Johl, in compromise of claims, which arose because of prior legal

3   malpractice by Sinadinos.

4         178.   In mid-2007, Sinadinos convinced Mr. Baljit Johl to remove the burden of

5   his trust deed from one parcel in the Vintage Creek project, to another parcel which Sinadinos

6   promised to designate at a later time.  Sinadinos subsequently failed to comply with his promise

7   to Mr. Baljit Johl, and he raised claims against Sinadinos for the alleged fraud.  Acting in his

8   capacities as manager of Vintage Creek and its lawyer, Sinadinos unlawfully and unethically

9   reached a compromise agreement with Mr. Baljit Johl in early 2008.  Contrary to the express

10  objections by Solorio and Natomas, Sinadinos fraudulently transferred the equity interest in the

11  approximate amount of $500,000 in another property located in Vintage Creek, designated the

12  Ubungen parcel, to Mr. Surjit Johl (who is the father of Baljit Johl) in April 2008.   Stewart Title

13  Company aided and abetted the fraudulent transfer by misrepresenting the consideration and

14  value of the property involved in the transfer, the Ubungen parcel.  By misrepresenting the nature

15  of the transaction on documents prepared in escrow, Stewart Title Company directly participated

16  in the fraudulent scheme of Sinadinos and his co-conspirators against Natomas.

17        179.   Sinadinos completed that transfer in substantial part for the purpose of

18  reaching a settlement of Mr. Baljit Johl's claims, arising from Sinadinos' original wrongdoing in

19  his dual capacities as manager and lawyer for Village and Vintage Creek.  Sinadinos failed to

20  comply with the applicable attorney ethical rules, before reaching his unilateral compromise with

21  Mr. Baljit Johl as a claimant against him.  By doing so, Sinadinos attempted to avoid the

22  justifiable claims of legal malpractice against him by plaintiffs and committed legal malpractice

23  by the manner of settling the Johl claims.

24        180.   Sinadinos previously attempted to commit fraud against the owners of the

25  Ubungen parcel.  On or about September 19, 2006, Sinadinos sent an email to Solorio, asking him

26  to obtain signatures from the Ubungen parcel owners on two separate documents, which

27  purported to describe the nature of the deal with the Ubungen owners in two different ways,

28  which were completely inconsistent with each other.  True and correct copies of the email and the

1  documents which were transmitted as attachments to the email are attached as Exhibit N to

2  Exhibits to First Amended Complaint, Volume 4, and are incorporated herein.

3      181.    For his own part, Mr. Baljit Johl conspired and participated with Sinadinos

4  in the fraudulent, unauthorized transfer of Vintage Creek equity in the Ubungen parcel, and Baljit

5  Johl and Harinder Johl are equally liable for the loss suffered by Natomas from this transaction.

6  Both Messrs. Baljit and Harinder Johl communicated directly with Solorio in the several months

7  before the transfer of equity.  True and correct copies of an email from Harinder Johl, dated

8  March 25, 2008, forwarding an email from Sinadinos to Mr. Johl, with true and correct copies of

9  documents which accompanied the email transmission from Sinadinos to Johl, are attached as

10 Exhibit O to Exhibits to First Amended Complaint, Volume 4, and are incorporated herein.

11 Solorio expressly and repeatedly told the Johls that Natomas objected to any such transfer, and

12 both Johls expressly confirmed that they were aware the transaction could not occur without the

13 consent of Natomas.  When Baljit and Harinder Johl conspired and participated with Sinadinos in

14 the completion of the transfer, they knowingly and intentionally committed fraud against

15 Natomas when they directed their father Surjit Johl to take title, because the Johls and Sinadinos

16 knew Natomas had not consented to the illegal transfer.

17 **N.    S&Y Capital Group Proposal**

18      182.    On August 15, 2008, Sinadinos gave first notice to Solorio of a proposed

19 joint venture between some part of the Village and Vintage Creek projects and an investment

20 firm, S&Y Capital Group, LLC (SYCG).  Sinadinos and his co-conspirators, including Stanley

21 Foondos and Larry Deane, had apparently been working on this proposed deal for several months,

22 before providing any information to Solorio.  Sinadinos and his co-conspirators violated

23 obligations contained in the operating agreements and resulting from the duties of Sinadinos, to

24 provide timely notice and allow sufficient time for Solorio, on behalf of Natomas, to conduct due

25 diligence regarding the proposal.  When Sinadinos notified Solorio of the proposal, he demanded

26 Solorio express his approval of the deal within two weeks.

27      183.    Solorio demanded detailed information in writing concerning the

28 background of the proposed deal with SYCG.  Sinadinos represented the deal had been solicited

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   by himself and others, including defendant Larry Deane.  Sinadinos further represented that

2   Deane had prepared substantial information related to the development projects, in support of the

3   solicitation to SYCG for proposed investment in the projects.  Deane never provided any

4   information to Solorio about his involvement in conspiring with Sinadinos and soliciting the

5   proposed deal from SYCG.

