1

2

3

4

5

6

7

8

9                    UNITED STATES DISTRICT COURT

10                   EASTERN DISTRICT OF CALIFORNIA

11                         ----oo0oo----

12

13  NATOMAS GARDENS INVESTMENT
    GROUP LLC, a California
14  limited liability company,
    ORCHARD PARK DEVELOPMENT LLC,
15  a California limited liability
    company,
16                                    NO. CIV. S-08-2308 FCD/KJM
            Plaintiffs,
17
        v.                            MEMORANDUM AND ORDER
18
    JOHN G. SINADINOS, STANLEY J.
19  FOONDOS, STEPHEN FOONDOS, et
    al.,
20
            Defendants.
21

22                         ----oo0oo----

23       This matter is before the court on defendants' various

24  motions to dismiss Natomas Garden Investment Group LLC and

25  Orchard Park Development LLC's (collectively, "plaintiffs") first

26  amended complaint ("FAC").  Defendant Larry Deane files a motion

27  to dismiss plaintiffs' FAC pursuant to Federal Rule of Civil

28

                                  1

Procedure 12(b)(6)[1] or, in the alternative, to stay this action pursuant to <u>Colorado River Water Conservation District v. U.S.</u>, 424 U.S. 800 (1976). Defendants John Sinadinos, Stanley Foondos, Stephen Foondos, Village Capital Group LLC, Vintage Creek LLC, South Watt & Florin Partners, Chi-Sac Florin Vineyards Investors LLC, Caselman & Carlisle Partners, Chi-Sac Gap Investors, Prime Minister Group LLC, Park Ridge Investments LLC, Chi-Sac South Sutter Investors, Chi-Sac White Rock 150 Investors LLC, Chicago South Watt Investors LLC, Chicago Infill Investors LLC, Glenn Sorenson, Jr., and Stockton & 65th LP (collectively, the "Sinadinos defendants") file a motion for judgment on the pleadings pursuant to Rule 12(c). Lastly, defendants Baljit Johl and Harinder Johl (collectively, the "Johls") file a motion to dismiss plaintiffs' FAC pursuant to Rules 12(b)(6) and 9(b) or, in the alternative, move for a more definite statement pursuant to Rule 12(e). Plaintiffs oppose the motions. For the reasons set forth below, defendants' various motions[2] are GRANTED in part and DENIED in part.[3]

///

///

---

[1] All further references to a "Rule" are to the Federal Rules of Civil Procedure.

[2] Defendants Constantine "Gus" Galaxidas and Stewart Title Company answered the FAC and are not moving parties on these motions. (Docket #s 25, 40.)

[3] Because oral argument will not be of material assistance, the court orders these matters submitted on the briefs. E.D. Cal. L.R. 78-230(h).

This case arose out of a failed business venture between Eric Solorio ("Solorio") and defendants John Sinadinos ("Sinadinos"), Larry Deane ("Deane"), and their various alleged co-conspirators. Beginning in 2003, Solorio negotiated to obtain rights to purchase undeveloped real property from several property owners in the Sacramento area. (First Am. Coml. ("FAC"), ¶ 43.) Solorio endeavored to subsequently develop and sell this land, for which he formed a limited liability company, plaintiff Natomas Gardens Investment Group LLC ("Natomas"). (Id. at ¶¶ 43-44.) In seeking financing for his potential project, Solorio met defendants Deane and Sinadinos. (Id. at ¶ 45.) Sinadinos, an attorney who was related to a major developer in the Sacramento region, immediately showed interest in the project and agreed to partner with Solorio. (Id. at ¶¶ 45-46.) Sinadinos recommended that Stanley Foondos, a certified public accountant, support Solorio's proposed development project through performance of all accounting and tax reporting responsibilities. (Id. at ¶ 51.)

By the end of 2003, Solorio, acting on behalf of plaintiff Natomas, had assembled purchase rights to a number of contiguous parcels in the Sacramento area, upon which Sinadinos made the necessary deposits in escrow. (Id. at ¶ 52.) By mid-2004, Natomas had obtained rights to purchase and develop fourteen parcels of land in Sacramento County comprising approximately 109 acres. (Id. at ¶ 53.) This development project was designated

---

[4] All relevant facts are drawn from plaintiffs' FAC, filed November 7, 2008. (Docket #5.)

Florin Vineyards, and Sinadinos formed a limited liability company, Village Capital Group LLC ("Village"), as the development company associated with the project. (Id. at ¶¶ 53-54.) Plaintiff Natomas was given a 45 percent stake in Village, while the other 55 percent was held by Chi-Sac Village Capital Group Investors LLC ("Village Investors LLC"), a company managed and controlled by Sinadinos and Stanley Foondos. (Id. at ¶¶ 12, 20.)

By October 2004, plaintiff Natomas had obtained rights to purchase and develop seventeen additional parcels of land comprising approximately 85 acres. (Id. at ¶ 55.) This development project was designated Vintage Creek, and Sinadinos formed another limited liability company, Vintage Creek LLC ("Vintage"), as the development company associated with the project. (Id. at ¶¶ 55-56.) Similar to the respective interests in Village, Natomas was given a 45 percent stake in Vintage, while the other 55 percent was held by Chi-Sac Vintage Creek Investors LLC ("Vintage Investors LLC"), a company managed and controlled by Sinadinos and Stanley Foondos. (Id. at ¶¶ 12, 21.)

Additionally, during April-May 2005, Solorio assembled property acquisition rights for a development project located in Madera County, California. (Id. at ¶ 60.) Solorio, acting through his own limited liability company, plaintiff Orchard Park LLC ("Orchard Park"), negotiated and executed five option agreements to purchase contiguous parcels of real property comprising approximately 265 acres. (Id.) Acting upon Sinadinos' representations as to his substantial development experience, Solorio agreed to include Sinadinos as a shareholder

4

of Madera Avenue 12 Capital Group LLC ("Madera"), a limited liability company formed for the development of the Madera properties. (_Id._ at ¶ 61.)

Sinadinos represented to Solorio that he would invest $4,000,000 in each project for acquisition and development costs. (_Id._ at ¶ 57.) Upon expressing concern with Sinadinos' prior development project experience and ability to finance the various projects, Sinadinos provided Solorio with meeting minutes between Sinadinos and various individuals in Chicago who Sinadinos had brought on as investors in Village and Vintage. (_Id._ at ¶ 58.)

In mid-2004, Solorio, on behalf of plaintiff Natomas, insisted that operating agreements for Village and Vintage be drafted before homebuilders sought to purchase interests in the projects. (_Id._ at ¶ 85.) Sinadinos, however, delayed drafting the operating agreements until homebuilders were on the verge of purchasing interests in the projects. (_Id._ at ¶¶ 85-90.) Although Solorio had numerous objections to the proposed operating agreements, he was pressured into signing the agreements by the immediacy of the homeowners' investments and thereby made substantial concessions to Sinadinos and his alleged co-conspirators. (_Id._) Notably, Solorio transferred Natomas' property acquisition rights in Vintage to Sinadinos and his co-conspirators. (_Id._ at ¶ 87.) Sinadinos also pressured Solorio to execute an amendment to Vintage's operating agreement that provided Sinadinos with an additional $400,000 concession. (_Id._)

During approximately May 2004, Sinadinos and Stanley Foondos began commingling funds between Village and Vintage. (_Id._ at ¶¶ 66-70.) Although Solorio requested on numerous occasions that

Sinadinos and Stanley Foondos provide Natomas with a comprehensive financial report, Sinadinos and Foondos either ignored Solorio's requests or failed to disclose the details of the companies' various financial dealings. (<u>Id.</u> at ¶ 69.)

In November 2004, KB Homes entered into a purchase agreement with Village and made an initial deposit of over $2 million, after which Sinadinos and his co-conspirators began to fraudulently inflate their capital accounts in Village. (<u>Id.</u> at ¶¶ 71-72.) At this time, Glenn Sorenson, Jr. ("Sorenson") and his company, Stockton & 65th LP, invested approximately $3 million in Village in the form of a 1031 tax exchange. (<u>Id.</u> at ¶ 72.) Sinadinos promised Sorenson an annual 25 percent rate of return on his investment, and planned to use the funds to purchase a parcel owned by Baljit Johl, who had granted plaintiff Natomas an option to purchase the parcel at any time during the next several years. (<u>Id.</u> at ¶ 73.) Although Solorio objected to Sorenson's rate of return and Sinadinos' proposed use of investment funds, Sinadinos convinced Solorio to agree to Sorenson's investment on the promise that Sorenson would option the Johl parcel back to Village. (<u>Id.</u> at ¶¶ 73-75.) Through a series of fraudulent transactions set forth in greater detail *infra*, Sinadinos obtained an approximate profit of $800,000 through the transfer of the Johl parcel, transferred these funds to Village, and claimed that the transferred funds were additional capital invested by Sinadinos and his co-conspirators. (<u>Id.</u> at ¶¶ 79-80.) Additionally, Sinadinos used the remainder of Sorenson's investment that was not applied toward the Johl parcel to acquire another parcel in Village, the Von Behren parcel.

6

(Id. at ¶ 81.) Contrary to Sinadinos' and Sorenson's promises to Solorio, however, Sinadinos did not obtain an option agreement from Sorenson to option the Johl and Von Behren parcels back to Village. (Id. at ¶ 82.) As a result, plaintiff Natomas was defrauded of its purchase rights in the Johl and Von Behren parcels, as Village lacked contractually defined rights to repurchase the parcels on the favorable terms promised by Sinadinos and his co-conspirators. (Id.)

