1 | THOMAS W. BARTH, SBN 154075
BARTH TOZER & TIMM LLP
2 | 431 I Street, Suite 201
Sacramento, California 95814
3 | Telephone: (916) 440-8600
Facsimile: (916) 440-9610
4 | Email: tbarth@bttlawfirm.com

5 | PATRICK J. WALTZ, SBN 63130
WALTZ LAW FIRM
6 | 2022 28th Street
Sacramento, California 95818
7 | Telephone: (916) 454-0904
Facsimile: (916) 454-0909
8 | Email: Waltzlaw@sbcglobal.net

9 | Attorneys for Plaintiffs NATOMAS
GARDENS INVESTMENT GROUP LLC and
10 | ORCHARD PARK DEVELOPMENT LLC

11 | UNITED STATES DISTRICT COURT

12 | EASTERN DISTRICT OF CALIFORNIA

13 | NATOMAS GARDENS INVESTMENT GROUP    Case No. **2:08-CV-02308-FCD-KJM**
LLC, a California limited liability company,
14 | ORCHARD PARK DEVELOPMENT LLC, a
California limited liability company,
15 | | **SECOND AMENDED**
**COMPLAINT UNDER THE**
16 | Plaintiffs,                              **RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS**
17 | v.                                       **ACT; FRAUD; BREACH OF**
**FIDUCIARY DUTIES;**
18 | JOHN G. SINADINOS, STANLEY J. FOONDOS,  **PROFESSIONAL LEGAL**
STEPHEN FOONDOS, VILLAGE CAPITAL        **MALPRACTICE; PROFESSIONAL**
19 | GROUP LLC, a California limited liability company,  **ACCOUNTING MALPRACTICE;**
VINTAGE CREEK LLC, a California limited liability  **CONVERSION; AND PETITION**
company, SOUTH WATT & FLORIN PARTNERS, a  **FOR WRIT OF MANDATE TO**
20 | California general partnership, CHI-SAC VILLAGE  **COMPEL INSPECTION OF**
CAPITAL GROUP INVESTORS LLC, a California  **RECORDS**
21 | limited liability company, CHI-SAC FLORIN
VINEYARDS INVESTORS LLC, a California limited  **JURY TRIAL DEMANDED**
22 | liability company, CASELMAN & CARLISLE
PARTNERS, a California general partnership, CHI-
23 | SAC VINTAGE CREEK INVESTORS LLC, a
California limited liability company, CHI-SAC GAP
24 | INVESTORS, PRIME MINISTER GROUP LLC, a
California limited liability company, PARK RIDGE
25 | INVESTMENTS LLC, a California limited liability
company, CHI-SAC SOUTH SUTTER INVESTORS,
26 | CHI-SAC WHITE ROCK 150 INVESTORS, LLC, a
California limited liability company, CHICAGO
27 | SOUTH WATT INVESTORS, LLC, a California
limited liability company, CHICAGO INFILL
28 | INVESTORS LLC, a California limited liability

---

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1  company, STEWART TITLE COMPANY, GUS
   GALAXIDAS, GLENN SORENSEN, JR.,
2  STOCKTON & 65TH, LP, a California limited
   partnership, LARRY DEANE, BALJIT JOHL,
3  HARINDER JOHL, MARGARIDA LEAVITT, and
   DOES 1 through 100, inclusive,
4
             Defendants.
5

6        Plaintiffs Natomas Gardens Investment Group LLC (Natomas) and Orchard Park

7  Development LLC (Orchard Park) for their complaint against defendants, allege as follows:

8                    **I.     NATURE OF THE ACTION**

9        1.     By a scheme of fraud, embezzlement, money laundering, mail and wire

10 fraud, unlawful tax evasion, witness tampering, interstate travel in aid of a racketeering

11 enterprise, breach of fiduciary duties, professional malpractice, and conversion, defendants

12 destroyed and substantially interfered with plaintiffs' business opportunities at seven residential

13 development projects via a pattern of racketeering activities.  Plaintiffs began each of the projects

14 by assembling the rights to acquire numerous contiguous parcels in each project, located in the

15 Sacramento region and near Madera, California.  Defendants began their elaborate, unlawful

16 scheme by promising to finance the development entitlement process for each of the projects.

17       2.     Unknown to plaintiffs, defendants undertook numerous illegal transactions

18 from the beginning of their involvement in these projects.  Defendants siphoned off large and

19 small amounts of money to themselves and others.  Rather than honor their fiduciary duties, abide

20 by a duty of care and their respective professional codes of conduct, and invest capital in a

21 financially responsible strategy for acquisition and development of raw land, defendants used

22 undocumented, shady deals among themselves to defraud plaintiffs by bilking money and equity

23 value from each of the separate projects.

24       3.     Defendants promised plaintiffs the investment of capital in these projects,

25 which would only be repaid, with return on investment, upon completion of the development

26 entitlement process and ultimate sale of each project to home builders.  Instead, defendants

27 moved money in, among, and out of these projects without any financial controls or proper

28 ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

SECOND AMENDED COMPLAINT UNDER RICO; FRAUD, BREACH OF FIDUCIARY DUTIES, ETC.        [CASE NUMBER 2:08-CV-02308-FCD-KJM]

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    notice/approvals.  They often characterized large sums as "loans" on the checks, with no other

2    documentation, such as promissory notes or deeds of trust.

3               4.      From the beginning, defendants had several fraudulent goals in mind.

4    They knew they would profit from their scheme, regardless of the strength of the real estate

5    market.  They laundered their illegal profits on many occasions by intentionally not documenting

6    the original source of funds and/or creating false documents such as tax returns and capital

7    account statements in order to conceal and disguise the nature, source and ownership of the funds.

8    Even before the slightest hint of a downturn in the real estate market, defendants implemented

9    their plan to eviscerate one of Natomas' projects, to guarantee their maximum illegal profits.  The

10   ill-fated project is Vintage Creek.

11              5.      While planning to cannibalize Vintage Creek, defendants also intended to

12   claim inflated equity positions in another project, designated herein as Village.  They laundered

13   money stolen elsewhere by claiming it as new money "invested" in Village.  A substantial portion

14   of defendants' "investments" in Village are fraudulently converted "loans" from elsewhere,

15   including Vintage Creek.

16              6.      Attempting to hide their illegal activities, defendants intentionally avoided

17   maintaining any customary financial records, used elaborate multi-stage transactions to obscure

18   the money trails, filed fraudulent, false tax returns, and resisted and refused complete disclosure

19   of books and records upon plaintiffs' demands for inspection.  Defendants also conspired among

20   themselves, for the purpose of having their surrogates apply pressure against plaintiffs, to force

21   the abandonment of their claims.

22              7.      In total, defendants' pattern of racketeering activity resulted in losses of

23   plaintiffs' entire business opportunities, goodwill, prospective business opportunities, and

24   monetary assets exceeding $3,000,000, subject to proof at trial in these proceedings.  Defendants'

25   illegal conduct exposes plaintiffs to very substantial liabilities for unpaid taxes, fines, penalties

26   and interest on phantom income, and claims of third-party victims of defendants' fraudulent

27   scheme.

28   ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

8.     As detailed below, defendants conducted and/or participated, directly or indirectly, in the conduct of enterprises through a pattern of racketeering activity, and/or conspired to do so, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Title 18, United States Code Section 1961, *et seq.*

9.     Certain defendants also breached their fiduciary duties in their capacities as managers of the development companies for these projects, and in their professional capacities, purporting to provide legal and accounting services for multiple companies.

10.    Through their conduct, defendants committed fraud against plaintiffs in connection with their scheme to embezzle substantial sums of money from the operations of these development projects, to obtain falsely inflated equity interests in the development projects by fraudulent means, and to commit tax fraud for financial benefit and avoidance of liability.

11.    Plaintiffs make certain allegations in this Complaint on the basis of information and belief, because the necessary information supporting those facts lies within the exclusive control of defendants.

## II.    PARTIES

12.    Plaintiff Natomas Gardens Investment Group LLC (Natomas) is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of California, with its principal place of business in the State of California.  The manager of Natomas at all relevant times has been Eric Solorio (Solorio), who also holds a majority membership interest in the limited liability company.  Natomas is, and at all relevant times was, the holder of a 45% membership interest in Village Capital Group LLC and Vintage Creek LLC.

13.    Plaintiff Orchard Park Development LLC (Orchard Park) is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of California, with its principal place of business in the State of California.  The manager of Orchard Park at all relevant times has been Mr. Solorio, and he owns all membership interests in the limited liability company.  Orchard Park is, at all relevant times was, the holder of a 25% membership interest in Madera Avenue 12 Capital Group LLC.

///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

14.     Defendant John G. Sinadinos (Sinadinos) is, and at all relevant times was, a citizen of California, and on information and belief, residing in Sacramento County, California. At all times relevant to this complaint, Sinadinos has been an attorney, licensed and admitted to practice in the State of California, and he has practiced as an attorney in committing the acts alleged herein.

15.     Defendant Stanley J. Foondos (Stanley Foondos, or Foondos) is, and at all relevant times was, a citizen of California, and on information and belief, residing in Sacramento County, California. At all times relevant to this complaint, Stanley Foondos has been a certified public accountant, licensed and admitted to practice in the State of California, and he has practiced as a certified public accountant in committing the acts alleged herein.

16.     Defendant Stephen Foondos (Stephen Foondos) is, and at all relevant times was, a citizen of California, and on information and belief, residing in Sacramento County, California.

17.     Defendant Village Capital Group LLC (Village) is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of California, with its principal place of business in the State of California. The manager of Village at all relevant times has been South Watt & Florin Partners, with Sinadinos as its managing partner and serving as the person responsible for management of Village.

18.     Defendant Vintage Creek LLC (Vintage Creek) is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of California, with its principal place of business in the State of California. The manager of Vintage Creek at all relevant times has been Caselman & Carlisle Partners, with Sinadinos as its managing partner and serving as the person responsible for management of Vintage Creek.

19.     Defendant South Watt & Florin Partners is, and at all relevant times was, a general partnership organized and existing under the laws of the State of California, with its principal place of business in the State of California. On information and belief, Sinadinos and Stanley Foondos have been partners in South Watt & Florin Partners at all times relevant to this

///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   complaint.  South Watt & Florin Partners has at all relevant times been the tax matters partner for

2   Village.

3             20.      Defendant Chi-Sac Village Capital Group Investors LLC is, and at all

4   relevant times was, a limited liability company organized and existing under the laws of the State

5   of California, with its principal place of business in the State of California.  Chi-Sac Village

6   Capital Group Investors LLC is, at all relevant times was, the holder of a 55% membership

7   interest in Village, and on information and belief, was at all relevant times one of the companies

8   used by Sinadinos and Stanley Foondos for financial transactions relating to the Village project,

9   and Sinadinos and Stanley Foondos held controlling ownership interests in Chi-Sac Village

10  Capital Group Investors LLC.

11            21.      Defendant Chi-Sac Florin Vineyards Investors LLC is, and at all relevant

12  times was, a limited liability company organized and existing under the laws of the State of

13  California, with its principal place of business in the State of California.  On information and

14  belief, Chi-Sac Florin Vineyards Investors LLC was at all relevant times one of the companies

15  used by Sinadinos and Stanley Foondos for financial transactions relating to the Village project,

16  and Sinadinos and Stanley Foondos held controlling ownership interests in Chi-Sac Florin

17  Vineyards Investors LLC.

18            22.      Defendant Caselman & Carlisle Partners is, and all relevant times was, a

19  general partnership organized and existing under the laws of the State of California, with its

20  principal place of business in the State of California.  On information and belief, Sinadinos and

21  Stanley Foondos have been partners in Caselman & Carlisle Partners at all times relevant to this

22  complaint.

23            23.      Defendant Chi-Sac Vintage Creek Investors LLC is, and at all relevant

24  times was, a limited liability company organized and existing under the laws of the State of

25  California, with its principal place of business in the State of California.  Chi-Sac Vintage Creek

26  Investors LLC is, at all relevant times was, the holder of a 55% membership interest in

27  Village. On information and belief, Chi-Sac Vintage Creek Investors LLC was at all relevant

28  times one of the companies used by Sinadinos and Stanley Foondos for financial transactions

1   relating to the Vintage Creek project, and Sinadinos and Stanley Foondos held controlling

2   ownership interests in Chi-Sac Vintage Creek Investors LLC.  At all relevant times, Chi-Sac

3   Vintage Creek Investors LLC was the tax matters partner for Vintage Creek.

4            24.     Defendant Chi-Sac Gap Investors is, and at all relevant times was, an entity

5   of unknown legal status, with its principal place of business in the State of California.  On

6   information and belief, Sinadinos and Stanley Foondos formed Chi-Sac Gap Investors as one of

7   the companies used by them for financial transactions relating to the Vintage Creek project.  The

8   purported members, partners, or persons affiliated with Chi-Sac Gap Investors are presently

9   unknown to plaintiffs, and plaintiffs will amend the complaint to allege those facts when

10  ascertained.

11           25.     Defendant Prime Minister Group LLC is, and at all relevant times was, a

12  limited liability company organized and existing under the laws of the State of California, with its

13  principal place of business in the State of California.  On information and belief, Prime Minister

14  Group LLC was at all relevant times one of the companies used by Sinadinos and Stanley

15  Foondos for financial transactions relating to both the Village and the separate Vintage Creek

16  projects, and Sinadinos and Stanley Foondos held controlling ownership interests in Prime

17  Minister Group LLC.

18           26.     Defendant Park Ridge Investments LLC is, and at all relevant times was, a

19  limited liability company organized and existing under the laws of the State of California, with its

20  principal place of business in the State of California.  On information and belief, Park Ridge

21  Investments LLC was at all relevant times one of the companies used by Sinadinos and Stanley

22  Foondos for financial transactions relating to both the Village and the separate Vintage Creek

23  projects, and Sinadinos and Stanley Foondos held controlling ownership interests in Park Ridge

24  Investments LLC.

25           27.     Defendant Chi-Sac South Sutter Investors is, and at all relevant times was,

26  an entity of unknown legal status, with its principal place of business in the State of California.

27  On information and belief, at all relevant times Sinadinos and Stanley Foondos have held

28  controlling ownership interests in Chi-Sac South Sutter Investors, and Sinadinos and Stanley

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   Foondos have used that company for financial transactions relating to both the Village and the

2   separate Vintage Creek projects.

3          28.    Defendant Chi-Sac White Rock 150 Investors LLC is, and at all relevant

4   times was, a limited liability company organized and existing under the laws of the State of

5   California, with its principal place of business in the State of California.  On information and

6   belief, at all relevant times Sinadinos and Stanley Foondos have held controlling ownership

7   interests in Chi-Sac White Rock 150 Investors LLC, and they have used that company for

8   financial transactions relating to both the Village and the separate Vintage Creek projects.

9          29.    Defendant Chicago South Watt Investors LLC is, and at all relevant times

10  was, a limited liability company organized and existing under the laws of the State of California,

11  with its principal place of business in the State of California.  On information and belief, at all

12  relevant times Sinadinos and Stanley Foondos have held controlling ownership interests in

13  Chicago South Watt Investors LLC, and they have used that company for financial transactions

14  relating to both the Village and the separate Vintage Creek projects.

15         30.    Defendant Chicago Infill Investors LLC is, and at all relevant times was, a

16  limited liability company organized and existing under the laws of the State of California, with its

17  principal place of business in the State of California.  On information and belief, at all relevant

18  times Sinadinos and Stanley Foondos have held controlling ownership interests in Chicago Infill

19  Investors LLC, and they have used that company for financial transactions relating to both the

20  Village and the separate Vintage Creek projects.

21         31.    Defendant Stewart Title Company is an entity of unknown legal status and

22  origin, with its principal place of business in the State of California.  Defendant Sinadinos has

23  used defendant Stewart Title Company at all times relevant to this case, for the purpose of

24  handling escrow accounts relating to certain property transactions, as hereinafter alleged.

25         32.    Defendant Gus Galaxidas is, and at all relevant times was, a citizen of

26  California, and on information and belief, residing in Sacramento County, California.

27         33.    Defendant Glenn Sorensen, Jr., is, and at all relevant times was, a citizen of

28  California, and on information and belief, residing in Sacramento County, California.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    34.    Defendant Stockton & 65th LP is, and at all relevant times was, a limited

2    partnership organized and existing under the laws of the State of California, with its principal

3    place of business in the State of California.  On information and belief, defendant Glenn

4    Sorensen, Jr., has held a controlling ownership interest in Stockton & 65th LP at all times relevant

5    to this case.

6    35.    Defendant Larry Deane is, and at all relevant times was, a citizen of

7    California, and on information and belief, residing in Sacramento County, California.  At all

8    relevant times, Mr. Deane has been a minority interest holder as a member of Natomas.

9    36.    Defendant Baljit Johl is, and at all relevant times was, a citizen of

10    California, and on information and belief, residing in Sacramento County, California.

11    37.    Defendant Harinder Johl is, and at all relevant times was, a citizen of

12    California, and on information and belief, residing in Sacramento County, California.

13    38.    Defendant Margarida Leavitt (Leavitt) is, and at all relevant times was, a

14    citizen of California, and on information and belief, residing in Sacramento County, California.

15    Defendant Leavitt is joined as a party defendant in this action because (1) her interests are such

16    that in her absence complete relief cannot be accorded among those already parties; and (2) she

17    holds an interest relating to the subject matter of the action, as hereinafter alleged, and in the

18    absence of defendant Leavitt, existing parties, including plaintiff Natomas may be subject to a

19    substantial risk of incurring additional or otherwise inconsistent obligations.

20    39.    Plaintiffs are ignorant of the true names and capacities of defendants sued

21    herein as Does 1 through 100, inclusive, and therefore sues these defendants by the fictitious

22    names.  Plaintiffs will amend this complaint to allege their true names and capacities when

23    ascertained.  Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously-

24    named defendants is responsible in some manner for each act or omission herein alleged.

25    40.    At all times herein mentioned, each of the defendants was the agent and

26    employee of each of the remaining defendants, and in doing the things hereinafter alleged, was

27    acting within the course and scope of that agency.

28    ///

41.     At all times herein mentioned, plaintiffs use the phrase "Sinadinos and his co-conspirators" or "Sinadinos, Stanley Foondos, and their co-conspirators" to mean defendants Sinadinos, Stanley Foondos, Stephen Foondos, South Watt & Florin Partners, Chi-Sac Village Capital Group Investors LLC, Chi-Sac Florin Vineyards Investors LLC, Caselman & Carlisle Partners, Chi-Sac Vintage Creek Investors LLC, Chi-Sac Gap Investors, Prime Minister Group LLC, Park Ridge Investments LLC, Chi-Sac South Sutter Investors, Chi-Sac White Rock 150 Investors, LLC, Chicago South Watt Investors LLC, Chicago Infill Investors LLC, Stewart Title Company, Gus Galaxidas, Glenn Sorensen, Jr., Stockton & 65th LP, Larry Deane, Baljit Johl, and Harinder Johl, as to their respective involvements, directly and indirectly, by active or passive participation and/or conspiracy, in the particular transactions as alleged in this complaint.  The participation of particular defendants in specific transactions is hereinafter alleged.

