UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

NATOMAS GARDENS INVESTMENT
GROUP, LLC, a California
limited liability company,
ORCHARD PARK DEVELOPMENT, LLC,
a California limited liability
company,

        NO. CIV. S-08-2308 FCD/KJM

        Plaintiffs,

    v.               MEMORANDUM AND ORDER

JOHN G. SINADINOS, STANLEY J.
FOONDOS, STEPHEN FOONDOS, et
al.,

        Defendants.

----oo0oo----

    This matter is before the court on defendants' various

motions to dismiss and motions for a more definite statement with

regards to plaintiffs Natomas Garden Investment Group, LLC and

Orchard Park Development, LLC's (collectively, "plaintiffs")

second amended complaint ("SAC"). (Docket #s 128, 134, 139.)

Plaintiffs oppose the motions. For the reasons set forth below,

1

defendants' motions are GRANTED in part and DENIED in part.[1]

**BACKGROUND**[2]

This case arose out of a failed business venture between Eric Solorio ("Solorio") and defendants John Sinadinos ("Sinadinos"), Larry Deane ("Deane"), and their various alleged co-conspirators. Beginning in 2003, Solorio negotiated to obtain rights to purchase undeveloped real property from several property owners in the Sacramento area. (SAC ¶ 44.) Solorio endeavored to subsequently develop and sell this land, for which he formed a limited liability company, plaintiff Natomas Gardens Investment Group, LLC ("Natomas"). (Id. at ¶¶ 44-45.) In seeking financing for his potential project, Solorio met defendants Deane and Sinadinos. (Id. at ¶ 46.) Sinadinos, an attorney who had some involvement in land development in the Sacramento region, immediately showed interest in the project and agreed to partner with Solorio. (Id. at ¶¶ 46-47.) Sinadinos recommended that Stanley Foondos ("Foondos"), a certified public accountant, support Solorio's proposed development project through performance of all accounting and tax reporting responsibilities. (Id. at ¶ 52.)

By the end of 2003, Solorio, acting on behalf of Natomas, assembled purchase rights to a number of contiguous parcels in the Sacramento area, upon which Sinadinos made the necessary deposits in escrow. (Id. at ¶ 53.) By mid-2004, Natomas

---

[1]   Because oral argument will not be of material assistance, the court orders these matters submitted on the briefs.  E.D. Cal. L.R. 230(g).

[2]   All relevant facts are drawn from plaintiffs' SAC, filed June 1, 2009.  (Docket #126.)

2

obtained rights to purchase and develop fourteen parcels of land
in Sacramento County comprising approximately 109 acres. (Id. at
¶ 54.) This development project was designated Florin Vineyards,
and Sinadinos formed a limited liability company, Village Capital
Group, LLC ("Village"), as the development company associated
with the project. (Id. at ¶¶ 54-55.) Natomas was given a 45
percent stake in Village, while the other 55 percent was held by
Chi-Sac Village Capital Group Investors, LLC ("Village Investors,
LLC"), a company managed and controlled by Sinadinos and Foondos.
(Id. at ¶¶ 12, 20.)

By October 2004, Natomas obtained rights to purchase and
develop seventeen additional parcels of land comprising
approximately 85 acres. (Id. at ¶ 56.)   This development
project was designated Vintage Creek, and Sinadinos formed
another limited liability company, Vintage Creek, LLC
("Vintage"), as the development company associated with the
project. (Id. at ¶¶ 56-57.) Similar to the respective interests
in Village, Natomas was given a 45 percent stake in Vintage,
while the other 55 percent was held by Chi-Sac Vintage Creek
Investors, LLC ("Vintage Investors, LLC"), a company managed and
controlled by Sinadinos and Foondos. (Id. at ¶¶ 12, 21.)

Additionally, during April-May 2005, Solorio assembled
property acquisition rights for a development project located in
Madera County, California. (Id. at ¶ 61.) Solorio, acting
through his own limited liability company, plaintiff Orchard Park
Development, LLC ("Orchard Park"), negotiated and executed five
option agreements to purchase contiguous parcels of real property
comprising approximately 265 acres. (Id.) Acting upon

3

1  Sinadinos' representations as to his substantial development

2  experience, Solorio agreed to include Sinadinos as a shareholder

3  of Madera Avenue 12 Capital Group, LLC ("Madera"), a limited

4  liability company formed for the development of the Madera

5  properties.  (Id. at ¶ 62.)

6      Sinadinos represented to Solorio that he would invest

7  $4,000,000 in each project for acquisition and development costs.

8  (Id. at ¶ 58.)  Upon expressing concern with Sinadinos' prior

9  development project experience and ability to finance the various

10  projects, Sinadinos provided Solorio with meeting minutes between

11  Sinadinos and various individuals in Chicago who Sinadinos had

12  brought on as investors in Village and Vintage.  (Id. at ¶ 59.)

13      In mid-2004, Solorio, on behalf of Natomas, insisted that

14  operating agreements for Village and Vintage be drafted before

15  homebuilders sought to purchase interests in the projects.  (Id.

16  at ¶ 89.)  Sinadinos, however, delayed drafting the operating

17  agreements until homebuilders were on the verge of purchasing

18  interests in the projects.  (Id. at ¶¶ 89-94.)  Although Solorio

19  had numerous objections to the proposed operating agreements, he

20  was pressured into signing the agreements by the immediacy of the

21  homeowners' investments and thereby made substantial concessions

22  to Sinadinos and his alleged co-conspirators.  (Id.)  Notably,

23  Solorio transferred Natomas' property acquisition rights in

24  Vintage to Sinadinos and his co-conspirators.  (Id. at ¶ 91.)

25  Sinadinos also pressured Solorio to execute an amendment to

26  Vintage's operating agreement that provided Sinadinos with an

27  additional $400,000 concession.  (Id.)