6          184.   Solorio followed up in writing with Sinadinos, attempting to obtain

7   specific information about the origin and proposed structure of the deal with SYCG.  Sinadinos

8   responded to several requests for information, giving certain details about the proposed deal,

9   while remaining vague about particular questions raised by Solorio.

10          185.   One particular category of information requested by Solorio related to the

11   disclosures which had been made by Sinadinos to SYCG about the nature of disputed issues

12   between Sinadinos and Solorio.  Sinadinos contended that all disputed issues between them were

13   irrelevant to his demand that Solorio approve the proposed deal.  Solorio expressly communicated

14   to Sinadinos that he considered it necessary to disclose certain aspects of the disputed issues

15   among them, to avoid any risk of future claims by SYCG that it would not have entered into the

16   transaction, had it known about these disputed issues.

17          186.   On September 9, 2008, Mr. Barth sent a letter to Sinadinos, on behalf of

18   Solorio in his capacity as manager of Natomas, specifying the particular nature of disclosures to

19   SYCG and related conditions which must be satisfied before Natomas could approve the

20   proposed deal with the investor.  Sinadinos responded through counsel on September 29, agreeing

21   to make the disclosures.  Plaintiffs are unaware whether the disclosures have occurred, or about

22   the status of the proposal involving SYCG.

23          187.   Prior to the August 15, 2008, notification by Sinadinos of the proposed

24   deal with SYCG, defendant Larry Deane, through counsel Don Wanland, demanded that Solorio

25   abandon claims against Sinadinos.  Mr. Wanland had earlier stated his client's position that the

26   contentions raised against Sinadinos, relating to apparent illegal financial transactions and

27   mishandling of development project funds, were unfounded.  As early as April 2008, Wanland

28   ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1  verbally represented that Mr. Deane had seen all the records of Village and Vintage Creek, and

2  was convinced there was no factual or legal basis to suspect Sinadinos had done anything wrong.

3  Plaintiffs are informed and believe, and thereon allege, that Deane, through counsel, was

4  attempting to dissuade Solorio from pursuing a thorough investigation of unlawful conduct by

5  defendants, in order to assist defendants in their efforts to avoid detection of their fraudulent

6  scheme and racketeering activities.

7  188.   In early August, Mr. Wanland renewed his objections on behalf of Deane,

8  to the ongoing inquiries by Solorio.  Accusing Solorio of a "fishing expedition, threatened

9  litigation, improper settlement tactics," Wanland demanded Solorio's agreement to dissolution of

10  Natomas.  By mid-August, Wanland restated his client's contention that there was no legal or

11  factual support, which might justify the continuing inquiry by Solorio against the activities of

12  Sinadinos and others.  Wanland demanded that Solorio agree to resolve his disputes with

13  Sinadinos immediately, or Deane would commence dissolution and other proceedings against

14  Solorio and Natomas.  Plaintiffs are informed and believe, and thereon allege, that Deane's

15  renewed objections through counsel were a continuation of his assistance to defendants.

16  189.   Solorio shared copies of his letters to Sinadinos with Deane, by transmittal

17  of the copies to his attorney, Mr. Wanland.  On September 10, 2008, Mr. Barth communicated by

18  email with Mr. Wanland, seeking the cooperation of Mr. Deane, by making his computer hard

19  drive available for review to obtain copies of email correspondence with Sinadinos and Stan

20  Foondos.  Mr. Wanland replied by e-mail that day, arguing that Solorio did not "have a bloody

21  leg to stand on," with no evidence to support "nonsensical and supercillious [*sic*] positions," that

22  he would be proceeding with the filing of an action "to dissolve the LLC [Natomas] and recover

23  damages including punitive damages," and that he "would personally look forward to seeing you

24  [Barth] in court."  Deane filed a complaint for dissolution of Natomas on October 20, 2008, in

25  Sacramento County Superior Court.

26  190.   Plaintiffs are informed and believe, and thereon allege, that defendant

27  Deane has conspired and participated with Sinadinos and other co-conspirators, to disrupt,

28  prevent, and dissuade Solorio from investigating and pursuing correction of the fraudulent, illegal

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    activities by them.  Plaintiffs are further informed and believe, and thereon allege, that Deane has

2    received multiple distributions of money in varying amounts from Sinadinos and his co-

3    conspirators, and Deane has received the assistance of Stanley Foondos to falsify Deane's own tax

4    returns, which has caused Deane to be loyal to Sinadinos and the continuing efforts to cover up

5    fraudulent activities causing damage to Natomas.  For example, Deane was fully aware of the

6    fraud committed by Sinadinos against Ms. Leavitt, after Solorio learned about it and shared the

7    information with Deane.  At the time, Deane even stated to Solorio that he agreed and understood

8    Sinadinos had committed some form of fraudulent conduct and illegal co-mingling of assets

9    among Vintage Creek and Village.  With full knowledge of fraudulent activities by Sinadinos and

10   his co-conspirators, Deane has continued to assist and conspire with Sinadinos, toward the goal of

11   benefiting the wrongdoers.  As a member of Natomas, Deane has violated his duties to Natomas

12   by such conspiracy and apparent participation with and in support of the scheme of Sinadinos.