Further, between June 2004 and December 2007, Sinadinos and his co-conspirators loaned approximately $2,155,000 from Vintage to Village, only $825,000 of which was reimbursed to Vintage. (Id. at ¶ 91.) Sinadinos and his co-conspirators used the remaining $1,330,000 to inflate their capital accounts in Vintage, thereby allegedly engaging in conversion and money laundering. (Id.) Moreover, beginning in November 2004, Sinadinos and his co-conspirators transferred substantial funds from Village and Vintage directly to themselves. (Id. at ¶ 93.) To accomplish such transfers, Sinadinos and his co-conspirators engaged in loan transactions that were never repaid, or received double repayment of funds actually loaned to Village and Vintage. (Id. at ¶¶ 94-116, 132-141.) Sinadinos also held himself out as the attorney for Village, Vintage, Madera, and their various investors, and paid himself and his law office approximately $354,000 for undocumented legal services between June 21, 2004 and October 15, 2007. (Id. at ¶¶ 167-175.) Likewise, Sinadinos used funds from Madera to pay his law firm staff and secretarial expenses, and "repaid" himself for fictional loans made to Madera. (Id. at ¶¶ 142-147, 172-175.)

7

Additionally, Sinadinos unlawfully transferred an equity interest in a Vintage parcel in exchange for a settlement and release of claims by Surjit Johl, Baljit Johl, and Harinder Johl, as set forth in greater detail *infra*. (Id. at ¶¶ 176-179.) Although Solorio communicated with Baljit and Harinder Johl that the transfer of the equity interest in the parcel could not occur without plaintiff Natomas' consent, the Johls nonetheless proceeded to execute the release with Sinadinos. (Id. at ¶ 181.)

Sinadinos and his co-conspirators also engaged in fraud to lure new investors to contribute capital to Village and Vintage. (Id. at ¶¶ 119-131.) Although Sinadinos and his co-conspirators were aware that Village and Vintage were doomed to financial failure due to the conspirators' self-serving financial dealings, they informed potential investors that Village and Vintage were financially viable projects. (Id.) The first such defrauded investor was Margarida Leavitt, who was referred to Sinadinos by Stephen Foondos, Ms. Leavitt's attorney. (Id. at ¶¶ 119-122.) Sinadinos and his co-conspirators used part of Ms. Leavitt's $1.2 million investment to purchase an equity interest in a parcel associated with Vintage, and the remaining amount to reimburse their prior investments without reducing their stated capital accounts. (Id. at ¶ 123.) Sinadinos and his co-conspirators engaged in a similar fraud to acquire investment proceeds from the Vathis family. (Id. at ¶¶ 124-131.)

Sinadinos then confided in Solorio, admitting that he had defrauded Ms. Leavitt and asking Solorio to assist in preserving the false appearance that Vintage was a successful development project. (Id. at ¶ 148.) After learning of Sinadinos'

fraudulent activity, Solorio repeatedly requested to look at the financial books and records of Village, Vintage, and Madera. (Id. at ¶¶ 149-150.) Sinadinos repeatedly denied Solorio access to the books and records, and Solorio subsequently retained the services of an attorney, Thomas Barth, and a forensic accounting firm, Ueltzen & Company ("Ueltzen"), to aid in inspecting all requested financial documents. (Id. at ¶¶ 149-152.) Following persistent requests from Thomas Barth, Sinadinos agreed to allow an employee of Ueltzen to inspect all records, yet the copies provided by Sinadinos for inspection were not complete. (Id. at ¶¶ 153-155.) Plaintiffs allege that Sinadinos refused to allow Solorio and plaintiffs Natomas and Orchard Park access to company records and documents, which by law should have been made available to them. (Id. at ¶ 159.) Additionally, plaintiffs allege that, in response to Solorio's request for all financial documents, Sinadinos and Stanley Foondos provided Solorio with false tax returns, and that for a number of years Sinadinos and Stanley Foondos have been reporting fraudulent tax returns for Village, Vintage, and Madera to the Internal Revenue Service. (Id. at ¶¶ 161-166.)

Around April 2008, Deane, through counsel Don Wanland ("Wanland") demanded that Solorio abandon all claims against Sinadinos. (Id. at ¶ 187.) Wanland represented that Deane had seen the financial records for Village and Vintage and was convinced that there was no factual or legal basis that Sinadinos had engaged in any wrongdoing. (Id.) Despite entreaties from Deane, however, Solorio refused to abandon his claims against Sinadinos. (Id. at ¶¶ 188-189.) Due to the dispute between

9

Deane and Solorio as to the legitimacy of Solorio's legal claims,
Deane filed suit in state court to dissolve Natomas, as set forth
in greater detail *infra*. (<u>Id.</u> at ¶¶ 188-190.) Plaintiffs allege
that Deane, with full awareness of Sinadinos' fraudulent and
unlawful conduct, has conspired with Sinadinos to prevent Solorio
from investigating and pursuing claims against Sinadinos and his
co-conspirators. (<u>Id.</u>)

Plaintiffs allege claims against defendants for individual
violations of the Racketeer Influenced and Corrupt Organizations
Act, 18 U.S.C. §§ 1961, <u>et seq.</u> ("RICO"), RICO conspiracy, fraud,
breach of fiduciary duty, professional legal malpractice,
professional accounting malpractice, and conversion. (<u>Id.</u> at ¶¶
192-251.)

**STANDARDS**

**I.   <u>Motion to Dismiss for Failure to State a Claim</u>**

On a motion to dismiss, the allegations of the complaint
must be accepted as true. <u>Cruz v. Beto</u>, 405 U.S. 319, 322
(1972). The court is bound to give the plaintiff the benefit of
every reasonable inference to be drawn from the "well-pleaded"
allegations of the complaint. <u>Retail Clerks Int'l Ass'n v.
Schermerhorn</u>, 373 U.S. 746, 753 n.6 (1963). Thus, the plaintiff
need not necessarily plead a particular fact if that fact is a
reasonable inference from facts properly alleged. <u>See</u> <u>id.</u>

Nevertheless, it is inappropriate to assume that the
plaintiff "can prove facts which it has not alleged or that the
defendants have violated the . . . laws in ways that have not
been alleged." <u>Associated Gen. Contractors of Cal., Inc. v. Cal.
State Council of Carpenters</u>, 459 U.S. 519, 526 (1983). Moreover,

10

the court "need not assume the truth of legal conclusions cast in the form of factual allegations." <u>United States ex rel. Chunie v. Ringrose</u>, 788 F.2d 638, 643 n.2 (9th Cir. 1986).

Ultimately, the court may not dismiss a complaint in which the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atlantic Corp. v. Twombly</u>, 127 S.Ct. 1955, 1974 (2007). Only where a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible," is the complaint properly dismissed. <u>Id.</u> "[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 514 (2002) (quoting <u>Hudson v. King & Spalding</u>, 467 U.S. 69, 73 (1984)).

In ruling upon a motion to dismiss, the court may consider only the complaint, any exhibits thereto, and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201. <u>See</u> <u>Mir v. Little Co. Of Mary Hospital</u>, 844 F.2d 646, 649 (9th Cir. 1988); <u>Isuzu Motors Ltd. v. Consumers Union of United States, Inc.</u>, 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998).

**II.** **Motion for Judgment on the Pleadings**

The standard governing a Rule 12(c) motion for judgment on the pleadings is basically the same as that which governs Rule 12(b) motions. The motion should be granted if, accepting as true all material allegations contained in the nonmoving party's pleadings, the moving party is entitled to judgment as a matter of law. <u>See</u> <u>Hal Roach Studios v. Richard Feiner & Co., Inc.</u>, 896 F.2d 1542, 1550 (9th Cir. 1989).

11

### III. **Motion for a More Definite Statement**

A motion for a more definite statement should not be granted unless a pleading is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Rule 12(e). This liberal standard is consistent with Rule 8(a)(2), which only requires pleadings that contain a "short and plain statement of the claim." The Federal Rules of Civil Procedure anticipate that the parties will familiarize themselves with the claims and ultimate facts through the discovery process. See Famolare, Inc. v. Edison Brothers Stores, Inc., 525 F. Supp. 940, 949 (E.D. Cal. 1981). Indeed, "where the information sought by the moving party is available and/or properly sought through discovery, the motion should be denied." Id.

### ANALYSIS

### I. **Jurisdiction**

Preliminarily, the Sinadinos defendants and Deane seek to dismiss plaintiffs' FAC on the basis that plaintiffs' state law claims predominate over plaintiffs' federal claims, and thus the court should decline subject matter jurisdiction over the entire matter.

Title 28 U.S.C. § 1367(c) provides, in relevant part: "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if - . . . (2) the claim substantially predominates over the claim or claims over which the court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction." "[U]nless a court properly invokes a section 1367(c) category in exercising its discretion to decline to entertain pendent claims,

supplemental jurisdiction must be asserted." <u>Executive Software</u>
<u>N.A., Inc., v. U.S. Dist. Ct.</u>, 24 F.3d 1545, 1556 (9th Cir. 1994)
(overruled on other grounds by <u>Cal. Dept. Of Water Resources v.</u>
<u>Powerex Corp.</u>, 533 F.3d 1087, 1091 (9th Cir. 2008). "It has
consistently been recognized that pendent jurisdiction is a
doctrine of discretion, not of plaintiff's right." <u>Gibbs</u>, 383
U.S. at 726. The justification for pendent jurisdiction "lies in
considerations of judicial economy, convenience and fairness to
litigants; if these are not present a federal court should
hesitate to exercise jurisdiction over state claims." <u>Id.</u>
(internal citation omitted). "[I]f it appears that the state
issues substantially predominate, whether in terms of proof, of
the scope of the issues raised, or of the comprehensiveness of
the remedy sought, the state claims may be dismissed without
prejudice and left for resolution to state tribunals." <u>Id.</u> at
726-27.