### III.     JURISDICTION AND VENUE

42.     This Court has jurisdiction over the subject matter of this action pursuant to Title 28 United States Code Section 1331, Title 18 United States Code Section 1961, *et seq.*, and Title 28 United States Code Section 1367.

43.     Personal jurisdiction and venue in this District are proper pursuant to Title 18 United States Code Section 1965 and Title 28 United States Code Section 1391(b) because: (a) defendants are found in, have agents in, and/or transact their business and affairs in, this District, and (b) a substantial part of the events or omissions giving rise to the claims for relief occurred in this District.

### IV.     FACTUAL BASIS FOR CLAIMS

**A.     Natomas Assembles Development Projects**

44.     During early to mid-2003, Solorio negotiated with property owners in several locations in Sacramento County, for the purpose of obtaining rights to purchase undeveloped land, for development and subsequent sale.  Prior to these activities, he had relatively little experience as a residential real estate developer.  He had previously worked on the development of properties belonging to relatives, entering into a joint venture with another

///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   individual, Alan Warren, in which Mr. Warren breached his obligations to Solorio, associated

2   with a small development project.

3         45.   After many meetings and discussions with property owners and their

4   representatives, Solorio succeeded in identifying a number of contiguous parcels, which could

5   form the nucleus of a development project in Sacramento County.  Before entering into

6   agreements with the property owners, Solorio filed articles forming Natomas as a new limited

7   liability company on August 18, 2003.

8         46.   As he was preparing to enter into certain purchase and sale agreements

9   with the property owners, Solorio investigated sources of financing for the potential project.  He

10   was acquainted with Tim Lewis and Jeff Moore, land acquisition manager in the home building

11   company, Tim Lewis Communities.  Solorio also met Larry Deane, who introduced him to John

12   Sinadinos.  Immediately, Sinadinos showed interest in the project.  Solorio understood that

13   Sinadinos was directly affiliated with, and even related to a major developer in the region, Angelo

14   Tsakopoulos.

15         47.   Upon first meeting Solorio, Sinadinos said that he was licensed to practice

16   law in New York and California, had in the past represented Donald Trump in New York, and

17   was in-house attorney for Angelo Tsakopoulos in California.

18         48.   During initial conversations with Sinadinos, Solorio shared information

19   about his ongoing legal dispute with Mr. Warren.  Among other things, Solorio shared that he did

20   not have enough money to support the cost of a lawsuit against Mr. Warren to protect his family's

21   property.  Sinadinos told Solorio repeatedly that he would personally loan money to Solorio to

22   make Warren go away.  Ultimately, even though Solorio strongly contended that he was not at

23   fault in the dispute with Warren, he accepted the promised assistance by Sinadinos, to pay for a

24   settlement of that dispute.

25         49.   From this initial contact with Solorio, plaintiffs are informed and believe,

26   and thereon allege, that Sinadinos concluded Solorio was an easy target for fraud.  He had learned

27   Solorio was not sophisticated in the business of real estate development, had no substantial

28   personal assets to vindicate his rights in litigation, and was apparently willing to rollover in a

00003574

- 11 -

1    legal fight, even when Solorio strongly believed he was right.  As a financial predator, Sinadinos

2    had found a mark.

3           50.     In early discussions, Solorio demanded that Sinadinos properly document

4    their respective rights and obligations, to avoid the same breach of fiduciary duty problem he had

5    encountered with Mr. Warren.  Sinadinos assured Solorio those problems would not occur,

6    specifically stating that "if anyone close to Angelo Tsakopoulos did anything unethical, he would

7    cut you off at the knees."  Solorio relied on this representation, trusting that Sinadinos would

8    follow appropriate business practices.

9           51.     In the early stages of their working relationship, Sinadinos arranged several

10   meetings by Solorio with Angelo Tsakopoulos.  The meetings took place in Sinadinos' law office

11   located in Mr. Tsakopoulos' company headquarters building. On each occasion, Mr. Tsakopoulos

12   reviewed the parcel maps for properties, to which Mr. Solorio had acquired acquisition rights, and

13   the Community Plan which contained each parcel, then congratulated Solorio on his progress in

14   assembling properties for real estate development, telling Solorio he had "hit a home run."  The

15   praise and assurances of financial success by Mr. Tsakopoulos solidified Solorio's confidence in

16   the apparent financial capabilities and real estate development expertise of Sinadinos.

17          52.     Sinadinos also introduced Solorio to defendant Stanley J. Foondos.  They

18   both represented to Solorio that Foondos was a certified public accountant with many high net

19   worth clients, who would be among the investors in the development projects.  They also

20   represented to Solorio that Foondos would support the development operations for these projects

21   by use of customary accounting practices, and performance of all accounting and tax reporting

22   responsibilities for the development companies associated with the projects.  Relying on their

23   representations, Solorio understood and expected that Stanley Foondos would be maintaining all

24   proper financial records for the development projects and completing necessary and appropriate

25   tax reporting for all development companies and their members.

26          53.     By the end of 2003, Solorio had assembled purchase rights to a number of

27   contiguous parcels at one general location in Sacramento County, acting on behalf of Natomas.

28   When Natomas entered into the first three purchase and sale agreements toward the end of August

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    2003, Sinadinos made necessary deposits in escrow, using one of his companies, Prime Minister

2    Group LLC.  Again in October 2003, Natomas entered into purchase and sale agreements with

3    three more property owners, and Sinadinos confirmed the deposits of earnest money in escrow for

4    those transactions, using letterhead of his law office, designated Sinadinos & Vryonis LLP.  At all

5    times relevant to these proceedings, Sinadinos has been an attorney, actively practicing as a

6    member of the California State Bar.

7            54.     Ultimately, by mid-2004 Natomas obtained rights under the provisions of

8    14 agreements to purchase and develop approximately 109 acres of land located generally in the

9    vicinity of the intersection of South Watt Avenue and Florin Road in Sacramento County.  The

10   first Natomas residential development project, originally designated Florin Vineyards, is depicted

11   on the map attached as Exhibit A to Exhibits to First Amended Complaint Under the Racketeer

12   Influenced and Corrupt Organizations Act; Fraud; Breach of Fiduciary Duties; Professional Legal

13   Malpractice; Professional Accounting Malpractice; Conversion; and Petition for Writ of Mandate

14   to Compel Inspection of Records, Volume 1 ("Exhibits to First Amended Complaint, Volume 1")

15   filed concurrently herewith and incorporated herein.

16           55.     Sinadinos formed Village Capital Group LLC as the development company

17   associated with the Florin Vineyards project, by filing limited liability company articles with the

18   Secretary of State on October 4, 2004.  For ease of reference, the Florin Vineyards development

19   will be referred to as the Village project throughout this complaint.

20           56.     During early 2004, Solorio negotiated with property owners on behalf of

21   Natomas, in a second general location of Sacramento County.  By October 2004, he obtained

22   rights under the provisions of 17 additional agreements to purchase and develop approximately 85

23   acres of land located generally in the vicinity of Caselman Road and Carlisle Avenue.  That

24   residential development project, originally designated Vintage Creek, is depicted on the map

25   attached as Exhibit B to Exhibits to First Amended Complaint, Volume 1, filed concurrently

26   herewith and incorporated herein.

27           57.     Sinadinos formed Vintage Creek LLC as the development company

28   associated with the Vintage Creek project, by filing limited liability company articles with the

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

00003574

- 13 -

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   Secretary of State on July 21, 2004.  For ease of reference, this project will be referred to as

2   Vintage Creek throughout this complaint.

3            58.     Sinadinos represented to Solorio that he would invest $4,000,000 in each

4   project, for acquisition and development costs.  He made that representation prior to drafting the

5   operating agreements for Village and Vintage Creek.  Solorio relied on Sinadinos to provide that

6   equity investment, which Sinadinos further represented as adequate to achieve development

7   entitlements for each project.

8            59.     At one point, Solorio asked Sinadinos for more detailed background

9   information about his prior development project experience, to verify his ability to provide

10  financing for these projects.  Sinadinos readily and frequently emphasized his development

11  experience and funding capacity, and he sent an e-mail to Solorio, containing a summary of his

12  recent and ongoing residential development investments.  Sinadinos also gave Solorio a copy of a

13  meeting agenda containing a "Project Status Update" regarding ongoing development projects,

14  including the Village project listed as item #8.  On April 23, 2004, Sinadinos personally provided

15  the meeting agenda and project status update to investors in the Chicago, Illinois, area.  Sinadinos

16  regularly traveled from Sacramento to Chicago to hold quarterly meetings with these investors,

17  who provided investment money for the projects managed by Sinadinos, including the Village,

18  Vintage Creek, and Madera projects.  A true and correct copy of the email summary is attached as

19  Exhibit D to Exhibits to First Amended Complaint Under the Racketeer Influenced and Corrupt

20  Organizations Act; Fraud; Breach of Fiduciary Duties; Professional Legal Malpractice;

21  Professional Accounting Malpractice; Conversion; and Petition for Writ of Mandate to Compel

22  Inspection of Records, Volume 2 ("Exhibits to First Amended Complaint, Volume 2") filed

23  concurrently herewith and incorporated herein.  A true and correct copy of the meeting agenda for

24  the Chicago investors is attached as Exhibit E to Exhibits to First Amended Complaint,

25  Volume 2, and incorporated herein.  Relying on the representations and investment summaries by

26  Sinadinos, Solorio understood that Sinadinos had participated as an investor and investment

27  manager in a number of very large development projects, resulting in highly successful

28  investments in those prior ventures.  Sinadinos led Solorio to believe that he had ample capacity

00003574                                      - 14 -

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    and experience to provide equity investments for each development project in amount and form

2    of $4,000,000.

3         60.    While assembling properties for Village and Vintage Creek, Natomas also

4    obtained purchase rights at two other locations in Sacramento County.  One project, designated

5    Vintage Ranch, consists of two parcels totaling approximately 20 acres, located east of the

6    Village project.  The other development, designated Hedge, consists of one parcel of

7    approximately 6 acres, located south of the Village project.

8         61.    During April-May 2005, Solorio assembled property acquisition rights for

9    a development project located generally in the vicinity of Avenue 12 and County Road 30 1/2 in

10   Madera County, California.  Commencing in approximately April 2005, Solorio acted by and

11   through his company, Orchard Park, to negotiate and execute five option agreements, relating to

12   contiguous land in that general location.  Under the terms of the option agreements, Orchard Park

13   acquired the right to purchase approximately 265 acres of real property for the purpose of

14   residential real estate development.  That project, ultimately designated "Orchard Park," is

15   depicted on a map attached as Exhibit C to Exhibits to First Amended Complaint, Volume 1, and

16   incorporated herein.

17        62.    Solorio paid option and entitlement costs for the Orchard Park

18   development for approximately twenty (20) months before Sinadinos' involvement in the project.

19   Sinadinos represented to Solorio that he would provide financing for entitlement costs of the

20   Orchard Park project.  Relying on the representations by Sinadinos about his financing capacity

21   and prior investment experience, Solorio agreed to include Sinadinos in the Company ultimately

22   formed for development of the Madera properties, Madera Avenue 12 Capital Group LLC

23   (hereinafter referred to as "Madera").

24   **B.    Sinadinos and Foondos Take Control of Natomas Projects**

25        63.    Beginning with the first transaction, Sinadinos and Stanley Foondos began

26   using other companies under their control and direction as a source of funds for deposit in escrow

27   on properties under contract with Natomas.  The Prime Minister Group LLC deposited $50,000

28   on September 5, 2003, for the benefit of Natomas, to fund escrow on the Sparks parcel in Village.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    The Prime Minister Group LLC also deposited $50,000 in escrow for the purchase agreement on

2    the Balovich parcel, also located in the Village project, in September 2003, for the benefit of

3    Natomas.  In October 2003, several more deposits were made by Sinadinos and Stanley Foondos,

4    using their other companies, in escrow for the benefit of Natomas, with respect to other parcels in

5    the Village project.

6         64.     A spreadsheet, entitled "Specific Examples of Enterprise Activities," is

7    attached as Exhibit I to Exhibits to First Amended Complaint Under the Racketeer Influenced and

8    Corrupt Organizations Act; Fraud; Breach of Fiduciary Duties; Professional Legal Malpractice;

9    Professional Accounting Malpractice; Conversion; and Petition for Writ of Mandate to Compel

10   Inspection of Records, Volume 4 ("Exhibits to First Amended Complaint, Volume 4"), and

11   incorporated herein.  The spreadsheet at Exhibit I lists particular details of selected mailings,

12   interstate wire transmissions, and other predicate acts by defendants, involved in or incidental to

13   the conduct of their fraudulent schemes.  Each transaction listed in the spreadsheet is cross-

14   referenced to the specific section and paragraph number in the complaint, which alleges facts

15   concerning such transactions.

16        65.     With respect to each initial deposit, Sinadinos sent a letter to Solorio,

17   requiring his agreement to give Sinadinos sole and absolute discretion to control the transaction

18   with the seller, and requiring Natomas to indemnify the Prime Minister Group LLC for any

19   breach of the agreement.  Those letters were delivered to Solorio on the letterhead of Sinadinos &

20   Vryonis LLP, Attorneys at Law.  A true and correct copy of one of those letters addressed to

21   Solorio on behalf of Natomas, from Sinadinos, dated September 10, 2003, with true and correct

22   copies of related third party deposit instructions, receipts and checks for deposits on the Balovich

23   and Sparks parcels, is attached as Exhibit J to Exhibits to First Amended Complaint Volume 4,

24   and incorporated herein.  From his review of the letters and his communications with Sinadinos,

25   Solorio was led to believe that he was required to enter into these letter agreements, in order to

26   obtain the financial support promised by Sinadinos and Foondos.  Solorio further understood

27   from review of these letters and related communications with Sinadinos, that Sinadinos was

28   giving legal advice for the benefit of Natomas, concerning the handling of the escrow deposit

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1 transactions and communications with property owners about the process of developing their

2 land.

3          66.      Ultimately when each initial deposit was released to a seller, Sinadinos

4 directed Solorio to send letters to that seller via certified mail, to notify them, as required under

5 the contract, that the company had elected to move forward with the development project and

6 their related underlying purchase and sale agreement.  The escrow release instructions to title

7 companies were transmitted by mail and wire communications for disbursement of money from

8 escrows for each of the 35 properties in the developments and for the additional six 1031

9 exchange investors who repurchased six of the properties.  True and correct copies of notices

10 mailed by Natomas, at the direction of legal counsel Sinadinos, to the Balovich and Sparks

11 property owners, dated December 24, 2003, with true and correct copies of the escrow release

12 forms that accompanied the notices, and the certified mail slips and return receipts for those

13 letters, are attached as Exhibit K to Exhibits to First Amended Complaint, Volume 4, and are

14 incorporated herein.

15          67.      During approximately May 2004, Sinadinos began co-mingling funds

16 between the separate accounts held for the benefit of the separate Village and Vintage Creek

17 projects.  The investment fund account he established for Vintage Creek was initially held by a

18 company he formed, Chi-Sac Gap Investors.  The investment fund account he established for the

19 Village project was initially held by a company he formed, Chi-Sac Florin Vineyards Investors

20 LLC.

21          68.      Initially, Sinadinos made apparent loans of money from the Vintage Creek

22 account to the Village account, with substantial repayment of the loans within several months.

23 For instance, on May 19, 2004, Sinadinos transferred $5,000 by check No. 9902 from the Vintage

24 Creek account to the Village account.  On June 21, 2004, he repaid $5,000 from Village to

25 Vintage Creek.  Also, on June 10, 2004, he wired $50,000 from the Vintage Creek account to the

26 Village account.  On September 7, 2004, he transferred $45,000 back to Vintage Creek by check

27 No. 1033, drawn on the Village account, with the note "partial re-pay."

28 ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

69.    Sinadinos did not create any documents, which would customarily relate to loan transactions, such as promissory notes or other evidence of indebtedness by one company to another.  Plaintiffs are informed and believe, and thereon allege, that Sinadinos and Stanley Foondos used the first several transactions of co-mingling funds among the company accounts to confirm that they had obtained the trust and cooperation of Solorio by misrepresentations that they would accurately and responsibly control the financing for the development projects.

70.    With limited exception, Sinadinos and Foondos did not inform Solorio about their financial transactions among the development companies.  In fact, Solorio made numerous requests directed to both Sinadinos and Stanley Foondos, that they provide a comprehensive finance report to Natomas on a periodic basis, detailing the financial status of the development projects.  In each instance, Sinadinos and Foondos either ignored such requests or failed to disclose the details of their transactions.

71.    In an attempt to track the financial progress of the development projects, Solorio created his own spreadsheets, using the limited financial information he obtained from other sources.  Unknown to him, Sinadinos and Foondos were not giving him relevant financial information, and they were conducting many fraudulent transactions without the knowledge of Solorio.  Moreover, Sinadinos and Stanley Foondos were not maintaining comprehensive financial records of their dealings.

C.    **Johl-Barnard-Sparks Transactions**

72.    During mid-2004, Sinadinos began a series of transactions intended by him and his co-conspirators to drain assets away from Vintage Creek for their illegal benefit as purported investors of Village.  The commencement of these transactions coincided with the timing of a first major infusion of cash into Village from an intended ultimate buyer of the project, the commercial home builder, KB Homes.  KB Homes entered into a purchase agreement with Village and made its first deposit of $2,243,575 into escrow on November 9, 2004.

73.    Plaintiffs are informed and believe, and thereon allege, that Sinadinos and his co-conspirators began their active pursuit of a scheme designed to obtain fraudulently inflated capital investment accounts in Village as it became clear that a national commercial home builder

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    had guaranteed, with an irrevocable letter of credit, to pay Village more than $8 million in

2    deposits toward the purchase of Village's property rights.  One of their early actions was the

3    investment by a co-conspirator, Glenn Sorensen, Jr., and his company, Stockton & 65th LP, of

4    approximately $3 million from a Section 1031 exchange into the Village project.