28  ///

4

During approximately May 2004, Sinadinos and Foondos began commingling funds between Village and Vintage. (Id. at ¶¶ 67-71.) Although Solorio requested on numerous occasions that Sinadinos and Foondos provide Natomas with a comprehensive financial report, Sinadinos and Foondos either ignored Solorio's requests or failed to disclose the details of the companies' various financial dealings. (Id. at ¶ 70.)

In November 2004, KB Homes entered into a purchase agreement with Village and made an initial deposit of over $2 million, after which Sinadinos and his co-conspirators began to fraudulently inflate their capital accounts in Village. (Id. at ¶¶ 72-73.) At this time, Glenn Sorenson, Jr. ("Sorenson") and his company, Stockton & 65th, LP, invested approximately $3 million in Village in the form of a 1031 tax exchange. (Id. at ¶ 73.) Sinadinos promised Sorenson an annual 25 percent rate of return on his investment and planned to use the funds to purchase a parcel owned by Baljit Johl, who had granted Natomas an option to purchase the parcel at any time during the next several years. (Id. at ¶ 74.) Although Solorio objected to Sorenson's rate of return and Sinadinos' proposed use of investment funds, Sinadinos convinced Solorio to agree to Sorenson's investment on the promise that Sorenson would option the Johl parcel back to Village. (Id. at ¶¶ 74-77.) Through a series of fraudulent transactions set forth in greater detail infra, Sinadinos obtained an approximate profit of $800,000 through the transfer of the Johl parcel, transferred these funds to Village, and claimed that the transferred funds were additional capital invested by Sinadinos and his co-conspirators. (Id. at ¶¶ 83-

5

84.)  Additionally, Sinadinos used the remainder of Sorenson's investment that was not applied toward the Johl parcel to acquire another parcel in Village, the Von Behren parcel.  (Id. at ¶ 85.) Contrary to Sinadinos' and Sorenson's promises to Solorio, however, Sinadinos did not obtain an option agreement from Sorenson to option the Johl and Von Behren parcels back to Village.  (Id. at ¶ 86.)  As a result, Natomas was defrauded of its purchase rights in the Johl and Von Behren parcels, as Village lacked contractually defined rights to repurchase the parcels on the favorable terms promised by Sinadinos and his co-conspirators.  (Id.)

Further, between June 2004 and December 2007, Sinadinos and his co-conspirators loaned approximately $2,155,000 from Vintage to Village, only $825,000 of which was reimbursed to Vintage. (Id. at ¶ 95.)  Sinadinos and his co-conspirators used the remaining $1,330,000 to inflate their capital accounts in Vintage, thereby allegedly engaging in conversion and money laundering.  (Id.)  Moreover, beginning in November 2004, Sinadinos and his co-conspirators transferred substantial funds from Village and Vintage directly to themselves.  (Id. at ¶ 97.) To accomplish such transfers, Sinadinos and his co-conspirators engaged in loan transactions that were never repaid, or received double repayment of funds actually loaned to Village and Vintage. (Id. at ¶¶ 98-120, 136-145.)  Sinadinos also held himself out as the attorney for Village, Vintage, Madera, and their various investors, and paid himself and his law office approximately $354,000 for undocumented legal services between June 21, 2004 and October 15, 2007.  (Id. at ¶¶ 171-179.)  Likewise, Sinadinos

used funds from Madera to pay his law firm staff and secretarial expenses, and "repaid" himself for fictional loans made to Madera.  (Id. at ¶¶ 146-151, 176-179.)

Additionally, Sinadinos unlawfully transferred an equity interest in a Vintage parcel in exchange for a settlement and release of claims by Surjit Johl, Baljit Johl, and Harinder Johl. (Id. at ¶¶ 180-183.)   Although Solorio informed Baljit and Harinder Johl that the transfer of the equity interest in the parcel could not occur without Natomas' consent, the Johls nonetheless proceeded to execute the release with Sinadinos. (Id. at ¶ 185.)

Sinadinos and his co-conspirators also engaged in fraud to lure new investors to contribute capital to Village and Vintage. (Id. at ¶¶ 123-135.)   Although Sinadinos and his co-conspirators were aware that Village and Vintage were doomed to financial failure due to the conspirators' self-serving financial dealings, they informed potential investors that Village and Vintage were financially viable projects.  (Id.)   The first such defrauded investor was Margarida Leavitt ("Leavitt"), who was referred to Sinadinos by Foondos, Leavitt's attorney.  (Id. at ¶¶ 123-125.) Sinadinos and his co-conspirators used part of Leavitt's $1.2 million investment to purchase an equity interest in a parcel associated with Vintage, and the remaining amount to reimburse their prior investments without reducing their stated capital accounts.  (Id. at ¶ 127.)   Sinadinos and his co-conspirators engaged in a similar fraud to acquire investment proceeds from the Vathis family.  (Id. at ¶¶ 128-135.)

///

Sinadinos then confided in Solorio, admitting that he had defrauded Leavitt and asking Solorio to assist in preserving the false appearance that Vintage was a successful development project. (Id. at ¶ 152.)  After learning of Sinadinos' fraudulent activity, Solorio repeatedly requested to look at the financial books and records of Village, Vintage, and Madera. (Id. at ¶¶ 153-154.)  Sinadinos repeatedly denied Solorio access to the books and records, and Solorio subsequently retained the services of an attorney, Thomas Barth, and a forensic accounting firm, Ueltzen & Company ("Ueltzen"), to aid in inspecting all requested financial documents.  (Id. at ¶¶ 153-156.)  Following persistent requests from Thomas Barth, Sinadinos agreed to allow an employee of Ueltzen to inspect all records, yet the copies provided by Sinadinos for inspection were not complete.  (Id. at ¶¶ 157-159.)  Plaintiffs allege that Sinadinos refused to allow Solorio, Natomas, and Orchard Park access to company records and documents, which by law should have been made available to them. (Id. at ¶ 163.)  Additionally, plaintiffs allege that, in response to Solorio's request for all financial documents, Sinadinos and Foondos provided Solorio with false tax returns, and that for a number of years Sinadinos and Foondos have been reporting fraudulent tax returns for Village, Vintage, and Madera to the Internal Revenue Service.  (Id. at ¶¶ 165-170.)