13   **O.**    **Interstate Travel in Support of Racketeering Scheme**

14               191.    Plaintiffs are informed and believe, and thereon allege, that Sinadinos and

15   his co-conspirators have traveled on a periodic basis to the Chicago, Illinois area for the purpose

16   of meeting with investors, who have participated financially in the Village, Vintage Creek, and

17   Madera projects.  For example, a true and correct copy of an email from Arah Tressler, of First

18   American Title Company, to Sinadinos, Solorio and Deane, dated September 5, 2006, concerning

19   escrow instructions communicated via telephone call from Sinadinos, while he was in Chicago, is

20   attached as Exhibit P to Exhibits to First Amended Complaint, Volume 4, and is incorporated

21   herein.  By these travels, Sinadinos and his co-conspirators have advanced and supported their

22   conspiracy and racketeering activities.  They have also used interstate facilities, mails and wires,

23   to facilitate the establishment, promotion and carrying on of their money laundering activities.

24   Both the interstate travel and use of the interstate facilities in this manner are violations of Title

25   18 United States Code Section 1952.

26                    **V.    COUNT ONE—RICO**

27               192.    Plaintiffs repeat and reallege each of the allegations contained in all

28   previous paragraphs in this complaint, as if fully set forth herein.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

193.   At all relevant times, plaintiffs were "persons" within the meaning of RICO, Title 18 United States Code Sections 1961(3) and 1964(c). At all relevant times, Sinadinos and his co-conspirators were "persons" within the meaning of RICO, Title 18 United States Code Sections1961(3) and 1962(c).

194.   At all relevant times described in this complaint, Sinadinos and Stanley Foondos formed an associated-in-fact enterprise for the purpose of acquiring real estate development opportunities and carrying out the fraudulent schemes described in this complaint. The associated-in-fact enterprise was, and continues to be, an "enterprise" within the meaning of RICO, Title18 United States Code Section 1961(4). At all relevant times described in this complaint, Sinadinos and Stanley Foondos also formed and participated in the management and control of Village Capital Group LLC and Vintage Creek LLC, for the unlawful purpose of carrying out the fraudulent schemes described in this complaint. Village Capital Group LLC and Vintage Creek LLC were, and continue to be, "enterprises" within the meaning of RICO, Title 18 United States Code § 1961(4). At all relevant times, these enterprises were engaged in, and their activities affected, interstate and foreign commerce, within the meaning of RICO, Title18 United States Code Section 1962(c).

195.   At all relevant times, Sinadinos, Stanley Foondos, and their co-conspirators associated with these enterprises conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, Title18 United States Code Section 1961(5), in violation of RICO, Title18 United States Code Section 1962(c).

196.   Specifically, at all relevant times, Sinadinos and Stanley Foondos engaged in "racketeering activity" within the meaning of Title18 United States Code Section 1961(1) by engaging in the acts set forth above. The acts set forth above constitute a violation of one or more of the following statutes: Title18 United States Code Section 1341 (mail fraud); Title18 United States Code Section 1343 (wire fraud); Title18 United States Code Sections 1956, 1957 (money laundering); Title18 United States Code Section 1952 (interstate travel); and Title18 United States Code Section 1512 (witness tampering). Sinadinos and Stanley Foondos each committed

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   and/or conspired and/or aided and abetted the commission of two or more of these acts of

2   racketeering activity.

3         197.    The acts of racketeering activity referred to in the previous paragraph

4   constitute a "pattern of racketeering activity" within the meaning of Title18 United States Code

5   Section 1961(5). The acts alleged are related to each other by virtue of common participants,

6   common victims, a common method of commission, and the common purpose and common result

7   of defrauding plaintiffs of their business opportunities for successful development of the

8   residential real estate projects and defrauding plaintiffs of substantial assets in the development

9   projects, exceeding $3 million, according to proof at trial, enriching Sinadinos, Stanley Foondos,

10   and their co-conspirators while concealing their fraudulent activities. The fraudulent scheme

11   continued for more than four years, and threatens to continue longer, but for the filing of this

12   Action.

13         198.    As a result of the violation of Title18 United States Code Section 1962(c)

14   by Sinadinos, Stanley Foondos, and their co-conspirators, plaintiffs lost the value of their

15   successful real estate development projects, which would have been completed and successfully

16   sold to homebuilders or other investors, but for the conduct of the fraudulent scheme by

17   Sinadinos, Stanley Foondos, and their co-conspirators. The value of the successful development

18   projects lost as a proximate result of defendants' conduct of a pattern of racketeering activity is

19   subject to proof at trial, and plaintiffs are informed and believe, and thereon allege that the lost

20   value in the projects exceeds $15 million.