Defendants cite <u>Bodenner v. Graves</u>, 828 F. Supp. 516, 518
(W.D. Mich. 1993), for the proposition that since plaintiffs'
state law claims substantially predominate over their federal
claims, plaintiffs' action should be dismissed in its entirety.
In <u>Bodenner</u>, the court dismissed a suit filed by the plaintiffs
that alleged twenty-eight state-law claims and one RICO claim on
the ground that state-law issues predominated in the matter. <u>Id.</u>
First, the court dismissed the plaintiffs' various state-law
claims pursuant to 28 U.S.C. Section 1367(c), as the court found
that due to the sheer imbalance of state-law claims relative to
the solitary RICO claim, "state law claims substantially
predominate over the federal claim asserted." <u>Id.</u> at 518. Next,

13

the court considered whether it could grant the defendants'
request for a complete dismissal and dismiss the sole RICO claim
as well.  The court acknowledged that authority on this issue was
sparse.  Id. at 518-19.  However, it turned to 18 U.S.C.
§ 1441(c), which the court stated was "closely analogous" to 28
U.S.C. § 1367 "with respect to the complete dismissal issue."
Id.  Section 1441(c) authorizes complete dismissal where a case
has been removed from state court to federal court and provides
that the district court "in its discretion, may remand all
matters in which State law predominates."  Id. at 518.  The court
then cited numerous cases which it surmised stood for the
proposition that an entire case may be dismissed under Section
1367(c) where state law issues predominate.  Id. at 519.  Relying
on the authority of these cases, the court dismissed the
plaintiffs' RICO claim, finding that the state law issues
predominated in the matter.  Id.

While defendants place much emphasis upon Bodenner for the
proposition that, here, plaintiffs' entire case can be dismissed
because state law issues predominate, the court notes that not
only is Bodenner not controlling in this court, the court finds
the decision wholly unpersuasive.  See Borough of West Mifflin v.
Lancaster, 45 F.3d 780, 786-87 (3rd Cir. 1995) (rejecting
Bodenner's interpretation of Section 1441(c)).  Title 28 U.S.C.
§ 1367(c) merely permits a court to decline supplemental
jurisdiction over *pendent* state law claims; it does not permit
the dismissal of federal claims over which the court has original
jurisdiction.  Only where such federal claims are otherwise
dismissed, do the standards of Section 1367(c) come in to play.

14

Further, 28 U.S.C. § 1441(c) authorizes remand of all issues in which state law predominates only where the federal claims are "separate and independent" from the state law claims joined in the complaint. See Borough, 45 F.3d at 786. Since neither of these situations exist here, it is not proper to dismiss plaintiffs' entire suit.[5]

Accordingly, defendants' motion to dismiss plaintiffs' FAC for lack of subject matter jurisdiction is DENIED.

## II. **Colorado River Abstention**

The Sinadinos defendants and Deane seek to stay the federal court proceeding on the basis that duplicative judgments will result if plaintiffs are allowed to proceed with this federal action.

///
///
///
///
///
///
///
///

---

[5] Defendants also seek to dismiss plaintiffs' state law claims on the basis that the court lacks subject matter jurisdiction to hear the claims. Defendants contend that plaintiffs' federal RICO claims should be dismissed, and thus the court should not retain supplemental jurisdiction over plaintiffs' state law fraud, breach of fiduciary duty, malpractice, and conversion claims. As set forth below, however, plaintiffs' RICO claims are, at least in part, sufficiently alleged to survive some of the defendants' motions to dismiss, and thus the court retains supplemental jurisdiction over plaintiffs' state-law claims.

The abstention doctrine[6] formulated in <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800 (1976), provides that in the presence of a concurrent state court proceeding, a federal court can abstain from hearing an action based on "considerations of [w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." <u>Id.</u> at 817.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." <u>Id.</u> at 813. "Generally, as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'" <u>Id.</u> at 817 (quoting <u>McClellan v. Carland</u>, 217 U.S. 268, 282 (1910)). Therefore, the application of the <u>Colorado River</u> doctrine can be justified "only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest." <u>Id.</u> at 813 (internal quotations omitted). As such, "the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent

---

[6]    "The <u>Colorado River</u> doctrine is not technically an abstention doctrine; therefore a district court's decision declining to exercise federal jurisdiction pursuant to <u>Colorado River</u> is more properly referred to as a stay or dismissal, as the case may be." <u>Smith v. Cental Az. Water Conservation Dist.</u>, 418 F.3d 1028, 1032 n.4 (9th Cir. 2005) (internal quotations omitted). The Ninth Circuit advocates that district courts should issue a stay instead of dismissing an action: "A stay, like a dismissal, avoids the waste of judicial resources from duplicative litigation in two courts." <u>Attwood v. Mendocino Coast Dist. Hosp.</u>, 886 F.2d 241, 244 (9th Cir. 1989). However, "unlike a dismissal, a stay avoids the risk that the federal plaintiff will be time-barred from reinstating the federal suit. In this way, a stay will effectively conserve court resources while avoiding premature rejection of the litigants' access...to a federal forum." <u>Id.</u> (internal quotations omitted).

state proceeding for reasons of wise judicial administration are considerably more limited," though these circumstances "do nevertheless exist." Id. at 818.

Application of what has become known as the Colorado River doctrine requires a court first to address the threshold question of whether there are parallel state and federal proceedings involving the same matter. Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 13-15 (1983). Exact parallelism is not required for the Colorado River doctrine to apply. Nakash v. Marciano, 882 F.2d 1411, 1416 (9th Cir. 1989). "It is enough if the two proceedings are 'substantially similar.'" Id.; Quackenbush, 87 F.3d at 297 (abstention appropriate under Colorado River doctrine even though the plaintiff in federal action claimed it was no longer a party to the state proceeding). A proceeding is substantially similar if "substantially the same parties are contemporaneously litigating substantially the same issues in another forum." Interstate Material Corp. v. City of Chicago, 847 F.2d 1285, 1288 (7th Cir. 1988). "[T]he requirement of 'parallel' state court proceedings implies that those proceedings are sufficiently similar to the federal proceedings to provide relief for all of the parties' claims." Intel Corp. v. Advanced Micro Devices, Inc., 12 F.3d at 913 n.4 (9th Cir. 1994) (citing Nakash, 882 F.2d at 1416); see also Crawley v. Hamilton County Com'rs, 744 F.2d 28, 31 (6th Cir. 1984) (holding that the issue of whether the state court proceedings are parallel must be determined in accordance with how the state court proceedings *currently exist*, rather than how the state court proceedings may be modified by amended cross-

complaints or joinder of additional parties).

If the threshold question of similarity is answered in the affirmative, the court must then determine whether the sort of "exceptional circumstances" warranting a stay or dismissal are appropriate. The Supreme Court has set forth various factors that a district court should consider when assessing the appropriateness of a stay or dismissal in light of concurrent state court proceedings, including: (1) assumption by either court of jurisdiction over the res or property at dispute in the lawsuit; (2) the inconvenience of the federal forum, (3) the desirability of avoiding piecemeal litigation, and (4) the order in which jurisdiction was obtained by the concurrent forums. <u>Id.</u> at 818. In <u>Moses H.</u>, the court also found relevant to the inquiry (5) whether federal law provides the decision on the merits, and (6) the probable inadequacy of the state court proceeding to protect the parties' rights. 460 U.S. at 23, 26. Further, the Ninth Circuit has recognized that forum shopping can in some cases justify <u>Colorado River</u> abstention. <u>Fireman's Fund Ins. Co. v. Quackenbush</u>, 87 F.3d 290, 297 (9th Cir. 1996) (citing <u>Travelers Indem. Co. v. Madonna</u>, 914 F.2d 1364, 1371 (9th Cir. 1990)). However, "[n]o one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required." <u>Id.</u> at 818-19 (citing <u>Landis v. N. Am. Co.</u>, 299 U.S. 248, 254-55 (1936)). The factors are "to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand." <u>Moses H.</u>, 460 U.S. at 21.

"Under the rules governing the Colorado River doctrine, the existence of a substantial doubt as to whether the state proceedings will resolve the federal action precludes the granting of a stay." Intel, 12 F.3d at 913. Put another way, a district court may enter a Colorado River stay only if it has "nothing further to do in resolving any substantive part of the case" and has full confidence that the parallel state proceeding will "be an adequate vehicle for the complete and prompt resolution of the issues between the parties." Moses H., 460 U.S. at 28.

Since the court concludes that the state and federal proceedings in this matter are not parallel, this action cannot be stayed pursuant to the Colorado River doctrine. Defendant Deane filed suit against Solorio in state court to dissolve plaintiff Natomas. None of the other named parties to this action are parties to the state court proceeding. Further, the issues being litigated in each of the respective proceedings are substantially different. In the state court proceeding, Deane filed suit against Solorio for a decree of dissolution, or, alternatively, a decree directing purchase of Deane's interest in Natomas, and breach of fiduciary duty.[7] While Solorio cross-

_____

[7] Plaintiffs object to Deane's request for judicial notice of 133 exhibits filed in support of his reply brief. Deane filed his request for judicial notice to proffer the state court filings which he maintains are relevant to the court's Colorado River inquiry. Courts may take judicial notice of state court filings that are related to the litigation before the court. Meredith v. Oregon, 321 F.3d 807, 817 n.10 (9th Cir. 2003). The state court filings in question are related to this litigation as the Sinadinos defendants and Deane claim that this action should be stayed in light of the concurrent state court

(continued...)

19

claimed against Deane for breach of contract, implied and comparative indemnity, and breach of fiduciary duties, these claims arose out of provisions in Natomas' Operating Agreement, rather than any alleged fraudulent conduct by Deane. On the other hand, plaintiffs raise much different claims in this federal proceeding, including claims for RICO violations, RICO conspiracy, fraud, breach of fiduciary duty, legal and accounting malpractice, and conversion. (FAC ¶¶ 192-251.)

Significantly, the state and federal proceedings at issue here are not so similar that the state proceedings will provide relief for all of the parties' claims. For example, the state court may hold that Natomas should be dissolved because of irreconcilable differences between Deane and Solorio, or that Deane, by filing suit, has breached the Operating Agreement and fiduciary duties owed Solorio. Regardless of the outcome in state court, however, plaintiffs' numerous federal claims will not be resolved by the state court proceeding. Although the state and federal proceedings undoubtedly share common facts, the proceedings are not so similar that these federal proceedings may be stayed.