5           74.      Defendant Sorensen met with Solorio more than eight times during the

6    months of July-October 2004, with Sinadinos present, in the law offices of Sinadinos & Vryonis

7    LLP, in Sacramento.  During the first meeting, Sorensen explained to Solorio that Sorensen was

8    the manager of Stockton & 65th LP.  Sorensen further explained to Solorio that Stockton had

9    executed a contract to sell property which was in escrow awaiting the final payment from the

10   buyer.  Sorensen further explained to Solorio that he, on behalf of Stockton, was looking for a

11   replacement property to purchase in order to defer to the income tax burden under IRS Code

12   Section 1031.  Sorensen told Solorio that Sinadinos had offered to "park" the proceeds on one or

13   more parcels to which Solorio had acquired the purchase rights on behalf of Natomas.  Sorensen

14   explained that Sinadinos had regularly parked money for him and numerous other investors that

15   were clients of Sinadinos and Stanley Foondos.  Solorio had already executed a binding

16   agreement with Baljit Johl to sell the Johl property to Natomas under a three-year option, and

17   Sorensen reiterated the prior suggestion of Sinadinos that Solorio should restructure the purchase

18   agreement to an all cash sale and allow Stockton to be named as the buyer on the contract instead

19   of Natomas.  Solorio adamantly objected to this proposal and made clear to Sinadinos and

20   Sorensen that Natomas would remain the named buyer on the respective option contracts.  Solorio

21   also voiced his concerns to Sorensen that Solorio had never met Sorensen prior to this

22   introduction and Solorio was uncomfortable with the proposed assignment from Natomas to

23   Stockton.

24          75.      As an apparent effort to give assurances to Solorio about the protections for

25   Natomas in the proposed transaction, Sorensen repeatedly explained to Solorio that Stockton

26   would simultaneously execute a purchase option in favor of Village, upon assignment by

27   Natomas of its option agreements for the Johl and Von Behren properties to Stockton.  Sinadinos

28   and Sorenson restructured the purchase agreement between Natomas and Johl, to require Johl to

00003574                    - 19 -

1     reinvest funds paid by or on behalf of Natomas into other properties in the Village project, in

2     order to convince Solorio that Village would not suffer a loss of investment money in the

3     transaction.  During these meetings among Sorensen, Sinadinos and Solorio, Sorensen stated that

4     after an assignment of the Johl agreement from Natomas to Stockton, Stockton would direct the

5     re-investment by Johl of the money he would receive from Stockton into the Village project,

6     according to the terms of the restructured purchase agreement between Natomas and Johl.  In late

7     September 2004, a meeting occurred among Sorensen, Sinadinos, Solorio, and Harinder and

8     Baljit Johl.  At that meeting, Sorensen assured the Johl's and Solorio that Stockton would

9     immediately execute an option back to Village and the Johl investment would stay in the Village

10    project, as the restructured Natomas-Johl contract reflected.

11          76.      When Sinadinos first approached Solorio about the proposed investment,

12    he explained that Sorensen would be paid a return on his investment of 25% annually, among

13    other highly favorable provisions.  Solorio objected repeatedly to the proposal on a number of

14    grounds.  The high rate of return was not in line with prior statements by Sinadinos, that he had

15    "parked" Section 1031 money for investors at a rate of return ranging from 6% to 8%.  Besides

16    rejecting the proposed high rate of return to Sorensen, Solorio objected to the commitment of all

17    of the investment money to only two parcels in the Village project, as proposed by Sinadinos.

18    The primary parcel targeted for the investment was owned by Mr. Baljit Johl, who had granted

19    Natomas an option to purchase the property at any time during the next several years.  There was

20    no need in 2004 to commit substantial funding to the purchase of the Johl parcel.

21          77.      Despite Solorio's objections, Sinadinos went ahead with his plan,

22    promising Solorio in exchange for his cooperation, that Sorensen's 25% return would be paid

23    solely out of other investors' share of project returns.  Sinadinos also agreed with Solorio that

24    upon Sorensen's payment of approximately $2.3 million to Johl, that Johl would "park" $1.3

25    million as a Section 1031 exchange by Johl into other properties in the Village project.  Those

26    other properties were designated in the Johl-Natomas purchase agreement as either the Park Place

27    parcel or the parcel belonging to Andrew Sephos.  As previously alleged, Sorensen actively and

28    repeatedly made assurances to Solorio that his company, Stockton & 65th LP, would immediately

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   execute a written option, giving Village the right to repurchase the properties Stockton was

2   acquiring in the Village project, for the same terms contained in the original Johl-Natomas

3   purchase agreement, with the promise by Sinadinos to pay Sorensen the annual return of 25%.

4          78.     In order to obtain the agreement by Solorio and Natomas to the proposed

5   transactions with Stockton & 65th LP and Sorensen, Sinadinos and Sorensen promised that

6   Stockton & 65th LP would option the properties acquired through these transactions back to

7   Village for the same price paid by Stockton & 65th LP to acquire the parcels.  These option

8   agreements were represented by Sinadinos and Sorensen as part of the consideration to be

9   obtained from Stockton & 65th LP and Sorensen contemporaneous with closing the transaction in

10   the fall of 2004.

11          79.     Relying on those promises, Solorio agreed to initiate the transaction with

12   Sorensen by assigning the interests of Natomas in the Johl and Von Behren parcels, within

13   Village, to Stockton & 65th LP.  On September 29, 2004, the parties executed the assignment of

14   the Johl parcel from Natomas to Stockton & 65th LP.

15          80.     Upon fraudulently obtaining the cooperation and consent by Natomas to

16   the proposed investment by Stockton & 65th LP, Sinadinos and Sorensen executed their original

17   plan, which they had misrepresented to Solorio.  Sinadinos and Sorensen completed a purchase

18   by Sorensen of the Johl parcel in November 2004, for approximately $2.3 million.  In December

19   2004, rather than "park" the proceeds of $1.3 million received by Johl into other Village parcels

20   as Sorenson and Sinadinos had promised and the Johl-Natomas purchase contract had explicitly

21   agreed, Sinadinos and Sorenson instead directed Johl to purchase the Barnard parcel which is part

22   of the entirely separate Vintage Creek project.  Allegedly to secure repayment to Johl of those

23   proceeds, Sinadinos arranged for a deed of trust to be placed against the original Johl parcel in

24   Village for the benefit of Johl.  Within four months Sinadinos and Sorenson asked Johl to remove

25   his deed of trust and instead placed it on another parcel not subject to purchase by the national

26   homebuilder.  Following their request, Johl agreed to move his deed of trust to another parcel.

27          81.     On two occasions in the fall of 2004, Solorio met with Sorensen in

28   Sinadinos's law office and asked why Stockton had not executed an option back to Village.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    Sorensen replied that his tax attorney was reviewing the draft option agreement and Stockton

2    would provide a final agreement within days.  After the assignment of purchase rights by

3    Natomas to Stockton, Sorensen never provided final option agreements nor executed options back

4    to Village, and he ignored more than a dozen more requests by Solorio between the fall of 2004

5    and spring of 2008 for the written option agreement in favor of Village, which included a request

6    sent by Solorio by certified mail to Sorensen on behalf of Stockton, which went unanswered.  By

7    the active participation of Sorensen in the multiple promises and assurances of both Sorensen and

8    Sinadinos that Stockton & 65th LP would comply with certain obligations as consideration for the

9    assignment of Natomas purchase rights to Stockton, including the false promise that Sorensen

10   would execute an option on identical terms back to the Village project, and the false promise that

11   Sorensen and Stockton would direct the reinvestment of funds received by Johl in the Village

12   project, as well as the subsequent, direct participation by Sorensen in the execution of the

13   fraudulent scheme with Sinadinos, concerning the subject transactions, Sorensen and Stockton

14   were aware of the fraudulent RICO enterprise and intended to participate in it.  Also, by failing

15   and refusing to document the option rights in the Johl and Von Behren properties, Sorensen and

16   Stockton continue to hold property rights unlawfully obtained from Natomas, without any

17   contractual obligations to sell the properties to Village.

18         82.    Only part of the $1.3 million transferred by Sinadinos into Vintage Creek

19   was used to acquire the Barnard parcel.  Sinadinos took control of Vintage Creek's net profit from

20   the Barnard-Johl sale in early January 2005, in the approximate amount of $837,287.

21         83.    Sinadinos simultaneously arranged what he purported to be a "loan" from

22   Vintage Creek to Village in the approximate amount of $700,000, using the "profit" he obtained

23   from the excess Johl proceeds. He conducted and completed that action of transferring the money

24   from Vintage Creek to Village by pattern of conduct of mail and wire fraud.  Within days of the

25   close of escrow from the Barnard-Johl sale and the resulting purported loan of Vintage Creek's

26   profits to Village, Sinadinos used that money to purchase substantial equity ownership in the

27   Sparks parcel, which is part of the Village project.  On approximately December 21, 2004,

28   Sinadinos sent an Amendment to Purchase and Sale Agreement, for the Sparks parcel, to Solorio

00003574                                    - 22 -

1    by e-mail.  Sinadinos used that document, among others, to put his fraudulent scheme into effect,

2    relating to the purchase of equity ownership in the Sparks parcel.

3               84.      Ultimately, Sinadinos, Stanley Foondos, and their co-conspirators have

4    claimed, in the form of filing fraudulent tax returns for both companies, and multiple letters and

5    emails in 2007 and 2008 that the $700,000 is not a debt owed by Village to Vintage Creek.

6    Instead, Sinadinos, Stanley Foondos, and their co-conspirators claim the approximate $700,000

7    used to purchase the Sparks parcel is "additional capital invested" by the investor entity, Chi-Sac

8    Village Capital Group Investors LLC, which they are members of and thereby added to the

9    investment capital account maintained by Sinadinos and Foondos for the Village project and

10   reflected as such on the falsely filed tax returns.  Plaintiffs are informed and believe, and thereon

11   allege, that Sinadinos, Stanley Foondos, and their co-conspirators would stand to benefit directly

12   by the fraudulent addition of approximately $700,000 to the investment capital account for Chi-

13   Sac Village Capital Group Investors LLC , and by their actions to launder the proceeds

14   transferred from Vintage Creek into the purported form of their own investments in Village.

15              85.      Sinadinos and Sorenson arranged for the balance of the proceeds from the

16   original investment by Stockton & 65th LP, the money not originally placed into the Johl parcel,

17   to be paid toward the purchase of equity in the approximate amount of $673,000 in the Von

18   Behren parcel, in Village.  Sinadinos and Sorenson completed that purchase by Stockton &

19   65th LP during November 2004.

20              86.      Contrary to Sorenson's and Sinadinos' original promises to Solorio,

21   Sinadinos did not obtain an agreement by Stockton & 65th LP or Sorensen to option the Johl and

22   Von Behren parcels back to Village.  Even though Solorio asked repeatedly for the option

23   agreements on those parcels to be documented by Sinadinos and Sorenson, Sinadinos and

24   Sorenson failed and refused, and continue to refuse the drafting and completion of those option

25   agreements.  As a result, plaintiff Natomas was defrauded of its purchase rights to the Johl and

26   Von Behren parcels, and Village has been placed at risk by Sinadinos and Sorenson of having no

27   clear, contractually defined rights regarding the repurchase of the Johl and Von Behren parcels

28   from Stockton & 65th LP or Sorensen on the favorable terms originally promised by Sinadinos

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    and his co-conspirators.  In effect, Sinadinos and his co-conspirators, including Stockton & 65th

2    LP and Sorensen, have placed Natomas at risk, and subject to undefined and unfavorable

3    potential legal demands they might impose against the project.  On two occasions by use of

4    interstate wire transmissions via e-mail, Sinadinos attempted to fraudulently establish a $6 million

5    debt owed by Village to Stockton & 65th LP, to be due and payable in December 2008.  On one

6    such occasion, Sinadinos sent an email to Solorio on October 24, 2006, with an attached list of

7    purported amounts owed to investors in the Village project, showing $6 million owed to Stockton

8    & 65th LP.

9    **D.      Homebuilder Investments and Execution of Operating Agreements**

10                87.     Sinadinos delayed drafting and completion of the operating agreements for

11   Village Capital Group LLC and Vintage Creek LLC, until after he had completed the

12   undocumented Stockton & 65th LP Section 1031 exchange of $3 million, and after Sinadinos had

13   executed two separate purchase and sale agreements with homebuilders who each agreed to

14   purchase the companies' projects, and just prior to a required distribution of substantial proceeds

15   deposited in each project by home builders.  The KB Homes first deposit in escrow during

16   November 2004 of approximately $2.2 million remained in escrow until the first release of funds

17   for Village project purposes on May 19, 2005.  On that day, approximately $1.7 million was

18   released for the purchase of two parcels in the project.

19                88.     The Village operating agreement was signed by and on behalf of its two

20   members, Natomas and Chi-Sac Village Capital Group Investors LLC, on May 12, 2005.  A true

21   and correct copy of the Operating Agreement for Village Capital Group, LLC, is attached as

22   Exhibit F to Exhibits to First Amended Complaint, Volume 2, and incorporated herein.  The first,

23   rough draft of that agreement was first presented to Solorio for review, on behalf of Natomas,

24   approximately nine months before it was ultimately signed.  Solorio objected to certain provisions

25   in the draft agreement and demanded the inclusion of other provisions.  In his attempts to

26   negotiate the form of the agreement, Solorio could not afford the cost of comprehensive legal

27   assistance.  Sinadinos referred Solorio to Allen Hine, an attorney with multiple undisclosed

28   conflicts of interest.  Among other objections, Solorio objected to the inclusion of an arbitration

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    clause in the operating agreement, and Hine advised that Solorio should not pursue that issue with

2    Sinadinos.  Sinadinos communicated with Hine and Solorio during negotiation of the operating

3    agreements, transmitting drafts of the documents by email.

4           89.     Nearly one year earlier, in mid-2004 Natomas had insisted that the

5    operating agreements for these development companies be drafted and executed before going into

6    contract with homebuilders who might purchase the projects.  Sinadinos delayed the negotiations

7    and review/revision of the operating agreements, until homebuilders were in binding contracts

8    and actually made their first deposits in escrow accounts held for the development companies.

9    Ultimately, Solorio executed the operating agreement, although he continued his objections to the

10   arbitration provisions inserted by Sinadinos.  Because of Sinadinos' calculated delay and his

11   entering into contract to sell Natomas' interest to homebuilders, if Natomas did not agree to

12   Sinadinos' unconscionable arbitration clause and waiver of Natomas' rights and instead tried to

13   part ways with Sinadinos, then Natomas was subject to substantial damages from the

14   homebuilders for breach of contract.  Natomas was exposed, because it controlled the purchase

15   rights, which Sinadinos contractually obligated for purchase by the homebuilders.  This situation,

16   together with other factors directly resulting from defendants' actions, caused Natomas undue

17   influence, duress and oppression.

18          90.     The Vintage Creek operating agreement was signed by and on behalf of its

19   two members, Natomas and Chi-Sac Vintage Creek Investors, on August 9, 2005.  A true and

20   correct copy of the operating agreement for Vintage Creek, LLC, is attached as Exhibit G to

21   Exhibits to First Amended Complaint Under the Racketeer Influenced and Corrupt Organizations

22   Act; Fraud; Breach of Fiduciary Duties; Professional Legal Malpractice; Professional Accounting

23   Malpractice; Conversion; and Petition for Writ of Mandate to Compel Inspection of Records,

24   Volume 3 ("Exhibits to First Amended Complaint, Volume 3") filed concurrently herewith, and

25   incorporated herein.

26          91.     Prior to Vintage Creek entering into the agreement with Tim Lewis

27   Communities (TLC), Solorio made multiple requests that Sinadinos complete the drafting of the

28   Vintage Creek operating agreement.  Sinadinos delayed the completion of that operating

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   agreement until after he had acquired more leverage over Natomas by receiving a $200,000

2   deposit from TLC on June 27, 2005, and Sinadinos continued to pressure Solorio through July 25,

3   2005, when Solorio assigned 50% of Natomas' interest in Vintage Creek property acquisition

4   rights to Sinadinos investment company, Chi-Sac Vintage Creek Investors LLC, and the

5   remaining 50% of Natomas' interest to Vintage Creek LLC.  Sinadinos obtained further leverage

6   over Natomas on July 29, 2005, by executing a sales contract with TLC and then on August 1,

7   2005, receiving another $796,885 deposit from TLC.  Once Sinadinos had taken full control of

8   the underlying purchase agreements and the first $1 million deposit by TLC into the project, then

9   Sinadinos sent by e-mail to Solorio on August 8, 2005, the final version of the Vintage Creek

10   operating agreement.  It was mutually executed the next day.  Two days later, on August 10,

11   2005, Sinadinos continued with his anger and yelling at Solorio in private meetings to pressure

12   Solorio into giving Sinadinos an additional $400,000 concession through an amendment of the

13   operating agreement, without any return consideration to Natomas.  Solorio was tired of being

14   badgered by Sinadinos over the prior year, and 10 days later he agreed to give Sinadinos the

15   $400,000 concession to alleviate to pressure Sinadinos was putting on Solorio and Natomas.

16   Sinadinos conducted the activities described above by the use of interstate wire transmission.  See

17   Exhibit I to Exhibits to First Amended Complaint Volume 4.

18          92.     The drafting and execution of the Vintage Creek operating agreement

19   suffered from the same defects as the Village operating agreement and more.  Solorio was

20   pressured by Sinadinos to enter into the Vintage Creek agreement on behalf of Natomas by

21   Sinadinos, because the agreement was a last-minute product after the receipt of the TLC deposit.

22   The "last-minute product" and Sinadinos' oppressive actions are evidenced in the additional

23   $400,000 concession he obtained 10 days after executing the operating agreement.  Solorio was

24   denied the ability of fair negotiations about the terms and conditions of the Vintage Creek

25   operating agreement, including the unconscionable arbitration clause in particular, because

26   Sinadinos had previously obtained, under duress, the complete control of Natomas' interest in its

27   personal property -- the 17 underlying option agreements for the project properties -- and

28   ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   Sinadinos obtained full control of $1 million deposit money TLC paid to acquire the rights to the

2   option agreements, which Natomas had assigned under duress without receiving consideration.

3      93. Also, Sinadinos was compelling signature by Solorio, on behalf of

4   Natomas, on the operating agreements long after Sinadinos had begun his fraudulent activities,

5   causing damages to the projects which were unknown to Solorio and undisclosed by Sinadinos.

6   Accordingly, Sinadinos obtained the concession by Solorio, of his objections to the arbitration

7   and related provisions limiting Solorio's access to a judicial forum and exercise of his right to a

8   jury trial, after Sinadinos had already committed substantial fraud against plaintiffs.

9      94. Just prior to executing the operating agreements, Sinadinos presented

10   conflict waiver letters to Solorio, which misrepresented and failed to disclose actual ethical

11   conflicts involving Sinadinos, in his capacity as lawyer for the development projects, Natomas,

12   and various participants and investors.  Accordingly, the purported waiver of trial and jury rights,

13   and the arbitration provisions in the operating agreements, are unconscionable, illegal,

14   unenforceable as contractual provisions, and subject to being stricken by the Court.