Around April 2008, Deane, through counsel Don Wanland ("Wanland"), demanded that Solorio abandon all claims against Sinadinos.  (Id. at ¶ 192.)  Wanland represented that Deane had seen the financial records for Village and Vintage and was convinced that there was no factual or legal basis that Sinadinos

had engaged in any wrongdoing. (Id.) Despite entreaties from Deane, however, Solorio refused to abandon his claims against Sinadinos. (Id. at ¶¶ 193-194.) Due to the dispute between Deane and Solorio as to the legitimacy of Solorio's legal claims, Deane filed suit in Sacramento County Superior Court to dissolve Natomas, as set forth in greater detail *infra*. (Id. at ¶¶ 193-195.) Plaintiffs allege that Deane, with full awareness of Sinadinos' fraudulent and unlawful conduct, has conspired with Sinadinos to prevent Solorio from investigating and pursuing claims against Sinadinos and his co-conspirators. (Id.)

Plaintiffs allege claims against defendants for individual violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. ("RICO"), RICO conspiracy, fraud, breach of fiduciary duty, professional legal malpractice, professional accounting malpractice, and conversion. (Id. at ¶¶ 197-256.) On May 12, 2009, this court entered an order granting in part and denying in part various defendants', including Deane's, motions to dismiss plaintiffs' first amended complaint. (Docket # 123). On August 3, 2009, the Superior Court entered an order staying the state action pending the outcome of this federal action. (Pls.' RJN in Opp'n to Deane's MTD, filed March 9, 2010 [Docket No. 211], Ex. C.)

**STANDARDS**

**I.   Motion to Dismiss for Failure to State a Claim**

On a motion to dismiss, the allegations of the complaint must be accepted as true. Cruz v. Beto, 405 U.S. 319, 322 (1972). The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded"

allegations of the complaint. <u>Retail Clerks Int'l Ass'n v.</u>
<u>Schermerhorn</u>, 373 U.S. 746, 753 n.6 (1963). Thus, the plaintiff
need not necessarily plead a particular fact if that fact is a
reasonable inference from facts properly alleged. <u>See</u> <u>id.</u>

Nevertheless, it is inappropriate to assume that the
plaintiff "can prove facts which it has not alleged or that the
defendants have violated the . . . laws in ways that have not
been alleged." <u>Associated Gen. Contractors of Cal., Inc. v. Cal.</u>
<u>State Council of Carpenters</u>, 459 U.S. 519, 526 (1983). Moreover,
the court "need not assume the truth of legal conclusions cast in
the form of factual allegations." <u>United States ex rel. Chunie</u>
<u>v. Ringrose</u>, 788 F.2d 638, 643 n.2 (9th Cir. 1986).

Ultimately, the court may not dismiss a complaint in which
the plaintiff has alleged "enough facts to state a claim to
relief that is plausible on its face." <u>Bell Atlantic Corp. v.</u>
<u>Twombly</u>, 127 S.Ct. 1955, 1974 (2007). Only where a plaintiff has
not "nudged [his or her] claims across the line from conceivable
to plausible," is the complaint properly dismissed. <u>Id.</u> "[A]
court may dismiss a complaint only if it is clear that no relief
could be granted under any set of facts that could be proved
consistent with the allegations." <u>Swierkiewicz v. Sorema N.A.</u>,
534 U.S. 506, 514 (2002) (quoting <u>Hudson v. King & Spalding</u>, 467
U.S. 69, 73 (1984)).

In ruling upon a motion to dismiss, the court may consider
only the complaint, any exhibits thereto, and matters which may
be judicially noticed pursuant to Federal Rule of Evidence 201.
<u>See</u> <u>Mir v. Little Co. Of Mary Hospital</u>, 844 F.2d 646, 649 (9th
Cir. 1988); <u>Isuzu Motors Ltd. v. Consumers Union of United</u>

1   States, Inc., 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998).

2   **II.  Motion for a More Definite Statement**

3       A motion for a more definite statement should not be granted

4   unless a pleading is "so vague or ambiguous that a party cannot

5   reasonably be required to frame a responsive pleading."  Fed. R.

6   Civ. P. 12(e).  This liberal standard is consistent with Rule

7   8(a)(2), which only requires pleadings that contain a "short and

8   plain statement of the claim."  The Federal Rules of Civil

9   Procedure anticipate that the parties will familiarize themselves

10  with the claims and ultimate facts through the discovery process.

11  See Famolare, Inc. v. Edison Brothers Stores, Inc., 525 F. Supp.

12  940, 949 (E.D. Cal. 1981).  Indeed, "where the information sought

13  by the moving party is available and/or properly sought through

14  discovery, the motion should be denied."  Id.

15                          **ANALYSIS**

16  **I.  Deane's Motion to Dismiss Plaintiffs' SAC**

17      Deane moves to dismiss plaintiffs' SAC on several grounds.

18  First, Deane argues the SAC violates this court's pre-trial

19  scheduling order by adding an additional party as a defendant

20  (Leavitt), without first receiving leave from the court, and

21  therefore, the SAC should be dismissed in its entirety.  (Status

22  (Pre-Trial Scheduling) Order, filed February 6, 2009 [Docket

23  # 51] (providing that "No further joinder of parties or

24  amendments to pleadings is permitted without leave of court, good

25  cause having been shown.").)  Deane next argues, inconsistently,

26  that that very same person, Leavitt, which plaintiffs added as a

27  party to this action, purportedly in violation of the pre-trial

28  scheduling order, is a party required to be joined under Rule 19

                              11

of the Federal Rules of Civil Procedure, and plaintiffs' failure
to join Leavitt mandates the action be dismissed. Deane also
argues plaintiffs have failed to join other required parties
including Natomas' receiver and the Vathis'. Additionally, Deane
argues Natomas lacks standing to bring suit because Natomas is
under receivership, and only the receiver is the real party in
interest. Finally, Deane argues plaintiffs have failed to state
a claim for conversion under California law.[3]

## A. The Receiver

Deane makes two arguments regarding Natomas' receivership.
He argues that the receiver is the real party in interest, and
therefore Natomas lacks standing to sue, and that the receiver is
a party required to be joined under Rule 19. Plaintiffs contend
that because the receiver was discharged in the state court
proceedings, Deane's contention that Natomas lacks standing or
that the receiver must be joined is moot.