21         199.    As a result of the violation of Title18 United States Code Section 1962(c)

22   by Sinadinos, Stanley Foondos, and their co-conspirators, defendants are liable to plaintiffs for

23   damages, resulting from the direct loss of funds from the Village, Vintage Creek, and Madera

24   companies, liabilities for 1031 "put" obligations in the development projects, and the penalties,

25   fines and interest resulting from defendants' tax evasion, in an amount to be determined at trial.

26   Plaintiffs are informed and believe, and thereon allege, that the money lost as a proximate result

27   of the conduct of a pattern of racketeering activity by defendants' enterprises exceeds $3 million.

28   ///

1    200.   Pursuant to RICO, Title18 United States Code Section 1964(c), plaintiffs

2  are entitled to recover threefold their damages plus costs and attorney's fees from defendants.

3    WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

4              **VI.   COUNT TWO—RICO CONSPIRACY**

5    201.   Plaintiffs repeat and reallege each of the allegations contained in all

6  previous paragraphs in this complaint, as if fully set forth herein.

7    202.   As set forth in Count One, Sinadinos, Stanley Foondos, and their co-

8  conspirators associated with enterprises within the meaning of RICO, Title18 United States Code

9  Section 1961(4), and conducted or participated, directly or indirectly, in the conduct of the

10  enterprises' affairs through a pattern of racketeering activity within the meaning of RICO, Title18

11  United States Code Section 1961(5), in violation of RICO, Title18 United States Code Section

12  1962 (c).

13    203.   At all relevant times, Sinadinos, Stanley Foondos, and their co-conspirators

14  each were associated with the enterprises and agreed and conspired to violate Title18 United

15  States Code Section 1962(c), that is, agreed to conduct and/or participate directly and indirectly,

16  in the conduct of the affairs of the enterprises through a pattern of racketeering activity, in

17  violation of Title18 United States Code Section 1962(d).

18    204.   Sinadinos, Stanley Foondos, and their co-conspirators committed and

19  caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the

20  objects thereof, including but not limited to the acts set forth above.

21    205.   As a result of the violation of Title18 United States Code Section 1962(d)

22  by Sinadinos, Stanley Foondos, and their co-conspirators, plaintiffs lost the value of their

23  successful real estate development projects, which would have been completed and successfully

24  sold to homebuilders or other investors, but for the conduct of the fraudulent scheme by

25  Sinadinos, Stanley Foondos, and their co-conspirators.  The value of the successful development

26  projects lost as a proximate result of defendants' conducting and/or participating in conducting the

27  enterprises' affairs through a pattern of racketeering activity is subject to proof at trial, and

28  plaintiffs are informed and believe, and thereon allege that the lost value exceeds $15 million.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

206.    As a result of the violation of Title18 United States Code Section 1962(d) by Sinadinos, Stanley Foondos, and their co-conspirators, defendants are liable to plaintiffs for damages, resulting from the direct loss of funds from the Village, Vintage Creek, and Madera companies, in an amount to be determined at trial.  Plaintiffs are informed and believe, and thereon allege, that the money lost as a proximate result of the conduct of a pattern of racketeering activity by defendants' enterprises exceeds $3 million.

207.    Pursuant to RICO, Title18 United States Code Section 1964(c), plaintiffs are entitled to recover threefold their damages plus costs and attorney's fees from defendants.

WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

## VII.    COUNT THREE—FRAUD

208.    Plaintiffs repeat and reallege each of the allegations contained in all previous paragraphs in this complaint, as if fully set forth herein.

209.    The representations and failures to disclose information and suppression of information alleged to have been made by defendants herein, were made with the intent to induce plaintiffs to act in a manner herein alleged in reliance thereon.

210.    There exists, and at all times herein mentioned there existed, a unity of interest and ownership between defendants Sinadinos and Foondos, and each of the defendant limited liability companies, partnerships, law and accounting offices, and other defendant entities, such that any individuality and separateness between defendants Sinadinos and Foondos and each defendant limited liability company, partnership, offices and entities, have ceased, and each of the defendant limited liability companies, partnerships, offices and other entities, is the alter ego of defendants Sinadinos and Foondos, based on the facts alleged herein.

211.    Adherence to the fiction of the separate existence of each of the defendant limited liability companies as entities distinct from defendants Sinadinos and Foondos would permit an abuse of the limited liability company privilege and would sanction fraud committed by defendants Sinadinos and Foondos.

212.    The representations made by defendants were in fact false.  For instance, the representation that defendants would provide adequate investment money for the successful

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1  development of the residential real estate projects, and would responsibly manage and control the

2  financial transactions toward such successful development, and would abide by the fiduciary

3  duties defined and implied in the operating agreements for Village, Vintage Creek, and Madera,

4  were in fact false.  The true facts were that defendants intended from the beginning of their

5  involvement with these development projects to embezzle, divert, sabotage, and destroy the

6  funding and development of the projects, and violate their fiduciary and professional duties, all

7  for their personal, fraudulent, financial benefit, to the detriment of plaintiffs.