Additionally, while defendants claim that Solorio has the opportunity to cross-claim in state court and thereby join the parties and issues identified in this court, the question of

---

[7](...continued)
proceedings. Accordingly, Deane's request for judicial notice is GRANTED. Plaintiffs' objection to the same is, for all intents and purposes, rendered moot in light of the court's finding that defendants have not demonstrated that the state and federal proceedings are parallel, thus precluding application of the Colorado River doctrine.

parallelism must be determined in accordance with how the state court proceedings *currently exist*, rather than how the state court proceedings may be modified by amended cross-complaints or joinder of additional parties. See Crawley v. Hamilton County Com'rs, 744 F.2d 28, 31 (6th Cir. 1984). As the respective proceedings stand today, the court finds that the state and federal proceedings are not parallel, and thus plaintiffs' federal action cannot be stayed pursuant to Colorado River.

Accordingly, the Sinadinos defendants' and Deane's motion to stay this action is DENIED.

## III. **Standing Under RICO**

Plaintiffs' first claim for relief alleges that defendants, through a "pattern of racketeering activity," violated RICO. (FAC ¶¶ 193-200.) The Sinadinos defendants and Deane seek to dismiss plaintiffs' first claim for relief on the basis that plaintiffs lack standing to bring their RICO claim.

Title 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with" an enterprise engaged in or affecting interstate commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d), in turn, provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [Section 1962]."

The term "racketeering activity" is defined to include a host of so-called predicate acts, including "any act which is indictable under . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) . . . section 1952

21

(relating to racketeering) . . . section 1956 (relating to the laundering of monetary instruments), [and] section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity)." 18 U.S.C. § 1961(1)(B). "Pattern" is a defined term requiring "at least two acts of racketeering activity . . ., the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." Id. at § 1961(5). Although necessary to sustain a RICO claim, the Supreme Court has held that the pleading of two predicate acts may not be sufficient for liability because § 1961(5) "assumes that there is something to a RICO pattern *beyond* the number of predicate acts involved." H.J. Inc v. Northwestern Bell Telephone Co., 492 U.S. 229, 238 (1989) (emphasis in original). Ultimately, "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." Id. at 239 (emphasis in original).

Further, RICO broadly defines "enterprise" in § 1961(4) to "includ[e] any individual, partnership, corporation, association, or other legal entity, or any union or group of individuals associated in fact although not a legal entity." The Supreme Court has explained that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." U.S. v. Turkette, 452 U.S. 576, 583 (1981). "[T]o establish liability

22

under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Cedric Kushner Promotions, Ltd., v. King, 533 U.S. 158, 161 (2001).

Of particular significance to this case, Section 1964(c) creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." "To recover under RICO, the individual 'must show proof of concrete financial loss' and must demonstrate that the racketeering activity proximately caused the loss." Guerrero v. Gates, 442 F.3d 697, 707 (9th Cir. 2006) (quoting Chaset v. Fleer/Skybox Int'l, LP, 300 F.3d 1083, 1087 (9th Cir. 2002). "Without harm to a specific business or property interest - a categorical inquiry typically determined by reference to state law - there is no injury to business or property within the meaning of RICO." Diaz v. Gates, 420 F.3d 897, 900 (9th Cir. 2005). Thus, most succinctly stated, a civil RICO claim has six distinct requirements. A plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that proximately causes (6) damages to the plaintiff. See Sigmond v. Brown, 828 F.2d 8, 8 (9th Cir. 1987); Sedima v. Imrex Co., Inc., 473 U.S. 479, 496 (1985). However, because the "mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." Figueroa Ruiz v. Alegria, 896 F.2d 645, 650 (1st Cir. 1990).

**A. Plaintiffs' RICO Claims Against Village and Vintage**

Plaintiffs allege that the Sinadinos defendants engaged in racketeering activity through their management and control of Village and Vintage. However, plaintiffs also name Village and Vintage as defendants in this action.

"For the purposes of section 1962(c), RICO plaintiffs must allege a defendant – the 'person' or 'persons' – who is distinct from the 'enterprise' whose business the defendant is conducting." Under RICO, an "enterprise" refers to "'a being different from, not the same as or part of, the person whose behavior the act was designed to prohibit.'" <u>Rae v. Union Bank</u>, 725 F.2d 478, 481 (9th Cir. 1984) (quoting <u>U.S. v. Computer Sciences Corp.</u>, 689 F.2d 1181, 1190 (4th Cir. 1982)). Therefore, an entity cannot be both a RICO "enterprise" and a RICO defendant. <u>See</u> <u>Rae</u>, 725 F.2d at 481; <u>Wilcox v. First Interstate Bank of Oregon</u>, 815 F.2d 522, 529 (9th Cir. 1987); <u>Sever v. Alaska Pulp Corp.</u>, 978 F.2d 1529, 1534 (9th Cir. 1992) (finding that a Section 1962(c) suit cannot succeed where the corporation, the named defendant, is both the "person" and the "enterprise").

Plaintiffs allege that Village and Vintage are "enterprises" within the meaning of 18 U.S.C. § 1961(4), through which Sinadinos and his co-conspirators allegedly carried out their pattern of racketeering activity. (FAC ¶ 194.) While the nature of the claims directed at Village and Vintage is not entirely clear from the FAC, it appears that plaintiffs also allege that Village and Vintage, themselves, engaged in RICO violations. Due to the Ninth Circuit's well established person/enterprise distinction, plaintiffs' RICO claims as to Village and Vintage

24

cannot stand.

Accordingly, plaintiffs' RICO claims as to Village and Vintage are DISMISSED.[8]

## B. Plaintiffs' Individual RICO Claims Against Sinadinos and his Co-Conspirators

The Sinadinos defendants and Deane contend that plaintiffs lack standing to bring an independent claim for defendants' alleged RICO violations since plaintiffs were investors of defendants Village and Vintage. Defendants assert that as investors of defendant limited liability companies, plaintiffs cannot bring a RICO claim on behalf of themselves, but instead must present their claim as a derivative action on behalf of the defendant companies.

Where "'the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders,'" the shareholder's action is derivative. <u>Pareto v. FDIC</u>, 139 F.3d 696, 699 (9th Cir. 1998) (quoting <u>Jones v. H.F. Ahmanson & Co.</u>, 1 Cal.3d. 93, 106 (1969)). Generally, "there is no shareholder standing to assert RICO claims where the harm is derivative of harm to the corporation." <u>Sparling v. Hoffman Const. Co., Inc.</u>,

---

[8]     The court notes that none of the moving defendants specifically seek dismissal of the claims against Village and Vintage. However, the Sinadinos defendants addressed the claims against Village and Vintage in arguing that plaintiffs lack standing to bring their RICO claim against all defendants. The Sinadinos defendants argued that neither Village nor Vintage can be an "enterprise," which is a required element of a viable RICO claim, since they are allegedly named as defendants to plaintiffs' RICO claim. Although it is not entirely clear from the FAC which claims plaintiffs raise against Village and Vintage, to the extent plaintiffs intended to assert RICO claims against these entities, the court hereby dismisses those claims.

864 F.2d 635, 640 (9th Cir. 1988). A shareholder generally only sustains injury because he is a shareholder of the corporation, and his injury "is derivative of that of the corporation and is not caused proximately by the RICO violations." Hamid v. Price Waterhouse, 51 F.3d 1411, 1420 (9th Cir. 1995) (internal quotations omitted). However, "the mere presence of an injury to the corporation does not necessarily negate the simultaneous presence of an individual injury." Pareto, 139 F.3d at 699. Indeed, "an action may lie both derivatively and individually based on the same conduct." Id. A plaintiff shareholder may not sue for harm that was suffered by the class of shareholders as a whole unless the plaintiff can show either "(1) an injury distinct from that of the other shareholders or (2) a special duty owed by the defendant to the plaintiff[] that is different from the duties owed by the defendant to the corporate entity." Altamont Summit Apartments, LLC v. Wolff Prop., LLC, 2002 WL 926264, at *13 (D. Or. Feb. 13, 2002) (citing Sparling, 864 F.2d at 640).

While defendants' alleged RICO violations caused injury to Village, Vintage, and Madera, this case is unique in that plaintiffs are minority shareholders who were allegedly the only investors that did not benefit from defendants' RICO violations. See Jara v. Supreme Meats, Inc., 121 Cal. App. 4th 1238, 1259 (2004) (holding that a minority shareholder may bring an individual action for breach of fiduciary duty against the majority shareholders where there is an absence of policy considerations favoring a derivative action, stating that the "objective of preventing a multiplicity of lawsuits and assuring

26

equal treatment for all aggrieved shareholders does not arise
when there is only one minority shareholder.  The objective of
encouraging intra-corporate resolution . . . is entirely
meaningless where the defendants constitute the entire complement
of the board of directors and all corporate officers.").
Meanwhile, Village Investors LLC and Vintage Investors LLC, the
majority shareholders of Village and Vintage, allegedly
benefitted from defendants Sinadinos and Stanley Foondos'
fraudulent activities.  While investors in Village Investors LLC
and Vintage Investors LLC received funds from Village and Vintage
without a corresponding decrease in stated capital, plaintiffs'
financial stake in Village and Vintage allegedly became
progressively less valuable.  Since plaintiffs have alleged that
they suffered an injury distinct from the majority shareholders
of Village and Vintage, they are uniquely situated to allege an
individual RICO claim against defendants.  Thus, the court finds
that plaintiffs have standing to raise this claim.

      **C.**    **Plaintiffs' Injury Sustained as a Proximate Result of
Defendants' Alleged RICO Violations**

The Sinadinos defendants and Deane further contend that
plaintiffs' RICO claim should be dismissed because plaintiffs
fail to allege that they suffered injury as a proximate result of
defendants' alleged RICO violations.

A plaintiff's right to sue under RICO requires a showing
that the defendant's unlawful conduct was not only a "but for"
cause of the plaintiff's injury, but was the proximate cause as
well.  Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268
(1992) (dismissing the plaintiff's RICO claim because the

plaintiff's alleged injuries were not proximately caused by the defendants).  "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 460 (2006). "From a substantive standpoint, a RICO plaintiff who can show a direct injury may still lose the case if the injury does not satisfy other traditional requirements of proximate cause - that the wrongful acts be a substantial and foreseeable cause and that the connection be logical and not speculative." Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 615 (6th Cir. 2004).  However, given the liberal pleading standards of Rule 8, RICO cases with proximate cause problems are not well-suited for dismissal on the pleadings and are more appropriately evaluated via motions for summary judgment.  Id.