15   **E.** **Fraudulent Loans from Vintage Creek to Village**

16      95. Besides the fraudulent transfer of approximately $700,000 in the Johl-

17   Barnard-Sparks transactions, Sinadinos and his co-conspirators also transferred additional illegal

18   "loans" from Vintage Creek to Village, by wire and check transactions between approximately

19   June 2004 through the end of 2007.  In total, Sinadinos and his co-conspirators transferred

20   approximately $2,155,000 from Vintage Creek to Village, balanced against partial

21   reimbursements of approximately $825,000.  Plaintiffs are informed and believe, and thereon

22   allege, that the result of these activities by Sinadinos and his co-conspirators has been the

23   conversion and laundering of approximately $1,330,000 of Vintage Creek monetary assets, which

24   Sinadinos, Stanley Foondos, and the co-conspirators have added to their purported capital

25   accounts, with no intention of reimbursing Vintage Creek.

26      96. Sinadinos only informed Solorio about two of these so-called loans from

27   Vintage Creek to Village.  In each instance, Solorio objected to the co-mingling of funds between

28   the Vintage Creek and Village projects.  At all times when these two loan transactions occurred

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   Solorio was unaware of the scope and nature of the illegal conduct by Sinadinos and his co-

2   conspirators.  The multiple occasions of co-mingling of funds by Sinadinos and his co-

3   conspirators between the projects violated the terms of the operating agreements for Vintage

4   Creek and Village.

5   **F.      Unlawful Return of Capital Contributions to Investors**

6            97.      On multiple occasions, between approximately November 2004 and

7   continuing to the present, Sinadinos and his co-conspirators transferred funds from Vintage Creek

8   and Village to themselves, without lawful authority and in direct contravention of the provisions

9   in the operating agreements.  These transfers of funds violated section 5 of the operating

10  agreements for the Village and Vintage Creek projects.  Sinadinos and his co-conspirators

11  reimbursed equity investments which they had allegedly made in the projects, using other

12  proceeds including payments by homebuilders KB Homes and TLC.

13           98.      Sinadinos and his co-conspirators also employed continuing, rampant use

14  of so-called "loans" to satisfy their required investments in the projects.  They readily reimbursed

15  themselves substantial amounts of money, which by law and the terms of the operating

16  agreements should have remained in their capital accounts as project investments.  The net effect

17  of this activity has been the siphoning off of funds to Sinadinos and his co-conspirators from

18  assets of the development companies to which they were not entitled, and the gross overstatement

19  of their respective capital accounts in these companies.

20           99.      Sinadinos and his co-conspirators also made double payment of alleged

21  loan reimbursements, resulting in the direct theft of substantial sums by them.  Sinadinos and his

22  co-conspirators accomplished these illegal transactions by means of mail and wire fraud.  See

23  Exhibit I to Exhibits to First Amended Complaint Volume 4.

24           100.     At first, Sinadinos promised that he would provide investments of

25  $4,000,000 in each of the development projects, Village and Vintage Creek.  He began those

26  investments by making deposits, usually in the amount of $50,000, to open escrow on the

27  purchase of property by Natomas.  For instance, during September and October 2003, Sinadinos

28  ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    made such deposits by using his company, Prime Minister Group LLC, to open escrow on the

2    acquisition of the Sparks and Von Behren parcels in the Village project.

3              101.    By November 2004, Sinadinos used other funds invested in the Village

4    project to reimburse $50,000 on the Von Behren parcel, by payment of those funds to another

5    company controlled by him and Stanley Foondos, Chi-Sac Florin Vineyards Investors LLC.

6              102.    On January 31, 2005, Sinadinos directed First American Title Company

7    handling the close of escrow on the purchase of the Barnard parcel by Johl (previously described

8    in the Johl-Barnard-Sparks transaction) to transfer approximately $98,000 to his company

9    affiliated with the Vintage Creek project, Chi-Sac Gap Investors.  On that same day, Sinadinos

10   used the account held by Chi-Sac Gap Investors to reimburse his other company, Prime Minister

11   Group LLC, the amount of $75,000.  On the check he used for that payment, he wrote the note

12   "repay loan."  By that transaction, Sinadinos actually repaid himself and his co-conspirators for a

13   capital investment using project funds to which he was not entitled, without authority to do so.

14             103.    On the next day, February 1, 2005, Sinadinos paid an additional $20,000 to

15   himself and his co-conspirators, by check made payable to the Prime Minister Group LLC from

16   the Chi-Sac Gap Investors account.   Again, Sinadinos unlawfully reimbursed himself and his co-

17   conspirators some or all of a prior capital investment using project funds to which he was not

18   entitled.  Plaintiffs are informed and believe, and thereon allege, that Sinadinos and his co-

19   conspirators made these payments to themselves with the intent of receiving an unlawful

20   reimbursement of capital, without reducing their purported capital accounts for these

21   development projects.  They continued to claim these capital investments in the projects, although

22   they had secretly reimbursed themselves from project funds.

23             104.    Plaintiffs are informed and believe, and thereon allege, that the total

24   amount of unlawful reimbursement of capital investment funds by Sinadinos and his

25   co-conspirators, and the resulting overstatement of their capital accounts, is more than several

26   hundred thousand dollars, subject to proof at trial.

27             105.    In a pattern of activity similar to the outright reimbursement of original

28   capital investments, Sinadinos made frequent repayments to himself, his co-conspirators, and

00003574                                    - 29 -

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1  their companies of prior alleged "loans" to Village and Vintage Creek.  In each instance when

2  there had actually been a prior investment by one of Sinadinos' companies, such repayments were

3  unlawful returns of equity to Sinadinos and his co-conspirators.  In many circumstances, the

4  payments by Sinadinos were outright embezzlement of development company assets.

5       106.  On May 20, 2005, Sinadinos wrote check number 9905 on a Village

6  account, payable to another company controlled by him, Park Ridge Investments, for $25,000.

7  Plaintiffs are informed and believe, and thereon allege, that this payment of $25,000 to Park

8  Ridge by Sinadinos was an unlawful return of equity to an investor in the project.

9       107.  On June 6, 2006, Sinadinos wrote check number 1105 from a Vintage

10  Creek account, for $20,000, payable to Chi-Sac South Sutter Investors.  Sinadinos wrote a note on

11  the check, attempting to characterize it as a "loan repayment." Plaintiffs are informed and believe,

12  and thereon allege, that Sinadinos and his co-conspirators hold controlling interests in Chi-Sac

13  South Sutter Investors, and that no prior loan had been made by that company to Vintage Creek,

14  which would justify the purported repayment.  This payment resulted from an agreement by

15  Sinadinos and his co-conspirators to siphon off $20,000 of Vintage Creek assets for the direct,

16  unlawful benefit of themselves.

17       108.  On June 15, 2006, Sinadinos wrote check number 1110 on a Vintage Creek

18  account, payable to Park Ridge Investments, for $25,000.  He wrote a note on the check of "repay

19  loan 4/15/05."  Park Ridge Investments had previously deposited $25,000 in a Vintage Creek

20  account by check dated April 13, 2005, signed by Sinadinos.  He also wrote check number 1111

21  on June 15, 2006, made payable to Park Ridge Investments, in the amount of $2,916, on which he

22  wrote the note "interest 4/14/5-6/15/6."  His payment of the $25,000 and the purported interest to

23  Park Ridge was an unauthorized return of equity, with interest, to an investor in the project.

24       109.  Again, plaintiffs are informed and believe, and thereon allege, that

25  Sinadinos and his co-conspirators have claimed a capital account balance which includes original

26  investments such as the $25,000 by Park Ridge, although Sinadinos has actually reimbursed those

27  amounts with interest.  The reimbursements to the investors benefit Sinadinos and his

28  ///

1   co-conspirators directly, because they hold controlling ownership interests in the entities which

2   have invested in the Village and Vintage Creek projects.

3           110.    Also on June 15, 2006, Sinadinos made two other payments by check to

4   Park Ridge Investments from a Vintage Creek account, in the respective amounts of $10,000 and

5   $20,000.  He executed two more checks on that day, allegedly paying interest to Park Ridge

6   Investments on those purported loans, in the respective amounts of $1,108 and $2,122.  He wrote

7   notes on those checks, referring to alleged repayments of loans, with interest.  Plaintiffs are

8   informed and believe, and thereon allege, that Sinadinos had never made any original "loans" on

9   behalf of his company, Park Ridge, for those amounts, and the purported repayments were his

10  outright embezzlement of those funds from Vintage Creek.

11          111.    On September 28, 2006, Sinadinos wrote check number 1143 from a

12  Vintage Creek account, for $55,000, payable to Park Ridge Investments.  There was no note on

13  the check, and no prior indication of a deposit in that amount from Park Ridge.  Plaintiffs are

14  informed and believe, and thereon allege, that Sinadinos and his co-conspirators embezzled the

15  $55,000 from Vintage Creek by this transaction, without any legal justification for the transfer of

16  project funds.

17          112.    On February 20, 2007, defendant Gus Galaxidas loaned $110,000 to

18  Village.  Sinadinos and Stanley Foondos received a kickback of $3,000 each from Village funds,

19  as commissions, apparently for originating the loan by Galaxidas, who is also an investor in

20  Village, the broker for the contracted sale to a homebuilder and has resulting fiduciary duties and

21  required legal disclosures that were outright disregarded by Galaxidas.  Sinadinos used the

22  Galaxidas loan for construction of a wall during February 2007, around an approximate two acre

23  homesite on the Nguyen parcel in the Village project.

24          113.    Plaintiffs are informed and believe, and thereon allege, that Sinadinos,

25  Foondos, and Galaxidas conspired to deposit the $110,000 in Village, allowing Sinadinos and

26  Foondos to take an illegal commission from that deposit, with the original intent of reimbursing

27  that money, with interest, to Galaxidas from Vintage Creek assets.  In fact, on May 30, 2007,

28  Sinadinos and his co-conspirators directed by e-mail communications to Stewart Title Company

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   that the $110,000 be paid to Galaxidas, with interest at 10% per annum.  On that day, Stewart

2   Title Company paid Galaxidas approximately $113,727 from an escrow containing excess funds

3   belonging to the separate and independent Vintage Creek project.  By these transactions,

4   Sinadinos and his co-conspirators, including Foondos, Galaxidas and Stewart Title Company,

5   actively participated in the conduct of mail and wire fraud, resulting in the depletion of Vintage

6   Creek assets associated with the unlawful payments to Galaxidas, Sinadinos and Foondos.  A true

7   and correct copy of the email communication from Sinadinos to Stewart Title and Galaxidas,

8   copied to Solorio, Deane, and Stanley Foondos, is attached as Exhibit L to Exhibits to First

9   Amended Complaint, Volume 4, and incorporated herein.

10             114.    Sinadinos paid himself and his co-conspirators twice for certain purported

11   loan repayments from the Village and Vintage Creek projects.  By these activities, Sinadinos and

12   his co-conspirators embezzled money from both projects by a scheme of duplicate

13   reimbursements.  In each instance, the reimbursement of equity investments was itself unlawful,

14   as occurred in similar circumstances with the heretofore alleged "loan" repayments.

15             115.    On March 29, 2005, Sinadinos wrote a check on an account held by his

16   company, Park Ridge Investments, for $35,000, payable to Chi-Sac Gap Investors.  He made that

17   payment, writing a note on the check of "loan."  Plaintiffs are informed and believe, and thereon

18   allege, that Sinadinos and his co-conspirators held controlling interests in Park Ridge Investments

19   and Chi-Sac Gap Investors at all times relevant to these transactions.

20             116.    On March 30, 2005, Sinadinos wrote a check on an account belonging to

21   Chi-Sac Gap Investors, for $35,000, made payable to Park Ridge Investments.  He made that

22   payment, indicating on the check that it was a repayment of the loan from the prior day.

23             117.    On June 15, 2006, Sinadinos wrote a check on an account belonging to

24   Vintage Creek, in the amount of $35,000, made payable to Park Ridge Investments.  He made

25   that payment, writing a note on the check of "repay loan 3/31/05."  That payment was a duplicate

26   reimbursement of the purported loan from Park Ridge Investments on March 29, 2005.  Sinadinos

27   and his co-conspirators embezzled $35,000 by these transactions.

28   ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

118.    On October 2, 2006, Sinadinos wrote a check on an account belonging to Chi-Sac White Rock 150 Investors LLC, in the amount of $10,000, made payable to Village. He made that payment as a purported loan to Village. Plaintiffs are informed and believe, and thereon allege, that Sinadinos and his co-conspirators had controlling interests in Chi-Sac White Rock 150 Investors LLC at all times relevant to these transactions.

119.    On October 6, 2006, Sinadinos wrote a check on account belonging to Village, in the amount of $10,000, made payable to himself. He made that payment, with a note on the check indicating the purpose for the payment was to repay the $10,000 loan from Chi-Sac White Rock 150 Investors LLC.

120.    On November 6, 2006, Sinadinos wrote a check on an account belonging to Village, in the amount of $10,000, made payable to Chi-Sac White Rock 150 Investors. He made that payment, including a note on the check of "repayment." That payment was a duplicate reimbursement of the purported loan from White Rock 150 Investors LLC on October 2, 2006. Sinadinos and his co-conspirators embezzled $10,000 by these transactions, from Village assets.

## G.    Fraud in Inducement of New Investors into Vintage Creek

121.    Plaintiffs are informed and believe, and thereon allege, that from the beginning of their involvement with these residential development projects, Sinadinos and his co-conspirators never intended to repay the funds they were stealing from Vintage Creek, which exceed $1.3 million. Their intentional fraudulent scheme to bilk money away from Vintage Creek was well underway even prior to the initial investment by the homebuilder, TLC, in July 2005, when TLC made its first deposit of $1.3 million.

122.    Sinadinos and his co-conspirators were fully aware that the deposits being made by TLC in Vintage Creek were essentially nonrecourse; TLC would make no claim for a recovery of its investment, if the project failed. The eventual downturn in the real estate market after TLC became involved in Vintage Creek was irrelevant to the potential financial success of the Vintage Creek residential development project. Regardless of the movement of the general real estate market in the Sacramento region, Vintage Creek was doomed to financial failure by the

///

1   specific fraudulent intent of Sinadinos and his co-conspirators at the beginning, to deplete its

2   assets in a scheme designed solely to result in their personal, fraudulent financial benefit.

3         123.   As part of their overall scheme to pump assets out of Vintage Creek and

4   ultimately dump the development project, Sinadinos and his co-conspirators sought out third-

5   party victims for additional sources of illegal profits.  One such victim was Margarida Leavitt.

6   Ms. Leavitt had approximately $1.2 million in Section 1031 exchange money available in the

7   summer of 2007 to invest in real property.

8         124.   Plaintiffs are informed and believe, and thereon allege, that Sinadinos and

9   his co-conspirators, including Stanley and Stephen Foondos, made numerous fraudulent

10  misrepresentations to Ms. Leavitt, to convince her to invest her 1031 exchange money in the

11  purchase of the Donabedian parcel, in the Vintage Creek project.  Among other

12  misrepresentations, they informed her that she would be investing in an active residential real

13  estate development project, with some level of guaranteed, excellent financial return.

14        125.   Sinadinos and his co-conspirators purposefully avoided disclosing the truth

15  about their fraudulent scheme and the certain financial failure of the Vintage Creek project, when

16  they intentionally defrauded her for the purpose of securing her investment of $1.2 million in the

17  project.  Approximately one year before their misrepresentations to Ms. Leavitt, TLC had

18  expressly communicated to Sinadinos that it was not interested in continuing with the purchase

19  agreement and would wait until its next option payment was due before formally terminating its

20  purchase rights for the development.  In May 2007 TLC formally terminated their rights as

21  previously stated.  After the abandonment of the Vintage Creek project by the homebuilder in

22  May 2007, any reasonable investor would be very likely influenced by that information toward

23  not investing their funds in that project.  Sinadinos and his co-conspirators not only failed to

24  disclose the abandonment of the project by the homebuilder to Ms. Leavitt; they failed to disclose

25  the company's other financial obligations to "put option" holders and substantial income tax

26  liability for tax evasion and they falsely represented the opposite picture to her, that the

27  development would return substantial benefit on her investment.

28  ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    126.    Plaintiffs are informed and believe, and thereon allege, that the role of co-

2    conspirator Stephen Foondos in this scheme to defraud Ms. Leavitt was his representation of her

3    interests as her attorney in the transaction with Sinadinos and Stanley Foondos.  Plaintiffs are

4    informed and believe, and thereon allege, that she was introduced to this fraudulent transaction by

5    co-conspirator Stanley Foondos, who had previously served as her certified public accountant.

6    Not only did Stephen and Stanley Foondos conspire with Sinadinos to defraud Ms. Leavitt; they

7    actively participated in the conduct which implemented the fraud, by means including mail and

8    wire transmissions.  True and correct copies of an email, dated June 22, 2007, and the documents

9    attached to the original email, sent by Sinadinos to Sharon Wichmann at Stewart Title, with

10    copies to Stanley Foondos, Deane, and Solorio, concerning Leavitt escrow-related documents, are

11    attached as Exhibit M to Exhibits to First Amended Complaint, Volume 4, and incorporated

12    herein.

13    127.    In early August 2007, the co-conspirators accomplished the fraudulent

14    transaction, by closing escrow on the purchase of the Donabedian parcel with $1.2 million of

15    Ms. Leavitt's Section 1031 proceeds.  The Donabedian sellers originally agreed with Natomas to

16    sell the property in June 2004 for $900,000.  Prior to mid-2007, Vintage Creek had paid

17    $450,000, or half the purchase amount.  Plaintiffs are informed and believe, and thereon allege,

18    that Sinadinos and his co-conspirators used the net proceeds from the Leavitt investment, in the

19    approximate amount of $750,000, to further the goals of their fraudulent, racketeering scheme,

20    whether to illegally reimburse their prior investments without reducing their stated capital

21    accounts, or to accomplish the embezzlement and laundering of those proceeds.

22    128.    During the summer of 2007, Sinadinos and his co-conspirators lured

23    another third-party investor into Vintage Creek by fraudulent means, after the homebuilder TLC

24    had abandoned the project.  During July 2007, Sinadinos and his co-conspirators closed escrow

25    on an investment of approximately $662,000 by the Vathis family.  Plaintiffs are informed and

26    believe, and thereon allege, that Sinadinos and his co-conspirators fraudulently misrepresented to

27    the Vathis family that their investment in Vintage Creek would result in a particular projected

28    ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    favorable return, based on the false representation that the development project was proceeding

2    toward successful conclusion, with guaranteed substantial increase in value of the property assets.

3             129.    At the time of making such misrepresentations, Sinadinos and his co-

4    conspirators were fully aware of their intentions to dump the Vintage Creek project, with full

5    knowledge that they were eviscerating and planning to abandon the development.  Plaintiffs are

6    informed and believe, and thereon allege, that had the Vathis family been aware of the truth about

7    the Vintage Creek project, they would not have invested their money.