On December 19, 2008, Judge Loren E. McMaster, in
Sacramento County Superior Court, granted Deane's motion for
appointment of a receiver over Natomas. (Deane's RJN in Support
of MTD SAC ["Deane's MTD RJN"], filed June 22, 2009 [Docket No.
136], Ex. 3.) Judge McMaster was aware of this lawsuit when he
granted Deane's motion. In his order appointing Scott Sackett as

---

[3] Deane also contends plaintiffs have failed to
adequately plead claims for violation of RICO or fraud against
him. Plaintiffs clarify in their opposition that they are not
alleging such claims against Deane. (Pls.' Opp'n to Deane's MTD,
filed March 9, 2010 [Docket # 209], 6:12-22.) To the extent
there is a lack of clarity in the SAC as to which claims are
directed at which defendants, plaintiffs' RICO and fraud claims
are hereby DISMISSED with prejudice as to defendant Deane.
Deane's motion to dismiss plaintiffs' claim for RICO conspiracy
has previously been denied by the court. (Docket # 123.)

1   Natomas' receiver, Judge McMaster clearly articulated the

2   receiver's duties, including specifically the receiver's role in

3   this action.  (Deane's MTD RJN, Ex. 6.)  Judge McMaster stated:

4   "The Receiver shall not substitute in the Federal Lawsuit on

5   behalf of Natomas or otherwise appear or take any action in the

6   Federal Lawsuit until further order of this Court."  (Id. 4:25-

7   27.)  The order provided that after this court ruled on the

8   motions to dismiss plaintiffs' first amended complaint, if the

9   case was not dismissed, the receiver would "act solely as an

10  examiner" to evaluate the merits of Natomas' claims and make a

11  report to the state court.  (Id.)  Upon receiving the report, the

12  state court would hold a hearing to determine whether the claims

13  should proceed in federal court, and if they should, "who should

14  prosecute the Federal Lawsuit on behalf of Natomas."  (Id.)

15      That hearing, however, never took place, as on August 3,

16  2009, the state court entered an order discharging the receiver

17  due to Deane's failure to comply with the terms of the court's

18  order regarding payment of the receiver.  (Pls.' RJN in Opp'n to

19  Deane's MTD, Ex. B.)  That same day, the state court granted a

20  stay of the state proceedings pending the conclusion of the

21  instant action.  (Id. Ex. C.)  The state court did not rule on

22  Solorio's then pending request to terminate the receivership,

23  finding the request moot since the action had been stayed.  Id.

24  This left Natomas in the unique position of being in receivership

25  with no receiver.  Because the state court action is stayed

26  pending the outcome of this case, no receiver will be appointed

27  by the state court before the conclusion of this action.

28  ///

13

1   Nonetheless, Deane argues that even though there is no
2   receiver, Natomas lacks standing to bring this action because the
3   claims still belong to the receivership estate.   For this
4   proposition, Deane cites First State Bank of Northern California
5   v. Bank of America, 618 F.2d 603 (9th Cir. 1980) and O'Flaherty
6   v. Belgum, 115 Cal. App. 4th 1044 (2004).   Neither of these
7   cases, however, control the outcome of this case.
8      First State Bank of Northern California involved a situation
9   where the California Superintendent of Banking, acting pursuant
10  to California law, took possession of First State Bank of
11  Northern California ("FSB") and placed it under receivership with
12  the Federal Deposit Insurance Corporation ("FDIC") as receiver.
13  618 F.2d at 604.   In a brief, per curiam opinion, the Ninth
14  Circuit affirmed the trial court's ruling that FSB lacked
15  standing to bring the action because the receiver was the real
16  party in interest under California law.   Id.   In reaching its
17  conclusion that the receiver was the real party in interest, the
18  court relied on the "broad powers and responsibilities which the
19  [California] Financial Code delegates to the receiver."   Id.   One
20  of the provisions which the court relied on was California
21  Financial Code § 3113 which provides: "[t]he commissioner in the
22  name of the delinquent bank or in his or her own name may
23  prosecute and defend any and all actions and other legal
24  proceedings appropriate or necessary to the liquidation of such
25  bank."   Cal. Fin. Code § 3113 (2010).
26     The present case is distinguishable from First State Bank of
27  Northern California.   Unlike a bank forced into receivership by
28  the government, where the receiver's responsibilities are set

14

forth in the Financial Code, here, a limited liability company was forced into receivership due to the irreconcilable differences of its shareholders.  The state court order creating the receivership clearly contemplates controlling the receiver's role in this action and that order did not grant the receiver power similar to the receiver in First State Bank of Northern California, who was governed by California Financial Code § 3113.

Likewise, O'Flaherty v. Belgum is distinguishable from the present case.  O'Flaherty involved the dissolution of a law firm. 115 Cal. App. 4th at 1047.  The court had "appointed an 'all-purpose' receiver to manage the business of" the law firm and the order appointing the receiver "specifically provided that '[t]he Receiver is vested with all the usual powers, rights and duties of Receivers appointed by this Court or otherwise defined by statute.'"  Id. at 1061 (alterations in original)(emphasis removed).  The court, relying on California Code of Civil Procedure Section 568[4] stated that "*[i]n the absence of a specific order to the contrary*, a receiver appointed for a dissolved partnership has the sole authority to commence an action on behalf of a dissolved partnership."  Id. at 1062 (emphasis added).