8  213.  When defendants made their representations, they knew them to be false

9  and made the representations with the intention to deceive and defraud plaintiffs and to induce

10  plaintiffs to act in reliance on such representations in the manner herein alleged, or with the

11  expectation that plaintiffs would so act.

12  214.  Plaintiffs, at the time these representations and failures to disclose

13  information and suppression of information by defendants occurred, and at the time plaintiffs

14  took the actions herein alleged, were ignorant of the falsity of defendants' representations, failures

15  to disclose information and suppression of information, and believe defendants' representations to

16  be true.  In reliance on misrepresentations, plaintiffs were induced to and did cooperate with

17  defendants, enter into business relations with defendants for development of the Village, Vintage

18  Creek, and Madera projects, as herein alleged, and undertook all other actions as alleged, toward

19  plaintiffs' intended purpose of successfully completing the development of the projects with the

20  expected assistance and support of defendants.  Had plaintiffs known the actual facts, they would

21  not have taken such actions.  Plaintiffs' reliance on defendants' representations was justified based

22  on the apparent expertise and experience of defendants' with substantial development projects, as

23  further reinforced by representations of others about defendants' capabilities and background in

24  successful real estate residential development projects, and further justified by the representation

25  of the professional legal and accounting capacities of defendants Sinadinos and Foondos.

26  215.  As a proximate result of the fraudulent conduct of defendants as herein

27  alleged, plaintiffs were damaged by the loss of business opportunities and loss of development

28  project funds, as herein alleged.  The aforementioned conduct of defendants' involved intentional

1   misrepresentations, deceit, or concealment of material facts known to defendants with the

2   intention on the part of defendants of thereby depriving plaintiffs of property or legal rights or

3   otherwise causing injury, and was despicable conduct that subjected plaintiffs to cruel and unjust

4   hardship in conscious disregard of plaintiffs' rights, so as to justify an award of exemplary and

5   punitive damages.

6           WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

7           **VIII.    COUNT FOUR—BREACH OF FIDUCIARY DUTIES**

8           216.    Plaintiffs repeat and reallege each of the allegations contained in all

9   previous paragraphs in this complaint, as if fully set forth herein.

10          217.    Plaintiff Natomas is, and at all times herein mentioned was, a member

11  holding 45% interest in Vintage Creek LLC and Village Capital Group LLC.  Plaintiff Orchard

12  Park is, and at all times herein mentioned was, a member holding 25% interest in Madera Avenue

13  12 Capital Group LLC.

14          218.    Defendants Sinadinos, Stanley Foondos, and South Watt & Florin Partners

15  are, and at all times mentioned herein were, managers of Village Capital Group LLC.  Defendant

16  Sinadinos, Stanley Foondos, and Caselman & Carlisle Partners are, and at all times mentioned

17  herein were, managers of Vintage Creek LLC.  Defendant Sinadinos is, and at all times herein

18  mentioned was, a manager of Madera Avenue 12 Capital Group LLC.

19          219.    Defendants Sinadinos, Stanley Foondos, South Watt & Florin Partners, and

20  Caselman & Carlisle Partners violated their fiduciary duties to plaintiffs in the manner alleged in

21  this complaint.

22          220.    As a direct and proximate result of defendants' violations of their fiduciary

23  duties as set forth herein, plaintiffs have been damaged, as herein alleged.

24          WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

25          **IX.    COUNT FIVE—PROFESSIONAL LEGAL MALPRACTICE**

26          221.    Plaintiffs repeat and reallege each of the allegations contained in all

27  previous paragraphs in this complaint, as if fully set forth herein.

28  ///

FIRST AMENDED COMPLAINT UNDER RICO; FRAUD, BREACH OF FIDUCIARY DUTIES, ETC.        [CASE NUMBER 2:08-CV-02308-FCD-KJM ]

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

222.    At all times herein mentioned, defendant Sinadinos was licensed to engage in the practice of law in the State of California and was practicing law in Sacramento, California.

223.    On or about approximately August 2003, at Sacramento, California, plaintiff Natomas and defendant Sinadinos formed an attorney-client relationship, for purposes related to the investment financing, management, and development of the Village and Vintage Creek projects, located in Sacramento County, California.  On or about approximately May 2005, at Sacramento, California, plaintiff Orchard Park and defendant Sinadinos formed an attorney client relationship, for purposes related to the investment financing, management, and development of the Madera project, located in Madera County, California.

224.    By virtue of the attorney-client relationship that existed between Sinadinos and plaintiffs, Sinadinos owed to plaintiffs a fiduciary duty, and by virtue of plaintiffs having placed confidence in the fidelity and integrity of Sinadinos and entrusting Sinadinos with the investment financing, management, and development of the Village, Vintage Creek, and Madera projects, a confidential relationship existed all times between plaintiffs and Sinadinos.

225.    Despite having voluntarily accepted the trust and confidence of plaintiffs, and in violation of this relationship, Sinadinos abused the trust and confidence of plaintiffs in the manner alleged herein.  In doing the acts herein alleged, defendant Sinadinos acted with oppression, fraud, and malice, and plaintiffs are entitled to punitive damages.