In Anza, the Supreme Court addressed the concept of proximate cause in the RICO context.  547 U.S. at 451.  The plaintiff alleged that the defendants violated RICO by submitting false tax returns to the state of New York.  Id. at 454. Although this course of conduct did not directly concern the plaintiff, the plaintiff alleged that the defendants gained a competitive advantage over the plaintiff by using the proceeds of the fraud to offer lower prices to customers.  Id. at 454-55. Applying the proximate cause analysis of Holmes, 503 U.S. at 268-71, the Court found that the direct victim of the defendants' alleged unlawful conduct was the state of New York, not the plaintiff.  Anza, 547 U.S. at 458.  The Court stated that the alleged harm that the plaintiff suffered was the result of "a set

of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." Id. Due to the attenuation between the plaintiff's harm and the defendants' alleged RICO violations, the Court found that the absence of proximate cause was clear. Id.

The Court held that this conclusion was supported by the underlying premises of the proximate cause requirement. Id. First, the Court emphasized that due to the remoteness of the RICO violations relative to the plaintiff's harm, ascertaining the correct figure for damages would have been difficult, as it was not entirely clear that the defendants' lower prices were the sole product of the defendants' alleged fraudulent tax returns. Id. at 458-59. Second, the Court was not entirely convinced that the plaintiff's decreased sales were the result of the defendants' alleged fraud, as the Court stated that businesses gain and lose customers for any number of reasons and that establishing the percentage of lost sales attributable to the defendants' alleged fraud would require a complex assessment. Id. at 459. Thus, the Court found that the plaintiff's RICO claim must be dismissed since "[t]he element of proximate causation recognized in Holmes is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation." Id. at 460.

Here, accepting plaintiffs' allegations as true, defendants embezzled and unlawfully converted over $3 million from Village, Vintage, and Madera, resulting in a corresponding loss to the limited liability companies in which plaintiffs were invested. Thus, as alleged in the FAC, there is no attenuation between

defendants' alleged RICO violations and plaintiffs' loss of value
in the limited liability companies, as defendants' fraudulent
acts were a substantial and foreseeable cause of the injuries
alleged by plaintiffs. While it is difficult to quantify the
lost business opportunities that the limited liability companies
endured due to defendants' alleged RICO violations, the amount
that defendants allegedly converted for their own gain is a sum
certain. Moreover, although the amount embezzled by defendants
was not certain to result in a corresponding identical loss to
plaintiffs due to the companies' various financial obligations,
plaintiffs have alleged cognizable damages that are sufficient to
demonstrate that defendants' alleged fraudulent acts indeed
proximately caused a loss to plaintiffs. Further, unlike in
<u>Anza</u>, the victims of defendants' course of conduct were
plaintiffs, not unnamed third parties.

Accordingly, the court finds that plaintiffs have
sufficiently alleged that they suffered injury as a proximate
result of defendants' alleged RICO violations.

### D. Plaintiffs' Derivative Claims

Plaintiffs assert derivative claims against individual
defendants John Sinadinos and Stanley Foondos on behalf of
defendants Village Creek, Vintage Creek, and Madera for alleged
professional legal and accounting malpractice. (FAC ¶¶ 230-234,
240-244.) The Sinadinos defendants and Deane collectively seek
to dismiss plaintiffs' malpractice claims on the basis that
plaintiffs lack standing to bring suit for derivative claims
under Rule 23.1.

///

30

"The derivative form of action permits an individual shareholder to bring 'suit to enforce a *corporate* cause of action against officers, directors, and third parties.'" <u>Kamen v. Kemper Fin. Serv., Inc.</u>, 500 U.S. 90, 95 (1991) (quoting <u>Ross v. Bernhard</u>, 396 U.S. 531, 534 (1976)) (emphasis in original). Rule 23.1, which details the requirements for shareholder derivative suits, provides:

> (a) Prerequisites.  This rule applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce.  The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association.

> (b) Pleadings Requirements.  The complaint must be verified and must:  . . .

> (3) state with particularity:

>> (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and

>> (B) the reasons for not obtaining the action or making the effort.

(Emphasis in original omitted.)

### i.  Adequacy of Representation

Defendants contend that plaintiffs' derivative claim should be dismissed because plaintiffs do not adequately represent the interest of the other shareholders of the limited liability companies and have a disabling conflict of interest that prevents them from representing the companies' interests.  According to the Ninth Circuit, for purposes of Rule 23.1 "[a]n adequate representative must have the capacity to vigorously and

31

conscientiously prosecute a derivative suit and be free from economic interests that are antagonistic to the interests of the class.'" Larson v. Dumke, 900 F.2d 1363, 1367 (9th Cir. 1990) (citing Lewis v. Curtis, 671 F.2d 779, 788-89 (3rd Cir. 1982)). The court's analysis of whether a plaintiff is an adequate representative is informed by consideration of the following eight factors: (1) indications that the plaintiff is not the true party in interest; (2) the plaintiff's unfamiliarity with the litigation and unwillingness to learn about the suit; (3) the degree of control exercised by the attorneys over the litigation; (4) the degree of support received by the plaintiff from the other shareholders; (5) the lack of any personal commitment to the action on the part of the representative plaintiff; (6) the remedy sought by the plaintiff in the derivative action; (7) the relative magnitude of the plaintiff's personal interests as compared to his interest in the derivative action itself; and (8) plaintiff's vindictiveness toward the defendants. Id. "These factors are 'intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1.'" Id. (quoting Davis v. Comed, Inc., 619 F.2d 588, 593 (6th Cir. 1980)).

"In determining the adequacy of representation under Rule 23.1, it is well established that courts can and should consider 'outside entanglements making it likely that the interests of the other stockholders will be disregarded in the management of the suit.'" Guenther v. Pacific Telecom, Inc., 123 F.R.D. 321, 345 (D. Or. 1987) (citing G.A. Enterprises, Inc. v. Leisure Living

<u>Communities, Inc.</u>, 517 F.2d 24, 27 (1st Cir. 1975)); <u>see also</u>

<u>Davis</u>, 619 F.2d at 593. While the court must also consider any

conflicts of interest in determining the adequacy of

representation, "[t]he prevailing view appears to be that there

is no *per se* rule prohibiting shareholders from simultaneously

bringing both direct and derivative actions," and that the better

reasoned and predominant rule is to look behind the surface

duality of the two types of actions and allow them to proceed

together unless an actual conflict emerges. <u>In re RasterOps</u>

<u>Corp. Sec. Lit.</u>, 1993 WL 476651 (N.D. Cal. Sept. 10, 1993).

Courts generally take the approach that "[i]f and when plaintiffs

prove their allegations and the remedy stage is reached, the

court may take corrective measures to resolve any actual

conflicts which arise at that time." <u>Keyser v. Commonwealth Nat.</u>

<u>Fin. Corp.</u>, 120 F.R.D. 489, 492 n.8 (M.D. Pa. 1988) (holding that

the plaintiff's simultaneous direct and derivative claims could

proceed); <u>First Am. Bank and Trust by Levitt v. Fogel</u>, 726 F.

Supp. 1292, 1298 (S.D. Fla. 1989) (same); <u>but see</u> <u>Ryan v. Aetna</u>

<u>Life Ins. Co.</u>, 765 F. Supp. 133, 135-37 (S.D.N.Y. 1991) (holding

that the plaintiff was barred from simultaneously bringing its

direct and derivative claims due to an actual conflict of

interest); <u>Ruggiero v. Am. Bioculture, Inc.</u>, 56 F.R.D. 93, 95

(S.D.N.Y. 1972) (holding as a *per se* rule that the plaintiff

could not bring both a class action against the corporation and a

derivative action on behalf of the corporation).

Three of the <u>Larson</u> factors are especially relevant to the

court's analysis here as to whether plaintiffs are adequate

representatives of other shareholders invested in defendant

companies: the degree of support received by plaintiffs from the other shareholders, the relative magnitude of plaintiffs' personal interests as compared to their interest in the derivative action itself, and plaintiffs' vindictiveness toward defendants. First, plaintiffs have no support from the other shareholders of Village and Vintage to bring a derivative action. However, the weight of this factor is diminished by the fact that the other shareholders are defendants in this action who allegedly benefitted from the misappropriation of funds from the limited liability companies. Second, plaintiffs undoubtedly have a strong interest in their personal claims relative to their derivative claims. Plaintiffs filed both personal and derivative claims against Sinadinos and his co-conspirators for their alleged RICO violations. However, plaintiffs' claim against Village and Vintage has now been dismissed for failure to state a claim, and thus the conflict that previously existed between plaintiffs and Village and Vintage has been rendered nonexistent. Although there is arguably a conflict between plaintiffs' various claims, the issue remains whether there is another shareholder who is equally qualified to bring suit and seek relief for defendants Sinadinos and Foondos' alleged misconduct. Lastly, there may be an issue as to plaintiffs' vindictiveness toward defendants, given that plaintiffs are bringing both direct and derivative claims.

Meanwhile, the remaining factors weigh in favor of plaintiffs serving as representatives in the derivative action. Notably, there are indications that plaintiffs are the true parties in interest, plaintiffs are familiar with the litigation,

there is no evidence that plaintiffs' attorneys exercise undo
control over the litigation, plaintiffs are personally committed
to the litigation, and the remedy sought by plaintiffs is
recovery for the allegedly wronged companies.