8             130.    By their fraudulent conduct, Sinadinos and his co-conspirators induced the

9    Vathis family to invest Section 1031 exchange funds in a Vintage Creek parcel, which resulted in

10   net proceeds of approximately $187,000.  Plaintiffs are informed and believe, and thereon allege,

11   that Sinadinos and his co-conspirators used the net proceeds from the Vathis investment to further

12   their fraudulent scheme, in the same manner they used the net proceeds from the fraud

13   perpetrated against Leavitt.  In particular, approximately $113,727 was transferred from the

14   Vathis escrow in Vintage Creek by Stewart Title Company, according to and in concert with the

15   email directions by Sinadinos, to Gus Galaxidas, for the fraudulent purpose of repaying his prior

16   loan to the separate and independent company Village, with interest, for construction of the wall

17   around the Nguyen parcel.  Sinadinos and his co-conspirators used the illegal proceeds from the

18   Vathis fraud for the unlawful payment of the Galaxidas loan.

19            131.    By the end of 2007, just a few months after the Vathis and Leavitt

20   fraudulent transactions, Sinadinos and his co-conspirators took specific action to continue their

21   scheme of dumping the Vintage Creek project.  They sent letters to nearly all property owners in

22   the project, notifying the owners that Vintage Creek was terminating their purchase and option

23   agreements.  Sinadinos and his co-conspirators transmitted those letters through the mail to the

24   property owners on or about December 31, 2007, intending to support their fraudulent scheme by

25   claiming the equity interests lost by Vintage Creek in those properties as losses offsetting other

26   taxable gains such as the $4 million profit from the TLC transaction, the $837,000 profit from the

27   Barnard-Johl transaction, the $750,000 profit from the Leavitt transaction and the $187,000 profit

28   from the Vathis transaction.

1    132.   Sinadinos and his co-conspirators did not send termination letters to either

2    Ms. Leavitt or the Vathis family.  Although they had terminated project interests in nearly all

3    other properties, Sinadinos and his co-conspirators continued the fraudulent scheme of misleading

4    the Leavitt and Vathis property owners about the continued viability of the project.

5    133.   During 2008, Sinadinos and his co-conspirators have continued their fraud

6    against Leavitt and Vathis.  They have continued making monthly option payments to the

7    property owners, to avoid arousing suspicions by the owners about defendants' intentions for the

8    Vintage Creek project.  Sinadinos and his co-conspirators also made payments during 2008, sent

9    by mail to representatives of an owner's group, responsible for coordinating environmental review

10   for multiple regional development projects.  During approximately April 2008, Sinadinos wrote a

11   check in the amount of $50,000 on an account belonging to his law office, made payable to

12   Vintage Creek.  He deposited that check in an account belonging to Vintage Creek and paid

13   approximately half of that amount to the owner's group, regarding environmental review for

14   Vintage Creek.

15   134.   Plaintiffs are informed and believe, and thereon allege, that the only reason

16   for Sinadinos' transmittal of that payment to the owner's group was his fraudulent plan to

17   misrepresent that Vintage Creek continues as an active development project.  Instead, the truth is

18   that Sinadinos and his co-conspirators have never intended to pursue successful residential

19   development in the Vintage Creek project, and clearly terminated the project by no later than

20   December 2007.  One month prior to the payment by Sinadinos to the owner's group, during

21   March 2008, defendant Larry Deane sent an e-mail correspondence to the owner's group,

22   requesting that they "remove Vintage from the group."  The continuing payments of obligations

23   pertaining to Vintage Creek in 2008 are for the sole reason of covering up their previous frauds

24   against Ms. Leavitt, the Vathis family and plaintiffs.

25   135.   All of these fraudulent transactions, directly targeting Leavitt and Vathis as

26   victims of financial fraud, have exposed plaintiffs to the risk of liability claims which may be

27   made by the defrauded investors.  As soon as plaintiffs became aware of the fraudulent activities

28   by Sinadinos and his co-conspirators in these regards, plaintiffs began immediately attempting to

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

00003574

- 37 -

1  correct defendants' wrongful conduct and disassociate from the fraudulent activities by

2  defendants.  Besides the increased liability risk to the plaintiffs occasioned by defendants'

3  fraudulent activities, plaintiffs are informed and believe, and thereon allege, that defendants have

4  attempted to inflate their stated capital investments in the Village project by the use of their ill-

5  gotten proceeds from Leavitt and Vathis, in a scheme of money laundering.

6  **H.    Embezzlement, Kickbacks, and Money Laundering**

7          136.    Sinadinos and his co-conspirators have conducted multiple additional

8  transactions involving embezzlement, kickbacks, and money laundering.  Those unlawful

9  activities included unauthorized payments to themselves and their other companies, use of Village

10  and Vintage Creek money to satisfy obligations of their other companies, payment of "loan fees"

11  or "points" for many investments in these projects, and laundering the proceeds of their fraudulent

12  activities by promoting their illegal enterprise and attempting to hide their illegal profits from the

13  Internal Revenue Service.

14          137.    On August 2, 2005, Sinadinos wrote check number 1006 on an account

15  belonging to Vintage Creek, in the amount of $25,000, made payable to his investment group

16  associated with that project, Chi-Sac Gap Investors.  He deposited that check in the Chi-Sac Gap

17  Investors account.  On that same day, he wrote check number 1081, on the Chi-Sac Gap Investors

18  account, in the amount of $25,000, made payable to Village.  On that check he wrote the note

19  "capital contribution," intending to falsely represent that the payment from his investment group,

20  Chi-Sac Gap Investors was an investment of their own funds into the Village project.  He

21  deposited the $25,000 check into the Village account, treating it as an addition to the capital

22  account in that project for the benefit of himself and his co-conspirators.  Those funds actually

23  originated from the first deposit by TLC in the Vintage Creek project, on July 29, 2005.  So, by

24  these transactions, Sinadinos and his co-conspirators fraudulently converted and laundered

25  $25,000 of TLC money belonging to Vintage Creek, for their personal, unlawful benefit.

26          138.    As previously alleged, Park Ridge Investments is a company directly

27  controlled by Sinadinos and his co-conspirators, and Park Ridge received numerous payments by

28  them from Vintage Creek funds.  One of the latter payments by Sinadinos and his co-conspirators

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    from Vintage Creek to Park Ridge Investments occurred on September 28, 2006.  On that day,

2    Sinadinos wrote check number 1143 in the amount of $55,000, made payable to Park Ridge

3    Investments.  He transferred that money to Park Ridge without legal authority, resulting in the

4    embezzlement of that money for the personal, unlawful benefit of himself and his co-conspirators.

5           139.    On March 26, 2007, Sinadinos and his co-conspirators laundered part of

6    the money illegally obtained from Vintage Creek, via transfers to Park Ridge Investments.  On

7    that day, Sinadinos wrote check number 2067 on an account belonging to Park Ridge

8    Investments, in the amount of $50,000, made payable to Village, and deposited that check in a

9    Village account.  Plaintiffs are informed and believe, and thereon allege, that Sinadinos and his

10   co-conspirators completed this deposit in Village for the purpose of laundering the proceeds of

11   their prior mail and wire fraud against Natomas, intending to use the money stolen from Vintage

12   Creek to fraudulently inflate their purported capital accounts and ownership interest in Village.

13          140.    Also on March 26, 2007, Sinadinos and his co-conspirators obtained one

14   more illegal benefit from the $50,000 money laundering transaction into Village.  On that day,

15   Sinadinos wrote check number 1111 from a Village account, in the amount of $2,500, made

16   payable to "cash," with a note written by him of "Park Ridge loan."  Sinadinos wrote and cashed

17   that check to obtain a $2,500 commission for his personal benefit, which he justified based on the

18   illegal transfer of $50,000 of laundered proceeds into Village.

19          141.    On August 4, 2007, Sinadinos wrote check number 1232 on an account

20   belonging to Vintage Creek, for $34,000, made payable to the Sacramento Legal Group, as partial

21   payment of a commission on the Leavitt transaction.  Stephen Foondos is part of the Sacramento

22   Legal Group.  Also on August 4, 2007, Sinadinos wrote check number 1233 on an account

23   belonging to Vintage Creek, for $16,000, made payable to Stephen Foondos, as further

24   commission to him for serving as the attorney for Ms. Leavitt, as she was being swindled by the

25   co-conspirators.  Plaintiffs are informed and believe, and thereon allege, that not only did Stephen

26   Foondos violate his fiduciary and professional, ethical obligations to Ms. Leavitt by this

27   transaction, but he also profited by the $50,000 kickback completed in two separate payments to

28   him and his law firm.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    142.    Then, on September 6, 2007, Stephen Foondos wrote check number 2495

2    on his personal account, in the amount of $50,000, made payable to Village.  He and Sinadinos

3    deposited that check in the Village account, for the apparent purpose of laundering the money he

4    had received as a kickback from the fraud perpetrated against Ms. Leavitt in the Vintage Creek

5    project.  Also on September 6, 2007, Sinadinos wrote check number 1145 on a Village account,

6    in the amount of $10,000, made payable to Stephen Foondos.  Plaintiffs are informed and believe,

7    and thereon allege, that this payment was a further kickback of $10,000 to Stephen Foondos,

8    while Sinadinos and his co-conspirators credited Stephen Foondos with an artificially inflated

9    capital account in the Village project, based on his money laundering investment of $50,000.

10   143.    Sinadinos and his co-conspirators used approximately $7,400 of Vintage

11   Creek money to pay California Secretary of State, California State Franchise Tax Board, and

12   United States Treasury filing fees for other companies, including Chi-Sac Vintage Creek

13   Investors, Chicago Infill Investors, South Watt & Florin Partners, and Chi-Sac Village Investors.

14   Those payments, mailed on at least 15 occasions beginning in July 2005 and continuing through

15   April 2008, were unauthorized and an illegal use of Vintage Creek money for the benefit of

16   Sinadinos and his co-conspirators.

17   144.    Sinadinos and his co-conspirators used approximately $6,000 of Village

18   money to pay California Secretary of State, California State Franchise Tax Board, and United

19   States Treasury filing fees for other companies, including Chi-Sac Village Capital Group

20   Investors, Chicago Infill Investors, and Chicago South Watt Investors.  Those payments, mailed

21   on at least 13 occasions beginning in July 2005 and continuing through October 2007, were an

22   unauthorized and illegal use of Village money for the benefit of Sinadinos and his co-

23   conspirators.

24   145.    Between approximately November 2004 and February 2008, Sinadinos and

25   his co-conspirators wrote checks on a Vintage Creek account, ranging in value from $2,500 to

26   $7,500, made payable to "Cash," for the sole apparent purpose of embezzling those funds from

27   the company.  The total amount taken from Vintage Creek unlawfully in this manner was

28   approximately $42,500.  Those payments were not authorized, and in one instance the signature

1   endorsing the back of a $5,000 check appears to be that of Georganna Sinadinos, the wife of

2   defendant Sinadinos.

3   **I.**   **Sinadinos Plunders Madera**

4           146.    Sinadinos followed his pattern of fraudulent business activities in his

5   position as co-manager with Solorio for the Madera project.  He controlled the financial

6   transactions relating to Madera and refused repeated requests by Solorio for information about

7   project finances.  After preventing Solorio's access to financial information concerning Madera,

8   Sinadinos used money belonging to Madera for the unlawful, personal financial benefit of himself

9   and his co-conspirators.  Sinadinos has provided a copy of an unsigned operating agreement,

10  which he purports to be the final version of the operating agreement for Madera Avenue 12

11  Capital Group LLC.  A true and correct copy of the document, which Sinadinos purports to be the

12  operating agreement for Madera, is attached as Exhibit H to Exhibits to First Amended

13  Complaint, Volume 3, and incorporated herein.

14          147.    On several occasions, he used Madera funds to pay his law office secretary,

15  fraudulently characterizing such payments as "consulting" fees.  On November 30, 2006, he

16  wrote check number 9902 on an account belonging to Madera, for $2,116, made payable to Joy

17  Villaruz, a secretary he shares with other persons in his office.  The note written by him on the

18  check reads "Nov. '06 consulting."  On January 22, 2007, he wrote check number 1009 on a

19  Madera account, in the amount of $2,116, made payable to Joy Villaruz.  Sinadinos wrote check

20  number 1026 on the Madera account, made payable to Ms. Villaruz in the amount of $2,116, with

21  a note indicating "June '07 consulting."  He wrote the date "6/25/06" on the check, but it appears

22  that check was written in June 2007.  His payment of his own law office overhead using Madera

23  funds was unauthorized and a theft of project funds by him.

24          148.    Sinadinos wrote check number 9901 on the Madera checking account on

25  November 30, 2006, for $5,000, payable to the "Law offices of John G. Sinadinos."  The note

26  written by him on the check reads "legal fees."  On December 4, 2006, Sinadinos wrote check

27  number 9909 on the Madera checking account, for $24,000, payable to the "Law offices of John

28  Sinadinos."  He deposited those funds in his law office account.  On December 11, 2006,

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   Sinadinos wrote check number 9910 on the Madera checking account, in the amount of $10,000,

2   made payable to the "Law offices of John Sinadinos."  He deposited those funds in his law office

3   account.  These payments by Sinadinos were not authorized, not based upon any invoice for legal

4   fees, and based on his fraudulent intent to steal money from the project.

5           149.    On March 5, 2007, Sinadinos wrote check number 1013 on the Madera

6   checking account, in the amount of $5,000, made payable to the "Law offices of John G.

7   Sinadinos."  He wrote the note on the check of "short term loan."  Sinadinos had no authority to

8   make a loan to his law office from Madera project funds.  The payment by Sinadinos was not

9   based upon proper invoicing for any legal services to the Madera project.  Plaintiffs are informed

10  and believe, and thereon allege, that he wrote this check for the purpose of embezzling $5,000

11  from Madera for his personal benefit.

12          150.    Also on March 5, 2007, Sinadinos wrote check number 1014 on the

13  Madera checking account, in the amount of $5,000, made payable to "Vintage Creek, LLC."  On

14  this check he also wrote the note of "short-term loan."  Sinadinos had no authority to make such a

15  loan to Vintage Creek from Madera project funds.  On May 17, 2007, Sinadinos wrote check

16  number 1025 on the Madera checking account, in the amount of $25,000, made payable to

17  "Vintage Creek, LLC."  He wrote the note on this check of "loan."  Sinadinos had no authority to

18  make such loans to Vintage Creek from Madera project funds.  Plaintiffs are informed and

19  believe, and thereon allege, that he wrote these checks for the purpose of embezzling the money

20  from Madera for the benefit of himself and his co-conspirators.

21          151.    On August 3, 2007, Sinadinos wrote check number 1224 on the Vintage

22  Creek checking account, in the amount of $26,000, made payable to "John Sinadinos."  He wrote

23  the note on this check of "repay Madera 5/17."  This payment by Sinadinos to himself was a theft

24  of money from the Madera and Vintage Creek projects.  He had no authority to pay himself the

25  $25,000, which he purportedly loaned to Vintage Creek from Madera, plus an inexplicable extra

26  $1,000 from Vintage Creek money.  Evidently, he thought it appropriate to pay himself an

27  additional fee of $1,000 for having successfully completed this fraudulent transaction.

28  ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

**J.**     <u>**Solorio Learns of Racketeering Activity and Demands Inspection of Records**</u>

152.     After Sinadinos completed his transaction with Ms. Leavitt, he confided in Solorio that he had defrauded Leavitt and asked Solorio to assist in preserving the false appearance of Vintage Creek as a successful residential development project. At that time, Solorio first became aware that Sinadinos was engaging in fraudulent activities involving the Vintage Creek project.

153.     Solorio asked Sinadinos for access to books, records and documents of all development projects, including Vintage Creek, Village, and Madera. He had previously asked for such access to monitor the financial conditions of the companies, and Sinadinos had consistently ignored or avoided those requests. Sinadinos again ignored his requests, and by passive refusal to cooperate, Sinadinos refused the requested access to project records. Solorio sought the assistance of attorney Allen Hine. Mr. Hine failed to make any substantial progress.

154.     Based on his growing suspicions after learning about the Leavitt transaction that Sinadinos had been engaging in the widespread fraudulent activities, Solorio was seeking information from the development companies, to which he was entitled by law and operating agreements. Solorio continued to press Sinadinos for access to the books, records and documents of the companies. Sinadinos responded that the records were always available for his review, but then Sinadinos would not allow the access by Solorio to the documents.

155.     After approximately six months of Sinadinos' failure and refusal to cooperate in Solorio's request for access to the records, Solorio became aware that Mr. Hine would not assist him as necessary, in this dispute. In approximately April 2008, Solorio hired the firm of Barth Tozer & Timm LLP. On April 4, 2008, Mr. Barth sent a letter to Sinadinos on behalf of Solorio, in his capacity as manager of Natomas and as manager of Orchard Park, demanding that Sinadinos identify, preserve and protect all records of the Vintage Creek, Village and Madera companies, whether in paper, electronic, or other form. On behalf of Solorio, in his capacity as manager of Natomas and Orchard Park, Mr. Barth demanded access to all books, records and documents relating to Vintage Creek, Village, and Madera, as required by law and the terms of the respective operating agreements for each company.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    156.    Solorio also retained the services of the forensic accounting firm, Ueltzen

2  & Company, for the purpose of reviewing and auditing financial information which might be

3  disclosed by Sinadinos.  A forensic accountant with that firm, Joy Urquhart, was assigned to work

4  on this dispute.

5    157.    From the beginning of April 2008 and continuing for several months,

6  Sinadinos and his co-conspirators resisted and failed to comply with Solorio's request for access

7  to company books, records and documents.  Barth sent a letter dated April 7, 2008, to Sinadinos,

8  demanding on behalf of Solorio that all records of the companies, required to be maintained by

9  the operating agreements, be made available for inspection and copying.  Sinadinos did not

10  respond to that letter.

11    158.    After a brief period of attempts to resolve disputes between the parties,

12  Barth renewed the request for his client's access to all records of the three companies, by letter to

13  Sinadinos, dated April 24, 2008.  Sinadinos first responded that Solorio did not have proper

14  authority to request access to the company books, records and documents.  Counsel representing

15  Sinadinos, Carl Blaine, specifically advised that Solorio, acting in his capacity as manager of

16  Natomas, and his agents had authority to gain access to the documents.  Sinadinos therefore

17  allowed an inspection visit by Ms. Urquhart to his office in late April 2008.  He made available

18  certain financial records for her inspection and promised to provide copies of those records.

19    159.    The copies he provided were incomplete, missing copies of entire folders

20  of information.  Upon a second visit by Ms. Urquhart and Barth to his office in early May 2008,

21  Sinadinos provided copies of the particular folders, which had been identified by Urquhart as

22  missing from her first inspection of the records.  At the time of the second visit, Barth renewed

23  his earlier request on Solorio's behalf, for all other books, records and documents of the three

24  development companies.  At that time and in following days, Barth pursued demands on behalf of

25  his client to the release of certain missing records by Sinadinos.  Among other records, Barth

26  sought his client's access to escrow documents, signed operating agreements, and detailed records

27  of ongoing litigation involving the projects.