In this case, contrary to O'Flaherty, the order creating the receivership over Natomas, while general in many regards,

---

[4]     Section 568 provides as follows: "The receiver has, *under the control of the Court*, power to bring and defend actions in his own name, as receiver; to take and keep possession of the property, to receive rents, collect debts, to compound for and compromise the same, to make transfers, and generally to do such acts respecting the property as the Court may authorize.  Cal. Code Civ. Proc. § 568 (2010) (emphasis added).

specifically set forth the receiver's role in this action. (Deane's MTD RJN, Ex. 3.)  In other words, that order was "a specific order to the contrary" governing the receiver's power over the partnership's claims that was contemplated in O'Flaherty.  See O'Flaherty, 115 Cal. App. 4th at 1062.

Thus, because there is a specific order placing parameters on the receiver's role in this action, it is that order, and not the general role of a receiver as controlled by state law, like in O'Flaherty, which governs the receiver's standing in this action.  That order clearly stated: "The Receiver shall not substitute in the Federal lawsuit on behalf of Natomas or otherwise appear or take any action in the Federal Lawsuit until further order of this Court." (Deane's MTD RJN, Ex. 3.)  Deane has presented no contrary order granting the receiver authority to substitute in this action, and, no such order will be forthcoming at any point during this case as the state court proceedings have been stayed pending the outcome of this action.

Therefore, the court concludes that the receiver is not the real party in interest under these circumstances and is not a party required to be joined under Rule 19.

**B.   Rule 19 Joinder of Leavitt and the Vathis'**

Rule 19(a) provides for joinder of necessary and indispensable parties.  The court must (1) determine whether the absent party is a "necessary" party, and (2) if the absent party is necessary, but joinder is not feasible, whether the party is "indispensable."  Kescoli v. Babbit, 101 F.3d 1304, 1309 (9th Cir. 1996).  The moving party bears the burden of persuasion. See Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir.

16

1990).  A party is necessary if (1) complete relief cannot be accorded in the party's absence, or (2) the party claims an interest relating to the subject of the action and is so situated that the disposition of the action in the party's absence may (a) impair or impede the party's ability to protect that interest or (b) leave any of the existing parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest.  Fed. R. Civ. P. 19(a).  "If a person has not been joined as required, the court must order that the person be made a party."  Id.

With regard to Leavitt, both plaintiffs and Deane agree that Leavitt is a necessary party under Rule 19.  Deane argues that because the court's scheduling order does not permit the addition of parties without leave from the court, the entire complaint should be dismissed.  However, Rule 19 is clear as to the remedy for failing to join a necessary party.  "If a person has not been joined as required, the court must order that the person be made a party."  Id.  The failure to join a party under Rule 19 can only lead to dismissal of a suit where the court cannot obtain jurisdiction over the necessary party and that party is determined to be indispensable to the action.  Id. 19(b).

According to the complaint, Leavitt is a California resident.  (Compl. ¶ 38.)  Therefore, the court likely has jurisdiction over Leavitt making an analysis under Rule 19(b) unnecessary.  Because the parties agree that Leavitt is a necessary party under Rule 19(a) and there appear to be no issues relating to jurisdiction over Leavitt, the court orders that

17

1   Leavitt be joined as a party to this action.[5]  As such, Deane's

2   motion to join Leavitt as a party under Rule 19 is GRANTED.

3        With regard to the Vathis family, the court concludes that

4   they are not parties which must be joined under Rule 19.  Deane

5   argues that the Vathis' are necessary because complete relief

6   cannot be afforded in their absence and, particularly, Deane may

7   be subject to multiple judgments requiring him to convey the same

8   piece of property to two separate parties.  This is not the case.

9   The two claims plaintiffs have plead against Deane are for civil

10  RICO conspiracy and conversion––neither of which would give the

11  court power to grant such relief.  The only remedy for a civil

12  RICO violation brought by an individual, rather than the Attorney

13  General, is treble damages, costs, and attorneys' fees.  <u>See</u> 18

14  U.S.C. § 1964(c); <u>Religious Tech. Ctr. v. Wollersheim</u>, 796 F.2d

15  1076, 1080-89 (9th Cir. 1986), *cert. denied*, 479 U.S. 1103 (1987)

16  (discussing, in depth, the legislative history of § 1964 and

17  concluding "that Congress did not intend to give private civil

18  RICO plaintiffs access to equitable remedies").  Likewise, as

19  Deane correctly argues in his motion, a claim for conversion

20  cannot be for real property.  <u>See</u> <u>Salma v. Capon</u>, 161 Cal. App.

21  4th 1275, 1295 (2008) ("The tort of conversion applies to

22  personal property, not real property.").  As plaintiffs have no

23  claim that would create double liability towards Deane with

24  regards to the Vathis family, the court concludes that they are

25  not parties required to be joined under Rule 19.

26

27       [5]   Finding that Leavitt is a party required to be joined
    under Rule 19 renders Deane's argument regarding plaintiffs'
28  violation of the court's pre-trial scheduling order moot.

18

C.   **Conversion**

Lastly, Deane moves to dismiss plaintiffs' ninth and eleventh claims for relief which are direct and derivative claims for conversion of personal property.  Deane argues that the tort of conversion does not apply to real property, equity, or money. While plaintiffs concede that conversion does not support a claim for real property, they argue that, under certain circumstances which are present here, a conversion claim involving money is appropriate.

Conversion is the wrongful exercise of dominion over personal property of another.  Moore v. Regents of the Univ. of Cal., 51 Cal. 3d 120, 137 (1990).

> A cause of action for conversion requires allegations of [a] plaintiff's ownership or right to possession of property; [the] defendant's wrongful act toward or disposition of the property, interfering with [the] plaintiff's possession; and damage to [the] plaintiff. [citation].  Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment.

PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP, 150 Cal. App. 4th 384, 395 (2007) quoting McKell v. Washington Mutual, Inc., 142 Cal. App. 4th 1457, 1491 (2006). "Conversion cases permitting an action for conversion of money typically involve those who have misappropriated, commingled, or misapplied specific funds held for the benefit of others . . . [where] the amount of money converted was readily ascertainable." Id. at 396.  "While it is true that money cannot be the subject of a conversion unless a specific sum capable of identification is invovlved, . . . it is not necessary that each coin or bill be

19

1   earmarked." <u>Haigler v. Donnelly</u>, 18 Cal. 2d 674, 681 (1941).