226.    Plaintiffs in fact placed confidence and reliance in Sinadinos until plaintiffs discovered the true facts concerning the fraudulent scheme and conduct of racketeering activity, as alleged herein.  Plaintiffs reasonably relied on Sinadinos in view of their attorney-client relationship and the multiple assurances and representations by Sinadinos, as alleged herein.

227.    At the same time that Sinadinos was representing plaintiffs in the aforementioned matters, Sinadinos was also retained by other defendants in this action, including but not limited to the named limited liability companies and entities involved in the investment and financing for the projects, as alleged herein.  The legal interests of those defendants and the interests of plaintiffs were actually adverse at the time of the dual representation, based on the fraudulent scheme among Sinadinos and his co-conspirators and defendants in this action.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1  Sinadinos failed to disclose to plaintiffs that he was representing adverse clients in these matters,

2  at the same time that he was representing plaintiffs.  He failed to disclose the areas of potential

3  and actual conflict between the legal interests of his other clients, other defendants in this action,

4  and the interests of plaintiffs, and further failed to advise plaintiffs of the possibility and

5  desirability of seeking independent legal advice.

6       228.  Sinadinos further compromised legal claims against him for malpractice

7  and wrongful conduct, without disclosure to plaintiffs, without obtaining their informed written

8  consent, and using assets belonging to his clients, as alleged herein.

9       229.  As a result of Sinadinos' aforementioned fraud, breach of fiduciary duties

10  to plaintiffs, and conflicts of interest, and other unethical conduct alleged herein, he gained the

11  advantages alleged herein, including more than $350,000 in illegal payment of attorneys fees and

12  conversion of substantial development project funds to his personal, unlawful benefit.  As a

13  proximate result of Sinadinos' fraud, breach of fiduciary duties to plaintiffs, conflict of interest,

14  and other unethical conduct alleged herein, plaintiffs suffered the damages herein alleged,

15  including costs of attorneys fees caused by Sinadinos' wrongful conduct.

16      WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

17      **X.**    **COUNT SIX—PROFESSIONAL LEGAL MALPRACTICE**

18      **(DERIVATIVE CLAIMS RE: VILLAGE, VINTAGE CREEK, AND MADERA)**

19       230.  Plaintiffs repeat and reallege each of the allegations contained in all

20  previous paragraphs in this complaint, as if fully set forth herein.

21       231.  After formation of each of the development companies, Village Capital

22  Group LLC, Vintage Creek LLC, and Madera Avenue 12 Capital Group LLC, respectively, and

23  after execution of the operating agreements for each of those companies, Sinadinos contended

24  that he represented such companies in his capacity as their attorney, as well as being a manager of

25  the companies.

26       232.  Plaintiffs allege and contend that Sinadinos represented plaintiffs at all

27  times relevant to these proceedings, and that Sinadinos established, fostered, and abused the

28  attorney-client relationship with plaintiffs, as alleged in this complaint and as set forth in Count

00002764

1   Five, herein.  In the alternative, and particularly regarding the wrongful conduct by Sinadinos on

2   and after the formation of Village, Vintage Creek and Madera, plaintiffs assert each and every,

3   and all the claims set forth in Count Five herein, against Sinadinos, on behalf of and for the

4   benefit of defendants Village Capital Group LLC, Vintage Creek LLC, and Madera Avenue 12

5   Capital Group LLC.

6          233.    If plaintiffs are successful in this action, a substantial benefit will result to

7   defendants Village, Vintage Creek, and Madera, on whose behalf this action is prosecuted, and

8   plaintiffs are entitled to recovery of their attorney's fees incurred herein.

9          234.    Plaintiffs did not make any efforts to secure curative actions from

10  defendants Village, Vintage, and Madera in prosecuting this action, because any such efforts

11  would have been futile in that Sinadinos and Stanley Foondos manage and control such

12  companies, and they are primary wrongdoers, as alleged herein.  However, plaintiffs delivered to

13  defendants Village, Vintage Creek, and Madera, by transmission to Sinadinos and Stanley

14  Foondos, via email and mail to their attorney, Carl Blaine, on November 3, 2008, a true copy of

15  the complaint which plaintiffs then proposed to file.

16         WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

17  **XI.     COUNT SEVEN – PROFESSIONAL ACCOUNTING MALPRACTICE**

18         235.    Plaintiffs repeat and reallege each of the allegations contained in all

19  previous paragraphs in this complaint, as if fully set forth herein.

20         236.    At all times herein mentioned, defendant Stanley Foondos was, and now is

21  a certified public accountant, duly licensed by the California State Board of Accountancy to

22  practice his profession in California, and practicing the same in Sacramento, California.

23  Commencing on or about August 2003, plaintiffs and defendant Stanley Foondos entered into an

24  agreement at Sacramento, California, that defendant Stanley Foondos would provide complete

25  accounting, bookkeeping, financial management, and tax reporting services for the Village,

26  Vintage Creek, and Madera projects.

27         237.    At all times during the existence of that agreement, plaintiffs relied

28  completely on defendant Stanley Foondos to perform the agreement, as well as on his skill and

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    ability as an accountant.