Despite some concerns that weigh against plaintiffs serving
as representatives for the derivative suit, plaintiffs allege
that because there are no other shareholders invested in Village,
Vintage, and Madera who are similarly situated, plaintiffs, by
default, fairly and adequately represent the interests of
shareholders "similarly situated." Plaintiffs claim that they
are not similarly situated to any other shareholder because the
remaining shareholders in both Village and Vintage benefitted
from the alleged misappropriation of funds from the companies.
As defendants readily concede, the other shareholders of the
limited liability companies are named defendants in the current
action. Plaintiff Natomas holds a forty-five percent membership
interest in both Village and Vintage. The remaining fifty-five
percent interest in both Village and Vintage is held by
defendants Village Investors LLC and Vintage Investors LLC,
respectively. Defendants Sinadinos and Foondos allegedly hold a
controlling ownership interest in both of these entities. As the
only shareholders who allegedly did not benefit from defendants'
alleged unlawful conduct, plaintiffs are not only uniquely
situated to bring their derivative claim, but are also the only
shareholders willing to seek relief on behalf of the allegedly
harmed companies.

Further, the court must consider outside entanglements to
ascertain whether the interests of other shareholders will be

35

disregarded in the management of the suit. Yet, such an analysis is necessarily contingent upon the existence of other innocent shareholders. Here, where all of the shareholders with the exception of plaintiffs are engaged in the alleged misconduct for which the derivative suit was filed, the interests of the other shareholders are largely immaterial.

Based upon the foregoing, the court finds that plaintiffs are adequate representatives to bring a derivative suit against defendants.[9]

### ii.  Pleading Requirements

The Sinadinos defendants and Deane additionally argue that plaintiffs' derivative claim should be dismissed because plaintiffs failed to abide by the pleading requirements of Rule 23.1. "A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." In re Silicon Graphic Inc. Sec. Lit., 183 F.3d 970, 989 (9th Cir. 1999). The circumstances under which demand would be futile are determined in accordance with the laws of the state in which the business entity was incorporated. Id. at 990. Under California law, "the test for proving demand futility is whether the facts show a reasonable doubt that (1) the directors are disinterested and independent, and (2) the challenged transaction was otherwise the

---

[9]     The court emphasizes "that cases determining when a derivative plaintiff is an adequate representative are fact specific, and that, in the common-law tradition, we are deciding only the facts before us without offering *obiter dictum* as to the legal consequences that would attach to a different set of facts." Larson, 900 F.2d at 1369.

product of a valid exercise of business judgment." <u>Oakland Raiders v. National Football League</u>, 93 Cal. App. 4th 572, 587 (2001). "The proof must be of 'facts specific to each director from which the [trier of fact] can [find a reasonable doubt] that that particular director could or could not be expected to fairly evaluate the claims of the shareholder plaintiff.'" <u>Id.</u> (quoting <u>Shields v. Singleton</u>, 15 Cal. App. 4th 1611, 1622 (1993)).

While plaintiffs concede that they did not demand action from defendants Sinadinos and Stanley Foondos, the managing and controlling members of the respective limited liability companies, plaintiffs allege with particularity the reasons why such demand would have been futile. (FAC ¶¶ 234, 244.) Plaintiffs first allege that they did not make a demand upon defendant managers because the defendants are not disinterested and independent, as they are the primary wrongdoers whose conduct allegedly gave rise to the derivative suit. (<u>Id.</u>) Plaintiffs allege that they repeatedly attempted, through their manager Solorio, to secure information regarding the financial dealings of the limited liability companies, but were unsuccessful due to the obstructionist tactics of defendant Sinadinos. (<u>Id.</u> at ¶¶ 149-160.) Further, plaintiffs allege, throughout the course of the FAC, that defendant managers' recurring acts of embezzling and unlawfully converting assets from the limited liability companies were not the product of a valid exercise of business judgment. Defendants alleged unlawful conduct was not intended to confer a benefit or advantage upon Village and Vintage, but rather enrich the managing members at the companies' expense.
///

Accordingly, the court finds that plaintiffs complied with the requirements of Rule 23.1, as they are adequate representatives of Village and Vintage and abided by the strict pleading requirements of the rule.

## IV. Plaintiffs' RICO Conspiracy Claims Against Glenn Sorenson Jr., Stockton & 65th LP, and Stephen Foondos[10]

Plaintiffs allege that Glenn Sorenson Jr., Stockton & 65th LP, and Stephen Foondos conspired to participate in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). The Sinadinos defendants contend that plaintiffs' RICO conspiracy claims should be dismissed on the basis that plaintiffs fail to sufficiently allege that defendants conspired to participate in a pattern of racketeering activity.

Title 18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [Section 1962]." "A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." Salinas v. U.S., 522 U.S. 52, 63 (1997) (citing U.S. v. Socony-Vacuum Oil Co., 310 U.S. 150, 253-54 (1940)). Thus, "[i]t makes no difference that the substantive offense under § 1962(c) requires two or more predicate acts." Id. at 65. "The

_____

[10] The Sinadinos defendants seek to dismiss plaintiffs' individual RICO claims as to defendants Glenn Sorenson Jr., Stockton & 65th LP, and Stephen Foondos pursuant to Rule 12(b)(6). Plaintiffs did not oppose the motion as to this issue. Accordingly, defendants' motion to dismiss plaintiffs' individual RICO claims as to Glenn Sorenson Jr., Stockton & 65th LP, and Stephen Foondos is GRANTED; however, plaintiff is permitted leave to amend to assert individual RICO claims against these defendants provided plaintiffs have sufficient facts to do so.

38

interplay between [18 U.S.C. § 1962] (c) and (d) does not permit [the court] to excuse from the reach of the conspiracy provisions an actor who does not himself commit or agree to commit two or more predicate acts requisite to the underlying offense." Salinas, 522 U.S. at 65. "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of *furthering or facilitating the criminal endeavor*." Id. (emphasis added). In the Ninth Circuit, a defendant may be held liable for conspiracy to violate Section 1962(c) if he "'knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise.'" U.S. v. Fernandez, 388 F.3d 1199, 1230 (9th Cir. 2004) (quoting Smith v. Berg, 247 F.3d 532, 538 (3rd Cir. 2001)). Additionally, the defendant must be "aware of the essential nature and scope of the enterprise and intend[] to participate in it." Fernandez, 388 F.3d at 1230 (quoting Howard v. Am. Online Inc., 208 F.3d 741, 751 (9th Cir. 2000); see also U.S. v. Fiander, 547 F.3d 1036, 1042 (9th Cir. 2008). However, to prove a RICO conspiracy, the plaintiff need not show that the defendant conspired to operate or manage the enterprise himself. Fernandez, 388 F.3d at 1230.

## A. Plaintiffs' RICO Conspiracy Claims against Sorenson & Stockton & 65th LP

Plaintiffs allege that Glenn Sorenson, Jr. ("Sorenson") and his company, Stockton & 65th LP ("Stockton"), engaged in a RICO conspiracy by purchasing parcels held by Village and subsequently defrauding Village. Sorenson and Stockton invested $3 million in

39

the Village project.  (FAC ¶¶ 72-73.)  According to plaintiffs,
these funds were used to purchase the Johl and Von Behren parcels
in Stockton's name, even though plaintiff Natomas held an option
on these parcels.  (Id. at ¶¶ 73-76, 81.)  In order to obtain
Natomas's consent to assign the parcels to Stockton, defendant
Sinadinos represented to Solorio that Stockton would option the
parcels back to Natomas.  (Id. at ¶¶ 75-76.)  However, defendant
Sinadinos did not obtain an agreement from Sorenson or Stockton
to option the parcels back to Village.  (Id. at ¶ 82.)  As a
result, plaintiff Natomas was allegedly defrauded of its purchase
rights in the Johl and Von Behren parcels and no longer has clear
contractual rights regarding the parcels.  (Id.)  Further,
defendant Sinadinos also represented to Solorio that defendant
Johl would "park" $1.3 million of the $2.3 million he received
for his parcel in other properties in the Village project.  (Id.
at ¶ 74.)  Following the purchase of the Johls' parcel, however,
defendants Sinadinos and Sorenson allegedly directed the Johls to
purchase the Barnard parcel, which was part of the Vintage
project.  (Id. at ¶ 77.)

    While plaintiffs' allegations demonstrate that defendants
Sorenson and Stockton were investors of the Village project,
these allegations are not sufficient to state a claim against
Sorenson and Stockton for RICO conspiracy.  Notably, plaintiffs
do not specifically allege that defendants Sorenson and Stockton
were "aware of the essential nature and scope of the enterprise
and intended to participate in it."  Fernandez, 388 F.3d at 1230.
Plaintiffs agreed to assign the parcels to Stockton upon
representations from Sinadinos that Stockton would option the

40

parcels back to Village. However, plaintiffs do not allege that Sorenson and Stockton made representations that they would option the property back to Village. Similarly, plaintiffs allege that defendant Sinadinos continues to refuse to draft an agreement to option the parcels back to Village, yet plaintiffs do not allege acts or conduct engaged in by Sorenson or Stockton to defraud plaintiff Natomas of its purchase rights to the parcels. While it appears from the allegations of the complaint that Sorenson and Stockton may have benefitted from defendant Sinadinos' alleged unlawful conduct, this is not the standard for determining whether a party engaged in a RICO conspiracy. Significantly, plaintiffs do not specifically allege that Sorenson and Stockton were aware of the alleged RICO conspiracy and intended to participate in it.[11]

Accordingly, defendants' motion to dismiss plaintiffs' RICO conspiracy claims as to Sorenson and Stockton is GRANTED. However, leave to amend should be granted "unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393,

---

[11] Plaintiffs allege in their opposition to the Sinadinos defendants' motion for judgment on the pleadings that Sorenson and Stockton facilitated and assisted in defendant Sinadinos' fraudulent conduct. Specifically, plaintiffs allege that Sorenson and Stockton committed RICO conspiracy by 1) obtaining unusually favorable terms for the purchase of the parcels, 2) directly participating in completion of the fraudulent scheme, and 3) failing to grant Village an option agreement to repurchase the parcels. However, in their FAC plaintiffs place blame for the fraudulent transaction on Sinadinos, alleging that Sinadinos, rather than Sorenson, promised plaintiffs that Stockton would option the parcels back to Village, and that Sinadinos has refused to draft the option agreements. (FAC ¶¶ 75, 82.)