28  ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

160.    Again, Sinadinos resisted providing the documents.  He sent a letter dated May 8, 2008, refusing to provide access to escrow documents pertaining to real property transactions in the Village and Vintage Creek projects.  After communication by Barth with Sinadinos' attorney Mr. Blaine, Blaine convinced his client to cooperate on disclosure of escrow documents from the two title companies which had worked on transactions for the projects.

161.    After several more weeks of delay, First American Title Company provided copies of certain escrow documents in its possession to Solorio.  First American Title Company had predominately worked on real estate transactions involving the Village project.  Stewart Title Company had predominately worked on real estate transactions involving Vintage Creek.  Sinadinos and Stewart Title promised to provide complete copies of escrow documents which could be disclosed under the law to Solorio.

162.    The copies of escrow documents ultimately provided by Stewart Title, after some additional delay, were incomplete.  In particular, the copies of escrow documents from Stewart Title did not include any information pertaining to specific transactions, such as the Leavitt investment.  More so, Stewart Title withheld at least 15 escrow files including the TLC file.  Plaintiffs are informed and believe, and thereon allege, that Sinadinos and Stewart Title Company unlawfully conspired together to refuse access by Solorio and/or his representatives to all available escrow documents, to which Solorio is entitled to have access, in part to conceal defendants' illegal activities and in part to conceal co-conspirator, Stewart Title Company's illegal activities, as involved in the managing and ultimate disposition of the Ubungen escrow.

163.    Plaintiffs are informed and believe, and thereon allege, that Sinadinos and his co-conspirators have refused access by Solorio, in his capacity as manager of Natomas, and/or his representatives, to multiple documents and company records, which by law and the terms of the operating agreements should be made available to Solorio.  As a particular example, Solorio and his representatives have made numerous requests for a copy of the operating agreement for Madera, complete with signatures by all parties to the agreement.  Sinadinos has failed and refused for nearly one year to provide a copy of that document, or even to respond that no such

///

00003574

1  document exists.  Sinadinos has only provided a copy of what he purports to be the operating

2  agreement for Madera, but it is unsigned.

3        164.    Another example of the failure by Sinadinos to provide lawful access by

4  Solorio to company books and records pertains to the option agreement that Sinadinos was

5  required to obtain between Stockton & 65th LP and Village, regarding the Johl and Von Behren

6  parcels in that project.  Sinadinos has not provided a copy of the required option agreement.  In

7  one conversation with Mr. Barth, Sinadinos stated there was no such agreement, but he later

8  argued he had not made such a statement.  In other verbal and written statements, Sinadinos

9  claims that he has "an agreement in principle" with Sorensen and Stockton & 65th LP.  But,

10  Sinadinos has failed and refused to provide access to an enforceable option agreement, on the

11  terms originally required by the agreement to assign Natomas' rights to the parcels acquired by

12  Sorensen.

13  **K.    Fraudulent Tax Reporting by Sinadinos and Foondos**

14        165.    Solorio demanded, on behalf of Natomas, that Sinadinos provide access to

15  all tax returns pertaining to Village, Vintage Creek, and Madera.  Sinadinos responded by

16  alleging that the tax returns were in the possession, custody and control of Stan Foondos, and

17  Mr. Foondos would provide complete copies of those returns.  Sinadinos and Foondos produced

18  copies of tax returns during approximately May 2008, which they represented to be the returns

19  filed with the IRS on behalf of Village and Vintage Creek for tax years 2005 and 2006.  The

20  copies of tax returns provided by Sinadinos and Foondos are substantially and materially different

21  from the prior Schedule K-1s provided to plaintiffs, unsigned, without any indication they were

22  filed with the Internal Revenue Service, beyond the statements of that purported fact by Sinadinos

23  and Foondos.

24        166.    Plaintiffs are informed and believe, and thereon allege, that the tax returns,

25  copies of which were provided by Sinadinos and Foondos, were never filed with the IRS.

26  Instead, Sinadinos and Foondos conspired to disclose to plaintiffs copies of false returns,

27  intending to cover up their fraudulent activities and dissuade plaintiffs from further investigation

28  of the wrongful conduct by Sinadinos, Foondos, and their co-conspirators.  Besides the fraud

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    perpetrated by Sinadinos and his co-conspirators against the federal government, their unlawful

2    conduct has specifically exposed plaintiffs to the risk of penalties, interest, and other charges

3    which would not have accrued if defendants had properly reported all financial transactions to the

4    IRS. Moreover, the production of copies of false returns by Sinadinos and his co-conspirators to

5    plaintiffs violated defendants' obligations under relevant provisions of the California Corporations

6    Code and the operating agreements, to allow access by plaintiffs to all proper books, records and

7    documents of the three development companies.

8              167.   Plaintiffs are informed and believe, and thereon allege, that the actual tax

9    returns filed by Sinadinos, Foondos, and their co-conspirators, were intentionally falsified, for the

10   apparent fraudulent purpose of hiding assets and substantial financial transactions from the

11   federal government, to avoid the payment of taxes lawfully owed on all such transactions and

12   launder the proceeds of tax evasion (unreported and unpaid taxes). As a particular example, the

13   fraudulent tax returns filed by Sinadinos, Foondos, and their co-conspirators, fail to disclose the

14   millions of dollars invested by the homebuilders in these projects and fraudulently misrepresent

15   the capital accounts of Sinadinos and his co-conspirators, as purported investors in these

16   development projects. Plaintiffs are informed and believe, and thereon allege, that Sinadinos,

17   Stanley Foondos, and their co-conspirators committed mail fraud and wire fraud by willfully

18   filing materially false tax returns with the IRS and the California Franchise Tax Board. Further,

19   Sinadinos, Foondos, and their co-conspirators caused Natomas and each member of the

20   companies to unknowingly commit mail fraud and wire fraud by individually filing false tax

21   returns based upon the false partnership returns (Schedule K-1) prepared by Foondos.

22             168.   Furthermore, plaintiffs are informed and believe, and thereon allege, that

23   Sinadinos and his co-conspirators specifically conducted their scheme of fraudulent transfers of

24   money among the various development companies, in substantial part for the fraudulent purpose

25   of hiding money from the IRS, which they were embezzling, converting, and laundering for their

26   personal, financial benefit. A particular example of such transactions occurred on August 4,

27   2005, involving multiple checks written by Sinadinos to himself and Stanley Foondos.

28   ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

169.    On August 4, 2005, Sinadinos wrote checks numbered 1008 through 1010 on the Vintage Creek account, payable to himself in the respective amounts of $9,500, $9,500, and $6,000.  He also wrote three more checks, numbered 1011 through 1013, on the Vintage Creek accounts, payable to Stanley Foondos in the respective amounts of $6,000 $9,500 and $9,500.  On each of the six sequential checks, Sinadinos wrote the note "loan."

170.    Plaintiffs are informed and believe, and thereon allege, that Sinadinos and Foondos fraudulently intended to transfer $25,000 each into their personal accounts from Vintage Creek, without triggering the customary bank reporting to the IRS of money transfers exceeding $10,000.  The only purpose for writing separate checks in the amounts chosen by Sinadinos and Foondos was to accomplish tax fraud in the transfer of these funds.

**L.    Fraudulent Payments of Attorneys Fees and Consultant Payments**

171.    Commencing in approximately August 2003 and continuing to the present, Sinadinos acted in multiple capacities for each of the three development projects.  From the start of his involvement with the Village and Vintage Creek projects, he acted in his individual capacity as the manager of the two separate joint ventures each consisting of an investor entity and Natomas which later became two separate limited liability companies formed for the development of each of the two projects.  Sinadinos also acted in his capacity as a general partner of the partnerships designated to be managers of such limited liability companies.  Sinadinos also acted in the capacity as the attorney representing plaintiffs, the various investors and development companies associated with all three projects.  At all times from approximately August 2003 and continuing to the present, Sinadinos communicated with plaintiffs and others concerning these projects by using his law office stationery, holding himself out to be the attorney representing all of the development entities associated with the projects, including plaintiffs, using his law office phone/fax/email to communicate with plaintiffs and holding all meetings with plaintiffs in his law offices.

172.    At all times relevant to these proceedings, Sinadinos has failed to provide or execute any retainer agreements with any of the plaintiffs or the development entities associated with the projects.  Furthermore, at all times relevant to these proceedings, Sinadinos

1   has failed to prepare or provide invoices, detailing any legal work he may have performed for any

2   of the plaintiffs, development entities, or the three development projects.

3            173.    Despite failing to complete ethically-required documents, to define the

4   lawyer-client relationships he allegedly formed, and despite his failure to properly document any

5   justification for payment for his alleged legal services, Sinadinos paid himself and his law offices

6   approximately $354,000 between June 21, 2004 and October 15, 2007.  Each of those payments

7   were in large, round numbers, without any justification or documentation to support them.

8            174.    Using Vintage Creek funds, he paid his former law firm of Sinadinos &

9   Vryonis a payment in June 2004 of $20,000, and a payment in July of 2005 of $25,000.  On

10  May 18, 2006, Sinadinos paid the "Law Office of John Sinadinos" the amount of $50,000 by

11  check.  On June 15, 2006, he made a similar payment to his law office in the amount of $25,000.

12  Over the course of time between June 2004 and October 2007, Sinadinos paid unauthorized and

13  unjustified legal fees to his law offices from Vintage Creek assets in the amount of approximately

14  $189,000.

15           175.    Using Village funds, Sinadinos paid his former law firm of Sinadinos &

16  Vryonis $25,000 on May 20, 2005.  On September 13, 2005, October 17, 2005, and January 5,

17  2006, he made three separate payments of $25,000 each to the "Law Office of John Sinadinos."

18  Over the course of time between May 2005 and October 2006, Sinadinos paid unauthorized and

19  unjustified legal fees to his law offices from Village assets in the amount of approximately

20  $165,000.

21           176.    As previously alleged, Sinadinos also paid certain amounts from the

22  account for Madera to his law offices, characterizing the payments as "loans," without complying

23  with proper ethical requirements for taking loans from his purported clients, nor documenting any

24  basis for the payments in the form of attorney fees.  The payment of the alleged loans to his law

25  office were unauthorized, unjustified, unethical, and unknown to plaintiffs.

26           177.    Besides paying the illegal amounts to his law offices from monetary assets

27  belonging to three separate projects, Sinadinos also unlawfully used project money to pay the

28  staff in his law offices.  Between August 26, 2004 and October 18, 2007, Sinadinos paid several

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1  secretaries and a person he claims to be his godson working as an assistant in his law office, the

2  total amount of approximately $17,299 from Vintage Creek funds, by 10 separate checks bearing

3  the explanatory note of "consultant" on each check.  Each payment was made to the individuals

4  while they worked as assistants and secretaries in Sinadinos' law office.  At all times relevant to

5  these proceedings, those individuals were not authorized, nor were they employed or serving in

6  any capacity as "consultants" to these three development projects.

7         178.    Between approximately August 5, 2005, and May 23, 2007, Sinadinos also

8  paid two of his law office secretaries the total amount of $9,711 from funds belonging to the

9  Village project.  That total amount was paid out over seven different occasions, in amounts

10  ranging from $280-$2,645, with the checks predominately bearing the notation that the payments

11  were for a "consultant."  Again, neither of the secretaries in Sinadinos' law office were

12  authorized, employed or serving in any capacity as a "consultant" to the Village project.

13         179.    As previously alleged, Sinadinos made similar unlawful, unauthorized, and

14  unethical payments to his law office staff from the Madera account, without plaintiffs'

15  knowledge.

16  **M.**    **Fraudulent/Unethical Settlement of Johl Claims**

17         180.    While Solorio was fighting with Sinadinos in April 2008, to compel

18  compliance with document inspection and copying on behalf of Natomas, Sinadinos was

19  continuing his fraudulent conduct to the detriment of the development companies and Natomas.

20  Sinadinos, with the direct and active assistance of defendants Baljit and Harinder Johl, completed

21  an unlawful, unethical transfer of Vintage Creek property equity interests to Mr. Surjit Johl, in

22  exchange for a settlement and release of claims alleged by Surjit Johl, Baljit Johl and Harinder

23  Johl against Sinadinos, with the conspiratorial assistance of Stewart Title Company.

24         181.    By doing so, Sinadinos and the Johls personally undertook the illegal

25  transfer of approximately $500,000 of equity value from Vintage Creek to Johl, compromising

26  alleged legal claims against Sinadinos personally.  They had no legal authority to enter into such a

27  compromise, and in fact, they acted expressly contrary to several specific objections by Solorio,

28  on behalf of Natomas, to any such transfer.  Sinadinos did not comply with his legal, ethical

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   obligations of disclosure and consent by his purported clients, before he completed the transfer of

2   the Vintage Creek equity to Mr. Surjit Johl, in compromise of claims, which arose because of

3   prior legal malpractice by Sinadinos.

4         182.    In mid-2007, Sinadinos convinced Mr. Baljit Johl to remove the burden of

5   his trust deed from one parcel in the Vintage Creek project, to another parcel which Sinadinos

6   promised to designate at a later time.  Sinadinos subsequently failed to comply with his promise

7   to Mr. Baljit Johl, and he raised claims against Sinadinos for the alleged fraud.  Acting in his

8   capacities as manager of Vintage Creek and its lawyer, Sinadinos unlawfully and unethically

9   reached a compromise agreement with Mr. Baljit Johl in early 2008.  Contrary to the express

10   objections by Solorio and Natomas, Sinadinos fraudulently transferred the equity interest in the

11   approximate amount of $500,000 in another property located in Vintage Creek, designated the

12   Ubungen parcel, to Mr. Surjit Johl (who is the father of Baljit Johl) in April 2008.   Stewart Title

13   Company aided and abetted the fraudulent transfer by misrepresenting the consideration and

14   value of the property involved in the transfer, the Ubungen parcel.  By misrepresenting the nature

15   of the transaction on documents prepared in escrow, Stewart Title Company directly participated

16   in the fraudulent scheme of Sinadinos and his co-conspirators against Natomas.

17         183.    Sinadinos completed that transfer in substantial part for the purpose of

18   reaching a settlement of Mr. Baljit Johl's claims, arising from Sinadinos' original wrongdoing in

19   his dual capacities as manager and lawyer for Village and Vintage Creek.  Sinadinos failed to

20   comply with the applicable attorney ethical rules, before reaching his unilateral compromise with

21   Mr. Baljit Johl as a claimant against him.  By doing so, Sinadinos attempted to avoid the

22   justifiable claims of legal malpractice against him by plaintiffs and committed legal malpractice

23   by the manner of settling the Johl claims.

24         184.    Sinadinos previously attempted to commit fraud against the owners of the

25   Ubungen parcel.  On or about September 19, 2006, Sinadinos sent an email to Solorio, asking him

26   to obtain signatures from the Ubungen parcel owners on two separate documents, which

27   purported to describe the nature of the deal with the Ubungen owners in two different ways,

28   which were completely inconsistent with each other.  True and correct copies of the email and the

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   documents which were transmitted as attachments to the email are attached as Exhibit N to

2   Exhibits to First Amended Complaint, Volume 4, and are incorporated herein.

3          185.   For his own part, Mr. Baljit Johl conspired and participated with Sinadinos

4   in the fraudulent, unauthorized transfer of Vintage Creek equity in the Ubungen parcel, and Baljit

5   Johl and Harinder Johl are equally liable for the loss suffered by Natomas from this transaction.

6   Both Messrs. Baljit and Harinder Johl communicated directly with Solorio in the several months

7   before the transfer of equity.  True and correct copies of an email from Harinder Johl, dated

8   March 25, 2008, forwarding an email from Sinadinos to Mr. Johl, with true and correct copies of

9   documents which accompanied the email transmission from Sinadinos to Johl, are attached as

10  Exhibit O to Exhibits to First Amended Complaint, Volume 4, and are incorporated herein.

11  Solorio expressly and repeatedly told the Johls that Natomas objected to any such transfer, and

12  both Johls expressly confirmed that they were aware the transaction could not occur without the

13  consent of Natomas.

14         186.   The Johls communicated directly with Mrs. Ubungen and Mrs. Adelaida

15  Azurin, Mrs. Ubungen's mother, (both were title holders of the Ubungen property), to convince

16  them to complete the sale to the Johls.  Plaintiffs are informed and believe, and thereon allege,

17  that the Johls made specific misrepresentations during April 2008 to Mrs. Ubungen and

18  Mrs. Azurin, that the Johls were associated with Solorio and Vintage Creek, that Solorio had

19  asked the Johls to contact them to close escrow on behalf of Vintage Creek, and that Sinadinos

20  was controlling the completion of the transaction without involvement of Solorio.  Mrs. Azurin

21  specifically asked to speak with Solorio at the office of Stewart Title Company at the time escrow

22  was to close on the transfer to the Johls, and plaintiffs are informed and believe, and thereon

23  allege, that the title officer, the Johls and Sinadinos assured her that Solorio approved the transfer

24  and that the Johls and Sinadinos had authority from Solorio and Natomas to complete the

25  transaction.  Also, despite subsequent claims by Sinadinos that he had terminated the rights of

26  Vintage Creek to acquire the Ubungen parcel before the sale to the Johls, Mrs. Ubungen and Mrs.

27  Azurin never received any notice of termination, and at the time of the transfer to the Johls, they

28  understood that the close of escrow was subject to the agreement with Vintage Creek.  Plaintiffs

1   are informed and believe, and thereon allege, that if Mrs. Ubungen and Mrs. Azurin had been

2   informed that Vintage Creek no longer had rights to acquire their property, they would not have

3   sold their home on five (5) acres of land to the Johls for $100,000, as the transaction was

4   structured at close of escrow.  When Baljit and Harinder Johl conspired and participated with

5   Sinadinos in the completion of the transfer, they knowingly and intentionally committed fraud

6   against Natomas when they directed their father Surjit Johl to take title, because the Johls and

7   Sinadinos knew Natomas had not consented to the illegal transfer.  The Johls fraudulently

8   obtained the Ubungen property, in which Vintage Creek held an equity interest of $500,000, for

9   their total payment of $50,000 to Sinadinos, and the Johls paid $100,000 to the sellers.