2       Both plaintiffs and Deane agree that, for the tort of

3   conversion, plaintiffs must show that a specific, identifiable

4   sum is involved.  Where plaintiffs and Deane disagree is at what

5   stage of the litigation plaintiffs are required to show that sum.

6   Deane argues that plaintiffs are required to plead a specific,

7   identifiable sum whereas plaintiffs argue that they only need to

8   plead an amount that is capable of later identification.

9       California authorities provide no definite answer.  In <u>PCO</u>,

10  the court stated, in what amounts to dicta: "In this case,

11  plaintiffs *may* have stated a cause of action for conversion by

12  alleging, in effect, an amount of cash 'capable of

13  identification.'"  <u>PCO, Inc.</u>, 150 Cal. App. 4th at 397 <u>quoting</u>

14  <u>Haigler</u>, 18 Cal. 2d at 681 (emphasis added) (The <u>PCO</u> court

15  determined that the plaintiffs were required to present evidence

16  of a definite, identifiable sum of money at the summary judgment

17  stage of litigation).  Deane has provided no authority where a

18  conversion claim has been dismissed as a result of a Rule

19  12(b)(6) motion for failure to identify a specific, identifiable

20  sum of money.  Considering the liberal pleading requirements in

21  federal court, the court concludes that at the pleading stage it

22  is only necessary for plaintiffs to allege an amount of money

23  that is "capable of identification." <u>See</u> <u>id.</u> However, at

24  summary judgment plaintiffs will be required to prove a specific,

25  identifiable sum.  <u>PCO, Inc.</u>, 150 Cal. App. 4th at 397.

26      Here, plaintiffs have alleged conversion of an amount of

27  money that is capable of identification.  In count nine,

28  plaintiffs allege that "plaintiffs were, and still are, entitled

20

1  to possession, ownership, and control of all funds deposited in
2  the accounts for the Village, Vintage Creek, and Madera projects
3  by prospective buyers, investors, and homebuilders, to the extent
4  of plaintiffs' membership interests and capital accounts in the
5  development companies for those projects." (SAC ¶ 251.)
6  Likewise, in plaintiffs' derivative claim they allege that
7  "Village and Vintage were, and still are, entitled to possession,
8  ownership, and control of funds originally invested in the
9  projects, according to the terms of the respective operating
10 agreements for the companies, subject to specific terms for
11 repayment of the investments upon sale of the entitled projects
12 to homebuilders." (SAC ¶ 258). These allegations sufficiently
13 allege an amount that is capable of identification.

14      Accordingly, Deane's motion to dismiss plaintiffs' ninth and
15 eleventh claims for relief as to conversion of money is DENIED.
16 However, to the extent plaintiffs' SAC seeks to recover interests
17 in real property or equity interests in real property, Deane's
18 motion to dismiss is GRANTED.

19 **II.  Johls' Motion to Dismiss**

20      Defendants Baljit Johl and Harinder Johl (collectively, "the
21 Johls") have moved to dismiss plaintiffs' claim against them for
22 RICO conspiracy. As a similar motion by the Johls was previously
23 considered, and granted, as to plaintiffs' first amended
24 complaint, the court must determine whether plaintiffs'
25 additional allegations set forth in their SAC remedy the
26 deficiencies in their first amended complaint. (Mem. & Order re:
27 Defendants' MTD FAC at 49.)

28 ///

Title 18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [Section 1962]." "A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." Salinas v. U.S., 522 U.S. 52, 63 (1997) (citing U.S. v. Socony-Vacuum Oil Co., 310 U.S. 150, 253-54 (1940)). Thus, "[i]t makes no difference that the substantive offense under § 1962(c) requires two or more predicate acts." Id. at 65. "The interplay between [18 U.S.C. § 1962] (c) and (d) does not permit [the court] to excuse from the reach of the conspiracy provisions an actor who does not himself commit or agree to commit two or more predicate acts requisite to the underlying offense." Salinas, 522 U.S. at 65. "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of *furthering or facilitating the criminal endeavor*." Id. (emphasis added). In the Ninth Circuit, a defendant may be held liable for conspiracy to violate Section 1962(c) if he "'knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise.'" U.S. v. Fernandez, 388 F.3d 1199, 1230 (9th Cir. 2004) (quoting Smith v. Berg, 247 F.3d 532, 538 (3rd Cir. 2001)). Additionally, the defendant must be "aware of the essential nature and scope of the enterprise and intend[] to participate in it." Fernandez, 388 F.3d at 1230 (quoting Howard v. Am. Online Inc., 208 F.3d 741, 751 (9th Cir. 2000)); see also U.S. v. Fiander, 547 F.3d 1036, 1042 (9th Cir. 2008). However, to prove a RICO conspiracy,

22

the plaintiff need not show that the defendant conspired to operate or manage the enterprise himself. <u>Fernandez</u>, 388 F.3d at 1230.

In this court's May 12, 2009 order granting the Johls' motion to dismiss, the court concluded plaintiffs had failed to allege that the Johls (1) knowingly agreed to facilitate a RICO enterprise; (2) were aware of the essential nature and scope of the claimed RICO scheme; and (3) intended to participate in the RICO scheme. (Mem. & Order re: Defendants' MTD FAC at 49.) While plaintiffs have added several allegations regarding the Johls in their SAC, the court finds that plaintiffs continue to fail to allege an adequate RICO conspiracy claim against the Johls.