2          238.    Defendant Stanley Foondos negligently, carelessly, recklessly, and

3    intentionally rendered services as an accountant in the unlawful and wrongful manner alleged

4    herein.  Defendant thus failed to render the skill required of and commonly exercised by certified

5    public accountants, and intentionally violated the professional standards which apply to certified

6    public accountants.

7          239.    As a direct and proximate result of defendant Stanley Foondos' wrongful,

8    reckless, and intentional actions, including his participation and involvement in conspiracy to

9    conduct a pattern of racketeering activity, plaintiffs have suffered damages as alleged herein, in

10   an amount according to proof.  In doing the acts herein alleged, defendant Stanley Foondos acted

11   with oppression, fraud, and malice, and plaintiffs are entitled to punitive damages.

12          WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

13   **XII.    COUNT EIGHT – PROFESSIONAL ACCOUNTING MALPRACTICE**

14   **(DERIVATIVE CLAIMS RE: VILLAGE, VINTAGE CREEK AND MADERA)**

15          240.    Plaintiffs repeat and reallege each of the allegations contained in all

16   previous paragraphs in this complaint, as if fully set forth herein.

17          241.    Plaintiffs are informed and believe, and thereon allege, that after formation

18   of each of the development companies, Village Capital Group LLC, Vintage Creek LLC, and

19   Madera Avenue 12 Capital Group LLC, respectively, and after execution of the operating

20   agreements for each of those companies, Stanley Foondos contended that he represented such

21   companies in his capacity as their Certified Public Accountant, as well as being a partner in the

22   general partnerships managing the companies.

23          242.    Plaintiffs allege and contend that Stanley Foondos served as the certified

24   public accountant for tax reporting, accounting and bookkeeping services for plaintiffs at all times

25   relevant to these proceedings, and that Stanley Foondos established, fostered, and abused the

26   confidential relationship as a certified public accountant with plaintiffs, as alleged in this

27   complaint and as set forth in Count Seven, herein.  In the alternative, and particularly regarding

28   the wrongful conduct by Stanley Foondos on and after the formation of Village, Vintage Creek

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    and Madera, plaintiffs assert each and every, and all the claims set forth in Count Seven herein,

2    against Stanley Foondos, on behalf of and for the benefit of defendants Village Capital Group

3    LLC, Vintage Creek LLC, and Madera Avenue 12 Capital Group LLC.

4         243.    If plaintiffs are successful in this action, a substantial benefit will result to

5    defendants Village, Vintage Creek, and Madera, on whose behalf this action is prosecuted, and

6    plaintiffs are entitled to recovery of their attorney's fees incurred herein.

7         244.    Plaintiffs did not make any efforts to secure curative actions from

8    defendants Village, Vintage, and Madera in prosecuting this action, because any such efforts

9    would have been futile in that Sinadinos and Stanley Foondos manage and control such

10   companies, and they are primary wrongdoers, as alleged herein.  However, plaintiffs delivered to

11   defendants Village, Vintage Creek, and Madera, by transmission to Sinadinos and Stanley

12   Foondos, via email and mail to their attorney, Carl Blaine, on November 3, 2008, a true copy of

13   the complaint which plaintiffs then proposed to file.

14        WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

15            **XIII.   COUNT NINE - CONVERSION**

16        245.    Plaintiffs repeat and reallege each of the allegations contained in all

17   previous paragraphs in this complaint, as if fully set forth herein.

18        246.    At all times herein mentioned, plaintiffs were, and still are, entitled to

19   possession, ownership, and control of all funds deposited in the accounts for the Village, Vintage

20   Creek, and Madera projects by prospective buyers, investors, and homebuilders, to the extent of

21   plaintiffs' membership interests and capital accounts in the development companies for those

22   projects, as herein alleged.  At all times herein mentioned, Natomas was, and still is, entitled to

23   possession, ownership, and control of property interests and equity wrongfully transferred by

24   defendants from Village and Vintage Creek, including but not limited to the interests in the Johl,

25   Von Behren, and Ubungen parcels, to the extent of plaintiff's membership interests and capital

26   accounts, as herein alleged.

27        247.    On the dates previously alleged and in the manner herein alleged,

28   defendants took the property described above from plaintiffs' possession, ownership and control,

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1  and converted the same to their own use.  As a proximate result of defendants' conversion,

2  plaintiffs suffered injuries and damages as alleged herein, which are the natural, reasonable, and

3  proximate results of the conversion.  Defendants' acts alleged herein were willful, wanton,

4  malicious, and oppressive, undertaken with the intent to defraud, and justify the awarding of

5  exemplary and punitive damages.