41

1401 (9th Cir. 1986).  To the extent plaintiffs can allege
sufficient facts regarding Sorenson and Stockton's knowledge of
the alleged conspiracy and their intent to participate in the
conspiracy, plaintiffs are granted leave to amend.

### B.   Plaintiffs' RICO Conspiracy Claim against Stephen Foondos

Plaintiffs allege that Stephen Foondos engaged in a RICO
conspiracy by laundering money through Village and Vintage and
inducing individuals to invest in Vintage through
misrepresentation.  Stephen Foondos and Sinadinos allegedly made
numerous fraudulent misrepresentations to induce Margarida
Leavitt to purchase the Donabedian parcel in the Vintage project
for $1.2 million.  (FAC ¶¶ 120-121.)  Prior to contacting Ms.
Leavitt about purchasing the parcel, a large homebuilder had
previously terminated an option agreement to purchase Vintage.
(Id. at ¶ 121.)  However, Sinadinos and his alleged co-
conspirators allegedly failed to disclose to Ms. Leavitt that the
homebuilder had abandoned the project, and falsely represented
that her investment in the Vintage project would return a
substantial profit.  (Id.)  Stephen Foondos allegedly represented
Ms. Leavitt's interests as her attorney, and conspired with
Sinadinos to defraud Ms. Leavitt.  (Id. at ¶ 122.)

Plaintiffs further allege that on August 4, 2007, Sinadinos
wrote a $34,000 check made payable from Vintage to Sacramento
Legal Group, an organization in which Stephen Foondos holds a
professional interest.  (Id. at ¶ 137.)  That very same day,
Sinadinos allegedly wrote a $16,000 check from Vintage to Stephen
Foondos.  (Id.)  These payments were allegedly intended to serve

42

as a commission for inducing Ms. Leavitt to invest in Vintage. (*Id.*) Subsequently, on September 6, 2007, Stephen Foondos allegedly wrote a $50,000 check made payable from his personal account to Village in order to launder the money he received as a kickback for the fraud perpetrated against Ms. Leavitt. (*Id.* at ¶ 138.) Also on September 6, 2007, Sinadinos wrote a $10,000 check made payable from Village to Stephen Foondos that was intended to serve as an additional kickback to Stephen Foondos, and also credited Stephen Foondos with an artificially inflated capital account in Village based on the laundered investment of $50,000. (*Id.*)

Due to Stephen Foondos's alleged representation of Ms. Leavitt and subsequent receipt and payment of funds to Village and Vintage, the court finds that plaintiffs have alleged sufficient facts to state a claim against Stephen Foondos for RICO conspiracy. By allegedly inducing Ms. Leavitt to invest in Vintage through misrepresentations and also participating in money laundering, plaintiffs have adequately alleged that Stephen Foondos was aware of the essential nature and scope of Sinadinos' RICO enterprise and intended to participate in it. While the Sinadinos defendants claim that Stephen Foondos's representation of Ms. Leavitt alone does not entail a RICO conspiracy, the substantial exchange of funds between Stephen Foondos and Village and Vintage tends to show that Stephen Foondos was aware of, and agreed to facilitate, the illegal activities engaged in by defendant Sinadinos.

Accordingly, defendants' motion to dismiss plaintiffs' RICO conspiracy claim as to Stephen Foondos is DENIED.

**V.  Larry Deane**

Plaintiffs allege that Deane engaged in RICO violations arising from his efforts to prevent and obstruct plaintiffs' investigation of defendants' racketeering activities. Additionally, plaintiffs allege that Deane conspired to participate in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  Deane contends that plaintiffs' RICO and RICO conspiracy claims should be dismissed pursuant to Rule 12(b)(6).

### A.  Plaintiffs' RICO Claim against Deane for Witness Tampering

In their opposition to Deane's motion to dismiss, plaintiffs allege for the first time that Deane violated RICO by engaging in witness tampering.[12]  Witness tampering is deemed a RICO predicate act pursuant to 18 U.S.C. § 1961.  Title 18 U.S.C. § 1512 provides, in relevant part:

> (b) whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

> > (1) influence, delay or prevent the testimony of any person in any official proceeding; . . .

> > (3) hinder, delay or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

> shall be fined under this title or imprisoned not more

---

[12]    The court notes that plaintiffs did not raise a claim of witness tampering as to Deane in their FAC.  However, due to the liberal pleading standards of Rule 8, and considering that plaintiffs would likely be entitled to leave to amend, the court will address plaintiffs' allegations of witness tampering.

than 10 years or both. . . .

    (f) For the purposes of this section--

        (1) an official proceeding need not be pending or about to be instituted at the time of the offense; and

        (2) the testimony, or the record, document, or other object need not be admissible in evidence or free of claim of privilege.

(Emphasis in original omitted.)

"Section 1512(b) punishes not just corruptly persuading another, but *knowingly* corruptly persuading another." <u>Arthur Andersen LLP v. U.S.</u>, 544 U.S. 696, 704 (2005) (internal citations and modifications omitted) (emphasis in original). Although a judicial proceeding need not be pending or about to be instituted at the time of the offense, a proceeding must be reasonably foreseeable from the perspective of the party allegedly engaged in witness tampering. <u>Id.</u> at 707-08.

Even assuming *arguendo* that plaintiffs sufficiently allege that Deane engaged in the predicate act of witness tampering, plaintiffs have not alleged that Deane's course of conduct resulted in a concrete financial loss to plaintiffs. "To recover under RICO, the individual 'must show proof of concrete financial loss' and must demonstrate that the racketeering activity proximately caused the loss." <u>Guerrero</u>, 442 F.3d at 707 (quoting <u>Chaset</u>, 300 F.3d at 1087. Although Deane repeatedly urged Solorio to abandon his claims against Sinadinos, Solorio nonetheless proceeded with his claims and filed this action in federal court. It is clear from the allegations of the FAC that Solorio was undeterred by Deane's overtures and maintained that Sinadinos and his co-conspirators engaged in fraudulent business

45

transactions. Due to Solorio's steadfastness in pursuing his claims on behalf of plaintiffs, plaintiffs cannot allege that they suffered a concrete financial loss as a result of Deane's alleged racketeering activity. Perhaps if Deane, acting in concert with Sinadinos and his co-conspirators, had persuaded Solorio to abandon his claims for a substantial period, during which time plaintiffs incurred greater losses due to defendants' alleged fraudulent activities, plaintiffs could allege that they suffered a concrete financial loss. However, that is not the case. Since plaintiffs do not allege that they suffered a financial loss due to Deane's alleged attempts to hinder, delay, or prevent this action, Deane cannot be held liable under RICO.

Accordingly, Deane's motion to dismiss plaintiffs' RICO claim for witness tampering is GRANTED. However, leave to amend should be granted "unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986). To the extent plaintiffs can allege sufficient facts regarding damages suffered as a proximate result of Deane's alleged acts of witness tampering, plaintiffs are granted leave to amend.

**B.    Plaintiffs' RICO Conspiracy Claim against Deane**

Plaintiffs additionally allege that Deane engaged in a RICO conspiracy by actively concealing information regarding defendants' fraudulent conduct. Plaintiffs allege that some time in early 2008, Deane, through counsel Wanland, demanded that Solorio abandon his claims regarding Sinadinos' illegal financial transactions and mishandling of development funds on the basis

46

that such claims were unfounded. (FAC ¶ 187.) Wanland represented to Solorio that Deane had observed the financial records of Village and Vintage in their entirety and was convinced that there was no factual or legal basis for Solorio's claims. (Id.) Plaintiffs allege that through this course of conduct, Deane was "attempting to dissuade Solorio from pursuing a thorough investigation of unlawful conduct by defendants, in order to assist defendants in their efforts to avoid detection of their fraudulent scheme and racketeering activities." (Id.)

By mid-August, Wanland, on behalf of Deane, allegedly demanded that Solorio abandon his claims against Sinadinos, or else Deane would commence dissolution proceedings against plaintiff Natomas. (Id. at ¶ 188.) On September 10, 2008, Thomas Barth ("Barth"), counsel for Solorio, sought Deane's cooperation to make his computer hard drive available for inspection in order to review email correspondence between Deane, Sinadinos, and Stanley Foondos. (Id. at ¶ 189.) Deane refused Barth's request, and on October 20, 2008, filed a complaint for dissolution of plaintiff Natomas in Sacramento County Superior Court. (Id.) Plaintiffs allege that through this course of conduct, Deane conspired with Sinadinos and other co-conspirators to prevent Solorio from investigating defendants' alleged fraudulent activities and pursue legal action. (Id. at ¶ 190.) Further, plaintiffs allege that Deane has received multiple distributions of money from Sinadinos and his co-conspirators, which have induced Deane to continue to conceal defendants' alleged fraudulent activities.

///

47

Construing plaintiffs' complaint liberally and accepting all allegations contained therein as true, plaintiffs have alleged sufficient facts to support a claim for RICO conspiracy against Deane. According to the FAC, Deane, who has had the opportunity to review Village and Vintage's financial records, was not only aware of defendants' alleged mishandling of project funds, but also allegedly concealed and misrepresented this information to Solorio and received payments for assisting defendants' scheme. These allegations tend to show that Deane was aware of the scope and nature of defendants' alleged RICO scheme and facilitated its operation.

Accordingly, Deane's motion to dismiss plaintiffs' RICO conspiracy claim is DENIED.

## VI. **The Johls**

Defendants Baljit and Harinder Johl seek to dismiss plaintiffs' FAC pursuant to Rule 12(b)(6) and/or Rule 9(b). Alternatively, the Johls move for a more definite statement pursuant to Rule 12(e).