10  **N.      S&Y Capital Group Proposal**

11          187.    On August 15, 2008, Sinadinos gave first notice to Solorio of a proposed

12  joint venture between some part of the Village and Vintage Creek projects and an investment

13  firm, S&Y Capital Group, LLC (SYCG).  Sinadinos and his co-conspirators, including Stanley

14  Foondos and Larry Deane, had apparently been working on this proposed deal for several months,

15  before providing any information to Solorio.  Sinadinos and his co-conspirators violated

16  obligations contained in the operating agreements and resulting from the duties of Sinadinos, to

17  provide timely notice and allow sufficient time for Solorio, on behalf of Natomas, to conduct due

18  diligence regarding the proposal.  When Sinadinos notified Solorio of the proposal, he demanded

19  Solorio express his approval of the deal within two weeks.

20          188.    Solorio demanded detailed information in writing concerning the

21  background of the proposed deal with SYCG.  Sinadinos represented the deal had been solicited

22  by himself and others, including defendant Larry Deane.  Sinadinos further represented that

23  Deane had prepared substantial information related to the development projects, in support of the

24  solicitation to SYCG for proposed investment in the projects.  Deane never provided any

25  information to Solorio about his involvement in conspiring with Sinadinos and soliciting the

26  proposed deal from SYCG.

27          189.    Solorio followed up in writing with Sinadinos, attempting to obtain

28  specific information about the origin and proposed structure of the deal with SYCG.  Sinadinos

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   responded to several requests for information, giving certain details about the proposed deal,

2   while remaining vague about particular questions raised by Solorio.

3        190.   One particular category of information requested by Solorio related to the

4   disclosures which had been made by Sinadinos to SYCG about the nature of disputed issues

5   between Sinadinos and Solorio.  Sinadinos contended that all disputed issues between them were

6   irrelevant to his demand that Solorio approve the proposed deal.  Solorio expressly communicated

7   to Sinadinos that he considered it necessary to disclose certain aspects of the disputed issues

8   among them, to avoid any risk of future claims by SYCG that it would not have entered into the

9   transaction, had it known about these disputed issues.

10        191.   On September 9, 2008, Mr. Barth sent a letter to Sinadinos, on behalf of

11   Solorio in his capacity as manager of Natomas, specifying the particular nature of disclosures to

12   SYCG and related conditions which must be satisfied before Natomas could approve the

13   proposed deal with the investor.  Sinadinos responded through counsel on September 29, agreeing

14   to make the disclosures.  Plaintiffs are unaware whether the disclosures have occurred, or about

15   the status of the proposal involving SYCG.

16        192.   Prior to the August 15, 2008, notification by Sinadinos of the proposed

17   deal with SYCG, defendant Larry Deane, through counsel Don Wanland, demanded that Solorio

18   abandon claims against Sinadinos.  Mr. Wanland had earlier stated his client's position that the

19   contentions raised against Sinadinos, relating to apparent illegal financial transactions and

20   mishandling of development project funds, were unfounded.  As early as April 2008, Wanland

21   verbally represented that Mr. Deane had seen all the records of Village and Vintage Creek, and

22   was convinced there was no factual or legal basis to suspect Sinadinos had done anything wrong.

23   Plaintiffs are informed and believe, and thereon allege, that Deane, through counsel, was

24   attempting to dissuade Solorio from pursuing a thorough investigation of unlawful conduct by

25   defendants, in order to assist defendants in their efforts to avoid detection of their fraudulent

26   scheme and racketeering activities.

27        193.   In early August, Mr. Wanland renewed his objections on behalf of Deane,

28   to the ongoing inquiries by Solorio.  Accusing Solorio of a "fishing expedition, threatened

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   litigation, improper settlement tactics," Wanland demanded Solorio's agreement to dissolution of

2   Natomas. By mid-August, Wanland restated his client's contention that there was no legal or

3   factual support, which might justify the continuing inquiry by Solorio against the activities of

4   Sinadinos and others. Wanland demanded that Solorio agree to resolve his disputes with

5   Sinadinos immediately, or Deane would commence dissolution and other proceedings against

6   Solorio and Natomas. Plaintiffs are informed and believe, and thereon allege, that Deane's

7   renewed objections through counsel were a continuation of his assistance to defendants.

8          194.    Solorio shared copies of his letters to Sinadinos with Deane, by transmittal

9   of the copies to his attorney, Mr. Wanland. On September 10, 2008, Mr. Barth communicated by

10  email with Mr. Wanland, seeking the cooperation of Mr. Deane, by making his computer hard

11  drive available for review to obtain copies of email correspondence with Sinadinos and Stan

12  Foondos. Mr. Wanland replied by e-mail that day, arguing that Solorio did not "have a bloody

13  leg to stand on," with no evidence to support "nonsensical and supercillious [*sic*] positions," that

14  he would be proceeding with the filing of an action "to dissolve the LLC [Natomas] and recover

15  damages including punitive damages," and that he "would personally look forward to seeing you

16  [Barth] in court." Deane filed a complaint for dissolution of Natomas on October 20, 2008, in

17  Sacramento County Superior Court.

18         195.    Plaintiffs are informed and believe, and thereon allege, that defendant

19  Deane has conspired and participated with Sinadinos and other co-conspirators, to disrupt,

20  prevent, and dissuade Solorio from investigating and pursuing correction of the fraudulent, illegal

21  activities by them. Plaintiffs are further informed and believe, and thereon allege, that Deane has

22  received multiple distributions of money in varying amounts from Sinadinos and his co-

23  conspirators, and Deane has received the assistance of Stanley Foondos to falsify Deane's own tax

24  returns, which has caused Deane to be loyal to Sinadinos and the continuing efforts to cover up

25  fraudulent activities causing damage to Natomas. For example, Deane was fully aware of the

26  fraud committed by Sinadinos against Ms. Leavitt, after Solorio learned about it and shared the

27  information with Deane. At the time, Deane even stated to Solorio that he agreed and understood

28  Sinadinos had committed some form of fraudulent conduct and illegal co-mingling of assets

1    among Vintage Creek and Village. With full knowledge of fraudulent activities by Sinadinos and

2    his co-conspirators, Deane has continued to assist and conspire with Sinadinos, toward the goal of

3    benefiting the wrongdoers. As a member of Natomas, Deane has violated his duties to Natomas

4    by such conspiracy and apparent participation with and in support of the scheme of Sinadinos.

5    **O.     Interstate Travel in Support of Racketeering Scheme**

6            196.    Plaintiffs are informed and believe, and thereon allege, that Sinadinos and

7    his co-conspirators have traveled on a periodic basis to the Chicago, Illinois area for the purpose

8    of meeting with investors, who have participated financially in the Village, Vintage Creek, and

9    Madera projects. For example, a true and correct copy of an email from Arah Tressler, of First

10   American Title Company, to Sinadinos, Solorio and Deane, dated September 5, 2006, concerning

11   escrow instructions communicated via telephone call from Sinadinos, while he was in Chicago, is

12   attached as Exhibit P to Exhibits to First Amended Complaint, Volume 4, and is incorporated

13   herein. By these travels, Sinadinos and his co-conspirators have advanced and supported their

14   conspiracy and racketeering activities. They have also used interstate facilities, mails and wires,

15   to facilitate the establishment, promotion and carrying on of their money laundering activities.

16   Both the interstate travel and use of the interstate facilities in this manner are violations of Title

17   18 United States Code Section 1952.

18                          **V.     COUNT ONE—RICO**

19           197.    Plaintiffs repeat and reallege each of the allegations contained in all

20   previous paragraphs in this complaint, as if fully set forth herein.

21           198.    At all relevant times, plaintiffs were "persons" within the meaning of

22   RICO, Title 18 United States Code Sections 1961(3) and 1964(c). At all relevant times,

23   Sinadinos and his co-conspirators were "persons" within the meaning of RICO, Title 18 United

24   States Code Sections1961(3) and 1962(c).

25           199.    At all relevant times described in this complaint, Sinadinos and Stanley

26   Foondos formed an associated-in-fact enterprise for the purpose of acquiring real estate

27   development opportunities and carrying out the fraudulent schemes described in this complaint.

28   The associated-in-fact enterprise was, and continues to be, an "enterprise" within the meaning of

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    RICO, Title18 United States Code Section 1961(4).  At all relevant times described in this

2    complaint, Sinadinos and Stanley Foondos also formed and participated in the management and

3    control of Village Capital Group LLC and Vintage Creek LLC, for the unlawful purpose of

4    carrying out the fraudulent schemes described in this complaint.  Village Capital Group LLC and

5    Vintage Creek LLC were, and continue to be, "enterprises" within the meaning of RICO, Title 18

6    United States Code Section 1961(4). At all relevant times, these enterprises were engaged in, and

7    their activities affected, interstate and foreign commerce, within the meaning of RICO, Title18

8    United States Code Section 1962(c).

9            200.    At all relevant times, Sinadinos, Stanley Foondos, all of the entity

10   defendants (except Village, Vintage Creek, and Stewart Title Company), Stephen Foondos, Glenn

11   Sorenson, Jr., and Stockton & 65th LP conducted or participated, directly or indirectly, in the

12   conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning

13   of RICO, Title18 United States Code Section 1961(5), in violation of RICO, Title18 United

14   States Code Section 1962(c).

15           201.    Specifically, at all relevant times, the indicated defendants engaged in

16   "racketeering activity" within the meaning of Title18 United States Code Section 1961(1) by

17   engaging in the acts set forth above.  The acts set forth above constitute a violation of one or more

18   of the following statutes: Title18 United States Code Section 1341 (mail fraud); Title18 United

19   States Code Section 1343 (wire fraud); Title18 United States Code Sections 1956, 1957 (money

20   laundering); Title18 United States Code Section 1952 (interstate travel); and Title18 United

21   States Code Section 1512 (witness tampering).  The indicated defendants each committed and/or

22   conspired and/or aided and abetted the commission of two or more of these acts of racketeering

23   activity.

24           202.    The acts of racketeering activity referred to in the previous paragraph

25   constitute a "pattern of racketeering activity" within the meaning of Title18 United States Code

26   Section 1961(5).  The acts alleged are related to each other by virtue of common participants,

27   common victims, a common method of commission, and the common purpose and common result

28   of defrauding plaintiffs of their business opportunities for successful development of the

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1   residential real estate projects and defrauding plaintiffs of substantial assets in the development

2   projects, exceeding $3 million, according to proof at trial, enriching Sinadinos, Stanley Foondos,

3   and their co-conspirators while concealing their fraudulent activities.  The fraudulent scheme

4   continued for more than four years, and threatens to continue longer, but for the filing of this

5   Action.

6          203.   As a result of the violation of Title18 United States Code Section 1962(c)

7   by defendants, plaintiffs lost the value of their successful real estate development projects, which

8   would have been completed and successfully sold to homebuilders or other investors, but for the

9   conduct of the fraudulent scheme by defendants.  The value of the successful development

10  projects lost as a proximate result of defendants' conduct of a pattern of racketeering activity is

11  subject to proof at trial, and plaintiffs are informed and believe, and thereon allege that the lost

12  value in the projects exceeds $15 million.

13         204.   As a result of the violation of Title18 United States Code Section 1962(c)

14  by defendants, defendants are liable to plaintiffs for damages, resulting from the direct loss of

15  funds from the Village, Vintage Creek, and Madera companies, liabilities for 1031 "put"

16  obligations in the development projects, and the penalties, fines and interest resulting from

17  defendants' tax evasion, in an amount to be determined at trial.  Plaintiffs are informed and

18  believe, and thereon allege, that the money lost as a proximate result of the conduct of a pattern of

19  racketeering activity by defendants' enterprises exceeds $3 million.

20         205.   Pursuant to RICO, Title18 United States Code Section 1964(c), plaintiffs

21  are entitled to recover threefold their damages plus costs and attorneys' fees from defendants.

22         WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

23             **VI.   COUNT TWO—RICO CONSPIRACY**

24         206.   Plaintiffs repeat and reallege each of the allegations contained in all

25  previous paragraphs in this complaint, as if fully set forth herein.

26         207.   As set forth in Count One, Sinadinos, Stanley Foondos, and their co-

27  conspirators associated with enterprises within the meaning of RICO, Title18 United States Code

28  Section 1961(4), and conducted or participated, directly or indirectly, in the conduct of the

1   enterprises' affairs through a pattern of racketeering activity within the meaning of RICO, Title18

2   United States Code Section 1961(5), in violation of RICO, Title18 United States Code Section

3   1962(c).

4           208.    At all relevant times, Sinadinos, Stanley Foondos, Stephen Foondos, all of

5   the named entity defendants except Village and Vintage Creek, Gus Galaxidas, Glenn Sorenson,

6   Jr., Stockton & 65th LP, Larry Deane, Baljit and Harinder Johl each were associated with the

7   enterprises and agreed and conspired to violate Title18 United States Code Section 1962(c), that

8   is, were aware of the alleged RICO conspiracy and intended to facilitate or otherwise participate

9   in it, in violation of Title18 United States Code Section 1962(d).

10           209.    Sinadinos, Stanley Foondos, and their co-conspirators committed and

11   caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the

12   objects thereof, including but not limited to the acts set forth above.

13           210.    As a result of the violation of Title18 United States Code Section 1962(d)

14   by Sinadinos, Stanley Foondos, and their co-conspirators, plaintiffs lost the value of their

15   successful real estate development projects, which would have been completed and successfully

16   sold to homebuilders or other investors, but for the conduct of the fraudulent scheme by

17   Sinadinos, Stanley Foondos, and their co-conspirators.  The value of the successful development

18   projects lost as a proximate result of defendants' conducting and/or participating in conducting the

19   enterprises' affairs through a pattern of racketeering activity is subject to proof at trial, and

20   plaintiffs are informed and believe, and thereon allege that the lost value exceeds $15 million.

21           211.    As a result of the violation of Title18 United States Code Section 1962(d)

22   by Sinadinos, Stanley Foondos, and their co-conspirators, defendants are liable to plaintiffs for

23   damages, resulting from the direct loss of funds from the Village, Vintage Creek, and Madera

24   companies, in an amount to be determined at trial.  Plaintiffs are informed and believe, and

25   thereon allege, that the money lost as a proximate result of the conduct of a pattern of

26   racketeering activity by defendants' enterprises exceeds $3 million.

27           212.    Pursuant to RICO, Title18 United States Code Section 1964(c), plaintiffs

28   are entitled to recover threefold their damages plus costs and attorney's fees from defendants.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

SECOND AMENDED COMPLAINT UNDER RICO, FRAUD, BREACH OF FIDUCIARY DUTIES, ETC.    [CASE NUMBER 2:08-CV-02308-FCD-KJM ]

1        WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

2                          **VII.    COUNT THREE—FRAUD**

3        213.    Plaintiffs repeat and reallege each of the allegations contained in all

4    previous paragraphs in this complaint, as if fully set forth herein.

5        214.    The representations and failures to disclose information and suppression of

6    information alleged to have been made by defendants herein, were made with the intent to induce

7    plaintiffs to act in a manner herein alleged in reliance thereon.

8        215.    There exists, and at all times herein mentioned there existed, a unity of

9    interest and ownership between defendants Sinadinos and Foondos, and each of the defendant

10   limited liability companies, partnerships, law and accounting offices, and other defendant entities,

11   such that any individuality and separateness between defendants Sinadinos and Foondos and each

12   defendant limited liability company, partnership, offices and entities, have ceased, and each of the

13   defendant limited liability companies, partnerships, offices and other entities, is the alter ego of

14   defendants Sinadinos and Foondos, based on the facts alleged herein.

15       216.    Adherence to the fiction of the separate existence of each of the defendant

16   limited liability companies as entities distinct from defendants Sinadinos and Foondos would

17   permit an abuse of the limited liability company privilege and would sanction fraud committed by

18   defendants Sinadinos and Foondos.

19       217.    The representations made by defendants were in fact false.  For instance,

20   the representation that defendants would provide adequate investment money for the successful

21   development of the residential real estate projects, and would responsibly manage and control the

22   financial transactions toward such successful development, and would abide by the fiduciary

23   duties defined and implied in the operating agreements for Village, Vintage Creek, and Madera,

24   were in fact false.  The true facts were that defendants intended from the beginning of their

25   involvement with these development projects to embezzle, divert, sabotage, and destroy the

26   funding and development of the projects, and violate their fiduciary and professional duties, all

27   for their personal, fraudulent, financial benefit, to the detriment of plaintiffs.

28   ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

218.    When defendants made their representations, they knew them to be false and made the representations with the intention to deceive and defraud plaintiffs and to induce plaintiffs to act in reliance on such representations in the manner herein alleged, or with the expectation that plaintiffs would so act.

219.    Plaintiffs, at the time these representations and failures to disclose information and suppression of information by defendants occurred, and at the time plaintiffs took the actions herein alleged, were ignorant of the falsity of defendants' representations, failures to disclose information and suppression of information, and believe defendants' representations to be true.  In reliance on misrepresentations, plaintiffs were induced to and did cooperate with defendants, enter into business relations with defendants for development of the Village, Vintage Creek, and Madera projects, as herein alleged, and undertook all other actions as alleged, toward plaintiffs' intended purpose of successfully completing the development of the projects with the expected assistance and support of defendants.  Had plaintiffs known the actual facts, they would not have taken such actions.  Plaintiffs' reliance on defendants' representations was justified based on the apparent expertise and experience of defendants' with substantial development projects, as further reinforced by representations of others about defendants' capabilities and background in successful real estate residential development projects, and further justified by the representation of the professional legal and accounting capacities of defendants Sinadinos and Foondos.

220.    As a proximate result of the fraudulent conduct of defendants as herein alleged, plaintiffs were damaged by the loss of business opportunities and loss of development project funds, as herein alleged.  The aforementioned conduct of defendants' involved intentional misrepresentations, deceit, or concealment of material facts known to defendants with the intention on the part of defendants of thereby depriving plaintiffs of property or legal rights or otherwise causing injury, and was despicable conduct that subjected plaintiffs to cruel and unjust hardship in conscious disregard of plaintiffs' rights, so as to justify an award of exemplary and punitive damages.

WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

///

00003574

SECOND AMENDED COMPLAINT UNDER RICO; FRAUD, BREACH OF FIDUCIARY DUTIES, ETC.          [CASE NUMBER 2:08-CV-02308-FCD-KJM ]

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

## VIII.   COUNT FOUR—BREACH OF FIDUCIARY DUTIES

221.   Plaintiffs repeat and reallege each of the allegations contained in all previous paragraphs in this complaint, as if fully set forth herein.

222.   Plaintiff Natomas is, and at all times herein mentioned was, a member holding 45% interest in Vintage Creek LLC and Village Capital Group LLC.  Plaintiff Orchard Park is, and at all times herein mentioned was, a member holding 25% interest in Madera Avenue 12 Capital Group LLC.

223.   Defendants Sinadinos, Stanley Foondos, and South Watt & Florin Partners are, and at all times mentioned herein were, managers of Village Capital Group LLC.  Defendant Sinadinos, Stanley Foondos, and Caselman & Carlisle Partners are, and at all times mentioned herein were, managers of Vintage Creek LLC.  Defendant Sinadinos is, and at all times herein mentioned was, a manager of Madera Avenue 12 Capital Group LLC.

224.   Defendants Sinadinos, Stanley Foondos, South Watt & Florin Partners, and Caselman & Carlisle Partners violated their fiduciary duties to plaintiffs in the manner alleged in this complaint.

225.   As a direct and proximate result of defendants' violations of their fiduciary duties as set forth herein, plaintiffs have been damaged, as herein alleged.

WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

## IX.   COUNT FIVE—PROFESSIONAL LEGAL MALPRACTICE

226.   Plaintiffs repeat and reallege each of the allegations contained in all previous paragraphs in this complaint, as if fully set forth herein.

227.   At all times herein mentioned, defendant Sinadinos was licensed to engage in the practice of law in the State of California and was practicing law in Sacramento, California.

228.   On or about approximately August 2003, at Sacramento, California, plaintiff Natomas and defendant Sinadinos formed an attorney-client relationship, for purposes related to the investment financing, management, and development of the Village and Vintage Creek projects, located in Sacramento County, California.  On or about approximately May 2005, at Sacramento, California, plaintiff Orchard Park and defendant Sinadinos formed an attorney

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    client relationship, for purposes related to the investment financing, management, and

2    development of the Madera project, located in Madera County, California.

3            229.    By virtue of the attorney-client relationship that existed between Sinadinos

4    and plaintiffs, Sinadinos owed to plaintiffs a fiduciary duty, and by virtue of plaintiffs having

5    placed confidence in the fidelity and integrity of Sinadinos and entrusting Sinadinos with the

6    investment financing, management, and development of the Village, Vintage Creek, and Madera

7    projects, a confidential relationship existed all times between plaintiffs and Sinadinos.

8            230.    Despite having voluntarily accepted the trust and confidence of plaintiffs,

9    and in violation of this relationship, Sinadinos abused the trust and confidence of plaintiffs in the

10    manner alleged herein. In doing the acts herein alleged, defendant Sinadinos acted with

11    oppression, fraud, and malice, and plaintiffs are entitled to punitive damages.

12            231.    Plaintiffs in fact placed confidence and reliance in Sinadinos until plaintiffs

13    discovered the true facts concerning the fraudulent scheme and conduct of racketeering activity,

14    as alleged herein. Plaintiffs reasonably relied on Sinadinos in view of their attorney-client

15    relationship and the multiple assurances and representations by Sinadinos, as alleged herein.

16            232.    At the same time that Sinadinos was representing plaintiffs in the

17    aforementioned matters, Sinadinos was also retained by other defendants in this action, including

18    but not limited to the named limited liability companies and entities involved in the investment

19    and financing for the projects, as alleged herein. The legal interests of those defendants and the

20    interests of plaintiffs were actually adverse at the time of the dual representation, based on the

21    fraudulent scheme among Sinadinos and his co-conspirators and defendants in this action.

22    Sinadinos failed to disclose to plaintiffs that he was representing adverse clients in these matters,

23    at the same time that he was representing plaintiffs. He failed to disclose the areas of potential

24    and actual conflict between the legal interests of his other clients, other defendants in this action,

25    and the interests of plaintiffs, and further failed to advise plaintiffs of the possibility and

26    desirability of seeking independent legal advice.

27    ///

28    ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

233.    Sinadinos further compromised legal claims against him for malpractice and wrongful conduct, without disclosure to plaintiffs, without obtaining their informed written consent, and using assets belonging to his clients, as alleged herein.

234.    As a result of Sinadinos' aforementioned fraud, breach of fiduciary duties to plaintiffs, and conflicts of interest, and other unethical conduct alleged herein, he gained the advantages alleged herein, including more than $350,000 in illegal payment of attorney's fees and conversion of substantial development project funds to his personal, unlawful benefit.  As a proximate result of Sinadinos' fraud, breach of fiduciary duties to plaintiffs, conflict of interest, and other unethical conduct alleged herein, plaintiffs suffered the damages herein alleged, including costs and attorneys' fees caused by Sinadinos' wrongful conduct.

WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

## X.    COUNT SIX—PROFESSIONAL LEGAL MALPRACTICE (DERIVATIVE CLAIMS RE: VILLAGE, VINTAGE CREEK, AND MADERA)

235.    Plaintiffs repeat and reallege each of the allegations contained in all previous paragraphs in this complaint, as if fully set forth herein.

236.    After formation of each of the development companies, Village Capital Group LLC, Vintage Creek LLC, and Madera Avenue 12 Capital Group LLC, respectively, and after execution of the operating agreements for each of those companies, Sinadinos contended that he represented such companies in his capacity as their attorney, as well as being a manager of the companies.

237.    Plaintiffs allege and contend that Sinadinos represented plaintiffs at all times relevant to these proceedings, and that Sinadinos established, fostered, and abused the attorney-client relationship with plaintiffs, as alleged in this complaint and as set forth in Count Five, herein.  In the alternative, and particularly regarding the wrongful conduct by Sinadinos on and after the formation of Village, Vintage Creek and Madera, plaintiffs assert each and every, and all the claims set forth in Count Five herein, against Sinadinos, on behalf of and for the benefit of defendants Village Capital Group LLC, Vintage Creek LLC, and Madera Avenue 12 Capital Group LLC.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

238.    If plaintiffs are successful in this action, a substantial benefit will result to defendants Village, Vintage Creek, and Madera, on whose behalf this action is prosecuted, and plaintiffs are entitled to recovery of their attorney's fees incurred herein.

239.    Plaintiffs did not make any efforts to secure curative actions from defendants Village, Vintage, and Madera in prosecuting this action, because any such efforts would have been futile in that Sinadinos and Stanley Foondos manage and control such companies, and they are primary wrongdoers, as alleged herein.  However, plaintiffs delivered to defendants Village, Vintage Creek, and Madera, by transmission to Sinadinos and Stanley Foondos, via email and mail to their attorney, Carl Blaine, on November 3, 2008, a true copy of the complaint which plaintiffs then proposed to file.

WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

## XI.    COUNT SEVEN – PROFESSIONAL ACCOUNTING MALPRACTICE

240.    Plaintiffs repeat and reallege each of the allegations contained in all previous paragraphs in this complaint, as if fully set forth herein.

241.    At all times herein mentioned, defendant Stanley Foondos was, and now is a certified public accountant, duly licensed by the California State Board of Accountancy to practice his profession in California, and practicing the same in Sacramento, California. Commencing on or about August 2003, plaintiffs and defendant Stanley Foondos entered into an agreement at Sacramento, California, that defendant Stanley Foondos would provide complete accounting, bookkeeping, financial management, and tax reporting services for the Village, Vintage Creek, and Madera projects.

242.    At all times during the existence of that agreement, plaintiffs relied completely on defendant Stanley Foondos to perform the agreement, as well as on his skill and ability as an accountant.

243.    Defendant Stanley Foondos negligently, carelessly, recklessly, and intentionally rendered services as an accountant in the unlawful and wrongful manner alleged herein.  Defendant thus failed to render the skill required of and commonly exercised by certified

///

1  public accountants, and intentionally violated the professional standards which apply to certified

2  public accountants.

3       244.    As a direct and proximate result of defendant Stanley Foondos' wrongful,

4  reckless, and intentional actions, including his participation and involvement in conspiracy to

5  conduct a pattern of racketeering activity, plaintiffs have suffered damages as alleged herein, in

6  an amount according to proof.  In doing the acts herein alleged, defendant Stanley Foondos acted

7  with oppression, fraud, and malice, and plaintiffs are entitled to punitive damages.

8       WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

9  **XII.   COUNT EIGHT – PROFESSIONAL ACCOUNTING MALPRACTICE**

10  **(DERIVATIVE CLAIMS RE: VILLAGE, VINTAGE CREEK AND MADERA)**

11       245.    Plaintiffs repeat and reallege each of the allegations contained in all

12  previous paragraphs in this complaint, as if fully set forth herein.

13       246.    Plaintiffs are informed and believe, and thereon allege, that after formation

14  of each of the development companies, Village Capital Group LLC, Vintage Creek LLC, and

15  Madera Avenue 12 Capital Group LLC, respectively, and after execution of the operating

16  agreements for each of those companies, Stanley Foondos contended that he represented such

17  companies in his capacity as their Certified Public Accountant, as well as being a partner in the

18  general partnerships managing the companies.

19       247.    Plaintiffs allege and contend that Stanley Foondos served as the certified

20  public accountant for tax reporting, accounting and bookkeeping services for plaintiffs at all times

21  relevant to these proceedings, and that Stanley Foondos established, fostered, and abused the

22  confidential relationship as a certified public accountant with plaintiffs, as alleged in this

23  complaint and as set forth in Count Seven, herein.  In the alternative, and particularly regarding

24  the wrongful conduct by Stanley Foondos on and after the formation of Village, Vintage Creek

25  and Madera, plaintiffs assert each and every, and all the claims set forth in Count Seven herein,

26  against Stanley Foondos, on behalf of and for the benefit of defendants Village Capital Group

27  LLC, Vintage Creek LLC, and Madera Avenue 12 Capital Group LLC.

28  ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

248.   If plaintiffs are successful in this action, a substantial benefit will result to defendants Village, Vintage Creek, and Madera, on whose behalf this action is prosecuted, and plaintiffs are entitled to recovery of their attorney's fees incurred herein.

249.   Plaintiffs did not make any efforts to secure curative actions from defendants Village, Vintage, and Madera in prosecuting this action, because any such efforts would have been futile in that Sinadinos and Stanley Foondos manage and control such companies, and they are primary wrongdoers, as alleged herein.  However, plaintiffs delivered to defendants Village, Vintage Creek, and Madera, by transmission to Sinadinos and Stanley Foondos, via email and mail to their attorney, Carl Blaine, on November 3, 2008, a true copy of the complaint which plaintiffs then proposed to file.

WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

## XIII.   COUNT NINE - CONVERSION

250.   Plaintiffs repeat and reallege each of the allegations contained in all previous paragraphs in this complaint, as if fully set forth herein.

251.   At all times herein mentioned, plaintiffs were, and still are, entitled to possession, ownership, and control of all funds deposited in the accounts for the Village, Vintage Creek, and Madera projects by prospective buyers, investors, and homebuilders, to the extent of plaintiffs' membership interests and capital accounts in the development companies for those projects, as herein alleged.  At all times herein mentioned, Natomas was, and still is, entitled to possession, ownership, and control of property interests and equity wrongfully transferred by defendants from Village and Vintage Creek, including but not limited to the interests in the Johl, Von Behren, and Ubungen parcels, to the extent of plaintiff's membership interests and capital accounts, as herein alleged.

252.   On the dates previously alleged and in the manner herein alleged, defendants took the property described above from plaintiffs' possession, ownership and control, and converted the same to their own use.  As a proximate result of defendants' conversion, plaintiffs suffered injuries and damages as alleged herein, which are the natural, reasonable, and proximate results of the conversion.  Defendants' acts alleged herein were willful, wanton,

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1    malicious, and oppressive, undertaken with the intent to defraud, and justify the awarding of

2    exemplary and punitive damages.

3              WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

4    ## XIV.   COUNT TEN—PETITION FOR WRIT OF

5    ## MANDATE TO COMPEL INSPECTION OF RECORDS

6              253.    Plaintiffs repeat and reallege each of the allegations contained in all

7    previous paragraphs in this complaint, as if fully set forth herein.

8              254.    Defendant Sinadinos is, and at all times herein mentioned was, a manager

9    of Madera Avenue 12 Capital Group LLC, and as a general partner of South Watt & Florin

10   Partners and Caselman & Carlisle, he was and is a manager of Village Capital Group LLC and

11   Vintage Creek LLC.  As alleged herein, plaintiffs made multiple requests to Sinadinos and

12   Stanley Foondos to make available to plaintiffs for inspection and the making of extracts

13   therefrom, the books, records, and documents required to be maintained for these three

14   companies, and made available under the provisions of Corporations Code Sections 17058 and

15   17106 and the relevant operating agreements.

16             255.    Plaintiffs' requests were at all times reasonable, for purposes reasonably

17   related to plaintiffs interests as members and holders of the economic interests in the

18   aforementioned companies in that plaintiffs are informed and believe that defendants are

19   conducting a pattern of racketeering activity and a scheme to defraud plaintiffs, as alleged herein.

20   Sinadinos, Stanley Foondos, and other defendants only partially responded to plaintiffs' requests,

21   corruptly altered documents (tax returns), and denied access to all records of the companies, as

22   herein alleged.  Defendants' failure to allow plaintiffs full and complete inspection of company

23   records is without justification.

24             256.    Plaintiffs have no plain, speedy, and adequate remedy in the ordinary

25   course of law, other than the relief sought in this application, because of defendants' failure and

26   refusal to allow complete access and disclosure of company books, records and documents.

27   ///

28   ///

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

## XV.   COUNT ELEVEN—CONVERSION

## (DERIVATIVE CLAIMS OF VILLAGE AND VINTAGE CREEK)

257.   Plaintiffs repeat and reallege each of the allegations contained in all previous paragraphs in this complaint, as if fully set forth herein.

258.   At all times herein mentioned, Village and Vintage Creek were, and still are, entitled to possession, ownership, and control of funds originally invested in the projects, according to the terms of the respective operating agreements for the companies, subject to specific terms for repayment of the investments upon sale of the entitled projects to homebuilders, as herein alleged.  At all times herein mentioned, Village and Vintage Creek were, and still are, entitled to possession, ownership, and control of property interests and equity wrongfully transferred by defendants from Village and Vintage Creek, including but not limited to the interests in the Johl, Von Behren, and Ubungen parcels, as herein alleged.

259.   On the dates previously alleged and in the manner herein alleged, defendants, including Glenn Sorenson, Jr., Stockton & 65th LP, Harinder Johl, Baljit Johl, and Gus Galaxidas took the property described above from the possession, ownership and control of Village and Vintage Creek, and converted the same to their own use.  As a proximate result of defendants' conversion, Village and Vintage Creek suffered injuries and damages as alleged herein, which are the natural, reasonable, and proximate results of the conversion.  Defendants' acts alleged herein were willful, wanton, malicious, and oppressive, undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages.

260.   Plaintiff Natomas asserts each and every, and all the claims set forth herein, against Glenn Sorenson, Jr., Stockton & 65th LP, Harinder Johl Baljit Johl, and Gus Galaxidas on behalf of and for the benefit of defendants Village Capital Group LLC and Vintage Creek LLC.

261.   If plaintiff Natomas is successful in this action, a substantial benefit will result to defendants Village and Vintage Creek, on whose behalf this action is prosecuted, and plaintiffs are entitled to recovery of their attorneys' fees incurred herein.

///

1    262.    Plaintiffs did not make any efforts to secure curative actions from

2 defendants Village and Vintage Creek in prosecuting this action, because any such efforts would

3 have been futile in that Sinadinos and Stanley Foondos manage and control such companies, and

4 they are primary wrongdoers, who acted in conspiracy with other defendants, including Sorenson,

5 Stockton & 65th LP, Harinder Johl, Baljit Johl, and Gus Galaxidas, as alleged herein.

6    WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

7                        XV.    **PRAYER FOR RELIEF**

8    WHEREFORE, plaintiffs pray that:

9    1.    The Court issue an alternative writ of mandate, commanding defendants

10 Sinadinos, Stanley Foondos, South Watt & Florin Partners, Caselman & Carlisle, Village,

11 Vintage Creek, and Madera, and each of them, to make available to plaintiffs and to plaintiffs'

12 representatives for inspection and the making of extracts therefrom, the complete books, records

13 and documents of Vintage Creek LLC, Village Capital Group LLC, and Madera Avenue 12

14 Capital Group LLC, or to show cause before this Court at a time specified by court order why

15 they have not done so and why a peremptory writ should not issue;

16    2.    The Court direct the expenses of the inspection and investigation of the

17 company records, and such fees incurred to compel the inspection, be paid by the defendants

18 Sinadinos, Stanley Foondos, South Watt & Florin Partners, Caselman & Carlisle, Village,

19 Vintage Creek, and Madera;

20    3.    Plaintiffs be awarded damages, including compensatory, treble, and

21 punitive damages, as well as prejudgment and postjudgment interest, in an amount to be

22 determined at trial;

23    4.    Defendants be ordered to transfer property interests to plaintiffs, or Village

24 and Vintage Creek, subject to proof, with respect to those interests illegally obtained by

25 defendants, including but not limited to the property interests held by defendants Sorenson and

26 Stockton & 65th LP in the Johl and Von Behren properties, and the Ubungen property illegally

27 obtained by the Johl defendants; or in the alternative, that such defendants be ordered to pay

28 damages for the loss of such property interests by plaintiffs, Village, and Vintage Creek.

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

1     5. Defendants be ordered to disgorge any portion of the funds derived by

2 defendants' wrongful conduct from the assets of Vintage Creek LLC, Village Capital Group LLC,

3 and Madera Avenue 12 Capital Group LLC, which they received;

4     6. Plaintiffs be awarded attorneys' fees and costs of suit herein; and

5     7. For such other and further relief as the Court may deem just and proper.

6 Dated:  June 1, 2009.    BARTH TOZER & TIMM LLP

7

8          By_____

9            THOMAS W. BARTH

10        Attorneys for Plaintiffs NATOMAS
           GARDENS INVESTMENT GROUP LLC

11        and ORCHARD PARK DEVELOPMENT LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA

00003574

SECOND AMENDED COMPLAINT UNDER RICO; FRAUD, BREACH OF FIDUCIARY DUTIES, ETC. [CASE NUMBER 2:08-CV-02308-FCD-KJM ]

1

## **VERIFICATION**

2      I, Eric Solorio, the undersigned, declare that:

3      I am the Manager of Natomas Gardens Investment Group LLC and Orchard Park

4  Development LLC, plaintiffs in this matter.  I have read the foregoing **SECOND AMENDED**

5  **COMPLAINT UNDER THE RACKETEER INFLUENCED AND CORRUPT**

6  **ORGANIZATIONS ACT; FRAUD; BREACH OF FIDUCIARY DUTIES;**

7  **PROFESSIONAL MALPRACTICE; CONVERSION, AND INSPECTION OF RECORDS**

8  and know its contents.  It is true of my own knowledge, except as to the matters that are stated in

9  it on my own information and belief, and as to those matters, I believe them to be true.

10      I declare under penalty of perjury under the laws of the State of California that the

11  foregoing is true and correct and that this Verification was executed this 1st day of June, 2009, at

12  Sacramento, California.

13                      NATOMAS GARDENS INVESTMENT GROUP LLC

14

15                      ERIC SOLORIO, Manager

16

17                      ORCHARD PARK DEVELOPMENT LLC

18

19                      ERIC SOLORIO, Manager

20

21

22

23

24

25

26

27

28

BARTH TOZER & TIMM LLP
ATTORNEYS AT LAW
SACRAMENTO, CALIFORNIA