Plaintiffs allege in paragraph 208 of their SAC that the Johls "were associated with the enterprises" and "were aware of the alleged RICO conspiracy and intended to facilitate or otherwise participate in it." (SAC ¶ 208.) These conclusory allegations are not supported by any additional, factual allegations in the complaint. The majority of plaintiffs' new allegations regarding the Johls are contained in paragraph 186 of plaintiffs' SAC. These allegations, at most, show that Sinadinos and the Johls worked together on one occasion to the alleged detriment of Natomas. However, they do nothing to show that the Johls were aware of the essential nature and scope of Sinadinos' alleged RICO enterprise or that they intended to participate in it. <u>See</u> <u>Fernandez</u>, 388 F.3d at 1230. In fact, plaintiffs' new allegations in support of their RICO conspiracy claim against Sorenson and his company, Stockton & 65th, LP, allege that

23

Sorenson, acting on behalf of the same RICO enterprise which the Johls are allegedly aware of, acted contrary to the Johls' interests by misleading them that Sorenson would execute an option back to Village after purchasing the Johl parcel from the Johls. (SAC ¶ 75.) Similar to plaintiffs' allegations in their first amended complaint, the new allegations may show that the Johls acted dishonestly, but plaintiffs fail to allege that the Johls were aware of the essential nature and scope of Sinadinos' alleged RICO enterprise. (Mem. & Order re: Defendants' MTD FAC at 49 (finding that "The Johls may have acted dishonestly" but "the allegations do not show that the Johls were aware of the essential nature and scope of Sinadinos' alleged RICO scheme.").)

As such, the Johls' motion to dismiss plaintiffs' claim for RICO conspiracy is GRANTED. This is the second failed attempt by plaintiffs to allege a RICO conspiracy claim against the Johls. It does not appear that plaintiffs will, within the confines of Rule 11, be able to allege any set of facts upon which the Johls' activities could reach the threshold of a RICO conspiracy. Therefore, the motion is granted with prejudice, as future amendments would be futile.[6]

## III. **Sorenson, Stockton & 65th, LP and other Defendants**

Sorenson along with his company, Stockton & 65th, LP ("Stockton"), have also moved to dismiss plaintiffs' claims against them for RICO and RICO conspiracy. In the same motion, all defendants except for Deane, Stewart Title, Gus Galxidas, the

---

[6]   Because the court dismisses plaintiffs' RICO conspiracy claim against the Johls, it is unnecessary to consider the Johls' motion for a more definite statement.

24

Johls, and Leavitt move to dismiss plaintiffs' conversion claim. Plaintiffs admit that Sorenson and Stockton were erroneously named as defendants in count one of the SAC for RICO violations. As such, Sorenson and Stockton's motion to dismiss as to the RICO claim is GRANTED without leave to amend.   Plaintiffs, however, contend that they have alleged enough facts to support a claim for RICO conspiracy against Sorenson and Stockton and, as with Deane's motion to dismiss plaintiffs' conversion claim, argue that they are not required to allege a sum certain at the pleading stage to state a claim for the conversion of money.

### A.   RICO Conspiracy

Like the Johls, Sorenson and Stockton successfully moved to dismiss plaintiffs' first amended complaint with regards to plaintiffs' RICO conspiracy claim.   The court concluded that plaintiffs had failed to allege that Sorenson was "aware of the essential nature and scope of the enterprise and intended to participate in it."   (Mem. & Order re: MTD FAC at 40:23-26 quoting Fernandez, 388 F.3d at 1230.)   In an attempt to cure the deficiencies in the complaint, plaintiffs filed a SAC which includes additional allegations involving Sorenson and Stockton. Like the Johls' motion to dismiss, the question before the court is whether these additional allegations are enough to show that Sorenson was aware of the essential nature and scope of the RICO enterprise.

Plaintiffs allege that Sorenson and his company, Stockton, engaged in a RICO conspiracy by purchasing parcels held by Village and subsequently defrauding Village.   Sorenson and Stockton invested $3 million in the Village project.   (SAC ¶¶ 73-

25

74.)  According to plaintiffs, these funds were used to purchase the Johl and Von Behren parcels in Stockton's name, even though Natomas held an option on these parcels.  (<u>Id.</u> at ¶¶ 77-79, 85.) In order to obtain Natomas' consent to assign the parcels to Stockton, Sinadinos represented to Solorio that Stockton would option the parcels back to Natomas.  (<u>Id.</u> at ¶¶ 78-79.)  However, Sinadinos did not obtain an agreement from Sorenson or Stockton to option the parcels back to Village.  (<u>Id.</u> at ¶ 86.)  As a result, Natomas was allegedly defrauded of its purchase rights in the Johl and Von Behren parcels and no longer has clear contractual rights regarding the parcels.  (<u>Id.</u>)  Further, Sinadinos also represented to Solorio that defendant Johl would "park" $1.3 million of the $2.3 million he received for his parcel in other properties in the Village project.  (<u>Id.</u> at ¶ 77.)  Following the purchase of the Johls' parcel, however, Sinadinos and Sorenson allegedly directed the Johls to purchase the Barnard parcel, which was part of the Vintage project.  (<u>Id. at ¶ 80.)

The majority of plaintiffs' new allegations against Sorenson can be found in paragraphs 74, 75, and 81 of the SAC.  Plaintiffs specifically allege that "Sorenson and Stockton were aware of the fraudulent RICO enterprise and intended to participate in it." (<u>Id.</u> ¶ 81.)  While such a conclusion, by itself, would not be enough to overcome a motion to dismiss, the court concludes that plaintiffs have alleged enough additional facts from which a logical inference can be drawn that Sorenson was aware of the essential nature and scope of the enterprise.

///

Plaintiffs allege that Solorio, Sorenson, and Sinadinos met more than eight times during the months of July through October 2004. (Id. ¶ 74.) Sorenson explained to Solorio how Sorenson and Sinadinos worked together in the past and how Sinadinos "had regularly parked money for him." (Id.) Sinadinos and Sorenson allegedly both suggested to Solorio that Sorenson be allowed to purchase the Johl parcel, which Natomas had an option to purchase, and that Sorenson would grant an option back to Village. (Id. ¶ 74-75.) At one meeting between Sorenson, Sinadinos, Solorio, and the Johls in September 2004, Sorenson allegedly assured Solorio and the Johls that Stockton would immediately execute an option back to Village. (Id. ¶ 75.)

As alleged in the complaint, Solorio eventually agreed to allow Sorenson and Stockton to purchase the Johl parcel in exchange for Sorenson immediately granting an option back to Village. (Id. ¶ 79.) However, Sorenson did not immediately grant an option to Village as allegedly promised. (Id. ¶ 80.) Plaintiffs allege that Solorio met with Sorenson on two occasions in Sinadinos' law office to ask why Stockton had not executed its promised option back to Village. (Id. ¶ 81.) Sorenson stated that his tax attorney was reviewing the draft option agreement and that it would be completed "within days." (Id.) However, plaintiffs allege that Sorenson never provided such agreement and that he ignored repeated requests by Solorio between Fall of 2004 and Spring of 2008 to grant an option to Village. (Id.) Plaintiffs allege that Sorenson and Sinadinos, together, made promises to option the Johl parcel back to Village after Natomas allowed Sorenson to use Natomas' option to purchase the Johl

27

1   parcel.  (Id.)

2       Viewing these allegations in the light most favorable to
3   plaintiffs, as the court is required to do on a motion to
4   dismiss, the court finds that plaintiffs have stated sufficient
5   allegations to support an inference that Sorenson, and thus
6   Stockton, were aware of the essential nature and scope of the
7   alleged RICO enterprise.  As alleged, Sorenson worked closely
8   with Sinadinos, and together they made promises to Solorio that
9   Sorenson would option the Johl parcel back to Village.  The
10  failure to provide such an option back to Village furthered the
11  alleged RICO scheme by defrauding Natomas of its right to
12  purchase the Johl parcel.  It can be inferred from Sorenson's
13  close working relationship with Sinadinos, and that Sinadinos and
14  Sorenson jointly approached Solorio with their plan to have
15  Stockton purchase the Johl parcel, that Sorenson was aware of the
16  nature and scope of the RICO scheme.  Therefore, plaintiffs have
17  alleged sufficient facts to allege a RICO conspiracy claim
18  against Sorenson and Stockon.

19      As such, Sorenson and Stockton's motion to dismiss
20  plaintiffs' claim for RICO conspiracy is DENIED.

21      **B. Conversion**

22      Like Deane, the defendants on this motion argue that
23  plaintiffs' conversion claims, both direct and derivative, must
24  be dismissed because they fail to allege a specific, identifiable
25  sum of money.  For the reasons discussed, *supra*, the court
26  concludes that at the motion to dismiss stage of litigation
27  plaintiffs are only required to allege a sum that is "capable of
28  identification."  See PCO, Inc., 150 Cal. App. 4th at 397 quoting

<u>Haigler</u>, 18 Cal. 2d at 681 ("In this case, plaintiffs may have stated a cause of action for conversion by alleging, in effect, an amount of cash 'capable of identification.'").  As discussed with regards to Deane's motion to dismiss, the court concludes that plaintiffs have met that burden here.[7]  Defendants' motion to dismiss plaintiffs' conversion claim for money is therefore DENIED.

**IV.  <u>Motions For a More Definite Statement</u>**

In addition to their motions to dismiss, all moving parties have made motions for a more definite statement.[8]  While plaintiffs' SAC, like their first amended complaint, may not be a paradigm of clarity, it is not "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  Fed. R. Civ. P. 12(e).  The complaint alleges, in detail in over 50 pages, the underlying factual circumstances from which the claims for relief are derived.  This is a complicated and complex case involving many different transactions, conversations, parties, and companies.  Sufficient details have been given in the SAC, and the parties will be able to further familiarize themselves with the claims and ultimate facts through the discovery process.  <u>See</u> <u>Famolare, Inc. v.</u>

---

[7]     However, as with Deane's motion, it is not entirely clear whether plaintiffs included real property as part of their conversion claims.  Real property is not the proper subject of a conversion claim.  <u>Salma v. Capon</u>, 161 Cal. App. 4th 1275, 1295 (2008) ("The tort of conversion applies to personal property, not real property.").  To the extent plaintiffs' conversion claim could be interpreted as a claim for real property, defendants' motion is GRANTED.

[8]     It is, however, unnecessary to reach the Johls' motion for a more definite statement as they have been dismissed from this action, *supra*.

29

Edison Brothers Stores, Inc., 525 F. Supp. 940, 949 (E.D. Cal. 1981).

Accordingly, defendants' motions for a more definite statement are DENIED.

**CONCLUSION**

For the foregoing reasons, the court makes the following orders:

(1) Deane's motion to dismiss plaintiffs' complaint for violation of the pre-trial scheduling order is DENIED.

(2) Deane's motion to dismiss plaintiffs' complaint for lack of standing is DENIED.

(3) Deane's motion to join Margarita Leavitt as necessary party under Rule 19 is GRANTED.

(4) Deane's motion to join the Vathis' and the receiver as necessary parties under Rule 19 is DENIED.

(5) Deane's motion to dismiss plaintiffs' conversion claim is GRANTED as it relates to claims for real property but is DENIED to the extent that it claims conversion of money.

(6) Deane's motion to dismiss plaintiffs' claims for fraud and RICO are GRANTED without leave to amend.

(7) The Johls' motion to dismiss plaintiffs' RICO conspiracy claim is GRANTED without leave to amend.

(8) Sorenson and Stockton's motion to dismiss plaintiffs' RICO conspiracy claim is DENIED.

(9) Sorenson and Stockton's, as well as the other defendants who joined them in the motion, motion to dismiss plaintiffs' conversion claim is GRANTED as it

relates to claims for real property but is DENIED to the extent that it claims conversion of money.

(10) Sorenson and Stockton's motion to dismiss plaintiffs' claims for RICO is GRANTED without leave to amend.

(11) Defendants' motions for a more definite statement are DENIED.

IT IS SO ORDERED.

DATED: April 22, 2010

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

31