6          WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

7  ### XIV.   COUNT TEN—PETITION FOR WRIT OF
   MANDATE TO COMPEL INSPECTION OF RECORDS

8

9          248.    Plaintiffs repeat and reallege each of the allegations contained in all

10  previous paragraphs in this complaint, as if fully set forth herein.

11          249.    Defendant Sinadinos is, and at all times herein mentioned was, a manager

12  of Madera Avenue 12 Capital Group LLC, and as a general partner of South Watt & Florin

13  Partners and Caselman & Carlisle, he was and is a manager of Village Capital Group LLC and

14  Vintage Creek LLC.  As alleged herein, plaintiffs made multiple requests to Sinadinos and

15  Stanley Foondos to make available to plaintiffs for inspection and the making of extracts

16  therefrom, the books, records, and documents required to be maintained for these three

17  companies, and made available under the provisions of Corporations Code Sections 17058 and

18  17106 and the relevant operating agreements.

19          250.    Plaintiffs' requests were at all times reasonable, for purposes reasonably

20  related to plaintiffs interests as members and holders of the economic interests in the

21  aforementioned companies in that plaintiffs are informed and believe that defendants are

22  conducting a pattern of racketeering activity and a scheme to defraud plaintiffs, as alleged herein.

23  Sinadinos, Stanley Foondos, and other defendants only partially responded to plaintiffs' requests,

24  corruptly altered documents (tax returns), and denied access to all records of the companies, as

25  herein alleged.  Defendants' failure to allow plaintiffs full and complete inspection of company

26  records is without justification.

27          251.    Plaintiffs have no plain, speedy, and adequate remedy in the ordinary

28  course of law, other than the relief sought in this application, because of defendants' failure and

00002764                                    - 64 -

1  refusal to allow complete access and disclosure of company books, records and documents.

2  ### XV.   PRAYER FOR RELIEF

3  WHEREFORE, plaintiffs pray that:

4  1.    The Court issue an alternative writ of mandate, commanding defendants

5  Sinadinos, Stanley Foondos, South Watt & Florin Partners, Caselman & Carlisle, Village,

6  Vintage Creek, and Madera, and each of them, to make available to plaintiffs and to plaintiffs'

7  representatives for inspection and the making of extracts therefrom, the complete books, records

8  and documents of Vintage Creek LLC, Village Capital Group LLC, and Madera Avenue 12

9  Capital Group LLC, or to show cause before this court at a time specified by court order why they

10  have not done so and why a peremptory writ should not issue;

11  2.    The Court direct the expenses of the inspection and investigation of the

12  company records, and such fees incurred to compel the inspection, be paid by the defendants

13  Sinadinos, Stanley Foondos, South Watt & Florin Partners, Caselman & Carlisle, Village,

14  Vintage Creek, and Madera;

15  3.    Plaintiffs be awarded damages, including compensatory, treble, and

16  punitive damages, as well as prejudgment and postjudgment interest, in an amount to be

17  determined at trial;

18  4.    Defendants be ordered to disgorge any portion of the funds derived by

19  defendants' wrongful conduct from the assets of Vintage Creek LLC, Village Capital Group LLC,

20  and Madera Avenue 12 Capital Group LLC, which they received;

21  5.    Plaintiffs be awarded attorneys' fees and costs of suit herein; and

22  6.    For such other and further relief as the Court may deem just and proper.

23  Dated:  November 3, 2008.        BARTH TOZER & TIMM LLP

24

25  By_____
         THOMAS W. BARTH
26

27  Attorneys for Plaintiffs NATOMAS
    GARDENS INVESTMENT GROUP LLC
    and ORCHARD PARK DEVELOPMENT LLC
28

BARTH TOZER & TIMM LLP<br>ATTORNEYS AT LAW<br>SACRAMENTO, CALIFORNIA

1

## VERIFICATION

2     I, Eric Solorio, the undersigned, declare that:

3     I am the Manager of Natomas Gardens Investment Group LLC and Orchard Park

4  Development LLC, plaintiffs in this matter.  I have read the foregoing **FIRST AMENDED**

5  **COMPLAINT UNDER THE RACKETEER INFLUENCED AND CORRUPT**

6  **ORGANIZATIONS ACT; FRAUD; BREACH OF FIDUCIARY DUTIES;**

7  **PROFESSIONAL MALPRACTICE; CONVERSION, AND INSPECTION OF RECORDS**

8  and know its contents.  It is true of my own knowledge, except as to the matters that are stated in

9  it on my own information and belief, and as to those matters, I believe them to be true.

10     I declare under penalty of perjury under the laws of the State of California that the

11  foregoing is true and correct and that this Verification was executed this 31st day of October,

12  2008, at Sacramento, California.

13     NATOMAS GARDENS INVESTMENT GROUP LLC

14

15     ERIC SOLORIO, Manager

16

17     ORCHARD PARK DEVELOPMENT LLC

18

19     ERIC SOLORIO, Manager

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT UNDER RICO; FRAUD, BREACH OF FIDUCIARY DUTIES, ETC.     [CASE NUMBER 2:08-CV-02308-FCD-KJM ]