### A. The Johls' Rule 12(b)(6) Motion

Plaintiffs allege that the Johls engaged in a RICO conspiracy by receiving, without Solorio's consent, an equity interest in real property in exchange for the settlement of a malpractice claim against defendant Sinadinos. Some time prior to December 2004, defendant Baljit Johl ("Baljit") granted plaintiff Natomas an option to purchase certain real property. (FAC ¶ 73.) Subsequently, Solorio and defendant Sinadinos assigned the option to Sorenson, who purchased Baljit's property for $2.3 million. (Id. at ¶¶ 74-76.) Baljit allegedly

48

contracted to "park" $1.3 million of the amount he received for
his parcel as a 1031 tax exchange into other property in the
Village project.  (Id. at ¶ 74.)  Instead, defendants Sinadinos
and Sorenson allegedly directed Baljit to invest in a parcel
located in the Vintage project.  (Id. at ¶ 77.)  While defendant
Sinadinos originally arranged for a deed of trust to be placed
against Baljit's former parcel in order to secure payment to
Baljit, defendants Sinadinos and Sorenson allegedly asked Baljit
to move the deed of trust to another parcel, which Baljit agreed
to do.  (Id. at ¶ 77.)

In mid-2007, Baljit raised fraud claims against Sinadinos
after Sinadinos convinced Baljit to remove his deed of trust from
a parcel in Vintage and place it on another parcel, which
Sinadinos subsequently failed to designate.  (Id. at ¶ 178.)  In
early 2008, Baljit and Sinadinos allegedly arrived at a
compromise agreement, whereby the equity interest in the Ubungen
parcel in the Vintage project was transferred to Baljit's father,
Surjit Johl ("Surjit").  (Id.)  However, plaintiffs allege that
prior to the transfer of the Ubungen parcel, Solorio communicated
with both Baljit and Harinder Johl ("Harinder") and expressly
stated that plaintiff Natomas objected to the transfer of the
parcel.  (Id. at ¶ 181.)  Baljit and Harinder allegedly confirmed
that they were aware that the transfer could not occur without
the consent of Natomas, yet nevertheless completed the transfer
without Natomas' consent.  (Id.)

Under the facts alleged in the complaint, the Johls may have
acted dishonestly by receiving the Ubungen parcel as
consideration for settlement of their legal claim despite their

49

knowledge that Natomas did not consent to transfer of the parcel. However, this course of conduct alone does not implicate the Johls in a RICO conspiracy. Accepting plaintiffs' allegations as true, the Johls did not knowingly agree to facilitate a RICO enterprise. The Johls were investors in the Vintage project who had little contact with defendant Sinadinos, the alleged originator of the RICO scheme. In fact, the Johls pursued a legal claim against Sinadinos arising out of Sinadinos' alleged fraudulent conduct; these actions are hardly consistent with those taken by co-conspirators in a RICO scheme. Plaintiffs' allegations do not show that the Johls were aware of the essential nature and scope of Sinadinos' alleged RICO scheme, or that by simply accepting an equity interest in real property in exchange for the settlement of a legal claim, they intended to participate in the alleged RICO scheme. Thus, plaintiffs have failed to allege sufficient facts to show that the Johls were engaged in a RICO conspiracy.

**B.    The Johls' Rule 9(b) Motion**

The Johls also move for dismissal of plaintiffs' complaint pursuant to Rule 9(b) on the basis that the RICO claims levied against them are not alleged with sufficient particularity.

Rule 9(b) provides, in relevant part, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The rule "requires a pleader of fraud to detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme." <u>Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.</u>, 940 F.2d 397, 405 (9th Cir. 1991). "Averments of fraud

must be accompanied by "the who, what, when, where, and how' of the misconduct charged." _Vess v. Ciba-Geigy Corp. USA_, 317 F.3d 1097, 1106 (9th Cir. 2003) (citing _Cooper v. Pickett_, 137 F.3d 616, 627 (9th Cir. 1997)). Allegations of fraud based on information and belief generally do not satisfy the particularity requirements of Rule 9(b); however, this rule is relaxed where plaintiffs do not have knowledge of the underlying facts and the matter is within the opposing party's knowledge. _Neubronner v. Milken_, 6 F.3d 666, 672 (9th Cir. 1993). "The purpose of [Rule 9(b)] is to ensure that defendants accused of the conduct specified have adequate notice of what they are alleged to have done, so that they may defend against the accusations." _Concha v. London_, 62 F.3d 1493, 1502 (9th Cir. 1995). "Without such specificity, defendants in these cases would be put to an unfair advantage, since at the early stages of the proceedings they could do no more than generally deny any wrongdoing." _Id._ (citing _Semegen v. Weidner_, 780 F.2d 727, 731 (9th Cir. 1985).

Rule 9(b) applies to civil RICO fraud claims. _Edwards v. Marin Park, Inc._, 356 F.3d 1058, 1066 (9th Cir. 2004). The Ninth Circuit has recognized that Rule 9(b) may apply to claims – that although lacking fraud as a element - are "grounded" or "sound" in fraud. _Vess_, 317 F.3d at 1104 ("[A] plaintiff may choose not to allege a unified course of fraudulent conduct in support of a claim, but rather to allege some fraudulent and some non-fraudulent conduct. In such cases, only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements").

While fraud is not an essential element of a RICO conspiracy claim, plaintiffs' conspiracy claim as to the Johls is grounded

51

in fraud.[13]  Thus, plaintiffs' allegations against the Johls must satisfy Rule 9(b)'s heightened pleading requirement.

Although plaintiffs fail to allege sufficient facts to state a RICO conspiracy claim against the Johls, plaintiffs' allegations of fraudulent conduct as to the Johls are stated with sufficient particularity to survive a Rule 9(b) motion. Plaintiffs detail with particularity the time, place, and manner of each alleged act of fraud committed by the Johls, as well as the role of the Johls in the fraudulent scheme.  Plaintiffs' allegations identify the month, and often day, of the Johls conduct giving rise to plaintiffs' RICO conspiracy claims. Although plaintiffs do not allege sufficient facts to state a cognizable claim for RICO conspiracy against the Johls, plaintiffs have alleged the "who, what, where, when, and how" of the underlying alleged fraudulent misconduct.

### C.    The Johls' Rule 12(e) Motion

The Johls move for a more definite statement as to plaintiffs' entire complaint on the basis that plaintiffs do not specifically identify the parties involved in each unlawful act, and do not identify the claims directed at, or the relief sought from, the Johls.  Under Rule 12(e), a motion for a more definite statement should not be granted unless a pleading is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  This liberal standard is consistent with

---

[13]    The FAC provides, "When Baljit and Harinder Johl conspired and participated with Sinadinos in the completion of the transfer, they knowingly and intentionally committed fraud against Natomas when they directed their father Surjit Johl to take title, because the Johls and Sinadinos knew Natomas had not consented to the illegal transfer."  (¶ 181.)

Rule 8(a)(2), which only requires that pleadings contain a "short and plain statement of the claim." Plaintiffs' FAC is over 60 pages and identifies approximately twenty defendants within the broad term "Sinadinos and his co-conspirators;" this reference renders the complaint difficult for individual defendants to frame a responsive pleading. Although plaintiffs specifically refer to the Johls in alleging that they fraudulently transferred real property without the consent of plaintiff Natomas, it is unclear whether the Johls are also implicated in plaintiffs' claims directed against the various "co-conspirators."

Moreover, the FAC does not identify the relief sought from the Johls. While plaintiff's opposition to the Johls' motion to dismiss does clarify that the Johls allegedly engaged in a RICO conspiracy, this is not apparent from the face of the FAC. Without knowing the specific claims levied against them nor the specific relief sought by plaintiffs, the Johls cannot reasonably be expected to form a responsive pleading.

Accordingly, the Johls motion to dismiss plaintiffs' complaint pursuant to Rule 12(b)(6) is GRANTED. However, leave to amend should be granted "unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986). To the extent plaintiffs can allege sufficient facts regarding the Johls' knowledge of the alleged conspiracy and their intent to participate in the conspiracy, plaintiffs are granted leave to amend. Likewise, the Johls' motion for a more definite statement is GRANTED; plaintiffs shall amend their complaint to specific

53

what specify claims are asserted against the Johls and what
relief they seek against the Johls.  The Johls' motion to dismiss
plaintiffs' RICO conspiracy claim pursuant to Rule 9(b) is
DENIED.

**CONCLUSION**

For the foregoing reasons, the court makes the following
orders:

(1)    The Sinadinos defendants' and Deane's motions to
        dismiss for lack of subject matter jurisdiction,
        pursuant to Section 1367(c), are DENIED.

(2)    The Sinadinos defendants' and Deane's motions to stay
        this action pursuant to <u>Colorado River</u> are DENIED.

(3)    Plaintiffs' RICO claim as to Village and Vintage is
        DISMISSED with prejudice.

(4)    The Sinadinos defendants' and Deane's motions to
        dismiss plaintiffs' RICO claims for lack of standing
        are DENIED.

(5)    The Sinadinos defendants' motion to dismiss plaintiffs'
        individual RICO claims against Glenn Sorenson, Jr.,
        Stockton & 65th LP, and Stephen Foondos is GRANTED with
        leave to amend.

(6)    The Sinadinos defendants' motion to dismiss plaintiffs'
        RICO conspiracy claim as to Glenn Sorenson, Jr. and
        Stockton & 65th LP is GRANTED with leave to amend.

(7)    The Sinadinos defendants' motion to dismiss plaintiffs'
        RICO conspiracy claim as to Stephen Foondos is DENIED.

(8)    Defendant Deane's motion to dismiss plaintiffs' RICO
        claim based on witness tampering is GRANTED with leave

54

to amend, while Deane's motion to dismiss plaintiffs'
RICO conspiracy claim is DENIED.

(9)  Defendant Johls' motion to dismiss pursuant to Rule
     12(b)(6) is GRANTED with leave to amend, the Johls'
     motion to dismiss pursuant to Rule 9(b) is DENIED, and
     the Johls' motion for a more definite statement
     pursuant to Rule 12(e) is GRANTED.

Plaintiffs are accorded twenty (20) days from the date of
this order to file a second amended complaint.  Defendants are
accorded twenty (20) days after service thereof to file their
responses.

IT IS SO ORDERED.

DATED: May 12, 2009

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE